## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

ANDREW L. THOMAS,

      Movant,

v.

UNITED STATES OF AMERICA,

      Respondent.

Cv. No. 2:03-cv-02416-JPM-tmp
Cr. No. 2:98-cr-20100-01-JPM

## ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,
## GRANTING A LIMITED CERTIFICATE OF APPEALABILITY,
## AND
## CERTIFYING THAT AN APPEAL WOULD BE TAKEN IN GOOD FAITH

# TABLE OF CONTENTS

I.  BACKGROUND. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   A.  Criminal Case No. 98-20100. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

   B.  The Testimony at Trial. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

      1.  Charles Young (November 9, 1998). . . . . . . . . . . . . . . . . . . . . . . . . 6

      2.  James Day (November 9, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

      3.  Betty Jean Gay (November 9, 1998). . . . . . . . . . . . . . . . . . . . . . . . . 12

      4.  David Martin Roth (November 9, 1998). . . . . . . . . . . . . . . . . . . . . . 14

      5.  Christopher Sains (November 9, 1998). . . . . . . . . . . . . . . . . . . . . . . 16

      6.  Memphis Police Officer William L. Sanders (November 9, 1998). . . . . . 18

      7.  Memphis Police Officer Lance Leabres (November 9, 1998). . . . . . . . . 19

      8.  Memphis Police Captain William J. Lee (November 9, 1998). . . . . . . . 21

      9.  Shelby County Fingerprint Technician Gladys Lakes (November 9, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

      10.  Co-Defendant Anthony Mykael Bond (November 9, 1998). . . . . . . . . . 23

      11.  Memphis Police Officer Robin C. Hulley (November 9, 1998). . . . . . . 36

      12.  David Little, Pawn Shop Owner (November 9, 1998). . . . . . . . . . . . . . 38

      13.  ATF Special Agent John Prickett (November 10, 1998). . . . . . . . . . . . 40

      14.  John Hibbler, Owner, Auto Additions (November 10, 1998). . . . . . . . . 40

      15.  Angela Lavette Jackson (November 10, 1998). . . . . . . . . . . . . . . . . . . 41

      16.  Kevin McClain, McClain Motors (November 10, 1998). . . . . . . . . . . . 57

      17.  Jason Fleming, First American National Bank (November 10, 1998). . . . 58

      18.  Lajunta Kay Sikes, Auto Additions (November 10, 1998). . . . . . . . . . . 59

      19.  Tanya Monger (November 10, 1998). . . . . . . . . . . . . . . . . . . . . . . . . 61

      20.  Jerry Sims, MPD Latent Fingerprint Examiner (November 10, 1998). . . 63

      21.  Charlie Tittsworth, Loomis, Fargo & Company (November 10, 1998). . . 65

i

22. Deputy United States Marshal Scott Sanders (November 10, 1998). . . . . 66

Stipulation. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

Defense Witnesses. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 66

23. Robert E. Fisher, Music Town (November 10, 1998). . . . . . . . . . . . . . . 66

24. Dana Wiggins (November 10, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . . . 69

25. Louella Barber, Thomas' mother (November 10, 1998). . . . . . . . . . . . 76

26. William Upchurch (November 10, 1998). . . . . . . . . . . . . . . . . . . . . . . . 80

27. Eugene L. Miller, Private Investigator (November 10, 1998). . . . . . . . . 82

28. Russell Carpenter (November 12, 1998). . . . . . . . . . . . . . . . . . . . . . . . 83

29. Deputy United States Marshal Scott Sanders (November 12, 1998). . . . . 85

Thomas' Decision. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 85

30. Andrew Thomas (November 12, 1998). . . . . . . . . . . . . . . . . . . . . . . . . . 87

Keith Echols, Travis Brown, Willie Cooper—Fifth Amendment. . . . . . . . . . . . 96

31. Danise Murphy, Holiday Inn Express (November 12, 1998).. . . . . . . . . 97

32. Jennifer Howe, Best Western (November 12, 1998). . . . . . . . . . . . . . . 98

Government's Rebuttal. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 98

33. Paul Vandenbosch, Discount Cellular (November 12, 1998). . . . . . . . . 98

The Jury Charge and Verdict. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

C.   Criminal Case Number 00-20211. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 101

D.   The State Criminal Proceedings.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 102

E.   Civil Case Number 03-2416. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 103

F.   The Evidentiary Hearing in Case Number 03-2416.. . . . . . . . . . . . . . . . . . 117

Marty Pearce. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 117

Grant R. Sperry. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 138

Steven Briscoe. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 157

Scott A. Sanders, U.S. Marshals Service. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 158

ii

Robert Irby, Esq.. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 182

Jacob Erwin, Esq... . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 214

G.      Additional Proof Offered by Movant. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 215

William Upchurch, State Court Trial Testimony (September 22, 2001). . . . . . 215

Barry Brown, State Post-Conviction Hearing. . . . . . . . . . . . . . . . . . . . . . . 216

Angela Jackson, State Post-Conviction Hearing. . . . . . . . . . . . . . . . . . . . . 219

Bobby Lee Jackson, State Post-Conviction Hearing. . . . . . . . . . . . . . . . . . 224

Tonya Gentry, State Post-Conviction Hearing.. . . . . . . . . . . . . . . . . . . . . . 226

Gail Irene McDonald, State Post-Conviction Hearing.. . . . . . . . . . . . . . . . 231

Terrance Lawrence, State Post-Conviction Hearing (by deposition).. . . . . . . . 232

Stephanie Upchurch Williams, State Post-Conviction Hearing. . . . . . . . . . . . 234

II.     THE LEGAL STANDARD. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 235

III.    ANALYSIS OF MOVANT'S CLAIMS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 237

        A.      The Failure to Request a Severance (Claim 1). . . . . . . . . . . . . . . . . . . . . . . 237

        B.      The Failure to Investigate and Present the Bobby Jackson Defense (Claim 2). . 257

                1.      The Bolegg Letter is a Forgery.. . . . . . . . . . . . . . . . . . . . . . . . . . . . 260

                2.      Other Evidence of a Relationship Between Angela Jackson and Bobby
                        Jackson is Not Persuasive. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 275

                3.      Steven Briscoe Had No Relevant Information.. . . . . . . . . . . . . . . . . 279

                4.      The Southbrook Mall Robbery Was Not Relevant. . . . . . . . . . . . . . . 280

                5.      More Eyewitness Testimony Would Not Have Mattered. . . . . . . . . . . 283

        C.      The Failure to Investigate Dana Wiggins' Alibi (Claim 3). . . . . . . . . . . . . . . 288

        D.      The Cumulative Effect of Counsel's Ineffectiveness (Claim 4). . . . . . . . . . . . 293

IV.     APPEAL ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 296

iii

IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

---

|                              |   |                                      |
|------------------------------|---|--------------------------------------|
| ANDREW L. THOMAS,            | ◊ |                                      |
|                              | ◊ |                                      |
|     Movant, | ◊ |                                      |
|                              | ◊ |                                      |
| v.                           | ◊ | Cv. No. 2:03-cv-02416-JPM-tmp        |
|                              | ◊ | Cr. No. 2:98-cr-20100-01-JPM         |
| UNITED STATES OF AMERICA,    | ◊ |                                      |
|                              | ◊ |                                      |
|     Respondent. | ◊ |                               |
|                              | ◊ |                                      |
|                              | ◊ |                                      |

---

ORDER DENYING MOTION PURSUANT TO 28 U.S.C. § 2255,
GRANTING A LIMITED CERTIFICATE OF APPEALABILITY,
AND
CERTIFYING THAT AN APPEAL WOULD BE TAKEN IN GOOD FAITH

---

Before the Court is the Motion Under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct

Sentence by a Person in Federal Custody (the "§ 2255 Motion"), as amended, filed by Movant

Andrew L. Thomas, Tennessee Department of Correction prisoner number 206216, an inmate at the

Riverbend Maximum Security Institution in Nashville, Tennessee.[1]  An evidentiary hearing on that

motion was held on October 12 and 13, 2011.  For the reasons that follow, the motion pursuant to

28 U.S.C. § 2255 is DENIED.

I.        BACKGROUND

A.        Criminal Case Number 98-20100

On June 15, 1998, a federal grand jury returned a three-count indictment against Thomas and

a co-defendant, Anthony Mykael Bond.  (Indictment, *United States v. Thomas*, No. 2:98-cr-20100-

01-JPM (W.D. Tenn.), ECF No. 1.)  The Indictment charged the following offenses:

---

[1]Movant's Bureau of Prisons register number is 16523-076.

1

## COUNT ONE

1.     At all times material to this Indictment, Loomis Fargo & Company, was a business engaged in interstate commerce and in activity affecting interstate commerce.

2.     On or about April 21, 1997, in the Western District of Tennessee,



**-------------ANDREW L. THOMAS-------------**
**and**
**----------ANTHONY MYKAEL BOND----------**

being aided and abetted, each by the other, did unlawfully obstruct, delay, and affect, and attempt to obstruct, delay, and affect, commerce, as that term is defined in Title 18, United States Code, Section 1951, by robbery, as that term is defined in Title 18, United States Code, Section 1951, in that ANDREW L. THOMAS and ANTHONY MYKAEL BOND did unlawfully take and obtain property belonging to and in the custody of Loomis, Fargo, & Company, from an employee of Loomis, Fargo & Company, against the employee's will by means of force and violence to the employee's person.

In violation of Title 18, United States Code, Section 1951.

## COUNT TWO

On or about April 21, 1997, in the Western District of Tennessee,



**-------------ANDREW L. THOMAS-------------**
**and**
**----------ANTHONY MYKAEL BOND----------**

being aided and abetted, each by the other, did, during and in relation to a crime of violence, specifically, Robbery Affecting Commerce in violation of Title 18, United States Code, Section 1951, knowingly use and carry a firearm.

In violation of Title 18, United States Code, Section 924(c).

## COUNT THREE

On or about April 24, 1997, in the Western District of Tennessee,

**-------------ANDREW L. THOMAS-------------**

having been convicted of a crime punishable by imprisonment for a term exceeding one year, that is:

1.     AGGRAVATED ROBBERY, in the criminal court of Shelby County, Tennessee, Case Number 93-05162, on September 6, 1994;

2.     AGGRAVATED ROBBERY, in the Criminal Court of Shelby County, Tennessee, Case Number 93-05161, on September 6, 1994;

3.      ROBBERY, in the criminal court of Shelby County, Tennessee, Case Number 93-05160, on September 6, 1994;

4.      AGGRAVATED ROBBERY, in the Criminal Court of Shelby County, Tennessee, Case Number 93-05159, on September 6, 1994;

5.      AGGRAVATED ROBBERY, in the Criminal Court of Shelby County, Tennessee, Case Number 93-05158, on September 6, 1994;

6.      AGGRAVATED ROBBERY, in the Criminal Court of Shelby County, Tennessee, Case Number 93-05157, on September 6, 1994;

7.      AGGRAVATED ROBBERY, in the Criminal Court of Shelby County, Tennessee, Case Number 93-05156, on September 6, 1994;

8.      AGGRAVATED ROBBERY, in the Criminal Court of Shelby County, Tennessee, Case Number 93-05155, on September 6, 1994;

9.      ROBBERY, in the criminal court of Shelby County, Tennessee, Case Number 93-07600, on September 9, 1994;

10.     AGGRAVATED ROBBERY, in the Criminal Court of Shelby County, Tennessee, Case Number 93-09267, on January 31, 1993;

11.     THEFT OVER $1,000, in the Criminal Court of Shelby County, Tennessee, Case Number 91-11980, on May 6, 1992;

did possess in and affecting commerce a firearm, that is, a Mossberg .12 gauge shotgun, serial number K742634; in violation of Title 18, United States Code, Section 922(g).

(*Id.*)

Thomas was arrested on August 12, 1998. (Arrest Warrant returned executed, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 8.) Robert C. Irby was appointed to represent Thomas. (Order on Arraignment, *id.*, ECF No. 17.) On October 26, 1998, the case against Thomas was severed from that against Bond. (Mins., *id.*, ECF No. 36.) On November 4, 1998, pursuant to a written plea agreement, Bond entered a guilty plea to Count 1 of the Indictment. (Mins., *id.*, ECF No. 44; Plea Agreement, *id.*, ECF No. 45.)[2]

---

[2]At a sentencing hearing on March 1, 1999, the Court sentenced Bond to a term of imprisonment of twelve years, to be followed by a three-year period of supervised release. (Mins., *id.*, ECF No. 88; Sentencing Hr'g Tr. 51-55, *id.*, ECF No. 104.) Bond was also sentenced to pay a (continued...)

A jury trial on the case against Thomas commenced on November 5, 1998. (Mins., *id.*, ECF No. 54.) On November 13, 1998, the jury returned its verdict finding Thomas guilty on all counts of the Indictment. (Verdict, *id.*, ECF No. 68.) The Court conducted a sentencing hearing on February 16, 1999, at which Thomas was sentenced as an armed career criminal to life imprisonment plus five years, to be followed by five years of supervised release. (Mins., *id.*, ECF No. 79; Sentencing Hr'g Tr. 33, *id.*, ECF No. 93.)[3] The Court also imposed restitution in the amount of

_____

[2](...continued)
total of $320,215.37 in restitution. (Mins., *id.*, ECF No. 88.)

[3]Thomas was sentenced to concurrent terms of 20 years on Count 1 and life imprisonment on Count 3. Thomas also received five years on Count 2, to be served consecutively to the sentences imposed on Counts 1 and 3.

Section 3D1.1 of the 1998 version of the United States Sentencing Guidelines ("U.S.S.G.") provided that the sentence for Counts 1 and 3 was to be determined by first calculating the total offense level applicable to each count. Pursuant to U.S.S.G. § 2B3.1(a), the base offense level for robbery is 20. Thomas received a six-level enhancement because the victim sustained permanent or life-threatening injury, U.S.S.G. § 2B3.1(b)(3)(C), a one-level enhancement for a loss between $10,000 and $50,000, *id.* § 2B3.1(b)(7), and a two-level enhancement for obstruction of justice, *id.* § 3C1.1, resulting in a total offense level for Count 1 of 29.

Pursuant to U.S.S.G. § 2K2.1(a)(2), the base offense level for unlawful possession of a firearm is 24 where, as here, the defendant had two prior convictions of either a crime of violence or a controlled substance offense. After the two-level enhancement for obstruction of justice, the total offense level for Count 3 was 26.

The next step in the guideline calculation was to "[d]etermine the combined offense level applicable to all Groups taken together by applying the rules specified in § 3D1.4." U.S.S.G. § 3D1.1(a)(3). "The combined offense level is determined by taking the offense level applicable to the Group with the highest offense level," *id.* § 3D1.4, in this case 29, and increasing it by 2, resulting in a combined offense level of 31. Given Thomas' criminal history category of VI, the guideline sentencing range ordinarily would have been 188-235 months.

However, because Thomas had eight prior convictions for Aggravated Robbery (Presentence Report ("PSR") ¶¶ 58–65), he was sentenced as an armed career criminal pursuant to the Armed Career Criminal Act ("ACCA"), 18 U.S.C. § 924(e), and U.S.S.G. § 4B1.4. As a result, pursuant to U.S.S.G. § 4B1.4(b)(3)(A), the base offense level was 34. Given his criminal history category of
(continued...)

$155,215.37. (Sentencing Hr'g Tr. 33, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 93.) At the sentencing hearing, Thomas proclaimed his innocence (*id.* at 13-15), and the Court made the following statement about the weight of the evidence:

> **The Court, of course, sat through the entire case and was the judge in the case. Mr. Arvin is correct when he says that the evidence in this case is absolutely overwhelming. The videotape is one of those pieces of evidence. Nothing is a conclusive piece, it's a short tape, because the crime took a relatively short period of time. We all saw that tape. I have had the chance to see the defendant on many occasions now or at least a number of occasions, and I am satisfied that he is the individual in the tape. The fact that some individuals varied in minor details concerning specific clothing or other items is really not persuasive at all. There are a number of things which are overwhelming in the case. First of all, I do credit the witnesses who the defendant attacks. I believe that Mr. Bond was truthful in this case. I believe that the defendant's wife at the time was truthful in her testimony.** But if we simply look at the corroboration in connection with the automobile, there is really no doubt as to what happened as the initial vehicle left the parking area, went through the tunnel on to the side street, stopped and the defendant and his co-defendant got out, got into a small red vehicle. There is simply no doubt about that. There is no doubt that that vehicle was a vehicle that was in the possession of and in the name of Angela Jackson, the defendant's wife. It was a 1994 red Suzuki, two door, bearing a Tennessee license plate. That was the vehicle that was driven away from the location. It was the vehicle that was owned by the defendant's wife and it was the vehicle that the defendant regularly used in his everyday affairs. There is no reasonable doubt about that at all. There is no question about the fact that the defendant then took a significant portion of the money and purchased a vehicle. We heard from the person selling the vehicle. We heard about the significance of the vehicle that was purchased. It is clear that cash was paid for the vehicle. The bill of sale was introduced. Angela Jackson testified. The photo—I might say that the photo of the red Suzuki was introduced. The photo of Mr. Bond was identified by Angela Jackson, Mr. Thomas was identified by Angela Jackson. It can—it stretches imagination for anyone to suggest that he simply happened to have the money on that occasion and, frankly, the testimony given by those who asserted that they provided money to him was not credible. This is a case in which there may well have been perjury by witnesses who testified in the defendant's favor, but that can be dealt with in another circumstance. There is no real question that Angela Jackson and Mr. Thomas went to the Frayser Pawn Shop—a pawn shop in Frayser, Tennessee and purchased a firearm. That firearm was purchased by Mr. Jackson.

> **MR. ARVIN:** By Mr. Thomas.

> **THE COURT:** By Mr. Thomas through Ms. Jackson, I'm sorry. It was a Mossberg shotgun, and the information is accurately set out in paragraph 13. There

---

³(...continued)

VI, the guideline sentencing range was 262-327 months. The Court granted the Government's motion for an upward departure to life imprisonment on Count 3.

is absolutely no question, and it is admitted that Mr. Thomas was a convicted felon. It is clear that he used money from the robbery of Mr. Day to purchase that shotgun.

(*Id.* at 19-21 (emphasis added); *see also id.* at 21 ("The defendant asserts this is a case of mistaken identity. All I can say in that regard is that the defendant is not credible. The evidence is absolutely overwhelming. He ended up with the stolen money. His wife testified regarding the division of the funds. The co-defendant testified, and [Thomas'] position on this is not accepted by the Court."), 22 ("this case is one in which there is no reasonable doubt").) Judgment was entered on February 17, 1999. (J., *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 81.) The United States Court of Appeals for the Sixth Circuit affirmed. *United States v. Thomas*, 29 F. App'x 241 (6th Cir. Jan. 31, 2002) (per curiam), *cert. denied*, 537 U.S. 865 (2002).

### B. The Testimony at Trial

#### 1. Charles Young (November 9, 1998)

At trial, the Government called Charles Young, who was, during the events at issue, an assistant manager of the Walgreens drug store located at 4522 Summer Avenue in Memphis. (11/09/1998 Trial Tr. 67-68, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99.) Young had worked at the Summer Avenue store for seven years. (*Id.* at 68.) At the time of trial, he had been the manager of another Walgreens store for one year. (*Id.* at 67.)

Young testified that the Walgreens at 4522 Summer is "in a shopping center, we're the last building in an L-shaped shopping center." (*Id.* at 69.) The store, which is approximately 3200 square feet, was one of the larger Walgreens stores in Memphis. (*Id.*) "[W]e're at the entrance, we're the first store. When you come off Summer Avenue, turn into our driveway, we're the first store, and then you drive on down and it makes an L towards the left with a drive-through halfway through to the right. The drive-through exits on a side entrance street." (*Id.*) Young testified that "next to us was a Subway and then a Pack Mail and then a music store and then the drive-through area, and I think there was a shoe outlet store there and there is a jewelry store, another little business—a cleaners, I think, and then the big—it was a Piggly Wiggly then, I think it has changed

names now." (*Id.* at 69-70.) The Piggly Wiggly was a large grocery store located at the back of the shopping center. (*Id.*) According to Young, "It's the back of the L. We're at the front, they were at the bottom on the left." (*Id.* at 70.) The Walgreens had its own parking lot "right in front of Summer in between the store and Summer Avenue and then there's a big—just a big parking lot area in between the L." (*Id.*) The drive-through area "was for like trucks and stuff that come around the back of the stores to deliver, where they could come through and cars could exit on the side street." (*Id.*) The drive-through was covered (*id.*) and was located between the music store and the shoe store (*id.* at 70-71).

Summer Avenue ran in front of the Walgreens. The side street where the drive-through exited was called Novarese, "and then on the far side of the L there was Berclair." (*Id.* at 71.) The street behind the shopping center was Tutwiler. (*Id.*) Young testified that a car could turn in off of Summer and get to Novarese by "driv[ing] straight down in front of the Subway and music store and turn left through the drive-through . . . ." (*Id.*) It was not possible to turn off of Summer into the Walgreens lot and drive through the parking lots to get directly to Novarese; "there is no exit on the side of the Walgreens." (*Id.*)

There was a sidewalk around the Walgreens, and a stucco column near the entrance. (*Id.* at 75.) The entrance was at a corner of the store, and there were automatic entry doors. (*Id.* at 76.)

At the time of the events at issue, Walgreens used a "Wells Fargo" courier to transport its money and valuables to the bank. (*Id.* at 76-77.)[4] Walgreens deposited "[c]ash, checks and food stamps" (*id.* at 78), and the courier would sometimes deliver change when ordered by the store (*id.* at 79). Young testified that "[t]hey would come in, and one of the cashiers or somebody would call the assistant or the manager to the office and it was a double key. The carrier would have a key and the store would have a key to open the safe, and we would exchange it, then we—we would verify

---

[4] The witnesses variously describe the courier company as Wells Fargo and as Loomis Fargo. Two years before the trial, Loomis and Wells Fargo merged. At the time of trial, the business was called Loomis, Fargo & Company. *See supra* p. 65.

the bag, the envelopes when we put them in the bag, seal it, he signs for it, and he leaves." (*Id.* at 77.) The armored car guard would be wearing a uniform. (*Id.*) Young's duties at the time included dealing with the armored car driver. (*Id.*) At the time, the money was put into envelopes, and the driver had a plastic bag to hold all the envelopes. (*Id.*) The plastic bag was then sealed and put into a duffel bag. (*Id.*) Young explained that, "[w]hen you're counting money at night or whatever, you would put them in different increments or whatever, five hundred, thousand, whatever you count at the time, you can only shove an envelope so thick through the hole, through the drop hole to go into the safe." (*Id.* at 77-78.) Young would fill out bank deposit tickets for the envelopes. (*Id.* at 78.) "It was a four copy carbon deposit ticket." (*Id.*) The driver "would get two of them and we would keep two in the store." (*Id.*) The armored car came six days a week, Monday through Saturday. (*Id.*) The time "would differ. Usually between 9:00 and 12:00, 9:00 and 1:00, it just depends on how busy they were, they had bank closings or whatever." (*Id.*)

Young was at work on Monday, April 21, 1997, when the armored car driver came to the store. (*Id.* at 79.) He testified that "I think it was about 12:34, 12:35 in the morning or in the early afternoon." (*Id.*) It was at lunch time. (*Id.*) Young recalled that, when the courier arrived, "I think I was in the back somewhere, in the stock room or something, and then my cashier up front called me to it." (*Id.*) When Young came up, the courier was waiting at his office door. (*Id.* at 79-80.) The office is located "straight back to your right" from the store entrance. (*Id.* at 80.) Young testified that

> [h]e was waiting for me outside the office, so when I got there, we stepped into it and exchanged keys and opened the safe, and it was two days' deposits, that is why I am thinking it was Monday, because it is two days, and I—you have to separate the envelopes by day, check them off from your deposit ticket, make sure they're all there and then drop them in the bag and seal it up and then he signs for them.

(*Id.*) The total deposit that day was about $30,000, with about $18,000 in cash. (*Id.* at 81.) Young recalled that "on that day, he had also brought me a big change order and—after he left, I was putting the change into the safe, into one of my compartments I don't need a key for, and probably 30 seconds or so later, I heard the front cashier started screaming, said to dial 911, the guard had been

8

shot." (*Id.*) Young then heard "just basically three or more people start screaming. So I finished what I was doing and I ran outside, and there was the Wells Fargo driver laying on the ground." (*Id.*)

According to Young, he had "heard what sounded to be a pop," which he recognized as a gunshot, "and then that's when I heard the front cashier start screaming, she said to call the police and to call 911." (*Id.* at 89.) When he got outside, Young saw the armored car guard "probably about five feet outside the door laying with his head towards the parking lot." (*Id.*) Young recalled that "[h]e was laying there. He was pretty conscious from what—because he was on his back and he was hollering for somebody to call his wife." (*Id.*) In response to whether he observed anything about the guard, Young stated, "Just that I had noticed the blood coming out of the back of his head." (*Id.* at 90.) Young testified that "it wasn't a large amount, I figured it would be a large amount for the gunshot wound, but it was just a small puddle behind his head." (*Id.*)

Young told one of the cashiers to get a blanket to lay over the guard and to make sure the police had been called. (*Id.*) He recalled that "we would sit there and try to get people back, because people were running up trying to look at him." (*Id.*) There were "quite a few" people present. (*Id.*) Young "waited and waited, it didn't seem that long, and then the ambulance got there first. We had a fire department station right down Berclair, and they were there within probably a minute or two, and then once they started taking over, I went back inside the store." (*Id.*) The police "showed up a minute or a minute and a half after the ambulance showed up." (*Id.* at 91.) Once the police arrived, "they closed the scene off as a crime scene with that yellow tape, and then we couldn't do any more business." (*Id.* at 90-91.)

When Young went outside after the shooting, he saw the armored truck. He testified that "she was still parked right outside the—right behind that stucco column out into the parking lot." (*Id.* at 91.) Young said "she" because the truck had a female driver. (*Id.*) The driver "was just sitting inside the truck just beating on the steering wheel. She—from what I understand, they cannot leave the truck no matter what happens." (*Id.*) The truck was "[r]ight outside our front door, we

have a handicapped spot, and she was right behind the handicapped spot" (*id.*), "[p]robably twenty yards or so" from where the guard had fallen (*id.*).

There was a surveillance camera mounted near the front door of the Walgreens at the time of the robbery. (*Id.* at 97.) The camera was positioned so it would capture action outside the front doors. (*Id.*) Young reviewed the tape of the events of that day. (*Id.* at 97-98.) The tape showed the guard entering and leaving the store. (*Id.* at 98.)

## 2. James Day (November 9, 1998)

The second witness called by the Government was James Day, the armored car guard shot on Monday, April 21, 1997. Mr. Day was in a wheelchair. He testified that he was forty years old, married, and had three children. (*Id.* at 107.) At the time of trial, he was not working. (*Id.*) He had previously been employed by Loomis Fargo, where he had worked for one and one-half years, until April 21, 1997. (*Id.* at 107-08.) Before that, he had worked for Megamarket and Argenbright Security. (*Id.*) He was 5'11" tall. (*Id.* at 129.)

Day testified that, as a courier for Loomis Fargo, "I transported cash, checks, food stamps." (*Id.* at 108; *see also id.* at 109 (same).) Day would sometimes drive the armored truck. (*Id.* at 109.) Day worked on a two-person team. One person was the driver and the second person, known as the "hopper," was responsible for "get[ting] out and mak[ing] the transaction." (*Id.*) The truck had different compartments representing various banks. When the hopper returned with the money, he was supposed to put it in the compartment for the bank it was going to. (*Id.* at 112.) The hopper would use "a bag, like a large pocketbook," to carry the money from the business to the truck. (*Id.* at 112-13.)

The driver sat in the front seat and the hopper rode in the back, with the money. (*Id.* at 110.) The front portion of the truck, where the driver sat, was separated from the back by a partition. (*Id.* at 111.) After the hopper made each stop at a business, the driver would have to "pop the door" to let him into the back of the truck. (*Id.*) The driver was responsible for watching the hopper when

he got out of the truck.  (*Id.* at 112.)  To avoid the possible theft of an armored truck, the driver was never supposed to leave the truck.  (*Id.*)

When he worked at Loomis Fargo, Day wore a uniform:  "I wore blue, dark blue and black pants and I wore a blue and white striped shirt with a Loomis emblem on the—right here on the chest.  I wore a gun belt.  I had a gun and I wore a bullet proof vest."  (*Id.* at 114.)  Day's gun was a "357 Magnum."  (*Id.*)  The bag he carried was large and was "white or blue.  Dirty white."  (*Id.*)

On Monday, April 21, 1997, Day was a hopper.  (*Id.* at 116.)  It was a busy day, with fifty or sixty stops.  (*Id.* at 117.)  One of the stops on the route was the Walgreens at 4522 Summer.  (*Id.* at 116.)  They got to the Walgreens "[a]bout 12:30."  (*Id.* at 117-18.)  The truck stopped in front, "[n]ot too far" from the front door.  (*Id.* at 118.)  Day recalled that "I had some coins going to the Walgreens, so I had to get the coins, and I went to the back of the truck and got the coins and put them in my bag and took them into the Walgreens."  (*Id.*)  Day's procedure when he entered a business was to "[g]o inside and go to the cash office."  (*Id.*)  Day recalled that, "when I went in Walgreens, they summoned the manager, and I gave him my key, and he did what he had to do to get his deposit ready, and I put it in my bag and left."  (*Id.* at 119.)  The Walgreens manager's deposits were in Day's bag.  (*Id.* at 120.)  The deposits included some cash.  (*Id.*)

Day recalled that his procedure walking out of a business is to "look[], you know, both ways."  (*Id.*)  His procedure was then "to go on out the door."  (*Id.*)  He testified that when he exited the store, he "didn't see anything suspicious."  (*Id.*)  He also had not seen anything suspicious when he entered the store.  (*Id.*)  Day had planned to go to the truck, which was "parked out front of the business."  (*Id.* at 120-21.)

Day testified that, "when I went out the door and—my legs felt weak, so some way I feel I had been shot, so I started to go on and try to make it to the truck, but then I thought better because it was an armored truck, I didn't want to fall on no truck, so I just went down right there."  (*Id.* at 121.)  Day remembered "[n]othing until people started talking" to him.  (*Id.*)  "And after that, you know, I could hear people moving around and talking."  (*Id.* at 122.)  He remembered that "I was

talking to a lady, and I told her to call my wife and stuff like that." (*Id.*) An ambulance came and took him to the hospital. (*Id.*) Day had been shot in the back of the head. (*Id.*) He did not hear the shot that hit him. (*Id.*) He did not see the shooter. (*Id.* at 122-23.)

Day remained in the hospital for eighty-one days. (*Id.* at 123.) He lost the use of his legs. (*Id.*) He was disabled and unable to work. (*Id.*)

Day was asked whether he would have given up the contents of his bag voluntarily, and he responded, "Yes, I mean that was the last thing on my mind, the bag, I don't even remember anything about the bag." (*Id.* at 131.) If someone had held a gun on him, he would have given up the bag. (*Id.*)

On cross-examination, Day did not know whether he was on time that day. He said, "I would say so, but I don't know because I wasn't—that wasn't my regular route." (*Id.* at 133.) Day did not believe they made any other stops in the shopping center where the Walgreens was located. (*Id.*) Day had been trained to notice his surroundings, and he did not see anything out of the ordinary that day. (*Id.* at 133-34.) He did not remember seeing anybody standing near the front door or seeing a vehicle with its motor running near his truck. (*Id.* at 134.)

### 3. Betty Jean Gay (November 9, 1998)

Betty Jean Gay then testified. At the time of the trial, she had worked at the Walgreens at 4522 Summer for ten years. (*Id.* at 138.) On April 21, 1997, Gay was working as the front cashier. (*Id.*) The front cashier is stationed at the register nearest the door. (*Id.* at 139.) That day, Gay punched in after her lunch break at 12:34 p.m. (*Id.*) At that time, the Loomis Fargo courier was "just right outside the office door" where "they were counting the money." (*Id.*) The office is "right directly in front of where you punch in and out on the time clock." (*Id.*) After punching in, Gay "went up front and got my drawer out of the island register and went to the front register." (*Id.* at 140.)

Gay testified that, "[a]fter I had put my drawer in . . . , I was ringing up a customer and [the courier] came through going out the door." (*Id.*) She recalled that, "just as he went out the door, I

heard a shot and I turned around and looked and he was on the concrete, and this person had the money bag and the gun, had the money bag in his left hand and the gun in his right hand, and he was running." (*Id.* at 140-41.) Gay did not see the courier fall. (*Id.* at 141.) She testified that, "when I turned around, he was already down . . . [r]ight in front of the store, by the garbage can there. He was laying face down." (*Id.* at 141.)

The man Gay saw running "had on a light blue jacket or light blue shirt, and he was just running the opposite direction as far as north or east." (*Id.*) Initially, "[w]hen I looked around, [the man] was right at [the courier], you know, like he was—he had reached down or something, you know." (*Id.*) Gay "saw him with a bag and the money with the bag and the gun" while he was bent down. (*Id.* at 142.) The man was running toward Novarese. (*Id.*) The gun in his hand "just looked like a little silver gun, you know." (*Id.*) Gay stated that "I don't know anything about guns," but she identified the weapon as a pistol. (*Id.*) She also saw the money bag in the man's hands. (*Id.*)

Gay "hollered for him to call 911, that the Wells Fargo guy had been shot." (*Id.*) Then she "hollered again for him to call, because I didn't think they heard me." (*Id.* at 143.) Someone called 911. (*Id.*) Gay could not call herself because the telephone at the front register could not make outgoing calls. (*Id.*) She got up on "a little step like thing where our bags are, and I just stepped up on that because—so they could hear me." (*Id.*) Gay kept looking out the window. (*Id.*) She could see the armored car "sitting right out in front, and the driver in the armored car was just sitting up there just beating the steering wheel, you know, just crying, you know. You could just see that she was hysterical." (*Id.* at 144.) Gay recalled that "[i]t wasn't very long" before the ambulance arrived. (*Id.*) After the police arrived, "[w]e got all the customers out and . . . we had to close." (*Id.*)

When asked what she remembered about the robber, Gay testified that "[t]he only thing I can remember is a blue, a light blue shirt, a light jacket, and he was kind of tall and skinny." (*Id.* at 145.) He was a black man. (*Id.*) Gay did not remember anything about the pistol except that "it was silver." (*Id.*)

On cross examination, Gay testified that, at the time of the shooting, she was standing with her back to the door and was waiting on a customer. (*Id.* at 145-46.) She heard a noise and spun around. (*Id.* at 146.) Gay saw the robber's hands "just for a second, you know." (*Id.*) She did not recall what color pants the man was wearing or whether or not he was wearing gloves. (*Id.*)

Gay had not left the store during her lunch break. (*Id.* at 146-47.) She told the police that she could not identify the shooter. (*Id.* at 147)

### 4.    David Martin Roth (November 9, 1998)

David Martin Roth testified that, at the time of the trial, he had been a custom house painter for seventeen years and had worked for Danny Stokes Custom Painting for about eight years. (*Id.* at 149.) On April 21, 1997, he was at the Piggly Wiggly grocery store at lunchtime. (*Id.* at 149-50.) Roth remembered the day because "it was two days after my girlfriend's birthday, and we were going to have a party." (*Id.* at 150.) "[W]e went to the Piggly Wiggly to buy some shrimp and stuff." (*Id.*) Roth parked "[i]n front of the store, kind of on the Walgreens side about halfway up the parking lot." (*Id.* at 150-51.) Roth was with his girlfriend and another friend. (*Id.* at 151) Roth testified that, as they left the Piggly Wiggly, "I believe we were walking towards Walgreens, I think we had some shopping to do there." (*Id.* at 152.)

Roth recalled that "we were standing in front of our car and talking, the three of us, and we heard a loud noise, and we turned and looked toward Summer Avenue, and at that moment, when I kind of focused on where I thought the sound was coming from, a white car turned the corner from the front of the Walgreens, turned on—into our view and sped down the street on the—you know, alongside of Walgreens and all those stores and tried to turn down through that tunnel." (*Id.*) Roth did not recognize the noise as a gunshot. "I thought maybe a car wreck or something or somebody—another car hit another car in the parking lot or even just a door slamming." (*Id.*) He looked "straight to where the car came around the corner." (*Id.*) Roth testified that "I guess the car was parked right in front of the front entrance of Walgreens, and I was around the corner from it. I could not see the white car until it turned the corner." (*Id.* at 153.) The car "went straight down

the side of the shopping center going as fast as it could go, and then they tried to take a right through that tunnel, and they missed the turn, almost crashed into the wall on the left side, and they had to stop and back up and then turn out again, and then they turned left onto Novarese, and that's when I lost sight of them." (*Id.*) The car was going "sixty, seventy" in the parking lot. (*Id.*) It "finally made it through" the tunnel. (*Id.*)

Roth last saw the car "[a]s it turned left out of the shopping center" going away from Summer. (*Id.* at 154.) Roth testified that

> [w]e stood around for a minute and we were watching. There were people running everywhere out of Walgreens, and I think we stayed there long enough that we saw an ambulance arrive, and we thought there must have been a robbery or something and—but we decided just to leave, we didn't want to go up there and, you know, get involved, and so we got in our car and we drove out the other side of the shopping center around the block to this friend's house who was with us at the time, and when we came around the front of his house, we saw the white car again parked in the middle of the street in front of his house.

(*Id.*) The white car was parked "[a]t the corner of Tutwiler and Novarese" about one block from the tunnel. (*Id.* at 155.) The police were looking at the car. (*Id.*) That was the same white car Roth had seen speeding through the parking lot. (*Id.* at 155-56.)

The car "was a white mid size car, nothing wrong with it, it was a late model car, and I couldn't really tell, I was trying to see what the make and model of the car was and I couldn't notice that and—at first, but I remember the taillights and the taillights are big, and as soon as I saw the car the second time, I knew it was the same car." (*Id.* at 156-57.) When Roth saw the car a second time, parked near his friend's house, he identified it as a Pontiac Bonneville. (*Id.* at 157.)

Roth had seen two black men in the car. (*Id.* at 153.) He testified that "I was about 70 feet from the car when they almost hit the wall and backed up, and I was walking towards the car trying to see a license plate, which I couldn't, because the car was just moving, and then I looked inside the car, noticed two black men, average height. It seemed to me the passenger was probably my build and the driver seemed to be heavier than me." (*Id.* at 156.) The men were "light skinned black people." (*Id.*)

On cross examination, Roth testified that he got a good look at the car while it was in the parking lot. (*Id.* at 160.) He testified that "I can't be sure, but it seems both of [the men in the car] had light colored clothing on." (*Id.*) Roth was 5'10". (*Id.* at 161.) He based his belief that the men were of average height "just from how much of them I could see through the windows of the car, how much of them was above the top of the door." (*Id.*) "And it seemed like they were probably about my height from how I see it when I'm in the car." (*Id.*) He did not see any caps, and he did not think the men were wearing sunglasses. (*Id.*) When asked whether he had told the police at the scene that he would be unable to identify anyone, Roth responded that "I probably did. Not certain—not with a hundred percent certainty." (*Id.*) He did not see the men well enough to be able to identify either one of them. (*Id.* at 161-62.) Roth had not seen the men in the car before that day. (*Id.* at 166.) He also had not seen them since the day in question. (*Id.* at 167.) When asked whether the men had beards or anything like that, Roth responded that "I know the driver did not." (*Id.* at 166.) Roth could not see the passenger well enough to say whether he had a beard. (*Id.*) Roth had believed "at the time" that the driver was heavyset. (*Id.*)

### 5. Christopher Sains (November 9, 1998)

Christopher Sains testified that, at the time of trial, he had been employed by Coca Cola as a delivery truck driver for two and one-half years. (*Id.* at 169.) He was working at that job on April 21, 1997. (*Id.* at 170.) Sains made regular deliveries to the Walgreens on the 4000 block of Summer. (*Id.*) Deliveries were made "[a]t the back dock of the building." (*Id.*) The dock is "off of Summer in the back, I don't know the name of the street," but it is a side street off of Summer that goes to the back of the Walgreens. (*Id.*) Sains did not go through the Walgreens parking lot to get to the dock. (*Id.* at 171.) He testified that "I drive such a large truck, so I pull away from the Walgreens back dock, and I kind of like back in the back, back to it." (*Id.* at 170-71.)

Sains was at the Walgreens loading dock on April 21, 1997. (*Id.* at 171.) He recalled that,

at that certain time, I had just recently backed up and parked there, and I was getting out of the truck, and I saw a speeding car coming from the parking lot in front of Walgreens, which was totally out of control. And it was a white car, and once it

16

made a left going from Walgreens, I saw two individuals jumping out of this car into another car, which was a red car.

(*Id.*) He testified that "that's pretty much all I saw, two individuals, one—two black males, you know, and one was carrying a satchel I think that I saw from the distance that I was from it." (*Id.*) When Sains saw the white car "[i]t was directly in front of me, it was passing me at a high speed." (*Id.* at 171-72.) The car "was coming from the front part of Walgreens." (*Id.* at 172) Sains was not familiar with the front of the store. (*Id.*) The car "was coming through the tunnel." (*Id.*) According to Sains, "it was coming out of the tunnel passing me where I had just pointed out, and like I said, it was driving quite fast about to lose control. It hit a ditch which was right there in the drive, coming to the street, the side street there, and swerved and they almost lost control and regained control, went on down the street and jumped out of that car and, like I said, into another one." (*Id.* at 173.) "The car was going probably maybe 45, 50 miles an hour in a 10, 15 mile an hour zone." (*Id.*) When the car came out of the underpass "it went down the street. I don't know how far, but I know visible enough that I can see two individuals jumping out of one car into another one." (*Id.*) The men were going "[a]way from Summer." (*Id.*)

Sains testified that "I saw two individuals, like two black males jumping out, one had a bag, looked like a satchel, some type of satchel, and the other, you know, he jumped out at the same time, they got both in the little red car and they backed up and went, I guess that's north . . . [a]way from Summer." (*Id.* at 174.) The red car "looked like an MR2, something small like that, two door car, something small like that." (*Id.*) The men ran from the white car to the red car. (*Id.*) When asked about the bag, Sains testified that "[i]t was too far to just know exactly what type of bag it was. I just knew it was something—a large, you know, tote bag or something that they was carrying." (*Id.*) The white car "[s]eems like a Chevy, something, Impala type car." (*Id.*) The white car was "much bigger" than the red car. (*Id.* at 175.)

In response to whether he recalled anything else about the men, Sains testified that "that's pretty much it. I saw two young black men under the age of 25." (*Id.*) They were "around about 18 to 25, somewhere in that bracket." (*Id.*)

On cross examination, Sains could not estimate how far it was from where he was standing to where the men jumped out of the white car. (*Id.* at 175-76.) He testified that "I can't just really say how far, but I know it is visible enough to see, you know." (*Id.* at 176.) He did not recall what the men were wearing, but "[i]t was summertime, you know, it was something, you know, it wasn't no wool clothes or nothing like that, it was summertime type clothing, you know." (*Id.*) The men were wearing "[s]omething like a blue jean look." (*Id.*) He could not say if either man was wearing a cap. (*Id.*) He was too far away to tell whether either of the men had facial hair. (*Id.*) Sains "told the police that I could not truly identify, right." (*Id.*) When asked whether he could have identified the persons if they had been people he knew, he responded that, "[i]f I had been with them that day, you know what I mean or just that morning, I probably could recognize what—they could have been there, but no." (*Id.* at 177.) Sains had not seen anybody since that time who looked like the men he saw that day. (*Id.*)

### 6. Memphis Police Officer William L. Sanders (November 9, 1998)

Memphis Police Officer William L. Sanders testified that, at the time of trial, he had been employed by the Memphis Police Department ("MPD") for twenty-six years. (*Id.* at 180.) He was a crime scene investigator with the rank of patrolman. (*Id.*) His duties were "[t]o collect and preserve any evidence found on the scene of a crime," including the taking of photographs. (*Id.*)

Officer Sanders was on duty on April 21, 1997, when he was called to the scene of an armored car shooting at "the Walgreens store on Summer." (*Id.* at 181.) Sanders testified that,

> [w]hen I arrived on the scene, there was an armored car sitting—from Summer facing the store, the armored car was sitting to the left of the store in the driveway. Between the armored car and the front doors of the Walgreens store was on the ground a bullet proof vest, a couple of items, such as a key—I don't remember what else it was at this time, but there were a couple of items laying with the vest, a pool of blood. The vest was bloody, and it had already been taped off with crime scene tape to keep other people out of the area.

18

(*Id.*)  The victim was already gone.  (*Id.*)  There were other officers on the scene.  (*Id.* at 182.)

Officer Sanders testified that he took photographs of the crime scene (*id.* at 182, 183), and he identified those photographs (*id.* at 182-86).  Sanders also made a diagram of the crime scene. (*Id.* at 187.)  Sanders identified the receipts found in the pocket of the courier's bulletproof vest.  (*Id.* at 189.)

Officer Sanders testified that, on April 22, 1997, he was called to the Regional Medical Center at Memphis ("The Med") to pick up a bullet that had been removed from Day.  (*Id.*)  Sanders picked the bullet up and brought it to the MPD's property and evidence room and tagged it.  (*Id.* at 189-90.)  Approximately a month later, Sanders picked up the bullet from the property room and packaged it to be sent to the Tennessee Bureau of Investigation.  (*Id.* at 190.)

On cross examination, Officer Sanders estimated that he spent one or two hours at the crime scene on April 21, 1997.  (*Id.* at 191.)  He did not interview any witnesses.  (*Id.*)  Sanders recalled that "[t]here were several officers on the scene, and the officers that were in the area were there, Task Force officers were there . . . ."  (*Id.*)  The term "Task Force" referred to the Safe Streets Task Force ("SSTF").  (*Id.*)  Sanders did not recall when he arrived on the scene.  (*Id.*)  According to his report, he received the call at 1:00 p.m. and arrived shortly thereafter.  (*Id.* at 192.)  Sanders "got there between the time the street officers got there and Task Force officers got there."  (*Id.*)  "There may have been one or two Task Force officers there before me, I don't remember."  (*Id.* at 193.)  Sanders did not examine the white car that was used in the robbery.  (*Id.*)

**7.      Memphis Police Officer Lance Leabres (November 9, 1998)**

Memphis Police Office Lance Leabres testified that, at the time of trial, he had been employed as a police officer for two years.  (*Id.* at 201.)  In April 1997, he was a patrolman assigned to the Central Precinct (*id.*), which covers "from East Parkway to Germantown" (*id.* at 202).

Officer Leabres was on duty on April 21, 1997.  (*Id.*)  He was on routine patrol and would also respond to calls.  (*Id.*)  He was familiar with the Walgreens on the 4000 block of Summer, and he recalled getting a call to go there that day.  (*Id.*)  He testified that, "[a]t approximately 1300 hours,

about 1:00 o'clock in the afternoon, dispatcher advised that shots were fired, one was down at the Walgreens at Summer and Berclair. We were near Stratford and Macon, around that area." (*Id.*) Officer Leabres was with his partner, Officer Abrahams. (*Id.*)

> Officer Leabres recalled that
>
> [w]e started pulling down or responding to the scene, and before we got there, we were dispatched to the corner of Tutwiler and Novarese, which is the street just one north of Summer, and Novarese backs into Walgreens, and we were told to check for a white abandoned vehicle, somebody had reported to the dispatcher that individuals had been seen running out of it, it was suspected to be involved. We got to the corner of Tutwiler and Novarese and located a white Pontiac facing northbound at the corner, and we put it on hold for robbery to be fingerprinted.

(*Id.* at 202-03.) The white Pontiac was "on the southeast corner facing northbound." (*Id.* at 203.) Officers Leabres and Abrahams were the first officers on the scene with the Pontiac. (*Id.*) They "looked around to see if there was anything that might be pertinent to the vehicle, any evidence related to the vehicle. We secured it, we kept everybody away from the vehicle. We called for a wrecker." (*Id.*) The car "[h]ad its average wear-and-tear, the right rear opera window, that's the right rear smaller window was busted out and the steering column was busted, and it appeared to be stolen." (*Id.* at 203-04.) When asked to explain what he meant about the steering column being busted, Officer Leabres testified that "[s]omebody had got into the cover of the steering shaft and broke it out where they can get to the ignition and manually start it without a key." (*Id.* at 204.)

The officers advised the dispatcher to send a wrecker to tow the vehicle to the city lot. (*Id.* at 204-05.) Officers Leabres and Abrahams stayed with the car to wait for the wrecker. (*Id.* at 205.) The officers saw the wrecker put the car onto the flatbed to transport it to "crime scene, which is located at the city lot." (*Id.*) Officer Leabres identified the two tickets that he filled out that day. (*Id.* at 205-06.) He also identified photographs of the white car. (*Id.* at 206-08.)

On cross examination, Officer Leabres testified that he received the first call at about 12:30 or 12:45 p.m. (*Id.* at 209.) Before he reached the Walgreens, he received another call directing him to the corner of Tutwiler and Novarese. (*Id.*) He went directly to the location where the white car had been found and did not pass by the Walgreens. (*Id.*) He did not see the perpetrators at the car.

(*Id.*)  Other officers had already responded to the scene at the Walgreens.  (*Id.* at 209-10.)  Officer Leabres did not interview anyone during the course of the investigation.  (*Id.* at 210.)  The officer had no direct knowledge about the results of fingerprint tests on the white car.  (*Id.*)  Officer Leabres had no other role in the investigation.  (*Id.* at 211.)

Defense counsel asked whether Officer Leabres or the other officers at the scene had suspected an individual named Bobby Jackson (*id.* at 210), and the Court sustained the Government's objection, explaining that "[a]s a general rule, they have to have personal knowledge, as you know, of what is testified about, or sometimes records may be used also, but that would be speculative" (*id.* at 210-11).

### 8.  Memphis Police Captain William J. Lee (November 9, 1998)

Memphis Police Captain William J. Lee testified that, at the time of trial, he had been employed by the MPD for thirty years.  (*Id.* at 213.)  At that time, he was a supervisor "in the crime scene."  (*Id.*)  Lee was on duty on April 22, 1997.  (*Id.* at 213-14.)  He recognized the pictures of the 1987 Pontiac Bonneville that he was asked to photograph on April 22, 1997.  (*Id.* at 214.)  The pictures were taken "[o]n the vehicle storage lot at 475 Klinke."  (*Id.*)  Captain Lee testified that the Bonneville "had been processed for fingerprints prior to me taking pictures of it."  (*Id.* at 215.)  Lee did not personally process the car for fingerprints.  (*Id.* at 217.)

On cross examination, Captain Lee testified that he was a patrolman in April of 1997.  (*Id.* at 218.)  He got a call about the Bonneville at 9:10 a.m. on April 22, 1997.  (*Id.*)  Lee had also been at the scene of the investigation on April 21, 1997.  (*Id.* at 218-19.)  Captain Lee did not recall when he arrived at the crime scene.  (*Id.* at 221.)  When he arrived "uniform patrol officers was there and Officer Sanders from the crime scene was there."  (*Id.*)  Captain Lee testified that "Officers Sanders . . . took care of almost the entire scene.  I just went by to see if I could be of any assistance and, you know, he wrote his crime scene report from there and the sketch, and he took the pictures, and I believe he did put my name on the report, but he actually handled that—most of that entire scene by himself."  (*Id.*)

Captain Lee did not follow up with regard to fingerprint testing on the cars. (*Id.*) He did not see the car being prepared to take fingerprints. (*Id.* at 222.) Captain Lee acknowledged that two pictures showed black dust or dirt all over the Bonneville. (*Id.* at 222-23.) He agreed that there was probably black dust on the interior of the car as well. (*Id.* at 223.) Lee explained that the fingerprint powder might not show up on the photographs, but "after it was processed, you know, there should be fingerprint powder on the inside, the—probably, you know, on the rear-view mirror on the inside of the glasses . . . ." (*Id.*) Captain Lee was aware that someone's fingerprint had been identified, but he did not know who the print belonged to. (*Id.* at 224.)

### 9. Shelby County Fingerprint Technician Gladys Lakes (November 9, 1998)

Gladys Lakes testified that, at the time of trial, she had been employed by the Shelby County Sheriff's Department for sixteen years. (*Id.* at 226.) She was a fingerprint technician working in the records and identification section of the Sheriff's Department. (*Id.*) The records and identification section "compose[s] a fingerprint jacket and keep[s] the fingerprint cards of every inmate that comes through the system," meaning the Shelby County Jail. (*Id.* at 226-27.) Lakes was the custodian of those records. (*Id.* at 227.) Each inmate is identified with a records and identification (R&I) number at the time of his arrest. (*Id.*) Lakes brought a certified copy of the master fingerprint card for Anthony M. Bond, R&I number 219189. (*Id.*) The card included Bond's birth date and signature. (*Id.*) Lakes also brought a photograph of Bond, which had been obtained from the photography section. (*Id.* at 229.)

Lakes explained that "[a]t the time of the arrest, there are three sets of fingerprints taken. There are two tem [sic] print cards and a palm card. The master fingerprint card is kept in our record department, and the other tem print is—and the palm print is taken to our MPD latent section." (*Id.* at 230-31.) Lakes confirmed that the MPD latent fingerprint section received a copy of the Jail's master fingerprint card. (*Id.* at 231.)

On cross examination, Lakes testified that the only fingerprint card she had brought with her was for Anthony Bond. (*Id.*) She had not been requested to do anything with anyone else's

fingerprints in connection with this case. (*Id.*) Lakes did not perform any function on the case other than producing the fingerprint card pursuant to a subpoena. (*Id.* at 234.)

### 10. Co-Defendant Anthony Mykael Bond (November 9, 1998)

The Government called Thomas' co-defendant, Anthony Mykael Bond. Bond was born in June 1978, and he was twenty years old at the time of trial. (*Id.* at 236.) Bond and his family were from Memphis. (*Id.* at 236-37.) Bond had gone through the tenth grade at East High School. (*Id.* at 237.) He had been in custody since October 1997. (*Id.*)

Bond testified that he had known Thomas for about two years. (*Id.* at 238.) They met "[i]n the penitentiary" and became friends. (*Id.*) Bond was released in November 1996. (*Id.*) In April of 1997, Thomas and Bond spent time "just hanging around, you know, doing little things together." (*Id.* at 238-39.) They would sometimes ride around together. (*Id.* at 239.) Bond was living with his mother in Memphis (*id.*), and Thomas came over to Bond's house many times (*id.* at 240). At the time, Thomas had a girlfriend named Angela Jackson, with whom he was living. (*Id.* at 239.) Bond had met Angela Jackson. (*Id.*) Bond saw Thomas at Angela Jackson's house "a couple of times." (*Id.* at 239-40.) She lived "[i]n some apartments over there off of Pendleton" in Memphis. (*Id.* at 240.) Bond usually called Thomas "Bowleg." (*Id.* at 256.)

Bond testified that he took part with Thomas in the robbery of the Loomis Fargo armed car guard on April 21, 1997. (*Id.* at 240.) No other person was involved. (*Id.*) Bond was the driver. (*Id.*) Bond testified that Thomas shot the armored car guard. (*Id.* at 241.) Bond was 6'2". (*Id.*)

When asked about the planning of the robbery, Bond testified that "the day before the robbery, Andrew was talking about it, and he was just asking me do I want to rob a Wells Fargo truck, and I said yes." (*Id.* at 242.) Thomas "was saying that they had a lot of money, he was just telling me, you know, things about it." (*Id.*) Thomas told Bond the truck "would be on Summer and Jackson Avenue." (*Id.*) Thomas did not tell Bond how he knew that, and Bond testified that "I guess he just had been watching." (*Id.*) Bond testified that no one else knew they were planning to do a

robbery. (*Id.*) This conversation took place at Bond's mother's house on the Sunday before the robbery. (*Id.* at 242-43.)

At the time, neither Bond nor Thomas owned a car. (*Id.* at 243.) When asked what they did to get ready for the robbery, Bond testified that Thomas "borrowed his girlfriend's car, and we stole a car." (*Id.*) "That same night," Thomas and Bond "went to Poplar Plaza and then [Bond] stole a car and parked it." (*Id.*) Bond knew how to steal cars. (*Id.*) They got to Poplar Plaza in Thomas' girlfriend's car. (*Id.* at 244.) The car they stole was a Pontiac Bonneville. (*Id.*) In response to how he selected the car to steal, Bond testified that "I didn't pick it, it was just the first thing we saw." (*Id.*) Bond "[b]roke the window out and got inside and broke the steering column," using a screwdriver. (*Id.*) Bond recalled that "[i]t was late at night, I just don't remember the time." (*Id.*) They wanted a stolen car "[c]ause [Thomas] said that we needed a car to do it out of, to do the robbery out of." (*Id.*) After they stole the car, Bond "took it and parked it by my mamma's house . . . [o]n Tillman and Jackson." (*Id.* at 235.) That location was "[a]bout two minutes" from Bond's mother's house. (*Id.* at 247.) Bond drove the stolen car, and Thomas "trailed me in his girlfriend's car." (*Id.* at 245.) After that, "[h]e went home and I went home." (*Id.*)

Bond saw Thomas the next morning. (*Id.*) He testified that "[w]e had planned to do the robbery that Monday, and he came over to my house that morning." (*Id.*) According to Bond, Thomas "picked me up and then we rode off to get the stolen car." (*Id.*) Thomas was driving "[a] red car, his girlfriend's car." (*Id.*) He confirmed that the car belonged to Angela Jackson. (*Id.*) The car "was a little hatchback car, I don't know what kind." (*Id.* at 246.)

When asked about the plan for the robbery, Bond testified that Thomas "said that he was just going to pull the gun on the man and take his money and run, and then we was going to pull off." (*Id.*) Bond's role was to "[d]rive the car." (*Id.*) Bond testified that Thomas "had a gun and then, like I say, he said that he was just going to pull it on the man and get the money and he was gone." (*Id.*) Bond testified as follows about the gun:

> Q.     What kind of gun did Andrew Thomas have?

24

|     |                                                                           |
| --- | ------------------------------------------------------------------------- |
| A.  | I don't know what kind it was.                                            |
| Q.  | Was it a pistol or a rifle?                                               |
| A.  | It was a pistol.                                                          |
| Q.  | Tell the jury what it looked like.                                       |
| A.  | It looked like a little chrome pistol, a revolver.                        |
| Q.  | Okay. And when did you first see it? Had you seen it before Sunday?       |
| A.  | Yeah.                                                                     |
| Q.  | Tell us about that.                                                       |
| A.  | I just knew that he owned it.                                             |
| Q.  | How did you know he owned it?                                             |
| A.  | Because I seen him with it.                                               |
| Q.  | Where did you see him with it?                                            |
| A.  | At his girl house.                                                        |
| Q.  | Do you know if he ever carried it with him?                              |
| A.  | I just can't say. I seen him with it on him.                             |
| Q.  | All right. Now, did you see it that morning, Monday morning?             |
| A.  | Yes. Yes, sir.                                                            |

(*Id.* at 246-47.)

Thomas and Bond were together for "I guess about an hour, maybe two" before they went to the Walgreens. (*Id.* at 248.) Bond did not know exactly when they left his mother's house or arrived at the Walgreens. (*Id.*) Thomas drove Bond to get the stolen car. (*Id.* at 247.) Bond did not know where the gun was at that time. (*Id.* at 248.) After they got the car, "[w]e drove to Summer Avenue and went to the Walgreens." (*Id.*) Thomas "was driving the little red car, his girlfriend's car, and [Bond] got in the stolen car and drove it." (*Id.*) Bond followed Thomas to Summer Avenue, where "I seen an armored car." (*Id.*) He first saw the armored car when "driving down Summer Avenue going towards the Walgreens." (*Id.* at 248-49.) Thomas and Bond "weren't right behind

25

it. We went on a side street." (*Id.* at 249.) After they saw the armored car, they "[w]ent and parked the red car around the corner from the Walgreens." (*Id.*) The plan was to "[d]o the robbery in the stolen car and get back in the red car." (*Id.*) Bond testified that "we parked the red car and both of us got in the white car, and I drove to the Walgreens." (*Id.*) Thomas sat in the passenger seat. (*Id.* at 250.) Thomas "had [the gun] on him." (*Id.*)

Bond testified that "I drove where you come in at and went on around to—where Walgreens is at and parked the car" where Thomas told him to park. (*Id.*) Bond explained that "I parked right in front of the Walgreens facing out towards Summer." (*Id.*) He backed into the spot. (*Id.*) After he had parked, he saw the armored truck pull in. (*Id.*) Bond testified that "I just saw the truck pulling up, and then when it parked, that's all I seen." (*Id.*) Bond "didn't see [the guard] when he came out, I seen him when he went in." (*Id.* at 250-51.) Bond "just seen the man walking in." (*Id.* at 251.) Bond's job was to "[l]ook out on Summer Avenue and make sure no police were coming." (*Id.*)

Bond testified that "[i]t was about two minutes or something like that, I heard a shot." (*Id.*) He was in the car at the time. (*Id.*) Thomas was "[u]p in front of the Walgreens where the man was supposed to have came out at." (*Id.*) Bond stated that Thomas "just got out of the car and walked up to the door of the Walgreens." (*Id.*) Bond "was sitting in the car waiting on him to come back and I just heard the shot. [Thomas] came back to the car." (*Id.* at 252.) "He just came running to the car with the money and got in the car." (*Id.*) "I pulled off once he got in the car." (*Id.*) Bond "was driving fast" toward where the red car was parked. (*Id.*) He testified that "I pulled straight out and made a right and went around the armored truck and went back out up under the tunnel." (*Id.* at 253.) It took "[n]o time" to reach the red car. (*Id.*) "[W]e pulled to the red car, we both just jumped out of the car, and then [Thomas] got in the red car and drove and I was in the passenger's seat." (*Id.*) Bond had the money because Thomas was driving. (*Id.*) "It was in a brown bag." (*Id.*)

Bond recalled that "I was nervous" and "I was asking him, I was like why you shot him." (*Id.* at 254.) He testified that "we was on the way back from where the crime was committed, we

26

was driving, I just asked him why did he shoot him, and he just said that he had to do it, he was talking like his life was in danger." (*Id.*) Bond elaborated: "He was like I had to shoot him, because he said that he wasn't going to shoot him, but he shot him." (*Id.*) Bond was upset that Thomas had shot the guard "[b]ecause that isn't what he said was going to happen, and I didn't want to be a part of that." (*Id.*) Bond reiterated that it had not been part of the plan for anybody to get shot. (*Id.*)

When they got in the red car, Thomas "got on the expressway, drove all the way to his girlfriend's house." (*Id.* at 255.) The red car had been parked facing Summer, and Thomas "backed up toward Tutwiler" and turned around. (*Id.* at 255-56) It took about fifteen minutes to get to Angela Jackson's house. (*Id.* at 256.) Thomas parked the car "[i]n the back of her apartment," and Thomas and Bond went up to her apartment. (*Id.*) Bond testified that, "we got out, I had the money in my coat. We walked up to her apartment and went in." (*Id.*) Bond carried the money "[b]ecause I had the coat on and I had somewhere to put it." (*Id.* at 257.) He was trying to hide it. (*Id.*) Thomas had the gun. (*Id.*)

Angela Jackson was home when Thomas and Bond arrived. (*Id.*) Bond testified that "we got in there and then we changed our clothes, and he gave me some money, and I left." (*Id.*) Bond recalled that "we was in an argument, he gave me about six or seven thousand dollars for driving the car." (*Id.*) Bond did not recall exactly how much money he received. (*Id.* at 257-58.) He testified that "[w]e went in the brown bag and just took it out and sort it out." (*Id.* at 258.) He recalled that "[i]t was some checks and food stamps in there" with the money. (*Id.*) Thomas and Bond kept only the money. (*Id.*) Bond recalled that he and Thomas "took off all of our clothing that we had on during the robbery and put on some more clothes" and "[t]ook [the discarded clothes] and put them in a black garbage bag, along with the checks." (*Id.*) Bond testified that "I can't say what [Thomas] did with [the black bag], but I guess he disposed of it." (*Id.* at 259.) Angela Jackson was present and saw the money. (*Id.* at 261.)

According to Bond, "Andrew was telling me to take [the pistol] with me and get rid of it." (*Id.* at 260.) Bond testified that "I wouldn't take it, so he got it." (*Id.*) Bond "had it outside of the

apartment when we was talking about it, and I told him that I wouldn't take it with me . . . [b]ecause he had just shot the man." (*Id.*) Bond "[g]ave it back to him." (*Id.*) Bond testified that "[w]e were talking about it in the house, we finished talking about it outside." (*Id.* at 261.)

Bond had called Keith ("KeKe") Echols to come pick him up. When Echols arrived, Bond left. (*Id.* at 259.) Echols was a friend of Bond's. (*Id.* at 260, 262.) Bond had known him for about five years. (*Id.* at 262.) Bond told Echols about the robbery after it had occurred. (*Id.* at 260.) Echols also knew Thomas. (*Id.* at 262.) It took about five minutes for Echols to arrive. (*Id.* at 261.) Bond "was waiting on the side of the apartment when I seen him pull up, I walked out." (*Id.*) Bond had his share of the money in his pocket, and he testified that it took up a lot of room, "like I had bulges in my pants." (*Id.*) Echols and Bond "rode off and I told him to take me by my mother's house." (*Id.* at 262.) At that time, Bond told Echols what had happened. (*Id.*)

When they got to Bond's mother's house, Bond "dropped some money off and then I told [Echols] take me by my girlfriend's house." (*Id.* at 263.) Bond put the money in his room. (*Id.*) Bond's girlfriend was named Tanya Monger, and she lived "[o]n Pershing and Hollywood." (*Id.*) Bond wanted to spend some of the money, and he "was fixing to go buy a car." (*Id.* at 264.) Bond "went and got Tanya and then me and her went to a car lot, and I gave her the money to buy the car with." (*Id.*) The dealership was McClain Motors "[o]n Elvis Presley." (*Id.*) Bond bought a 1990 Chevrolet Caprice for $4800 in cash. (*Id.* at 264-65.) The money was part of the robbery proceeds. (*Id.* at 265.) Bond put the car in Monger's name "[b]ecause I don't never buy no car in my name." (*Id.*) Monger signed the papers for the car. (*Id.*)

Bond then went to "Southland Mall, Raleigh Springs Mall" with "Tanya and Keith and one of her girlfriends." (*Id.*) Bond testified that "I went to the mall and I spent a little money, bought clothes and things like that." (*Id.*) Bond bought Echols "some shoes and I think I bought him an outfit." (*Id.* at 266.) Bond bought Tanya "a ring and some shoes." (*Id.*) He also testified that "I bought myself clothes." (*Id.*)

Bond "stayed at a hotel room later on that night." (*Id.*) The motel was on Sycamore View. (*Id.*) Bond, "Tanya, Ke[K]e and a friend" stayed in one room. (*Id.*) Bond did not recall whose name the room was in. (*Id.* at 267.) They spent one night at the motel. (*Id.*)

The next day, Bond and Tanya "just rode around" in Bond's new car. (*Id.* at 267.) Bond also spent more of the money. He testified that "I bought some more clothes, shoes and stuff." (*Id.*) He did not know everything he had spent the money on. (*Id.*) The money lasted "[p]robably about a week or two." (*Id.*) When asked what he did with the rest of the money, Bond replied, "Just blew it off." (*Id.* at 268.) Bond also wrecked his new car. (*Id.*) He did not remember how long he had the car before he wrecked it. (*Id.*)

Bond was arrested on other charges by the MPD in October 1997. (*Id.*) He was taken to the Shelby County Jail. (*Id.*) He was interviewed by the police and asked about "a Wells Fargo robbery." (*Id.* at 268-69.) Bond eventually agreed to talk "[b]ecause I didn't want to have the charge for something I didn't do." (*Id.* at 269.) Bond "[j]ust basically told them what happened and who shot him." (*Id.*) In response to who he said did the robbery, Bond testified that it was "Bowleg and me." (*Id.*) Bond made, and signed, a written statement. (*Id.*) He pled guilty to Count 1 of the Indictment in this case. (*Id.* at 274.) He admitted that he pled guilty because he is guilty. (*Id.*) He also signed a written plea agreement. (*Id.* at 274-75.) The plea agreement provided that Count 2 of the Indictment would be dismissed. (*Id.* at 275.) Bond also had several pending state cases for aggravated robbery (*id.* at 276) and, as part of the plea agreement, he would not be charged for those robberies in federal court (*id.* at 275). Bond understood that, if he testified truthfully, the Government would make a motion under § 5K1.1 of the sentencing guidelines. (*Id.* at 276.) The maximum sentence Bond could receive on Count 1 was twenty years. (*Id.*) Bond understood that, if he did not testify truthfully, "[t]hat you won't make the 5K1 motion and that my state charge will become federal, too." (*Id.* at 277-78.) Under further questioning, Bond testified that he understood that his state charge could become federal and that there was no agreement between him and the Government if he did not testify truthfully. (*Id.* at 278.)

Bond had been convicted in state court as an adult of robbery and theft in 1995, when he was sixteen years old, and had been sentenced to eight years. (*Id.*) Bond had been released in November 1996, after serving two years. (*Id.* at 279.)

Bond testified that Thomas did not have a job in April 1997, and Thomas did not own a car at that time. (*Id.*) Soon after the robbery, Bond saw Thomas with a car. (*Id.*) Thomas "said that he bought him a car." (*Id.* at 280.) Bond recalled that "[i]t was a pink looking Chevrolet." (*Id.*)

On cross examination, Bond testified that he had been previously convicted of two felonies on a single occasion. (*Id.* at 286.) Bond admitted that he had left his fingerprints in the stolen car. (*Id.* at 287.) Bond understood that the Government had agreed to dismiss Count 2 of the federal indictment, which would have resulted in a consecutive sentence of five years. (*Id.* at 287-88.)

Bond had first spoken to the police about the case "around the time when I came to jail." (*Id.* at 288.) That was around October of 1997, six months after the robbery. (*Id.* at 289.) Bond had initially denied knowledge of the robbery. (*Id.*) Bond did not recall when he next spoke to the police. (*Id.*) He admitted that he was lying when he told the police he had nothing to do with the robbery. (*Id.* at 290.) He admitted that he was facing several charges in state court. (*Id.*)[5]

Bond denied that, sometime in the summer and fall of 1997, he had bragged about the armored car robbery. (11/09/1998 Trial Tr. 291, *United States v. Thomas*, No. 2:98-cr-20010-01-JPM (W.D. Tenn.), ECF No. 99.) He testified that the only person he told about the robbery was Keith Echols (*id.*) and that nobody else was around when he told Echols (*id.*). Bond denied telling Echols or anyone else that he was the shooter. He testified, "I never told anybody I shot the man." (*Id.*)

Bond was also asked about Bobby Jackson, and he testified as follows:

---

[5] Bond's PSR reflects that he had nine pending cases in which he had been charged with Aggravated Robbery arising from two incidents. (Bond PSR ¶¶ 46-47.) Another participant in one of the robberies described in the ¶ 47 of the PSR, and two of the victims, had identified Thomas as one of the perpetrators in that robbery on September 15, 1997.

Q.      . . . Isn't it true that on one occasion in the late summer, early fall of 1997, you told somebody that you and Bobby Jackson stuck up that armored car and that you shot the guard?

A.      I don't know no Bobby Jackson.

Q.      You don't know Bobby Jackson?

A.      No, sir.

Q.      You're absolutely certain about that?

A.      Yes, sir.

(*Id.* at 292.)  Bond testified that he was 6'2" and weighed about one hundred sixty pounds.  (*Id.* at 292.)  He described his build as "slim."  (*Id.*)

Bond stole the car used in the robbery from "right over there on the street beside Poplar Plaza."  (*Id.* at 292-93.)  He denied that he had seen the car later in the summer of 1997, while he was riding around with Keith Echols, and stated that he wondered if he could steal it again.  (*Id.*)  Bond testified, "I don't recall what you're talking about."  (*Id.*)

Thomas and Bond robbed the armored car guard "[a]round morning hours."  (*Id.*)  Bond had known nothing about an armored car robbery until Thomas raised the subject the day prior to the robbery.  (*Id.* at 294-95.)  Bond did not recall the exact time of the robbery, but stated, "I guess about 9:00 or something like that."  (*Id.* at 294.)  Bond explained that "[i]t has been so long ago, I just can't remember exact times."  (*Id.*)  Thomas drove his girlfriend's red car to Bond's mother's house.  (*Id.* at 295-96.)  Bond did not know what time they left his mother's house.  (*Id.* at 296.)  When asked how long they stayed at his mother's house, Bond replied, "It wasn't long.  He just came and got me."  (*Id.*)  Bond was reminded of his previous testimony that it was a couple of hours, and he responded that "I said we was together a couple of hours" from the time Thomas came to Bond's mother's house until they were finished with the robbery.  (*Id.*)

Bond did not recall what time it was when they stole the car (*id.* at 297) but "[i]t was at nighttime" (*id.*).  He guessed that it was "probably before midnight."  (*Id.*)  Bond was asked whether it had been before the "news time" on television, and he responded, "I'm saying it was probably

31

before midnight because my mother don't allow me to come in her house after midnight, and I know I slept at my mother's house, so I know it had to happen somewhere before midnight." (*Id.* at 298.) Bond had been home before midnight on April 20, 1997. (*Id.*)

On the morning of April 21, 1997, Bond and Thomas rode around in the stolen car and did not go directly to the Walgreens. (*Id.*) According to Bond, "we drove down Jackson Avenue area, around there, and then we went on to Summer Avenue." (*Id.*) Once they got onto Summer Avenue, they drove directly to the Walgreens. (*Id.*) Thomas "parked the red car on the side street and got in the car [Bond] was in." (*Id.* at 299.) At that time, Bond "guess[ed] it was about almost noon or afternoon or something." (*Id.*) Bond was not wearing a watch and did not look at a clock. (*Id.*) Bond testified that "after we parked the red car on the side street from Walgreens, we went to Walgreens in the white car." (*Id.*) Bond parked the white car "[i]n front of the Walgreens, like facing out towards Summer." (*Id.*) He left the engine running. (*Id.* at 300.) Bond recalled that, when "we was coming off the back street, I was seeing [the armored car] pull in, and by the time I got there, it was there." (*Id.*) Bond was unable to answer how he knew when the armored car would arrive. He testified that "I'm just going on [Thomas'] belief, on what he said." (*Id.*)

Bond could not recall the color of the shirt he had been wearing during the robbery. (*Id.*) In his statement, Bond had said that he was wearing jeans and a long sleeved blue shirt. (*Id.* at 301-02.) Bond testified that he did wear blue jeans and a long sleeved blue shirt. (*Id.* at 302.) Bond recalled that he was not wearing a cap or gloves. (*Id.*.)

Bond estimated that he arrived at the Walgreens around noon. (*Id.*) He sat out front of the Walgreens "[a]bout three to five minutes, somewhere like that." (*Id.*)

After the robbery, he left the scene and drove to Angela Jackson's apartment. Bond did not know the address of Angela Jackson's apartment, but he knew it was on Pendleton. (*Id.* at 302-03.) He did not know the route they took to Jackson's apartment. (*Id.* at 303.) Bond explained that "I didn't drive to her apartment, I just drove to the red car." (*Id.*) Bond had been a passenger in the red car, and Thomas drove to Angela Jackson's apartment. (*Id.*) Bond was asked about the route,

and he responded: "Like from Tutwiler, backed up like and got on Tutwiler and then went on another street and got on the expressway." (*Id.*) Bond did not know which exit Thomas used to get on the freeway. (*Id.* at 304.) Once they got on the freeway, they "took it all the way to Airway." (*Id.*) Bond could not say whether they took the 240 loop east all the way to the airport. (*Id.*) He testified that "I don't know the name of no expressways and the exits." (*Id.*) "I guess it circles around. I just, you know, like I said, I just ain't familiar with the expressways." (*Id.*) Bond had lived in Memphis his entire life and, before the events at issue, had ridden around in cars a lot both by himself and with friends. (*Id.* at 304-05.) Bond did not know the names of streets, but he thought Thomas backed onto Tutwiler, took a right, and then got on the expressway. (*Id.* at 305.) He recalled that "[y]ou had to make a left when you got to the expressway." (*Id.*) Bond believed they got on an expressway that ran alongside Summer, started going toward Bartlett, then made a little right on the expressway "and it took you all the way across the city." (*Id.* at 306-07.) They got off at the Airways exit, got onto Pendleton, and drove to Angela Jackson's apartment. (*Id.* at 307.)

Bond believed it took about fifteen minutes to get from the Walgreens to Angela Jackson's apartment. (*Id.* at 307-08.) They were driving fast and passing everybody. (*Id.* at 308.) Bond did not see any police cars. (*Id.*) He did not know what time it was when they got to Angela Jackson's apartment. (*Id.*) Bond denied that he had been carrying the gun when they arrived at Angela Jackson's apartment. (*Id.*)

Bond admitted that he knew Travis Brown. (*Id.* at 309.) He also admitted he knew Sharod Rodgers, but denied that he had ridden around with him. (*Id.* at 309-10.) Bond knew Willie C. Cooper and had ridden around with him. (*Id.* at 310.) Bond denied talking to Cooper about things that he had done. (*Id.*)

The bag Thomas took from Day was a satchel with two handles. (*Id.*) It was easy to open. (*Id.* at 310-11.) Bond was not sure how much money had been in the bag. (*Id.* at 311.) Bond based his belief that he had received about six or seven thousand dollars on what he knew he had bought. (*Id.*) On the day of the robbery, he bought a car for $4800. (*Id.*) He took Tanya Monger and Keith

Echols on a shopping spree that day at the Raleigh Springs Mall, the Southland Mall, and the Mall of Memphis. (*Id.* at 311-12.) At the Southland Mall, Bond bought himself some casual clothes and some shoes. (*Id.* at 312.) Bond did not know the name of the store where he bought the shoes. (*Id.*) He went to about three stores in that mall and bought something in each one. (*Id.* at 312-13.) Bond also bought Keith Echols "a pair of shoes and . . . a shirt or something like that" at the Southland Mall. (*Id.* at 313.) Bond did not know how much the shoes cost, but he agreed that shoes are not cheap. (*Id.*) Bond also bought his girlfriend shoes and a ring at the Southland Mall. (*Id.* at 313-14.) Bond bought the ring from "one of them where they be set up in the middle of the mall like a little jewelry cart." (*Id.* at 314.) "It was more stationary than a cart, it had glass." (*Id.*) The ring cost around $60 or $70. (*Id.*) Bond did not recall what he paid for his clothing and shoes. (*Id.*) The shoes were tennis shoes. (*Id.*) Bond believed they were Reeboks. (*Id.* at 315.) Bond also bought Reeboks for Echols. (*Id.*) Bond paid retail price for the shoes. (*Id.*)

When Bond, Monger, and Echols left Southland Mall, they went to the Raleigh Springs Mall (*id.*), where Bond bought some more casual clothes (*id.* at 316). He could not recall how many items he bought, but he testified that "I know I bought a couple of shirts." (*Id.*) He also bought a couple of complete, matching outfits and around two more pairs of shoes. (*Id.*) The shoes were casual shoes. (*Id.*) The brand name was Nautica (*id.* at 317), but Bond could not recall the price (*id.*). Bond did not buy anything for Monger and Echols at the Raleigh Springs Mall. (*Id.*) He went to two stores in the Raleigh Springs Mall and bought something for himself in each store. (*Id.*)

Bond did not go to the Mall of Memphis on the same day he visited the other malls. (*Id.* at 317-18.) He went to the Mall of Memphis the next day with a friend named Ernest. (*Id.* at 318.) Bond did not know Ernest's last name. (*Id.*) The only store Bond and Ernest went to at the Mall of Memphis was "Dillard's or Goldsmith's, one of them." (*Id.* at 322.) Bond bought "[s]ocks and things like that." (*Id.*) Bond did not buy anything for his girlfriend at that store. (*Id.*)

After the Walgreens robbery, Bond also "got gold teeth in [his] mouth." (*Id.* at 323.) Bond did not recall when he got the gold teeth. (*Id.*) The gold teeth were in the front of his mouth. (*Id.*)

He went to a Dr. Jordon on Chelsea, who charged him "[a]bout five hundred dollars" for all four teeth. (*Id.* at 323-24.)

Bond did not know whether the car, the gold teeth, and the shopping trip, combined, cost more than $6000 or $7000. (*Id.* at 324.) He did not know the total amount of money taken in the robbery. (*Id.*)

Bond had met Angela Jackson in 1997. (*Id.*) He denied that he knew Angela Jackson well or that he had a friendship with her that had nothing to do with Thomas. (*Id.* at 325.) Bond had had no contact with Angela Jackson other than through Thomas. (*Id.*)

Bond testified that he knew Russell Carpenter. (*Id.*) According to Bond, "I know him, but I don't just know him well." (*Id.*) He denied knowing "Bill Upchurch," stating that "[t]hat name don't sound familiar." (*Id.*) Bond was asked whether Carpenter and Upchurch knew that he knew Angela Jackson apart from Thomas, and he responded, "Like I said, I know Angela Jackson only through being involved with Bowleg, I ain't never had no relationship outside of that." (*Id.*) He stated unequivocally that there had been "[n]o contact." (*Id.* at 326.)

Bond did not go with Thomas when he purchased a car, but testified that "[h]e bought it with the money from the robbery." (*Id.*)

Bond had discussed with his attorney whether to plead guilty and the impact his pending state charges might have on the instant case. (*Id.* at 326-27.) Bond's attorney explained what a § 5K1.1 motion is. (*Id.* at 327) Bond understood that the Government would not make a § 5K1.1 motion unless he cooperated, and he also knew that the sentencing judge could not give him a lesser sentence unless a § 5K1.1 motion had been filed. (*Id.* at 327-28.) Bond did not know how much time he expected to get off his sentence as a result of his cooperation. (*Id.* at 328.) He understood that, if he could not turn somebody over to the Government, he would not get a § 5K1.1 motion. (*Id.*)

Bond denied telling anyone that he had gotten about $10,000 from the robbery. (*Id.* at 332.) He denied telling anybody that he shot the guard. (*Id.*)

On redirect, Bond was asked what Thomas had been wearing when he committed the robbery. Bond replied that "I think he had on a striped shirt and some shorts, if I can remember." (*Id.* at 333.)

Bond had read his plea agreement and went over it with his lawyer. (*Id.* at 334.) Bond read his entire plea agreement into the record. (*Id.* at 334-36.) He had signed the plea agreement. (*Id.* at 336.) It was Bond's understanding that, if he did not tell the truth, "the United States is going to withdraw from the agreement and not make the 5K1 motion." (*Id.*)

Bond testified that, after they left the Walgreens, Thomas drove the red car to Angela Jackson's house. (*Id.*) Angela Jackson was Thomas' girlfriend. (*Id.*) Bond reiterated that Thomas shot the guard and that his role was to drive the getaway car. (*Id.*) He did not know exactly how much money he got from the robbery. (*Id.*) Bond spent every cent of the money he had gotten. (*Id.* at 337.)

### 11. Memphis Police Officer Robin C. Hulley (November 9, 1998)

At the time of trial, Officer Robin C. Hulley had been with the MPD for almost twelve years. (*Id.* at 339.) On April 21, 1997, Officer Hulley was assigned to the Crime Scene Unit. (*Id.* at 339-40.) As a crime scene officer, Hulley was responsible for "collect[ing] evidence, gather[ing] latent prints, tag[ging] evidence, do[ing] photography, sketches." (*Id.* at 340.) Latent prints are gathered using black fingerprint powder. (*Id.*) She testified that "[w]e're given information either through the dispatcher or through the bureaus to process a certain item, a vehicle, whatever the situation, we just take the black fingerprint powder and a feather duster and we will go over the areas that they suspect prints would be." (*Id.*) Officer Hulley testified that

> [w]e have little three by five index cards that has information written on the flip side, the VIN number, the victim, information that pertains to the case that we're working on and we just use a transparent, like very similar to scotch tape, but it is a very heavy tape and we'll just lay it across the latent print and lift the print and place it onto the card.

(*Id.* at 347.) That card is called a print card. (*Id.*) Officer Hulley would place her name or initials and IBM number on the print card. (*Id.* at 348.) The cards were then delivered to the latent print

section of the MPD, which was responsible for identifying the fingerprints. (*Id.* at 347.) The MPD had "five latent prints experts that work in the crime scene building . . . ." (*Id.*)

Officer Hulley remembered processing a white Pontiac Bonneville on April 21, 1997. (*Id.* at 340.) The vehicle had come directly from the crime scene to the crime scene tunnel at the city lot at 475 Klinke, where Officer Hulley processed it for latent prints. (*Id.* at 340-41.) The crime scene tunnel is a secured area large enough to hold four vehicles. (*Id.* at 341.) "It is just a covered area to keep it from the weather and the elements and people outside of our department." (*Id.*)

Officer Hulley did not know the license tag number and VIN number of the Bonneville. (*Id.*) That information was contained "on a report and also on the fingerprint card." (*Id.*) Officer Hulley located the VIN number and license tag on her report. (*Id.* at 341-42.) That report reflected that the vehicle was processed at 3:10 p.m. on April 21, 1997. (*Id.* at 342.) Officer Hulley identified photographs of the Bonneville as it sat in the city lot after processing. (*Id.* at 342-43.)

Officer Hulley testified that "[a] latent print is simply a print that is left behind on whatever is handled. All it is is just the oil and perspiration in the skin that leaves a ridge detail." (*Id.* at 343.) Latent prints are found "much more often than not." (*Id.* at 344-45.) "It is rare that you don't find a print, but it can happen that you don't find a print." (*Id.* at 345.) Officer Hulley testified that, "on vehicles, you tend to find quite a few prints." (*Id.*)

Officer Hulley testified that,

[t]his particular car, I already knew the circumstances on the car, what it involved. I knew it involved a shooting. I processed it from front to end, hood, everything, and usually a lot of times on certain kinds of cases, there's only certain areas that we'll process. On stolen cars, we process around the windows and around the doors. On our higher profile cases or ones we have shootings or aggravated assaults, we will process inside, outside, papers, anything that we can find.

(*Id.* at 345-46.) Everything had been processed in this case. (*Id.* at 346.) Officer Hulley testified that, "[o]n the right side back door just under the door handle, I found a latent print." (*Id.* at 346.) Officer Hulley also "found several what I'll call smears that would be understandable, just they

weren't of value in any way. They had a little bit of ridge detail, but not enough to make an identification." (*Id.*)

On cross-examination, Officer Hulley testified that she thoroughly checked for latent fingerprints and gave every fingerprint she found to Mr. Sims. (*Id.* at 349.) Later in the investigation, she got a report back. (*Id.*) Officer Hulley did not know the identity of the person whose print was found on the Bonneville. (*Id.* at 350.)

Officer Hulley did not go to the crime scene to perform any investigation. (*Id.* at 351.)

### 12. David Little, Pawn Shop Owner (November 9, 1998)

At the time of trial, David Little was president of Triple A Mortgage Company. (*Id.* at 353.) Before that, Little had been in the pawn business for seven years. (*Id.*) He owned North Watkins Pawn and Jewelers, which was located at 8439 North Watkins in Frayser. (*Id.*) Frayser is located in Memphis. (*Id.* at 354.) Little testified that he closed the pawn shop on July 31, 1998. (*Id.*)

Little owned the pawn shop in April 1997. (*Id.*) The pawn shop sold both preowned and new firearms. (*Id.*) Little kept records of the firearms that he sold. (*Id.*) He testified that "you're required to keep a log book of every gun that comes into your store that goes out of the store. One was a federal form, I always called it a yellow sheet, I don't remember what the number was." (*Id.* at 354-55.) Little recalled that "every gun that went out of the store you had to document the yellow sheet." (*Id.* at 355.) At the time of trial, Little no longer had the yellow sheets because he had returned them to the Bureau of Alcohol, Tobacco and Firearms ("ATF"). (*Id.*) He testified that, "[w]hen you close a business, gun business, you surrender your license, you're required to send all the records that you have pertaining to that business back to the ATF." (*Id.*)

Little identified "a photostat of the ATF form 4473" that contained his signature. (*Id.* at 355-56.) That form reflected a sale of a firearm to Angela Lavette Jackson. (*Id.* at 356-57.) Little testified that "[t]he purchaser purchasing the gun fills out the top part of it in their own handwriting." (*Id.* at 357.) The form indicated that Angela Jackson was 4'11". (*Id.*) The address listed was 2335 Pendleton, Apartment 2, in Memphis. (*Id.*) The firearm that was purchased "was a Mossberg

shotgun model 500 a 12-gauge, serial number K742634." (*Id.*)  The form reflected that the shotgun "went out the door" on April 24, 1997.  (*Id.* at 358.)  Upon being asked about the price of the shotgun, Little responded, "[i]f that was a new one, it sold for two forty-nine.  If it was a used one, it was about one ninety-nine." (*Id.*)

On cross-examination, Little testified that he did not remember anything about the transaction.  (*Id.* at 359.)  His pawn shop did not have a video camera.  (*Id.*)  He was asked whether he personally waited on Angela Jackson, and he responded:  "More than likely, yes, sir.  Whoever the person was that handled the transaction usually filled out the bottom portion of the yellow sheet." (*Id.*)  Little's handwriting was on the form.  (*Id.*)  Little had no memory of the sale independent from what was reflected on the form.  (*Id.*)

Little had held a federal dealer's license for seven years.  (*Id.*)  He agreed that it was important for the person completing the form to tell the truth.  (*Id.* at 359-60.)  He acknowledged that the form states that making false statements is a felony under federal law.  (*Id.* at 360.)  Little would not sell a firearm to someone if he knew they had made a false statement on the form.  (*Id.*)  Little agreed that Angela Jackson had checked a box saying that she was the actual buyer of the firearm. (*Id.*)  If she had checked the "no" box in answer to that question, Little could not have sold the firearm to her.  (*Id.*)  If Little had accepted a Form 4473 that he knew contained incorrect information, he could have lost his firearms license.  (*Id.* at 360-61.)  As far as Little knew, Angela Jackson was the actual purchaser of the firearm.  (*Id.* at 361.)  If Little had known otherwise, he would not have given Angela Jackson the gun.  (*Id.*)

Little did not remember Angela Jackson.  (*Id.*)  Her purchase was the sixty-eighth firearms purchase made in his store in 1997.  (*Id.*)  Ordinarily, the pawn shop "would handle anywhere from 250 to 300 transactions per year." (*Id.* at 361-62.)  Little testified that, if he saw the purchaser of a firearm hand it to someone else in his store, "I would probably stop them from walking out of the door." (*Id.* at 362.)  In order for Angela Jackson to have walked out of the store with the firearm, she would have had to carry it herself.  (*Id.*)

On redirect examination, Little testified that he did not know what happens after purchasers have left the store. (*Id.*) People frequently came into the store together to buy things. (*Id.*)

### 13. ATF Special Agent John Prickett (November 10, 1998)

John Prickett, an ATF Special Agent, was qualified as an expert on the identification of firearms. (11/10/1998 Trial Tr. 376-78, *United States v. Thomas*, No. 2:98-cr-20100-JPM (W.D. Tenn.), ECF No. 100.) Special Agent Prickett testified that Mossberg 12-gauge shotguns are not manufactured in the State of Tennessee. (*Id.* at 378, 379.) They are manufactured in Connecticut. (*Id.*)

In response to what kind of weapon a Mossberg 12-gauge shotgun is, Special Agent Prickett testified:

> It is a 12-gauge, the model 500 is a pump gauge shotgun. I believe it comes in—I think it is made up at—as far as a 28-inch barrel, but it comes also in an 18 inch barrel, which is for close quarter type use, possibly for home protection or something of that nature.

(*Id.* at 378) Special Agent Prickett agreed that a 12-gauge is pretty heavy for a shotgun. (*Id.* at 379.)

On cross-examination, Special Agent Prickett testified that he was familiar with the ATF's Form 4473. (*Id.* at 380.) That is the form that is completed when a purchaser buys a specific firearm from a firearms dealer. (*Id.*) The form identifies the purchaser and the firearm, and the purchaser signs the form. (*Id.*) The form also requires the purchaser to check whether he or she is in various prohibited categories and "certify to that and sign the form." (*Id.* at 380-81.)

### 14. John Hibbler, Owner, Auto Additions (November 10, 1998)

John Hibbler owned Auto Additions, which sold used cars. (*Id.* at 383-84.) The business was located at 3350 Elvis Presley Boulevard in Memphis. (*Id.* at 383.) The business was at that location in April 1997. (*Id.* at 384.) Hibbler was the custodian of records for Auto Additions. (*Id.*) Hibbler testified that,

> when a vehicle is sold, if we have the—sometimes when we buy cars at an auction, if we don't have a title at that time, the title will be given later. If I do have a title,

once the vehicle is sold, the customer gets the title as well as a bill of sale of record and is basically we keep a bill of sale and a copy of the title.

(*Id.*)

Hibbler was asked to provide a copy of a bill of sale for a car sold to Angela Jackson. (*Id.*) He identified a bill of sale for a car that was sold on April 21, 1997. (*Id.* at 384-86.) The bill of sale reflected that the saleswoman was Kay Sikes. (*Id.* at 386.) The purchaser was Angela Jackson, 2335 Pendleton, apartment number 2, Memphis, Tennessee, 38119. (*Id.*) The vehicle was a 1981 Chevrolet Caprice. (*Id.* at 386-87.) The car was a "[f]our-door, full size Chevy, Caprice. It was pink in color, pink, fusc[hi]a type color. It was pretty customized, it had custom wheels on it and things like that." (*Id.* at 387.) The purchase price was $3750, and the sale price, with tax, was $3975. (*Id.*) Angela Jackson paid cash for the car on April 21, 1997. (*Id.*)

On cross-examination, Hibbler testified that the car had been sold to Angela Jackson. (*Id.* at 391.) Hibbler was asked whether he was present during the sale, and he testified that "I was there, but I wasn't there for the whole duration. When I got there, they were pretty well finishing up what was going on there. So when I came in, the both of them were there." (*Id.*)[6] Hibbler recalled that both Thomas and Angela Jackson were present and were being helped by the saleswoman. (*Id.*) Hibbler had no knowledge of any conversations Thomas and Angela Jackson might have had with the saleswoman other than what was reflected in the records. (*Id.* at 391-92.)

On redirect, Hibbler reiterated that both Thomas and Angela Jackson had been present. (*Id.* at 392.) Hibbler recognized Thomas and was able to identify him in the courtroom. (*Id.* at 392-93.)

### 15.     Angela Lavette Jackson (November 10, 1998)

Angela Lavette Jackson testified that she was twenty-eight years old and was testifying pursuant to a subpoena. (*Id.* at 403.) Angela Jackson was from Memphis and graduated from Booker T. Washington High School. (*Id.*) She attended Rice College for "[j]ust about six months

_____

[6]Earlier, Hibbler had testified on cross-examination that he had met Thomas through his step-father. (*Id.* at 388.) The Court sustained the Government's objection to that line of questioning because Hibbler was testifying as a records custodian. (*Id.* at 388-90.)

. . . ." (*Id.* at 403-04.) She had family in Memphis and she lived with her two daughters, who were six and eight years old. (*Id.* at 404.) In April 1997, Jackson had been employed by Hamilton Ryker. (*Id.*) At the time of trial, she was working for different companies on their production lines. (*Id.*) After she left Hamilton Ryker, she worked for a day care center called Kinder Caper. (*Id.* at 405.)

At the time of trial, Angela Jackson was married to Thomas. (*Id.*) They got married on May 7, 1997. (*Id.*) In April 1997, Jackson had been Thomas' girlfriend and they were living together. (*Id.*) Thomas' nickname was "Bowleg", but Jackson called him "Andrew." (*Id.*) Thomas called Jackson "Angela." (*Id.*) Some people called Jackson "Angie" "sometimes." (*Id.* at 405-06.)

Angela Jackson testified that she was still married to Thomas but "we're separated." (*Id.* at 406.) She explained that "I tried to get a divorce through Legal Service, and it didn't go through, they told me I had to get a lawyer. . . . And I got a lawyer, but we had a court date to go to court for the divorce, but he never sent me another letter stating that I had to come back with a witness." (*Id.*) Angela Jackson had filed divorce papers. (*Id.*) The Court overruled Thomas' invocation of the spousal privilege. (*See id.* at 406-09.)

Angela Jackson separated from Thomas "[a]round about June of '97." (*Id.* at 409.) In April 1997, Angela Jackson and her two daughters were living in an apartment complex at "2335 Pendleton, apartment 2." (*Id.* at 410.) At some point in April, Thomas began living with Angela Jackson. (*Id.*) She testified that "[a]bout [t]hen we started dating, and then slowly he started moving his things in." (*Id.*) Thomas also started spending the night. (*Id.*)

At the time, Angela Jackson was working for Hamilton Ryker, which did "bookkeeping and different things like that" for Federal Express. (*Id.*) Her job was to "file[] the papers." (*Id.* at 411.) Angela Jackson did not recall how long she worked for Hamilton Ryker, but "[i]t was a short period of time." (*Id.*) She earned $6 an hour. (*Id.*)

Thomas did not have a job and did not own a car. (*Id.*) The property he kept at Angela Jackson's apartment was "[j]ust clothes." (*Id.*)

Angela Jackson knew Thomas' family. (*Id.*) She testified that "I have known his family for—ever since I was small." (*Id.*) She knew Anthony Bond because "[h]e's a friend of Andrew." (*Id.*) She did not know Bond before meeting Thomas. (*Id.* at 412.) Angela Jackson testified that "I met [Bond] through Andrew." (*Id.*) She recalled that Thomas and Bond "used to ride together all the time, like ride in the car all the time." (*Id.*) Bond would sometimes come to her apartment. (*Id.*) "Sometimes he would just come in with Andrew, but they wouldn't stay a long period of time." (*Id.*)

Thomas and Bond would ride around together in Angela Jackson's car. (*Id.*) Angela Jackson testified that "Andrew would take me to work. He would drop me off at work." (*Id.*) Thomas used Angela Jackson's car "[j]ust about every[ ]day." (*Id.*) At the time, Angela Jackson owned "[a] red '94 Suzuki Swift." (*Id.*) "It's like a two door hatchback car." (*Id.* at 413.) By the time of trial, Angela Jackson no longer owned that car. (*Id.*) She testified that "[i]t got repossessed because I no longer could make payments on it." (*Id.*) This occurred "a short period of time" after April 1997. (*Id.*)

Angela Jackson's apartment on Pendleton was a two-bedroom. (*Id.* at 414.) It had a living room. (*Id.*) Angela Jackson did not know how many apartments were in the complex. (*Id.*) At the time of trial, Angela Jackson no longer lived at that address. (*Id.* at 415.) She "lived there a year." (*Id.*)

When Angela Jackson woke up on April 21, 1997, Thomas and her two daughters were present. (*Id.*) Thomas was "at the house" when Angela Jackson went to bed the previous night, and "[h]e was in the bed" when she woke up. (*Id.*) Angela Jackson recalled that "I was sick that morning. I called in sick, I didn't let the girls go to school, they stayed home with me." (*Id.* at 416.)

Angela Jackson testified that, "[t]hat morning before he left, [Thomas] told me that he was going to get Anthony and he'll be back." (*Id.*) He did not say anything about the car, but "just got the keys off the dresser." (*Id.*) That was not unusual behavior for Thomas. (*Id.*) Angela Jackson believed "[i]t was around 8:00, 8:30, something like that." (*Id.*) Thomas did not say where he and

43

Bond were going. (*Id.* at 417.) After Thomas left, Angela Jackson went back to bed and went to sleep. (*Id.*)

According to Angela Jackson, "[w]hen he returned, I was in the bed asleep and they was banging—he was banging on the door." (*Id.*) At the time, Thomas did not have a key to the apartment. (*Id.*) Angela Jackson recalled that "[h]e was banging on the door, I was in the bed asleep. And he banged again, and when I opened the door, he asked me what took me so long, and I told him that I was asleep." (*Id.* at 418.) Thomas "came in and Anthony [Bond] was behind him. . . . And that's when Anthony unzipped his jacket, and a lot of envelopes fell on the floor, and they started opening envelopes and counting the money on the floor." (*Id.*) Angela Jackson believed that "[i]t was after 12:00" and Thomas had been gone "[a] couple of hours . . . ." (*Id.*) Thomas "had on a striped shirt and some shorts." (*Id.* at 419.) Angela Jackson recalled that "they was talking about—their eyes was big, like excited, and when Anthony opened his jacket, that's when they started opening the envelopes." (*Id.*) Angela Jackson testified that "I saw them counting money, and Anthony had told me that I couldn't say anything, that I had to keep this a secret. No matter how long, I had to keep it inside." (*Id.*; *see also id.* at 421 ("[Bond] told me that I could not say anything about this, that it was our secret.").)

The envelopes were "just white regular envelopes." (*Id.*) They were inside Bond's jacket, and he dropped them to the floor. (*Id.*) When Bond unzipped his jacket, "it was just a lot of envelopes just fell on the floor." (*Id.* at 420.) Angela Jackson did not know how many envelopes there were. (*Id.*) "They started opening envelopes up and they was splitting the money." (*Id.*) Angela Jackson was in the living room with Thomas and Bond. (*Id.*) Angela Jackson recalled that "I was just stunned, I was just looking, and Andrew told me there is no need of me being shaky, he didn't need a shaky mother fucker and asked me to get up the other envelopes." (*Id.*) Thomas "asked [Angela Jackson] to ball the envelopes and everything up as he took the money out of them," and she complied. (*Id.* at 421.) "I balled up the envelopes like he asked me and put it in a jacket, and then I went back in the room." (*Id.*) Angela Jackson went back to the bedroom. (*Id.*)

Angela Jackson was asked to describe the money, and she testified, "It was a lot of money, I don't know how much." (*Id.*) She estimated that it was more than $10,000. (*Id.*) She explained: "Because they had split the money, and the car that he bought, it was almost four thousand dollars." (*Id.* at 421-22.) Angela Jackson could not recall the denominations of the bills. (*Id.* at 422.)

Aside from the envelopes and the money, Angela Jackson recalled that there "was a gun on the floor." (*Id.*) "It was a little handgun, it was silver, little grayish looking, and Andrew had told Anthony to get rid of the gun, to make sure that he took the gun with him." (*Id.*; *see also id.* at 424 ("Andrew had told Anthony to get rid of the gun, to take it with him.").) Angela Jackson did not notice the gun until Thomas mentioned it. (*Id.* at 422.) The gun "was by the table, it wasn't by the money." (*Id.*)

Angela Jackson recalled that, in addition to money, there was checks, which she also balled up. (*Id.*) She testified: "It was nothing they can do with the checks, so I had just balled them up also." (*Id.* at 422-23.) Angela Jackson did that "[b]ecause [Thomas] asked [her] to." (*Id.* at 423.)

Angela Jackson recalled that Thomas "changed clothes before we left, and Anthony also changed pants. I don't remember him changing a top, but he did change pants." (*Id.*) Angela Jackson "balled [the envelopes] up inside the jacket that Anthony had on" and "[i]t was thrown away when we left." (*Id.*) Angela Jackson did not recall who threw the jacket and envelopes away. (*Id.*) At the time, Angela Jackson's children were in the bedroom with her. (*Id.*) The money and envelopes were "[i]n the living room on the floor." (*Id.* at 424.)

After Thomas told Bond to get rid of the gun, Bond "made a phone call and he told someone to pick him up." (*Id.*) Then "[h]e left, and that's when he took the gun with him." (*Id.*) Angela Jackson saw Bond leave with the gun. (*Id.*)

Angela Jackson was asked to describe how Thomas and Bond split the money, and she replied, "Andrew was putting part of it on the side that he was on and the other part where Anthony was on." (*Id.*) Thomas had the money and was giving the orders. (*Id.*) Bond "was there just long enough to count the money and change pants and left. He wasn't there long." (*Id.* at 424-25.)

45

Angela Jackson testified that, right after Bond left, Thomas "told me to let's get ready to go so he can find him a car." (*Id.* at 425.) Angela Jackson "put on some clothes and we left." (*Id.*) She had previously been wearing "what I sleep in . . . ." (*Id.*) Angela Jackson got her daughters dressed, and they left in Angela Jackson's car. (*Id.*) Thomas asked Angela Jackson to put the money in her purse, and she complied. (*Id.* at 426.) Angela Jackson could not recall how much space the money took up, but she testified that she could not have put it in her pocket. (*Id.*)

Angela Jackson recalled that "[w]e went to two different car lots and then the last car lot that we went to was on Elvis Presley." (*Id.*) Thomas "saw a purple car, and he said that's clean, I want that, so we went inside to see how much did they want for the car. And once we got inside, he had told me to give him the money, and I took the money out of my purse and gave it to them." (*Id.*) The car "was a four-door purple car with like little rims or something like that on it." (*Id.* at 427.) It was purple rather than pink. (*Id.*) Angela Jackson testified that, "[w]hen we went to the car lot, he was asking the lady how much did she want for the car, you know, that he wanted it." (*Id.*) Thomas bought the car. (*Id.*) According to Angela Jackson:

> [H]e asked me to give him the money out of my purse, and that's when I gave him the money, and he was counting the money out to the lady, and he told me to put the car in my name because he didn't have any license, and once he got his license, he would change—we would get everything changed over.

(*Id.*) Angela Jackson signed the paper putting the vehicle in her name. (*Id.*)

Thomas drove the purple car off the lot, and Thomas and Angela Jackson returned to her apartment in their separate vehicles. (*Id.* at 428.) At that time, "[w]e got some change of clothes . . . [b]ecause we went to a hotel down by State Line Road . . . ." (*Id.*) Angela Jackson was asked why they had gone to a hotel, and she responded that Thomas "said we need to go there and leave my car parked there so they wouldn't suspect anything." (*Id.*) They went to a hotel and left Angela Jackson's Suzuki parked at her apartment. (*Id.*) The hotel was near a K-Mart, and "[w]e went over to K-Mart and got some clothes, just clothes for him to wear." (*Id.* at 429.) Angela Jackson recalled that Thomas "got him some clothes, and I think he bought me like two dresses, some two pair of

46

shorts and maybe two tops." (*Id.*) They paid for the clothes with the proceeds from the robbery. (*Id.*)

Angela Jackson testified that, after buying the clothes, "we went back and put the things away, we was watching television, and I can't remember exactly what news we was watching, but later that night, they were saying about the armored robbery truck." (*Id.*) Angela Jackson clarified that they had watched the news at 6:00 and also a later news program. (*Id.*) "The news was saying how the man, the armed robbery man had struggled for his life, and Andrew had said listen how the news caster lie, he said **I grabbed the nigger by his throat and I shot him**." (*Id.* at 430 (emphasis added).) When Thomas made that statement, "[h]e was sitting at the top of the bed" and Angela Jackson "was sitting at the end of the bed." (*Id.*) "When they were saying how the man struggled for his life, [Thomas] was saying how shaky that Anthony Bonds [sic] was, that he wasn't a killer, he was just a dope dealer." (*Id.* at 430-31.) Angela Jackson testified that, after hearing that, "I just sit there, I didn't say anything." (*Id.* at 431.) During this conversation, Angela Jackson's daughters were on the other bed. (*Id.*)

The next morning, Angela Jackson went to work and her daughters went to school. (*Id.*) Angela Jackson did not recall how she got to work. (*Id.*) That afternoon, Angela Jackson saw Thomas at her apartment after she got off work. (*Id.* at 431-32.) They went back to the hotel that afternoon, where they spent a second night. (*Id.* at 432.) At the hotel, "Andrew had the money." (*Id.*)

Angela Jackson also testified that, "like the next day" after the robbery, Thomas "asked me to open up an account, to put money in the account for him." (*Id.*) Angela Jackson and Thomas went to First American Bank on Winchester Road. (*Id.* at 432-33.) According to Angela Jackson, Thomas

> just said we need to keep it in there so he could save money, and I told him, I said, they going to ask me where did I get this money from. He said no, you got—he was telling me that I work, that I could have saved up money, so I went in and I did it.

47

(*Id.* at 433.)  Angela Jackson went into the bank alone with the money in her purse.  (*Id.*)  She did not take the money with her to work that day.  Instead, "Andrew had the money."  (*Id.*)  He gave her "over two thousand dollars," but Angela Jackson did not recall where they were when Thomas handed her the money.  (*Id.* at 434.)  Angela Jackson went into the bank, asked to speak to someone about opening an account, told the man how much money she wanted to deposit, and handed him the money.  (*Id.*)  The account was opened in Angela Jackson's name.  (*Id.*)

At the time, Angela Jackson did not have a bank account, and she also did not have a bank account at the time of trial.  (*Id.* at 435.)  Jackson used money orders to pay her bills.  (*Id.*)

Angela Jackson testified that, after the bank account had been opened, "Andrew was trying to—he was trying to get some money out so he could fix the car up."  (*Id.*)  Because the account was in Angela Jackson's name, "I would go to the teller and get the money out.  How much he would tell me to get out, I would get it."  (*Id.*)  Angela Jackson could not remember how many times she withdrew money from the bank.  (*Id.* at 436.)  She testified that "[i]t was like—we was going to the bank everyday drawing something out."  (*Id.*)  Angela Jackson and Thomas would go to the bank together.  (*Id.*)  She recalled that "[i]t wasn't long" before all the money had been withdrawn.  (*Id.*)  Angela Jackson never put any of her own money into the account.  (*Id.*)

In response to what Thomas spent the money on, Angela Jackson testified that "[h]e was buying like jewelry, rings, necklaces, different stuff like that and then he would buy stuff for the car, to put on the car."  (*Id.*)  "You know how they put like little gold specks or something like that on the car, you know, be fixing it up to look nice."  (*Id.*)  Angela Jackson testified that "[h]e bought necklace and—necklace, rings, and he also had bought our wedding ring."  (*Id.* at 436-37.)  Thomas also bought Angela Jackson "[t]he dresses and the shorts and two tops."  (*Id.* at 437.)  After they separated, Thomas asked for the wedding rings back, and Angela Jackson returned them to him.  (*Id.*)  Thomas made that request "shortly after we had separated."  (*Id.*)

Angela Jackson testified that Thomas "had bought a gun also with the money."  (*Id.*)  She said that "[i]t was like a long shotgun."  (*Id.*)  Angela Jackson did not know the make of the gun.

48

(*Id.*)  She recalled that "[w]e went to a store out in Frayser and he said that we needed a gun for protection for the house because different people is going to try to steal the car because of the type of car that we had."  (*Id.*)  Angela Jackson did not recall how many days after the robbery this had occurred.  (*Id.* at 438.)  The store was a pawn shop.  (*Id.*)  When they got to the pawn shop, Thomas "picked out which gun that he wanted."  (*Id.*)  Angela Jackson testified that Thomas "told me to put the gun in my name because he didn't have any ID or nothing like that."  (*Id.* at 439.)  She testified that "I put it in my name."  (*Id.*)  Angela Jackson recalled that "I had to fill out some papers saying have I ever committed—you know, different questions trying to tell about my background, did I have a felony or anything like that."  (*Id.*)  Angela Jackson had never been convicted of a felony.  (*Id.*)  She paid for the gun with cash that Thomas got out of his pocket.  (*Id.*)  After they left the store, Thomas was carrying the gun.  (*Id.*)  "[H]e put the gun in the car."  (*Id.*)  Angela Jackson testified that she did not touch the gun after it had left the store.  (*Id.* at 439-440.)  When they got back to the apartment, Thomas "put the gun up under the bed," where it remained.  (*Id.* at 440.)

Angela Jackson recalled that Thomas bought shells for the shotgun at K-Mart (*id.*) and that she had seen him fire the shotgun (*id.*).

Before the robbery on April 21, 1997, Thomas "used to always say he had to get that money, he got to get that money."  (*Id.*)  Angela Jackson recalled that "[w]e would be sitting at the house or we will be riding, and he said I got to get that money."  (*Id.*)  She remembered an incident when "[w]e was behind an armored truck and he would say I'm going to get that money."  (*Id.* at 441.)  At the time, Angela Jackson "didn't think none of it, because, you know, I just thought he was talking, I didn't take it seriously or anything."  (*Id.*)

Angela Jackson and Thomas were married on May 7, 1997.  (*Id.*)  They separated "[a]bout the end of June, it was before July."  (*Id.*)  Angela Jackson was asked why they had split up, and she responded:  "Because he was always, you know, in and out, never—he would always spend the night at the house, but he was always just in and out, always had business to take care of, and then one night he didn't come home at all, and that's when we decided to separate."  (*Id.* at 441-42.)  Angela

49

Jackson recalled that, "[t]hat next day, the locks was changed on the door. His mother and I had went to the beauty shop, and when we got back, him and his cousin was sitting outside waiting on me to get there so he can get his things out of the house." (*Id.* at 442.) Angela Jackson had had the locks changed. (*Id.*) She could not remember the name of Thomas' cousin. (*Id.*) Thomas got his things out of Angela Jackson's apartment. (*Id.*) Thomas took the purple Chevy, which Angela Jackson had never driven. (*Id.*) "Later, a man by the name of Russell Carpenter, he came and got the shotgun. Andrew didn't take the gun with [him]." (*Id.*) Carpenter was "[a] friend of Andrew's." (*Id.* at 443.)

Angela Jackson did not remember the month in which she first attempted to get a divorce. She testified that "it was last year when I first had went to Legal Services, I went through first before I needed a lawyer." (*Id.*)

After they separated, Angela Jackson testified that Thomas "called, he used to always come by the house." (*Id.*) She spoke with him. (*Id.*) Thomas "wanted the title to the car." (*Id.*) Angela Jackson recalled that

> [h]e was telling me that he knew that I had the title to the car, to get him the title, I told him I didn't have it, that maybe someone that used to ride with him had got it, you know, out of the car because sometimes we used to keep it in the glove compartment, and he just—he was like he going to have something done to me and my kids and people not know anything about it because he knew a lot of people.

(*Id.* at 443-44.) During that conversation, Thomas "was on the porch." (*Id.* at 444.) According to Angela Jackson, "[h]e had wanted the title, and he told me since I wasn't going to give him the title, that he wanted the rings back, and that's when I gave him the rings." (*Id.*)

After they spent the night in the hotel, Thomas never mentioned the robbery again. (*Id.*) Angela Jackson never mentioned the robbery to Thomas "[b]ecause I was afraid." (*Id.*) She testified that she was afraid the day she testified. (*Id.*) After they separated, Angela Jackson did not go to the police. (*Id.*)

The last time Angela Jackson had spoken to Thomas was "[l]ast year, a little after we had separated . . . ." (*Id.*) She did not recall the last time she had seen Thomas in person. (*Id.* at 444-45.)

In November 1997, Angela Jackson was still living at the apartment at 2335 Pendleton. (*Id.* at 445.) She recalled that "the FBIs had knocked on the door." (*Id.*) "When they came in, first they asked was—did Angie Jackson live here, and I said yes. And they asked me was I her, and I said yes, and they said we need to ask you some questions, and that's when they started asking me did I own the car, the four-door, you know, the purple car." (*Id.*) "I told them that Andrew had asked me to put the car in my name and I did, but he was going to get it changed after he had got his license, and that is when they asked me did I remember anything else." (*Id.*) Angela Jackson told the agents about the robbery. (*Id.*) She gave a signed statement. (*Id.* at 445-46.) Up until that time, Angela Jackson had not told anybody about the robbery "[b]ecause I was afraid." (*Id.* at 446.)

Angela Jackson testified that the agents came to her house on November 4, 1997. (*Id.* at 456.) Deputy Marshal Sanders came to Angela Jackson's house with other agents. (*Id.*) She gave her statement that day. (*Id.*) Angela Jackson identified Thomas in the courtroom. (*Id.* at 457-58.)

On cross-examination, Angela Jackson admitted that she was not at the Walgreens on April 21, 1997 and did not see what happened there. (*Id.* at 459.) She recalled an incident in 1997 in which Thomas told her that she had been cruel to his child, but she did not recall the month in which that had occurred. (*Id.* at 459-60.) She denied that that was the reason Thomas split from her. (*Id.* at 460.)

Angela Jackson conceded that she threw away the envelopes after the robbery. (*Id.*) She admitted that she deposited some of the proceeds in the bank. (*Id.* at 461.) She denied spending any of the proceeds. (*Id.*)

Angela Jackson recalled her testimony that Thomas bought a shotgun after the robbery. (*Id.*) She identified the Form 4473 that she had filled out when she bought the shotgun. (*Id.*) The form said that Angela Jackson was going to be the actual owner of the shotgun. (*Id.* at 462.) Angela Jackson was asked whether she had read the form before she signed it, and she replied, "I'm not for

51

sure if did I read all the questions." (*Id.*) Irby read the certification on the form and the warning that the making of a false statement could result in criminal penalties, and Angela Jackson acknowledged that that statement appeared directly above her signature. (*Id.* at 462-63.) The following exchange occurred:

> Q.     That is your signature on that form?
>
> A.     Yes, it is.
>
> Q.     So you're telling everybody now that you intended to lie on this federal form when you bought the shotgun—when you bought that shotgun, is that what you're telling us?
>
> A.     No.
>
> Q.     It isn't?
>
> A.     No.
>
> Q.     What are you telling us?
>
> A.     I'm saying that I filled the papers out for Andrew, he asked me to do it, and I did it.

(*Id.* at 463.) Angela Jackson denied that she had known she was doing anything wrong. (*Id.*) She explained that "I didn't read the above signed—when I signed it. I just filled it out because he asked me to do it." (*Id.* at 464.) She reiterated that "I said I didn't read the above of my signature, I didn't read that part." (*Id.*)

Angela Jackson denied that she had taken the shotgun to her brother's apartment. (*Id.*)

Angela Jackson acknowledged that she was not yet divorced from Thomas. (*Id.*) Irby asked her why, and she responded: "Because the lawyer, we went to go get the divorce, the lawyer never did give me another court date to come back down for a witness." (*Id.* at 464-65.) Angela Jackson's lawyer was Ed Lenow. (*Id.* at 465.) Her conversations with Lenow occurred in 1998. (*Id.*) In response to how long the matter had been pending, Angela Jackson testified that "[i]t first started last year when I tried to go through Legal Service and it didn't work. That's when Andrew and I both went down." (*Id.*)

Angela Jackson denied that she had a bitter relationship with Thomas, and she denied that she was angry with him. (*Id.* at 465-66.) Angela Jackson was asked whether she had shouted or expressed anger toward Thomas, and she replied, "No, not that I recall." (*Id.* at 466.) She acknowledged that she knew Russell Carpenter. (*Id.*) She also knew Bill Upchurch, who she identified as Thomas' cousin. (*Id.*) She denied telling either of those men that she was going to get Thomas. (*Id.)* Angela Jackson acknowledged that Thomas had accused her of being cruel to his child. (*Id.*) She denied that it was shortly after that incident that Thomas had told her that he didn't want to be with her. (*Id.* at 466-67.)

Angela Jackson denied testifying about who had been carrying the gun when Thomas and Bond arrived at her apartment on April 21, 1997. (*Id.*) Angela Jackson was shown the statement she gave on November 4, 1997. (*Id.* at 467-68.) The handwritten statement was written by Deputy Marshal Sanders and signed by Angela Jackson. (*Id.* at 468.) In that statement, Angela Jackson said that Anthony Bond had the gun when they arrived at her apartment. (*Id.* at 468-69.) Angela Jackson reiterated that she did not remember who had the gun. (*Id.* at 469.)

Angela Jackson testified that there were no problems between her and Thomas other than the incident about his son. (*Id.*) She admitted that, before they were married, she was upset that Thomas went out with other women. (*Id.* at 469-70.) When asked why she had not mentioned that previously, Angela Jackson replied that "they didn't ask me." (*Id.* at 470.) Angela Jackson denied that she was extremely upset. (*Id.*) She testified, "I wasn't screaming and upset, no, but I was upset." (*Id.*) Angela Jackson admitted that she had complained to other people about Thomas' other women. (*Id.* at 470-71.)

Angela Jackson recalled that she missed work on April 21, 1997. (*Id.*) She had called in sick to Hamilton Ryker. (*Id.*) She reiterated that Thomas was with her the morning of April 21, 1997. (*Id.*) Angela Jackson identified Laneel Clinton as Thomas' ex-girlfriend. (*Id.*) She did not recognize the name Dana Wiggins. (*Id.*) She denied that the first time she saw Thomas on August 21, 1997 was mid-afternoon. (*Id.* at 472.)

Angela Jackson denied that Thomas spent the night of April 20, 1997 with Dana Wiggins and that she was very upset. (*Id.*) She denied that she had picked Thomas up at his mother's house the afternoon of April 21, 1997, although she stated that he might have gone by his mother's house "later that evening." (*Id.*) Angela Jackson reaffirmed that Thomas had been with her that afternoon before visiting his mother. (*Id.* at 472-73.)

Angela Jackson and Thomas went to look at the car "[a] little bit between 1:00 and 2:00, I don't know the exact time." (*Id.* at 474.) Thomas and Bond came in after the robbery "after 12:00 because the news was on, it was after 12:00 o'clock." (*Id.* at 474-75.) Angela Jackson acknowledged that it had to have been before 1:00 because that was the time they went shopping for a car. (*Id.* at 475.)

Angela Jackson was not wearing a watch on April 21, 1997. (*Id.* at 476.) The only clock in the apartment was in a back room. (*Id.*) The news was on the television when Thomas arrived, but Angela Jackson did not know whether it was the program that came on at 12:00. (*Id.*) Angela Jackson did not have cable television. (*Id.* at 476-77.) She believed that the local news was on between 12:00 and 12:30. (*Id.* at 477.)

When Thomas and Bond were at her apartment, Angela Jackson saw Bond open his jacket and the envelopes dropped to the floor. (*Id.* at 477-78.) The money was inside the envelopes. (*Id.* at 478.) Angela Jackson did not see a bag or satchel. (*Id.*) Thomas and Bond counted the money. (*Id.*) After the money had been taken out of the envelopes, Angela Jackson balled up the envelopes and put them inside Bond's jacket. (*Id.*) The jacket and envelopes were laying on the floor until Thomas, Angela Jackson, and the children left. (*Id.* at 479.) At that time, Thomas threw away the jacket and envelopes. (*Id.*) Angela Jackson denied throwing anything away. (*Id.*)

Angela Jackson testified that she did not help count the money. (*Id.*) The money was divided between Thomas and Bond. (*Id.*) She thought they had more than $10,000. (*Id.*)

Angela Jackson recalled her testimony that Thomas was wearing shorts. (*Id.*) Irby played the Walgreens videotape for Angela Jackson. (*Id.* at 480.) Angela Jackson denied that the person

depicted in the video was wearing long pants. (*Id.* at 481.) Angela Jackson recalled her testimony that Thomas said he grabbed the guard by the throat. (*Id.* at 483.)

Angela Jackson was asked whether she had refused to turn over the car title to Thomas, and she responded that "I didn't have it." (*Id.*) She denied having destroyed the title. (*Id.*) Angela Jackson denied telling Thomas and other people that she was going to burn the title. (*Id.*) Angela Jackson denied that Thomas' family and friends had loaned him money so he could buy a car. (*Id.*)

Angela Jackson recalled her testimony that Thomas pulled money out of the bank account to fix up the car. (*Id.* at 484.) She recalled testifying that Thomas wanted to put gold flecks on the car. (*Id.*) Angela Jackson did not know whether the car had gold flecks in the paint when it was purchased. (*Id.*) She acknowledged that the car had been customized but insisted that "he did fix it up." (*Id.*)

Angela Jackson recalled her testimony that she spent the night of April 21, 1997 with Thomas in a motel near State Line Road. (*Id.* at 485.) They drove to the motel in the car Thomas had bought. (*Id.*) Angela Jackson did not remember the name of the motel and did not remember the name of the street on which it was located. (*Id.*) She did not know whether the motel was on State Line Road or on some road or street going off from that Road. (*Id.*) She did not remember the color of the motel. (*Id.*)

Angela Jackson denied that she spent the night of April 21, 1997 in a motel with a man named Eric. (*Id.* at 485-86.) Angela Jackson testified that Eric was "the man [she] dated before Andrew." (*Id.* at 486.) Angela Jackson denied that she continued to see Eric while she was with Thomas. (*Id.*) She testified that "I saw him, but I didn't—we didn't communicate with an affair or nothing like that, no." (*Id.*) She did not have a dating relationship with Eric while she was with Thomas. (*Id.*)

Angela Jackson testified that she and Thomas spent the nights of April 21 and April 22, 1997 in the motel. (*Id.*) She paid for the motel with money that Thomas gave her. (*Id.*) At the time, Angela Jackson was working at Hamilton Ryker. (*Id.* at 486-87.) Angela Jackson acknowledged

that Thomas got a job at Wells Lamont "[a]fter the robbery . . . ." (*Id.* at 487.)  She testified that she put money that Thomas had given her in the bank and that, whenever Thomas wanted money, she would go into the bank and make a withdrawal.  (*Id.*)  Angela Jackson would give the money to Thomas "[a]fter [she] came out the door . . . ." (*Id.*)

Angela Jackson denied that she was interested in receiving reward money for her testimony. (*Id.* at 488.)  She denied that she wanted to receive a reward from the armored car company, stating that, "if the FBI had never come to my house, I wouldn't have said a word." (*Id.*)

Angela Jackson recalled her testimony that, at some point, Russell Carpenter had gotten the shotgun from her.  (*Id.*)  She testified that "[i]t was during the night.  It was at nighttime when he came and got it." (*Id.*)  She did not remember the approximate date when this occurred.  (*Id.* at 489.)

Angela Jackson did not know who picked up Bond at her apartment on April 21, 1997.  (*Id.*) "I said he called someone from my house and told them to pick him up.  I don't know who it was." (*Id.*)  Bond had left the apartment, and Angela Jackson did not see who picked him up.  (*Id.*)

Angela Jackson denied that she was testifying because she was out to get Thomas.  (*Id.* at 490.)  She denied threatening to get Thomas.  (*Id.*)  Angela Jackson admitted that she was upset with Thomas because he saw other women.  (*Id.* at 490-91.)  She admitted that Thomas split up with her because he had accused her of being cruel to his child.  (*Id.* at 491.)  She denied that she was testifying because of those things.  (*Id.*)  She admitted that she had learned about the robbery and shooting of Mr. Day on the news and had done nothing for six months.  (*Id.*)  She affirmed that, if the FBI and police had not come to her apartment, she would never have said anything.  (*Id.* at 492.)

On redirect examination, Angela Jackson testified that she did not go to the police because she was afraid of Thomas.  (*Id.*)  According to Angela Jackson, Thomas "had mentioned to me once before that somebody had, you know, took—somebody else had already took the charge, if I ever tried to go tell it, that somebody else had already done it, and he had told me that something could happen to me and my kids because he had knew a lot of people." (*Id.*)  Angela Jackson was

frightened when she heard that Thomas had shot the guard. (*Id.* at 492-93.) Angela Jackson testified that she was under subpoena and that she would rather not be in court. (*Id.* at 493.)

Angela Jackson testified that, after Bond left on April 21, 1997, she and Thomas and her daughters went "[l]ooking for a car." (*Id.*) Angela Jackson recalled that they went to two dealerships before they went to the lot on Elvis Presley where they bought the car. (*Id.*) After they bought the car, "[w]e went home to get clothes, change of clothes and everything, and that's when he said we was going to a hotel." (*Id.* at 493-94.) They checked into a motel and then went to K-Mart. (*Id.* at 494.) They spent the night in the motel. (*Id.*) Angela Jackson testified that she was with Thomas from the time they went shopping for a car through that night. (*Id.*) She did not take note of the time that events occurred during that interval because that information did not matter to her. (*Id.*)

Angela Jackson was asked who had asked who to leave the apartment when she and Thomas separated, and she responded:

> Once—that night when he didn't come to the house, that's when I had the locks changed, and like him and my—him—him—his mother and I was together, we had went to the beauty shop that day, and when we arrived, he was at the house, and she told him to make sure that he had got everything.

(*Id.* at 494-95.)

Angela Jackson testified that she did not spend the proceeds of the robbery. (*Id.* at 495.) She bought the shotgun for Thomas. (*Id.* at 495-96.) According to Angela Jackson, Thomas took the gun out of the store. (*Id.* at 496.)

Angela Jackson testified that Thomas "always wore a cap" when she knew him. (*Id.*)

### 16. Kevin McClain, McClain Motors (November 10, 1998)

The Government called Kelvin McClain, the office manager of McClain Motors, a used car lot. (*Id.* at 498.) McClain was the custodian of the records for the business. (*Id.*) McClain Motors was located at 1505 Elvis Presley. (*Id.* at 499.)

McClain had been asked to bring records pertaining to a car that had been sold to Tanya Monger. (*Id.*) A bill of sale reflected a purchase of a 1990 Chevrolet Caprice by Tanya Monger for $4806. (*Id.* at 500-01.) McClain was not the salesman on that transaction. (*Id.* at 501.) The date of the sale was April 21, 1997. (*Id.*)

### 17. Jason Fleming, First American National Bank (November 10, 1998)

Jason Fleming was the custodian of records for First American National Bank, which had a branch in Memphis. (*Id.* at 503.) Fleming brought records pertaining to an account opened by Angela L. Jackson. (*Id.*) According to the bank records, Angela L. Jackson opened a "personal regular savings account" on or about April 22, 1997. (*Id.* at 505.) Four hundred dollars in cash was deposited on April 22, 1997, and an additional $2000 in cash was deposited on April 23, 1997. (*Id.* at 506.)

Withdrawals from the account had been made in person and through an ATM. (*Id.* at 507.) Fleming testified that there had been a $400 withdrawal on April 24, a $500 withdrawal on April 28, a $300 withdrawal on April 30, and a $300 withdrawal on May 2. (*Id.*) Additional amounts were withdrawn using an ATM machine, so the dates on the bank records may not have matched the actual withdrawal dates. (*Id.*) There were eight additional withdrawals, the last posted on May 27, 1997. (*Id.*) The total amount of money that had been withdrawn was $2400, which was the amount that had been deposited. (*Id.*) Fleming testified that the June 30, 1997 statement showed a balance of $0.58. (*Id.* at 507-08.) The $0.58 was interest from a prior month. (*Id.* at 508.) A service charge took out the interest, and there was not enough money in the account to cover the service charge. (*Id.*) At the time of trial, the account was no longer active. (*Id.*) The bank records reflected that the ATM withdrawals were made at the Whitehaven branch of the bank, at Elvis Presley and Winchester in Memphis. (*Id.* at 509.)

On cross-examination, Fleming admitted that he knew nothing about the facts of the case. (*Id.*)

### 18.    Lajunta Kay Sikes, Auto Additions (November 10, 1998)

Lajunta Kay Sikes testified that, at the time of trial, she was an independent contractor under contract to A.B. Express.  (*Id.* at 511.)  Sikes was responsible for delivering thirty-five millimeter film in her own vehicle.  (*Id.* at 511-12.)  From February 1997 through January 1998, Sikes worked at Auto Additions, which was "a multitude of things, car lot, auto accessories, car wash."  (*Id.* at 512.)  Auto Additions was located at 3350 Elvis Presley.  (*Id.*)  Part of Sikes' job at Auto Additions was to sell cars.  (*Id.*)

Sikes did not remember selling a car on April 21, 1997.  (*Id.*)  After looking at a bill of sale, Sikes recalled that particular sale.  (*Id.* at 512-13.)  Sikes testified that the car was "what they call a box Chevy," meaning "'81 four-door sedan."  (*Id.* at 513.)  The car "was like a hot pink with gold flecks in it, chrome wheels—Washburn wheels on it, rather."  (*Id.* at 513-14.)  It was the only item of its kind on the lot, and it had attracted a lot of lookers.  (*Id.* at 514.)  Sikes remembered selling the car but did not remember the date of the sale.  (*Id.*)  The bill of sale reflected that the sale occurred on April 21, 1997.  (*Id.*)

Sikes was asked what she remembered about the sale, and she replied:

> Basically, like I said, it was a popular car, everyone was coming in to look at it, and by the time this person came in to look at it, I was annoyed because everyone was just coming to look at the vehicle because no one had any money or anything, and I'll admit I talked bad to him when he came in.

(*Id.* at 514-15.)  Sikes clarified that she had "talked bad" to Thomas, who she pointed out in the courtroom.  (*Id.* at 515.)  At the time she sold him the car, Sikes did not know Thomas and did not know of him.  (*Id.*)  She testified as follows:

> After he came in, he said he wanted to see the car, and I told him I wasn't going to show the car anymore because I had too many people coming in and looking at it, they just wanted to start it up, hear the engine and just basically walk away, and I told him the next person that would see that car would have to show cash first.  He was like, well, if I have to show cash, then will I be able to buy the car.  So he showed the cash, we took it on a test drive, came back, and I sold the vehicle.

(*Id.* at 515-16.)  Sikes testified that "I don't know where the cash came from, but I do remember the two of us counting it out after we came back from the test drive."  (*Id.* at 516.)  Sikes did not recall

whether it was a large number of bills.  (*Id.*)  After they counted out the cash Sikes "gave him a drive-out tag and he left."  (*Id.*)

The bill of sale was in the name of Angela Lavette Jackson.  (*Id.*)  Sikes testified that "[h]e just came and in and said he wanted to put it in his girl's name, so I assumed she was a girlfriend, fiancee, wife or whoever."  (*Id.* at 516-17.)  Sikes remembered that a woman was with Thomas but did not remember her face.  (*Id.* at 517.)  The woman did not participate in the negotiations.  (*Id.*)  Sikes spoke to Thomas, and she counted the money with Thomas.  (*Id.*)  Sikes did not recall where Thomas had been carrying the money.  (*Id.*)  They counted the cash in a back office near the cash register.  (*Id.*)  It took "maybe five minutes or so" to count the cash.  (*Id.*)  The cost of the car, including tax, was $3975.  (*Id.* at 518.)  Thomas gave Sikes $3980 and got $5 back in change.  (*Id.*)

The paperwork for the sale would have been filled out the day of the sale.  (*Id.*)  Sikes was asked who filled out the paperwork, and she testified that "I did part and Ms. Jackson did part, and the owner of the lot, John Henry, did part."  (*Id.*)  The records for the sale reflect that the purchase price was paid in cash, and Sikes independently remembered that it was cash.  (*Id.* at 519.)

Thomas drove the car off the lot.  (*Id.*)  It had a drive-out tag.  (*Id.* at 519-20.)  Thomas received a title on April 21, 1997.  (*Id.* at 520.)  At a later date, Thomas called Sikes and asked "[c]ould we get him another [title] and put it in his name because sometime the original title that we gave him was destroyed."  (*Id.*)

On cross-examination, Sikes testified that it "was after lunch, somewhere between 2:00, maybe 3:00 o'clock," when Thomas bought the car.  (*Id.* at 521.)  Sikes was asked whether the woman with Thomas appeared to be sick or healthy, and Sikes responded that, "[a]ctually, I don't remember much about her other than when I handed her the bill of sale and asked her to put her name on it.  I can't remember what she looked like or anything else about her."  (*Id.*)

Sikes testified that the car "was in pretty good condition" when Thomas purchased it.  (*Id.*)  It had been customized.  (*Id.*)  The car already had gold flakes on it when it was sold.  (*Id.* at 522.)  Sikes was not aware of any reason why the car could not have passed inspection when it was sold.

(*Id.*)  She agreed that one of the reasons there were so many lookers for the car was because it had been customized and looked hot.  (*Id.* at 523.)

Sikes recalled her testimony that Thomas later asked her help with a title problem with the car.  (*Id.* at 522.)  She was asked whether the problem arose because Angela Jackson had burned the title or torn it up, and she responded, "I didn't know—I just know it had been destroyed some type of way, I don't know if it was burned or tore up, whatever."  (*Id.*)  Sikes told Thomas "[t]hat it was actually out of our hands, the car did not belong to Auto Additions, it was on consignment, so what I did was give him the pager number of the gentleman that owned the car, to have him contact him."  (*Id.* at 522-23.)  Sikes did not recall that Thomas had ever asked her to rewrite the bill of sale.  (*Id.* at 523.)

Sikes did not notice whether Thomas had any money with him that day other than the $3980 he tendered for the car.  (*Id.* at 523-24.)

### 19.    Tanya Monger (November 10, 1998)

Tanya Monger testified that she was twenty-one years old and unemployed.  (*Id.* at 534.)  Her most recent job was with Methodist Central.  (*Id.*)  Monger had gotten to the twelfth grade in school and lived in Memphis with her father.  (*Id.* at 534-35.)

In April 1997, Bond was Monger's boyfriend.  (*Id.* at 535.)  They "had really just started" dating at that time.  (*Id.*)  Bond was not working at the time.  (*Id.*)  Monger knew Thomas as "Anthony's friend."  (*Id.*)  Thomas' nickname was "Bowleg."  (*Id.*)  Monger recalled that Thomas "used to be with [Bond] when he came around" to her house.  (*Id.* at 535-36.)

Monger testified that, on March 21, 1997, Bond bought a car and put it in her name.  (*Id.* at 536.)  She recalled that Bond "had called me that morning and told me he was going to put a car in my name, and then I didn't believe him, then he came on over with KeKe."  (*Id.*)  KeKe was Keith Echols.  (*Id.*)  Bond came over to Monger's friend Treveous' house "[a]bout 11:00 o'clock."  (*Id.* at 536-37.)  Monger admitted that she did not know exactly what time it was that Bond and Echols came over.  (*Id.* at 537.)  Monger and Treveous, or Tretre, left with Bond and Echols and went to the

mall.  (*Id.*)  Bond pulled out his money from his pocket and asked Monger to hold it for him.  (*Id.* at 537-38.)  Monger recalled that "[i]t was a lot of money.  And he gave me some twenties and hundreds and he gave Tretre all hundred dollar bills."  (*Id.* at 537.)  Monger and Tretre put the money in their pockets.  (*Id.*)  Bond said he was giving the money to Monger and Tretre because "he didn't want nobody to rob him."  (*Id.*)

Monger went to the mall with Bond that day.  (*Id.* at 538.)  After they left the mall, they were going down Elvis Presley Boulevard and he "saw a car, and that's when he bought the Chevy."  (*Id.*)  Bond saw the car at McClain's Auto Parts on Elvis Presley.  (*Id.*)  Echols went in and test drove the car.  Monger and Echols pulled out the money and the salesman took them into a back room.  (*Id.*)  They bought the car, and Echols left to take his brother's truck home.  (*Id.*)  Bond and Monger picked up Echols in the Chevy.  (*Id.*)

Monger signed the papers for the car.  (*Id.* at 538-39.)  The car cost "forty-eight hundred dollars or something."  (*Id.* at 539.)  The money to pay for the car came from Bond.  (*Id.*)  Bond asked Monger to sign the papers because "[h]e said he couldn't get no car in his name, he didn't have no license."  (*Id.*)  Bond kept the car.  (*Id.*)  After purchasing the car, Bond "said he was broke then, but he went back to his mother's house and got some more money."  (*Id.*)  Bond and Monger spent that night in a room that Bond had rented at the Fairfield Inn.  (*Id.*)

Monger identified the bill of sale for the car, which reflected that the Chevy had been purchased on April 21, 1997.  (*Id.* at 540-41.)  She admitted that she was wrong when she testified that the sale had occurred on March 21, 1997.  (*Id.* at 541-42.)  She admitted that she was not really sure about dates and times and that she was sometimes guessing.  (*Id.* at 542.)  The car was "a '90 Chevy Caprice."  (*Id.* at 543.)  Bond later "tore it up."  (*Id.*)

Monger identified Thomas in the courtroom.  (*Id.*)  Monger testified that she did not see Thomas with a firearm "that day."  (*Id.* at 539.)  After April 21, 1997, Monger saw Thomas driving a purple Chevy.  (*Id.* at 544.)

On cross-examination, Monger testified that she had met Bond in November 1996. (*Id.*) She stopped dating Bond "[a]fter he got locked up" on October 21, 1997. (*Id.* at 545.) They dated for about six months beginning in April 1997. (*Id.*) Monger had never been to the home that Thomas shared with Angela Jackson. (*Id.*) She was not at the Walgreens on April 21, 1997 and knew nothing about what happened there that day. (*Id.* at 545-46.)

### 20.     Jerry Sims, MPD Latent Fingerprint Examiner (November 10, 1998)

Jerry Sims testified that he was employed by the MPD as a latent fingerprint examiner assigned to the latent section of the Crime Scene Squad. (*Id.* at 547.) Sims was not a police officer. (*Id.*) His duties as a latent fingerprint examiner were to "compare fragmentary latent lifts against known inked impressions[,] . . . process some items, paper items, metal items chemically to retrieve latent impressions, photographing them and later identify them against known inked impressions." (*Id.*) Sims' examinations were conducted at 475 Klinke Road. (*Id.* at 547-48.) After Sims testified to his training and experience (*id.* at 548-49), the Court accepted Sims as an expert on fingerprint examination (*id.* at 549). The defense had no objection. (*Id.*)

After testifying to the methods employed in fingerprint identification (*id.* at 550-51), Sims identified a fingerprint "lift" that Officer Hulley had turned in to his office (*id.* at 552-53).[7] The lift reflected a print that "came from the right rear door just below the door handle" of a vehicle. (11/10/1998 Trial Tr. 553, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) The known fingerprints of Anthony Bond were compared to the latent print obtained by Officer Hulley. (*Id.* at 556-57.) Sims "identified the latent print as being the right thumb print of Anthony Bond." (*Id.* at 557.) That determination was made on November 3, 1997. (*Id.*)

---

[7]Sims explained that a fingerprint "lift" is obtained "when crime scene officers go out to a crime scene and they will dust an item related to the crime scene and get the prints, and they're turned into our office, we catalog those and then compare them against any known suspects." (*Id.* at 551; *see also supra* p. 36 (Officer Hulley testified that, after dusting for prints, "we just use a transparent, like very similar to scotch tape, but it is a very heavy tape and we'll just lay it across the latent print and lift the print and place it onto the [index] card").)

On cross-examination, Sims testified that he had no statistics on the accuracy of fingerprint comparisons. (*Id.*) He was one hundred percent certain that the print that Officer Hulley obtained matched the known fingerprint of Bond. (*Id.* at 558.) Sims had never been proven to be wrong when he had made an identification with that degree of certainty. (*Id.*)

Sims testified that he "identified several sets of fingerprints from several different people" on the car. (*Id.*) He had been asked to compare Thomas' fingerprints with those found on the car. (*Id.*) The results of the comparison "were negative." (*Id.*) Sims also compared the known fingerprints of Bobby Lee Jackson, Terrance Lawrence, Rodney King, Aramas Caraway, Jackie Shorty, Tim Lewis and Bryant Lewis against the latent prints found on the car. (*Id.* at 559.) Sims concluded that "[t]hey were all negative except for Anthony Bond." (*Id.*) Sims' level of certainty was "[a] hundred percent certain." (*Id.*)

On redirect, Sims testified that he did not find the fingerprints of Bobby Jackson, Terrance Lawrence, or any of the other men he named on the vehicle. (*Id.* at 560.) The only fingerprints that Sims had identified from the vehicle came from Anthony Bond. (*Id.*)

Sims testified that it is possible for someone to touch something and not leave a fingerprint. (*Id.*) If a person touches a surface after washing his hands thoroughly with soap and water, "[y]ou may not get a print." (*Id.* at 560-61.) Other reasons a person may not leave a print after touching something is that "they could have wiped their hands on their pants or shirt, they may just not be one that leaves prints, they may have had a glove on, wouldn't have left a print." (*Id.* at 561.) Sims testified that some people are more prone to leave prints than others. (*Id.*)

Sims identified a copy of a request submitted by Sergeant Kittsmiller to compare the prints of Bobby Lee Jackson and Terrance Lawrence against "latent case number 970398." (*Id.*) Sims did an examination, which was negative. (*Id.*) He signed a report reflecting those results. (*Id.* at 561-62.)

### 21.     Charlie Tittsworth, Loomis, Fargo & Company (November 10, 1998)

Charlie Tittsworth testified that he was employed by Loomis, Fargo & Company as the Division Operational Manager for its South Central Division.  (*Id.* at 563.)  Two years before the trial, Looomis and Wells Fargo merged.  (*Id.*)  At the time of trial, Tittsworth was Acting General Manger in Memphis and was responsible for "oversee[ing] approximately 80 satellite and branch locations in Tennessee, Mississippi, Arkansas, the Florida Panhandle, Alabama, Texas, Oklahoma, and Louisiana.  (*Id.* at 563-64.)  Loomis Fargo operates in all fifty states and Puerto Rico.  (*Id.* at 564.)  The purpose of Tittsworth's testimony was to establish that Loomis Fargo was engaged in interstate commerce and in activity affecting commerce.  (*See id.* at 564-67, 570-71.)

Tittsworth testified about how an armored car robbery affected Loomis Fargo's operations. Loomis Fargo was self-insured, so any losses affected its profitability.  (*Id.* at 567.)  Robberies also dramatically affected employee morale.  (*Id.* at 567-68.)  Loomis Fargo is a time-sensitive business, and a robbery means that "everything pretty much comes to a standstill."  (*Id.* at 568.)  "[P]robably 85 to 90 percent of [its] customers require same day banking, and most of the banks are cut off at 2:00 or 2:30 that we have to make."  (*Id.*)  Loomis Fargo was completely self-insured for workers' compensation costs arising from robberies, and it was also self-insured to $2 million on cargo losses. (*Id.*)  For a cargo loss under $2 million, Loomis Fargo was required to pay the entity from whom it received the goods.  (*Id.*)  Loomis Fargo took responsibility for cargo as soon as it was picked up and signed for.  (*Id.* at 568-59.)

Tittsworth was familiar with records for the robbery of a Loomis Fargo armored truck on April 21, 1997.  (*Id.* at 569.)  The actual loss was "just a little under thirty thousand dollars."  (*Id.*) Tittsworth testified that Loomis Fargo also paid medical and workers' comp expenses for Mr. Day of "just a little over three hundred thousand, and it is still growing."  (*Id.*)

On cross-examination, Tittsworth admitted that he had no direct knowledge of the events of April 21, 1997.  (*Id.* at 571.)

**22.     Deputy United States Marshal Scott Sanders (November 10, 1998)**

The Government called Scott Sanders, who was, at the time, a Deputy United States Marshal ("DUSM").  (*Id.* at 573.)  At the time of trial, Sanders had held that position for approximately thirteen years.  (*Id.*)  DUSM Sanders testified that, for the past two years, he had been assigned to "a multi-agency task force known as the Safe Streets Task Force, which consists of agents from the FBI, detectives from the Memphis Police Department and the Shelby County Sheriff's Office and the U.S. Marshals office, which was designed to investigate specific crimes" in Memphis, including bank robberies and armored car robberies.  (*Id.* at 573-74.)  DUSM Sanders testified that he had been assigned to investigate the Walgreens robbery and was familiar with the surveillance video depicting the robbery.  (*Id.* at 574.)  DUSM Sanders used a videographic printer at the Task Force office to make still frame-by-frame photographs from the videotape for use in the investigation.  (*Id.*)

### Stipulation

The Government introduced a stipulation that, as to Count 3, "[t]he defendant, Andrew L. Thomas, represented by counsel[,] stipulates and admits that he has been convicted in court of a felony, that is a crime punishable by imprisonment for a term exceeding one year, prior to April of 1997."  (*Id.* at 577-78.)

### Defense Witnesses

**23.     Robert E. Fisher, Music Town (November 10, 1998)**

The defense called Robert E. Fisher, the owner of Music Town, a music store located at 4514 Summer Avenue, Suite 9, in Memphis.  (*Id.* at 584.)  His store was at that location on April 21, 1997.  (*Id.*)  Music Town was located in the shopping center with the Walgreens at 4522 Summer.  (*Id.* at 585.)  Robert Fisher's store was located "to the north of the breezeway" in that shopping center.  (*Id.* at 588.)

Robert Fisher was at work on April 21, 1997.  (*Id.* at 590.)  He testified that he was in his store when "[w]e heard a lot of commotion outside and I heard some squealing of tires."  (*Id.*)  He recalled that "[m]y brother had just left to go to lunch."  (*Id.*)  Robert Fisher testified that "I heard

the squealing of the tires. So I walked out the door, and I took about, I don't know, enough steps to get behind that pylon that's right there, there's an open way between that pylon and the store." (*Id.* at 591.) "And when I got there, I looked to my right, I heard a screeching sound, I looked to my right, I saw a light colored white—white car or light grey car stop, and then coming forward, they had tried to make a turn and they couldn't make the turn, so they had stopped, and they were backing up." (*Id.*) Robert Fisher testified that "[i]t was right around lunch time," but he did not recall what time that was. (*Id.*) He was standing beside the breezeway. (*Id.* at 592.) Robert Fisher testified that

> I had walked out. I heard a lot of screeching, I came forward, my brother screaming, yelling, I came out here and I stood here, a car was parked at that time right about like this, and there was other cars parked here, and he had come forward, he had stopped, he was backing up, and when he backed up, then he came around and he went out that way.

(*Id.*) The car "[t]urned to the left." (*Id.*) At the time of the incident, Robert Fisher's brother was farther away. (*Id.* at 593.)

Some policemen came by that afternoon to ask about the incident, and Robert Fisher gave them a description of what he had seen. (*Id.*) He testified that

> I saw a white car stop, I looked in—you could see into the car, it was stopped, looked through the windshield, I saw two male blacks in there. One of them seemed to be shorter than the other. They came on by me. I saw one of them turn and face towards me and look square at me. To be honest with you, all I remember is the eyes because at that time I figured something really big time had happened, and I saw two glaring eyes at me. And they were gone. Basically—it was a very short period of time.

(*Id.* at 594.) Robert Fisher was asked which of the two men appeared to be taller, and he replied: "It was a long time ago. I believe the man driving seemed to be taller, I believe. It has been a long time. It is hard for me to remember. Very few seconds." (*Id.*) Robert Fisher testified that he did not remember anything else about the driver of the car or about the passenger. (*Id.* at 594-95.)

Robert Fisher had been shown some pictures a month or two after the robbery. (*Id.* at 595.) He identified the photo array that the police had shown to him. (*Id.* at 595-96.) Robert Fisher testified that "I was asked can you identify anybody. I told them at the time I couldn't definitely. I could say that one of them looked like the guy that I saw driving." (*Id.* at 597.) Robert Fisher had

signed and dated the photo array. (*Id.*) Robert Fisher testified that he had not seen the person he identified either before or after the date of the robbery. (*Id.*)

Robert Fisher did not see anybody in the courtroom that he recognized from April 21, 1997. (*Id.* at 599.) Thomas was pointed out, and Robert Fisher testified that he did not recognize him. (*Id.* at 599-600.)

After the robbery, Robert Fisher ran through the breezeway and, when he got to the back, the Coca-Cola driver yelled that they had changed cars. (*Id.* at 600.) He saw the white car "halfway down Novarese . . . ." (*Id.* at 601.) Robert Fisher testified that "the car was stopped around the corner, and I saw a young friend of mine driving by, and I told him to not to let anybody touch that car." (*Id.* at 600; *see also id.* at 601 ("a friend of mine, in fact, a guy whose son who owns the tobacco store was driving by in his truck, and I said don't let anybody touch that car, and he said okay").)

On cross-examination, Robert Fisher testified that the officers only showed him photographs. (*Id.* at 601-02.) He never saw any of the suspects in person. (*Id.* at 602.) He was shown the photo array on August 4, 1997, more than three months after the robbery. (*Id.*)

Robert Fisher recalled that he was inside his store, heard a commotion, and ran out. (*Id.* at 602-03.) He saw a white car. (*Id.* at 603.) Robert Fisher recalled that "[t]he first time I saw it, it was stopped." (*Id.*) "And then it was moving fast." (*Id.*) Robert Fisher explained that "[i]t had come to a halt and it was stopped and backed up and then stopped again. That's when I—that's really when I saw it good, and then it turned its wheels hard to the right, barreled on out." (*Id.*) Robert Fisher testified that the entire duration in which he saw the car, "[i]ncluding being stopped and all, I would say under five seconds." (*Id.*) He agreed that it was really moving, tires were squealing, and "I didn't think it was going to make it out of the driveway, actually I thought it would bottom out." (*Id.* at 603-04.)

Robert Fisher agreed that he saw the men in the car for a briefer time than he saw the car itself. (*Id.* at 604.) He noticed the car itself, and then saw the men inside for under five seconds.

(*Id.*)  He never saw the men outside the car standing up.  (*Id.*)  Robert Fisher agreed that he did not really get a good look at the men.  (*Id.*)  He agreed that he was not really telling the jury that the man pictured in position three in the photo array was the driver of the car.  (*Id.*)  He had written on the photo spread that "it looks like the guy driving the car."  (*Id.* at 604-05.)  He agreed that he was not certain at all.  (*Id.* at 605.)  All he knew was that the driver was a young black man and that number three looked more like him than the other individuals who were depicted.  (*Id.*)  Robert Fisher believed he had not been shown any other photographs.  (*Id.*)  Robert Fisher had told the police at the time that he was not certain number three was the driver.  (*Id.*)  He testified:  "No, sir, I never—they asked me if it was definitely, and I said I can't say that."  (*Id.*)

Robert Fisher never really saw the passenger at all.  (*Id.*)  He believed that he would be unable to recognize either the driver or the passenger if he saw them again at trial.  (*Id.*)  He agreed that, as far as he knew, Thomas might have been in the car.  (*Id.* at 605-06.)  He did not get a good enough look to identify anybody.  (*Id.* at 606.)

On redirect, Robert Fisher testified that he was six to eight feet from the car when it went through the breezeway.  (*Id.*)  He also testified that, "[w]hen [the car] went by me, I was looking right in that window."  (*Id.*)  He saw somebody looking back at him.  (*Id.*)  He could not say that Thomas was in the car.  (*Id.*)  Robert Fisher did not believe he had ever seen Thomas before.  (*Id.*)

### 24.    **Dana Wiggins (November 10, 1998)**

Dana Wiggins testified that she lived in Memphis and had been dating Thomas in April 1997.  (*Id.* at 609.)  At the time, Wiggins had two jobs.  During the daytime, she worked for Discount Cellular Paging, a phone company, on Mount Moriah.  (*Id.* at 610.)  At night, Wiggins was a waitress at Tiffany's.  (*Id.*)  At the time of the trial, Wiggins was twenty-three years old.  (*Id.* at 613.)  Wiggins testified that she understood what perjury is.  (*Id.* at 611.)  She explained that "[w]hat perjury is if you lie to the courts, then they will—I mean I could be in trouble for that."  (*Id.*)

Wiggins testified that she had met Thomas in March 1997. (*Id.* at 609.) In response to whether she had met Thomas' family, Wiggins testified that "I met some of his relatives." (*Id.* at 609-10.)

Wiggins testified that she remembered the events of April 20 and 21, 1997. (*Id.* at 610.) According to Wiggins, "April 20th was the day I went and picked Andrew up, and it was the first time[] we had ever spent the night together, and also it was a week after my birthday." (*Id.*)[8] Wiggins testified that she picked Thomas up at around 7:00 p.m. on April 20, 1997, "at I believe it was his mother's house, it was over off of Winchester right by Elvis Presley." (*Id.* at 611.) When Wiggins arrived at Thomas' mother's house, "I pulled out in the street and he was already outside. He got in the car with me and we drove back to my house." (*Id.* at 612.) At the time, Wiggins lived "over on Shelby Drive right by Tchulahoma." (*Id.*) It took about fifteen minutes to get to Wiggins' house from Thomas' mother's house. (*Id.*)

Wiggins testified that, after they got to her house, "we just went inside and we watched TV, and that was about it. We stayed the night there." (*Id.*) Thomas was at Wiggins' house on the morning of April 21, 1997, and she testified that "[h]e stayed until I took him back home, so it was around—we left my house, I guess, about a little bit after 2:00 because we got to his mom's around 2:30" in the afternoon. (*Id.* at 612-13.) Wiggins testified that she and Thomas did not go out to eat the evening of April 20. (*Id.*) "Once we got to my house on the 20th, we didn't leave, until the 21st." (*Id.*) Wiggins did not ever leave Thomas alone in her home during that time, and Thomas did not ever leave. (*Id.*) Wiggins and Thomas were continuously together from 7:00 p.m. on April 20, 1997 until about 2:30 p.m. on April 21, 1997. (*Id.*)

Wiggins testified that, the afternoon of April 21, 1997, she and Thomas left in her car. (*Id.* at 614.) "I drove straight down Shelby Drive . . . until I got out to Airways and I just went down on Airways to Winchester and then Winchester to Elvis Presley on Rosita Circle." (*Id.*) Wiggins did

---

[8]Wiggins testified that her birthday was not April 13, one week prior to April 20. (*Id.*) Her birthday "was April 11, it was about a week after." (*Id.*)

not pull into the driveway at Thomas' mother's house. (*Id.*) "I think I pulled in right at the edge of the driveway because it is a long driveway." (*Id.*) Thomas "got out of the car and walked up the driveway." (*Id.*)

Wiggins knew that Thomas had a girlfriend at the time. (*Id.*) In response to whether she knew the name Angela Jackson, Wiggins testified that "I've never met her, but I know that was the girl he was seeing." (*Id.* at 616.)

Wiggins testified that she had given Thomas $1000 on April 21, 1997. (*Id.* at 614-15.) At the time, Wiggins and Thomas were at her house. (*Id.* at 615.) Wiggins gave Thomas the money "[b]ecause I knew he was wanting to get this car and I knew that some of his relatives and, you know, his mom were loaning him money, and he asked me would I loan him money." (*Id.*)

Wiggins testified that she knew Thomas purchased a car on April 21, 1997 because "he came by and showed it to me." (*Id.*) "It was a pink—like a light pink four-door Chevy and it had some rims on it, some real shiny rims." (*Id.*) The rims had been customized. (*Id.*) Wiggins had ridden in the car with Thomas "[a] couple of times." (*Id.*)

Wiggins and Thomas were still dating at the time of the trial. (*Id.* at 615-16.) She testified that she had never seen Thomas with a gun. (*Id.* at 616.)

On cross-examination, Wiggins testified that she was Thomas' girlfriend. (*Id.* at 617.) She denied that they had had an intimate relationship, but agreed that they spent nights together, including the night of April 20, 1997. (*Id.* at 617-18.) Wiggins was asked whether that was pretty intimate, and she responded, "Well, I mean nothing happened." (*Id.* at 618.) Wiggins testified that "I care a lot for [Thomas]. I do love him, yeah." (*Id.*) She reiterated that she was Thomas' girlfriend. (*Id.*)

Wiggins first met Thomas around March 1, 1997. (*Id.*) She recalled that "I was riding down Winchester right by Tchulahoma and he was riding in another car next to me, and we stopped at the red light, and that's how we met." (*Id.*)

Wiggins insisted that Thomas had been with her on April 21, 1997 until about 2:30 or 3:00 p.m. (*Id.* at 618-19.) She reiterated that they had never left the house until she took Thomas home

about 2:30 p.m. (*Id.* at 619.) She understood that Thomas had been charged with a serious crime that happened on April 21, 1997, and that she was Thomas' alibi. (*Id.* at 619-20.) She understood what an alibi was. (*Id.*) Wiggins understood that Thomas had been charged with the robbery of a Loomis Fargo truck in which a guard had been shot. (*Id.* at 620.)

Wiggins believed she learned about the charges against Thomas in September 1997 or "whenever he got picked up for them." (*Id.*) At that point, the following exchange occurred:

> Q. Okay. Whenever he got picked up back in the fall of '97, you knew that he was in trouble with these charges, too?
>
> A. Well, no, I mean whenever he told me, I don't remember the exact date.

(*Id.* at 621.) Wiggins affirmed that Thomas had told her that he was facing charges in this case. (*Id.*)

Wiggins testified that Thomas did not tell her that the date of the crime was April 21, 1997, and she could not explain where she had obtained that information. (*Id.* at 621-22.) Wiggins learned about the Walgreens robbery when she saw it on the evening news. (*Id.* at 622.) She heard on the news that the robbery had occurred at approximately 12:50 p.m. (*Id.*) Wiggins denied that she remembered what she had seen on the news later that year when Thomas told her he had been charged: "No, he told me the date that they're saying that he did it, and I was with him, because it was a week after my birthday, plus it was the first night that we had spent the night together." (*Id.* at 622-23.) Wiggins then agreed that Thomas had told her the date of the crime. (*Id.* at 623.)

At the time of the trial, Wiggins was not employed. (*Id.*) She was testifying pursuant to a subpoena. (*Id.*) The last job she had held was at Powertel. (*Id.*) Wiggins affirmed that, in April 1997, she worked at Tiffany's and at Discount Cellular and Paging. (*Id.*) Wiggins testified that her job at Tiffany's was waitress. She denied that she was also a dancer. (*Id.*)

Wiggins understood that, if she was telling the truth, Thomas was innocent of the crimes with which he had been charged. (*Id.* at 623-24.) She reiterated that she had learned of the charges in the Fall of 1997. (*Id.* at 624.) She knew that Thomas had been in jail since October 1997. (*Id.*) Wiggins agreed that she had waited until the trial to come forward with her story. (*Id.*) She did not

call the FBI, the MPD, the U.S. Attorney's office or the district attorney's office. (*Id.* at 624-25.) Wiggins was asked why she had let Thomas sit in jail all that time, and she responded that "I thought you had to wait until you go to court." (*Id.* at 625.)

Wiggins agreed that she had visited Thomas at the Shelby County Jail. (*Id.* at 625-26.) She had last worked about two months before the trial. (*Id.* at 626.) Wiggins did not recall whether she had visited Thomas at the Jail on October 12, 1998, but she testified that "I go down there and see him all the time." (*Id.* at 627.) She agreed that she had visited Thomas in October 1998. (*Id.*) In response to whether she had talked to Thomas about his case, Wiggins testified that "I mean we talked, you know, off and on about it, of course." (*Id.* at 627-28.)

Wiggins did not deny that she might have visited Thomas on October 26, 1998. She testified that "I try to go to see him every visit day he gets. I don't look at the dates before I leave." (*Id.* at 628.) Wiggins agreed that she came to a hearing in federal court in the case the morning of October 26, 1998, and she denied that she went to the Jail that afternoon to see Thomas. (*Id.* at 628-29.) Wiggins denied knowing that October 26, 1998 was an important date in the case. (*Id.* at 629.) She explained that "[w]e were sitting all the way in the back" and "I didn't hear anything of what was going on." (*Id.*) She denied hearing that a trial date had been set at that report date. (*Id.*) At that point, Wiggins testified that "I don't think that was the day I was here." (*Id.*; *see also id.* at 630 ("But I don't think it was October the 26th, because today is November the 10th. No, it wasn't.").) Wiggins testified that she was in the courtroom "I would say about a month ago. I don't remember the exact date." (*Id.* at 630.)

Wiggins testified that she did not know how many times she had talked to Thomas about his case. "I mean I don't know the exact amount of times. I mean we just talk about it off and on when I talk to him." (*Id.*) Wiggins was asked whether, in addition to visiting Thomas at the Jail, she also attended his court appearances. She responded that "I came down here and spoke with his attorney, yes, but I didn't see Andrew, no." (*Id.*) Wiggins agreed that she was in a magistrate judge's courtroom on August 18, 1998. (*Id.*) Wiggins recalled that both Thomas and "his charge partner"

were in court that day.  (*Id.*)  Wiggins agreed that she had also been in the courthouse the Thursday or Friday of the previous week sitting on a bench talking to Irby.  (*Id.* at 631.)  They were discussing the case.  (*Id.*)

Wiggins reaffirmed that she was with Thomas from the evening of April 20, 1997 through April 21, 1997.  (*Id.* at 631-32.)  She was definitely with Thomas between noon and 1:00 p.m. on April 21, 1997.  (*Id.* at 632.)  She recalled that April 21, 1997, was a Monday.  (*Id.*)  She insisted that, a year and a half later, she knew exactly where she was on April 21, 1997.  (*Id.*)  The next day, April 22, 1997, Wiggins was at work from noon to 1:00.  (*Id.* at 632-33.)  She was with her boss, whose name was Rubin, and two co-workers.  (*Id.* at 633.)  The next Monday, April 28, 1997, Wiggins was at work between noon and 1:00 with the same people.  (*Id.*)  On Monday, April 14, 1997, Wiggins was at work.  (*Id.*)  On April 21, 1998, Wiggins believed she was in New Orleans with her father.  (*Id.* at 633-34.)

Wiggins was asked about other dates that she had spent the night with Thomas, and she responded that "I spent the night with him like May the 6th."  (*Id.* at 634.)  Wiggins testified that "I have it written down in a calendar.  A lot of women do that, they write stuff down when it is important to them."  (*Id.*)  Wiggins could not testify to any other dates she had spent the night with Thomas without looking at her calendar.  (*Id.*)  She did not know the dates offhand "because those dates weren't important to me."  (*Id.*)  Wiggins did not know the exact number, but believed she spent "about ten" nights with Thomas.  (*Id.* at 634-35.)  She then clarified that "it is not that many. I would say about six or seven."  (*Id.* at 635.)

Wiggins was asked who else might have see her and Thomas together on April 21, 1997, and she replied:  "[N]o one.  I mean I live by myself."  (*Id.*)  They were in Wiggins' house alone.  (*Id.* at 635-36.)  After Wiggins dropped Thomas off at his mother's house at 2:30 or 3:00 p.m. on April 21, 1997, the next time she saw him was 7:00 or 8:00 that evening.  (*Id.* at 636.)

Wiggins recalled her testimony that she had given Thomas $1000 in cash to buy a car.  (*Id.*) She did not have a receipt for the withdrawal from her bank.  Wiggins testified that "I didn't have

a bank receipt.  I make cash, I'm a waitress."  (*Id.*)  In response to whether she had that amount of cash lying around, she testified that "I mean when you save it, you come home and you put it up." (*Id.* at 637.)  She insisted that she had given Thomas $1000 in cash that she had earned as a waitress. (*Id.*)  Wiggins did not go with Thomas to buy the car that she was partially paying for, and she did not put the car in her name.  (*Id.*)

Wiggins denied that she was lying about being with Thomas on April 21, 1997.  (*Id.*)  She insisted that "I am telling the truth."  (*Id.*)  She denied that Thomas had asked her to lie for him: "No, he has not.  Why would I lie and get myself in trouble?"  (*Id.*)  She insisted that "I'm his girlfriend but I'm not going to lie for him and go to jail for it."  (*Id.* at 638.)  Wiggins reiterated that "I was with him the whole entire time."  (*Id.*)

At the Court's request, Wiggins was asked what kind of car she drove.  She testified that she had "a 94 Honda Prelude."  (*Id.*)  "It was white with tinted windows."  (*Id.*)

On redirect, Wiggins testified that she earned $32,000 in 1997 from Discount Cellular.  (*Id.* at 639.)  She got the waitressing job "[j]ust so I would have a lot of money."  (*Id.*)  Wiggins testified that, "[p]er evening, I could make anywhere from a hundred dollars to three hundred dollars" in tips. (*Id.*)  She was careful with her money and saved a lot.  (*Id.*)

Wiggins did not plan to remain unemployed.  (*Id.*)  She expected to start a job with Sprint when the trial concluded.  (*Id.* at 639-40.)  Wiggins was a high school graduate who had completed one year of college.  (*Id.* at 640.)  She had been employed pretty much continuously from the time she left college.  (*Id.*)

Wiggins was asked why she remembered April 20 and 21, 1997 so clearly, and she replied:

> Why do I remember them?  It was the first night we had ever spent the night together, and we had just met in March and, you know, we had just started getting close, but I mean, like I said, women always write stuff down when it is important to them.

(*Id.* at 640-41.)  Throughout her life, it had been Wiggins' habit to write things down on a calendar or diary.  (*Id.* at 641.)  She did not bring her calendar or diary to court.  (*Id.*)  Wiggins was able to

75

remember May 6, 1997, "[b]ecause it was the day after [her] stepbrother's birthday." (*Id.*) She remembered her trip to New Orleans with her father "[b]ecause it is the first time I had ever been to New Orleans." (*Id.* at 641-42.)

Wiggins testified that she was not in the habit of giving $1000 to men. (*Id.* at 642.) She insisted that her testimony was true. (*Id.*)

### 25. Louella Barber, Thomas' mother (November 10, 1998)

Louella Barber testified that she lived in the Whitehaven section of Memphis and was Thomas' mother. (*Id.* at 647.) At the time of trial, Barber was employed by the Shelby Training Center, where she had worked since January 1995. (*Id.* at 648-49.)

In April 1997, Thomas was living with Barber. (*Id.* at 647.) Angela Jackson was Thomas' wife. (*Id.* at 647-48.) Barber testified that Thomas and Angela Jackson were married in April 1997, "but I can't think of the date." (*Id.* at 648.)

Barber testified that she had given Thomas $2000 in cash because "[h]e needed an apartment and he needed transportation for a job." (*Id.*)

Barber testified that she remembered the dates of April 20 and 21, 1997. (*Id.* at 649.) She remembered those dates

> [b]ecause I remember that was the evening Andrew came home, and when he came home that evening, he left back out and he didn't get back in until later on the next evening, but I had just arrived home from my job because I get off at 2:00 and I got home about 2:20 and Andrew was there about 2:30.

(*Id.*) Barber recalled that "I gave [Thomas] the money the day before," which was why she remembered the dates. (*Id.*)

Barber testified that she recognized the name Dana Wiggins and that "she is Andrew's supposedly fiancee now." (*Id.*) Thomas had been seeing Wiggins in April 1997. (*Id.* at 649-50.)

According to Barber, Thomas had bought a car on April 20, 1997. (*Id.* at 650.) She also testified that, "[t]hat evening, Dana picked him up, and then the next day she brought him back." (*Id.*) In response to what she remembered about April 20, 1997, Barber testified that "April 20 was

the day that he came back, because he left that evening about—the evening before about 6:00 o'clock, and I had just got in from work about 2:20. He came in about 2:30" in the afternoon. (*Id.* at 651.) The Court asked what had happened the rest of the day, and Barber responded that "[a]ll I know is they came home. When he came home, he came in and took a bath and changed clothes, and he left and when he came back, he had purchased a car." (*Id.*) Barber believed that this occurred on April 20, 1997, but stated that she was not certain about that date. (*Id.*) She agreed that it had been a good while ago. (*Id.*)

Barber testified that Thomas had brought the car home. (*Id.* at 651-52.) In response to what kind of car was it, Barber responded that "I'm not expert on cars. All I know it was a purple like car." (*Id.* at 652.) "But it was an old, old model car." (*Id.*)

Barber had given Thomas the money as a gift. (*Id.*) "I had already given him that money because I was looking for an apartment and a car for him in the Shoppers News, and after I didn't find anything, he told me that he would." (*Id.*) In response to when she got the money to give to her son, Barber testified that "I keep money there at home, sir. When I get paid, I know I'm going to do something for my children, I keep it there." (*Id.* at 652-53.) Barber testified that "I don't deal with banks period. I only deal with the Credit Union." (*Id.* at 653.) In response to whether she deposited her checks with the credit union, Barber replied that "I only deposit what I need in there." (*Id.*)

Barber reiterated that "I gave Andrew the money the day before he purchased the car." (*Id.*) In response to the denominations that she had given him, Barber testified that "I know I gave him some fifties and some twenties." (*Id.*) She also testified that "[i]t may have been some hundreds in there. I'm not sure, but I know that I gave him two thousand dollars because I had been saving it up." (*Id.*) Barber was asked whether the $2000 was all the money she had saved up, and she replied: "Well, that was just for him to find him an apartment with and to give him some type of transportation, so he will be able to go back and forward and get a job." (*Id.* at 653-54.)

In response to what made her remember the date, Barber testified as follows:

> That was the day when he bought that—when he brought that car home, I didn't like it, because I told him, I told you to go and find you some cheaper car, look in the Shopper News and try to find you a small car, for about eight or nine hundred dollars or somewhere around seven, and you will be able to find you an apartment.

(*Id.* at 654.) Barber testified that, when she saw the car, "I became angry." (*Id.* at 655.) "Because I wanted to know what had happened to the money, and I knew he had to use that money to purchase that car, and I know he did not have an apartment." (*Id.*) The car was "high level, the color, like purple." (*Id.*) Barber's objection was that "[h]e didn't follow my rules and regulations about the money that I gave him." (*Id.*)

In response to what day Thomas came home with the car, Barber testified that "[i]t had to have been around the 20th or 21st, it was one of the days up in there because I gave him the money one day. If I make a mistake, it was April the 20th." (*Id.* at 656.) Barber recalled that "Dana picked him up the day before, that evening." (*Id.*) "It had to have been between 5:30 and 6:00." (*Id.*) Thomas came back on a Monday at about 2:30. (*Id.*) She usually got home from work at 2:20 and Thomas came in about 2:30. (*Id.*) Barber was asked exactly when Thomas brought the car home to her, and she replied:

> All I can say, sir, is Andrew purchased that car and he came through that evening with it, and there was a misunderstanding between us, because I felt like he used the money for the wrong thing. I told him to get a small car and to find—and to search for an apartment. And I didn't see him having no apartment with that kind of car.

(*Id.* at 656-57.) Barber testified that she never saw Thomas with a gun. (*Id.* at 657.)

On cross-examination, Barber affirmed that she was Thomas' mother. (*Id.*) At the time of trial, he was "25, going on 26." (*Id.*) Barber knew that Thomas had been married to Angela Jackson. (*Id.*) In response to whether they were still married, Barber testified that, "[f]rom what I understand, he has been in jail and she has got a divorce." (*Id.*) Barber testified that there was no question that Thomas and Angela Jackson had been married. (*Id.* at 658.) Barber did not know the date on which Thomas and Angela Jackson had gotten married. (*Id.*)

78

Barber knew that Thomas had lived with Angela Jackson in her apartment on Pendleton. (*Id.*) Barber knew that Angela Jackson had a little red car, and she admitted that she "[s]ometimes" saw Thomas driving it. (*Id.*) Barber denied that Thomas used to drive that car all the time. (*Id.*) She admitted that Thomas did not have a car in April 1997. (*Id.* at 658-69.) In response to whether Thomas had had a job in April 1997, Barber testified that "[h]e was working for a temporary service." (*Id.* at 659.) Thomas did not have a job in February 1997. (*Id.*) In response to whether Thomas badly wanted a car, Barber replied that "I wanted him to have one, sir, because he needed a job." (*Id.*)

Barber reaffirmed that she had given Thomas $2000 in cash. (*Id.*) She insisted that "[t]hat's my working money, sir. I work for that money everyday." (*Id.*) She was not paid in cash. (*Id.* at 659, 660.) In response to where she had gotten the cash, Barber replied that, "[f]irst of all, I works, sir, and I have a right to put my money where I would like to place it." (*Id.* at 660.) The $2000 "was my money that I got out of my check, and if you want to go on further with it, I won money at the casinos." (*Id.*) Barber was not claiming that she won $2000 at the casino, but she reiterated that "I said I won money at the casino." (*Id.*) Barber had no record of how much money she had won at the casinos. She testified that "I won there several times, but it was not enough to get no slip." (*Id.*) Barber was asked whether she had $2000 lying around her house, and she replied: "There are things that I want to do for my children, sir, I will keep it at my house. I don't need to write a check for that." (*Id.* at 660-61.) Barber reiterated that she did not have a bank account. (*Id.* at 661.)

Barber testified that, in April 1997, she made more than $800 every two weeks. (*Id.*) She did not put the money she gave to Thomas on her tax return. (*Id.*) In response to whether she had a single record to document where she got the money, Barber replied, "All I can tell you is that I work everyday, sir." (*Id.*)

Barber had seen Thomas driving the car he bought in April 1997. (*Id.*) She was asked whether she knew that the car was not in Thomas' name, and she replied that "I never even

questioned that." (*Id.*) Barber admitted that the car was parked in her driveway when Thomas was arrested and that it was not in her name. (*Id.*)

Barber was asked whether she remembered Thomas coming home on April 20, 1997 because it was a special occasion. She responded that "I never said what it was, sir, he just came in there, and then in the evening he left out." (*Id.*) In response to all the other times Thomas had come home and then left, Barber replied: "Well, it is just that he's my son, sir, and he comes in whenever he gets ready." (*Id.*) She agreed that Thomas came and went a lot. (*Id.* at 663.) Barber insisted that she remembered that particular date: "I remember that date, sir, because that car, I couldn't stand it, and I knew he had used my money that I gave him, for one thing, and he used it for something else." (*Id.*) Barber denied that the occasions when Thomas came and went at night were pretty special. She testified that "Andrew is grown, sir." (*Id.*)

Barber denied that she had visited Thomas at the Jail. (*Id.*) She understood that the Jail kept records of visitors. (*Id.*) She testified that "I have only visited him once, but not now." (*Id.*; *see also id.* at 663-64 (same).) Barber testified that the last time she visited Thomas "had to have been over a year ago." (*Id.* at 664.) Barber denied that she had visited Thomas on October 26, 1997. (*Id.*)

Barber denied that she had talked to her son about the case. (*Id.*) Thomas would telephone Barber but did not talk about the case. (*Id.*) Barber knew to appear in court because she had been subpoenaed. (*Id.*) Barber understood that Thomas had been charged with a serious crime, and she did not want him to get in any trouble. (*Id.*) Barber was asked whether she did not want to see him get into trouble as a result of this case, and she replied: "Especially when he has not done anything." (*Id.* at 665.)

On redirect, Barber testified that perjury is lying under oath. (*Id.*) She insisted that her testimony was the truth. (*Id.*)

### 26. William Upchurch (November 10, 1998)

William Upchurch testified that he lived in Memphis and worked at the High Point Pinch in food service. (*Id.* at 668.) At the time of trial, he was thirty-one years old. (*Id.* at 670.) Upchurch

was Thomas' cousin, and he and Thomas were close. (*Id.* at 669.) Upchurch testified that he gave Thomas $500 in February 1997 to help him out. (*Id.*) In response to whether that was all the money he had given Thomas, Upchurch testified, "No, I gave him money before. That's all I gave him then, you know, but I'm just saying, you know, that's my cousin and our family, we're close, we look out for each other." (*Id.*)

Upchurch had known Angela Jackson all his life because "our family knew her family." (*Id.* at 669-70.) Upchurch testified that he had heard Angela Jackson threaten Thomas. (*Id.* at 670.) According to Upchurch, "I went to her to try to obtain the title [to the purple Chevy] to keep him from going through some altercations, and she told me that she won't give him nothing and that she was going to burn it up." (*Id.*) Upchurch took that to mean that Angela Jackson intended to burn the car title. (*Id.*) This incident occurred after Thomas and Angela Jackson "broke up and she had animosity against him." (*Id.* at 670-71.) At the time, Angela Jackson seemed angry and "[h]er emotions was to pay him back." (*Id.* at 671.) In response to whether Angela Jackson had said anything else at the time, Upchurch testified: "No, she told me herself out of her own mouth that she won't give him the title and that she had burnt them up." (*Id.*) Upchurch elaborated:

> I talked to her about—I know about three times about it, you know, because I thought she was telling me a story about it, so, you know, I kept on trying to, you know, keep him from going through some changes where somebody would have got hurt or anything, so I kept on after her, she kept telling me he ain't getting them and she burnt them up, that's what she told me.

(*Id.*) Upchurch believed that Angela Jackson

> was mad about the fact that she had got married and they had broke up, and so like I told her, people go through things, sometimes y'all got to see what goes on. She shouldn't have been that mad at him, you know, about that, because life goes on. He don't want her, he didn't want her. It could have been her, if she didn't want him, she didn't want him, but some people take it a little further.

(*Id.* at 671-72.)

On cross-examination, Upchurch testified that he was Thomas' cousin, that they were good friends and that they were very close. (*Id.* at 672.) Upchurch had testified on direct examination that he had given Thomas $500 in 1997. (*Id.*) The money was in cash. (*Id.* at 672-73.) Upchurch

testified that the money was his and he had earned it by working.  (*Id.* at 673.)  At the time he gave the money to Thomas, Upchurch did not work at the High Point Pinch.  (*Id.*)  Upchurch was paid by check at the job he held at that time, and he cashed his paycheck at a liquor store.  (*Id.*)  Upchurch claimed to have check stubs at home to document his income.  (*Id.*)  He had no written record that he had given Thomas money.  Upchurch explained that "I don't feel like I should.  He is my cousin.  If he is my cousin, I can give it to who I want to."  (*Id.*)  Upchurch insisted that "I gave him money."  (*Id.*)

Upchurch admitted that he had previously been convicted of a felony.  (*Id.* at 674.)  In 1995, he was convicted of receiving stolen property.  (*Id.*)  He also had a burglary conviction.  (*Id.*)  In 1986, Upchurch was convicted of robbery and was sentenced to five years.  (*Id.*)  In 1990, Upchurch was convicted of robbery a second time and was sentenced to four years.  (*Id.* at 674-75.)  In 1992, Upchurch was convicted of theft.  (*Id.* at 675.)

### 27.    Eugene L. Miller, Private Investigator (November 10, 1998)

Eugene L. Milner testified that he was a private investigator employed by Investigations Unlimited.  (*Id.* at 677.)  He functioned as an investigator on this case on behalf of the defense.  (*Id.*)  Investigations Unlimited had been in business under that name since 1978.  (*Id.* at 678.)  Milner had been employed by the company for five years.  (*Id.*)  Milner had previously worked for the MPD for twenty-five years.  (*Id.*)  When he retired, he was in the homicide squad, where he had worked for five years.  (*Id.*)  He previously had been assigned as a crime scene coordinator, a court coordinator, a dispatcher in communications, and to uniform patrol.  (*Id.* at 678-79.)  Milner spent four years in uniform patrol and three to four years as a crime scene investigator.  (*Id.* at 678.)  After he retired from the MPD, Milner worked for the Marshals Service for two years as a court security officer in Memphis.  (*Id.* at 679.)

Milner testified that, as part of his duties, he had been instructed to drive the most direct route from the Walgreens on Summer Avenue just west of Perkins to 2335 Pendleton.  (*Id.*)  Milner drove that route twice beginning at approximately 1:00 or 1:15 p.m.  (*Id.*)  The first time, the drive took

twenty-one minutes.  (*Id.*)  The route took seventeen minutes the second time.  (*Id.*)  Milner described the routes he took and the speeds at which he was driving.  (*See id.* at 680-81.)  The cross-examination addressed an alternate route that could have been taken.  (*See id.* at 682-83.)

### 28.  Russell Carpenter (November 12, 1998)

Russell Carpenter testified that he worked at the Hopefield Healthcare Center.  (11/12/1998 Trial Tr. 7, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 103.)  At the time of trial, he had known Thomas for "[e]ight to nine years."  (*Id.* at 7-8.)  Carpenter had given Thomas money in March or April of 1997.  (*Id.* at 8.)  He testified that "[p]ractically I've helped him out every since I've known him."  (*Id.*)  Carpenter knew Angela Jackson "[v]aguely."  (*Id.*)  Thomas had lived with Carpenter "[l]ast year—March, when he was released from prison."  (*Id.*)  Carpenter clarified that Thomas had been released on February 24 and "[h]e came to me about the first of March until about the 20-something of March of '97.  That was the first time."  (*Id.* at 10.)  During that time, Thomas had also lived with "Angela Jackson, his wife."  (*Id.* at 8.)  Thomas and Angela Jackson lived together "I think like March to like April of last year."  (*Id.*)  When asked when Thomas had lived with Carpenter, Carpenter responded, "Released from prison up until about March.  He got married in March and broke up in April and moved back [with Carpenter] in April of '97."  (*Id.* at 9.)

In response to whether he had ever witnessed Angela Jackson angry over the break up, Carpenter testified that "[h]e come in about five o'clock that morning that he didn't come home, and she thinks he was with another woman."  (*Id.*)  According to Carpenter, "[s]he was quite upset."  (*Id.*)  He testified that "I can't remember the whole conversation, but she was upset, and she say he's going to get what he got coming to him, something to that effect."  (*Id.*)

When Thomas moved in with Carpenter, he brought "[c]lothing, shoes, video tapes, CD's and cassettes."  (*Id.* at 15.)  He brought "[b]asically the same thing" when he moved in the second time."  (*Id.*)  Carpenter was asked whether Angela Jackson had ever come over to where he lived, and he responded, "A couple of times but she didn't come in.  She sat in the car and waited on"

Thomas.  (*Id.* at 16.)  In response to whether he had ever visited Angela Jackson's apartment, Carpenter replied, "A couple of times I dropped Andrew off and kept going."  (*Id.*)  Carpenter was in Angela Jackson's apartment "[o]ne time and no more than the living room."  (*Id.*)  He recalled that "I was in the area and I think I brought a plate back from his mom's house and dropped it off over to him."  (*Id.*)

Carpenter had last spoken to Angela Jackson "[p]robably last year sometime."  (*Id.*)  At the time, "[s]he was asking a lot of questions pertaining to Andrew.  That's when she told me he had been put in jail.  I didn't know he was in jail."  (*Id.* at 17.)  Carpenter clarified that "[s]he called me by telephone.  She said, 'I know your friend is in jail.  I really don't know but I'm so glad he's there.'  That's her exact words to me."  (*Id.*)  Carpenter said that conversation "[h]ad to be last year."  (*Id.*)  The last time he saw Thomas was July 4, 1997.  (*Id.* at 18.)

In response to whether anyone had visited Thomas while he lived with him, Carpenter stated, "Like I said, she came there a couple of times.  She sat in the car with him, dropped him off, and that was basically it.  They had a couple friends that came by, his cousins."  (*Id.* at 18.)  Thomas' cousin was named "Bill, Jr."  (*Id.*)

On cross examination, Carpenter admitted that he was good friends with Thomas and had known him for a long time.  (*Id.* at 18-19.)  He denied that he had visited Thomas while he was in prison.  (*Id.* at 19.)  Carpenter knew that Thomas was married to Angela Jackson and that they were living together in April and May of 1997.  (*Id.*)  They were living in Angela Jackson's apartment on Pendleton.  (*Id.* at 19-20.)  Carpenter knew where the apartment was.  (*Id.* at 20.)

Carpenter testified that he gave Thomas money in March and April of 1997.  (*Id.*)  At the time, Carpenter was working two full-time jobs.  (*Id.*)  He gave Thomas cash and did not recall the exact dates he gave Thomas money.  (*Id.*)  In response to whether he had given Thomas $500, Carpenter replied, "It totalled that.  Might have been more.  I gave him money every two weeks when I got paid."  (*Id.* at 20-21.)  Carpenter had no records showing when he gave Thomas money.  (*Id.* at 22.)

Carpenter lived in a house at 842 Kipling, near Highland and Summer. (*Id.*) He lived alone. (*Id.* at 21-22.) When asked how he knew where Thomas had lived in April and May of 1997, Carpenter responded: "Because he stayed—like I say, he stayed with me for a short period of time. He got married to Angela. We still had contact. He was calling me from her house. I spoke with her a couple of times over the phone from there and he was living there." (*Id.* at 21.) At the time, Thomas did not have a car, a job, or any money of his own. (*Id.* at 22.)

Carpenter admitted that he had previously been convicted of credit card fraud. (*Id.*) He did not want to see Thomas get in any trouble in this case. (*Id.*)

On redirect, Carpenter testified that he was telling the truth. (*Id.* at 22-23.)

### 29. Deputy United States Marshal Scott Sanders (November 12, 1998)

The defense called DUSM Sanders, who testified that he was "the case agent or the lead investigator" for the Walgreens robbery. (*Id.* at 33.) DUSM Sanders arrived on the scene at approximately 12:55 p.m. on April 21, 1997. (*Id.*) The victim was still on the scene at that time. (*Id.*) In response to who else was at the scene, DUSM Sanders testified that "[t]here were several uniformed officers whose names I don't recall, and several task force officers who worked with me on the scene." (*Id.* at 33-34.) DUSM Sanders did not personally interview all the witnesses. (*Id.* at 34.)

DUSM Sanders was asked whether he ever returned to the scene to interview witnesses, and he replied: "Numerous occasions I've been back to the scene of the crime to re-interview witnesses, display photographic spreads, look at the scene, and the general area. There's various dates. I can't recall each individual date." (*Id.* at 34-35.) The Court sustained objections to defense counsel's further questions about whether any witness made an identification and about whether the SSTF knew who it was looking for within a few days of the robbery. (*See id.* at 35.)

### Thomas' Decision

After a discussion with his client, defense counsel stated that "it appears that Mr. Thomas is not going to testify, but I'd like for him to make a statement on the record to that effect." (*Id.* at

41.) Thomas was sworn outside the presence of the jury and, under questioning by defense counsel, confirmed that he had discussed with his attorney the advantages and disadvantages of testifying. (*Id.* at 42-43.) Thomas understood that the trial would be his only opportunity to testify. (*Id.* at 42.) He had discussed the evidence in the case with his attorney. (*Id.*) He understood it was his decision whether to testify. (*Id.* at 43.) Thomas understood that no one could force him to testify or prevent him from testifying. (*Id.*) He understood that he had a right to testify if he wanted to do so. (*Id.*) Thomas stated that he had decided not to testify. (*Id.*) He also stated that the only reason he would not testify was that the Government could cross-examine him about his criminal record. (*Id.* at 43-44.) The Court asked Thomas whether he understood that he had a pretty extensive record that might look pretty bad, and Thomas responded that "[t]hat's the reason why I don't." (*Id.* at 44.) The Court asked Thomas what his decision was, and he replied: "I'm not going to testify." (*Id.*) The Court informed Thomas that the jury would be instructed that it should not hold his decision against him, and Thomas reiterated that it was his decision not to testify. (*Id.* at 44-45.)

A moment later, Irby announced that, "after further discussion with Mr. Thomas, I think he's got something else to say to the Court." (*Id.*) At that point, Thomas stated that "I decided I do want to testify." (*Id.* at 45-46.) Thomas affirmed that he had discussed the matter thoroughly with his attorney. (*Id.* at 46.) He reiterated that he wanted to testify (*id.*), and he also stated that,

> like I was stating at first, I know if I testify that my record of previous convictions could be brought up. That's the only thing I was scared of because it make it seem like that's a bad picture for the jury even though I'm going to [trial] now on some robberies that are similar to my convictions. But, you know, I don't have nothing to hide, so I need to say what I got to say.

(*Id.* at 46-47.) Thomas understood that, if he gave false testimony, he could receive a sentence enhancement for obstruction of justice. (*Id.* at 47-48.) He stated that "I don't intend to lie. I intend to tell the truth." (*Id.* at 48.) Thomas understood that, once he got on the stand, he would be required to subject himself to cross-examination. (*Id.*) Thomas acknowledged that he had decided to testify despite the advice of his attorney that he not do so. (*Id.* at 48-49.)

### 30. Andrew Thomas (November 12, 1998)

Thomas testified on his own behalf that, when he first got out of prison, he lived with his mother for two days. (*Id.* at 50-51.) He then lived with Russell Carpenter until he began dating Angela Jackson. (*Id.* at 51.) Thomas stated he had known Angela Jackson "all my life growing up. We started dating in March of '97." (*Id.*) According to Thomas, that relationship subsequently "soured and so I decided to go my separate way and she decided to go hers." (*Id.* at 52.) Thomas and Angela Jackson separated "probably around the first week of June maybe" of 1997. (*Id.* at 54-55.) While he was with Angela Jackson, Thomas was also involved with Dana Wiggins and Debra Reeves. (*Id.* at 55.)

Thomas testified that he "had several jobs. At that time I was working at Wells Lamont off of Getwell." (*Id.*) Wells Lamont is "like a shipping and receiving company. They deal with gloves and all types of household gloves and support-type gloves, work gloves." (*Id.*) Thomas "started working about the end of April going over into May . . . ." (*Id.*) He stayed with Wells Lamont "[a]bout two and a half months before I got another job." (*Id.* at 56.) Thomas' next job was at the J.C. Penney's warehouse. (*Id.*) He did not have a job before being hired at Wells Lamont. (*Id.*)

Thomas was asked about the car he had purchased, and he responded:

> Well, I had seen this car. When I had got out I had seen it several times when I'm going to my mom's house going down Elvis Presley. I would look over and say that's a nice car. And, you know, I'm basically—my style, you know, I like nice things, right, like nice cars. And that particular car there, that was already fixed up and I didn't have to put nothing on it or add anything to it. So that was saving some money right there.
>
> But I had seen the car and I stopped by and asked the guy on the parking lot how much did he want for it. They said $4,000. I said would I be able to look at it and he said yeah. So what I did is I had already told my family when I got out— before I was getting out, I was going to need some money to get some transportation and some money to buy a few clothes.
>
> So everybody had told me they was going to help me when I got out. So when I got out they started pitching in and helping me to get back on my feet.

(*Id.* at 56-57.) In response to how he was able to pay for the car, Thomas testified that "I paid cash for it, but I had help from my cousin, my mom, and my girl and friend to help me pay for the car."

(*Id.* at 57.)  The total cost of the car was $3975.  (*Id.* at 57-58.)  Thomas recalled that the car was "a pink-like car.  It's a pretty color out of the ordinary, bright light."  (*Id.* at 58.)

Thomas bought the car on April 21, 1997.  (*Id.*)  In response to what else he remembered about that day, Thomas replied, "Well, a lot of stuff happened that day.  But the one thing I do recall is that a Wells Fargo truck had got robbed."  (*Id.*)  Thomas knew that "[b]ecause later on that evening when I sa[w] the news had came on, the 10 o'clock news had came on, and it flashed across the screen that a Wells Fargo truck had been robbed."  (*Id.* at 59.)  In response to whether he had had anything to do with the robbery, Thomas replied, "No, most definitely not."  (*Id.*)

On April 21, 1997, Thomas was with his girlfriend, Dana Wiggins, "all day morning up until that evening."  (*Id.*)  They were "[a]t her home off Shelby Drive."  (*Id.*)  Thomas testified that,

> the day before I had a wreck and she told me she was going to get money for my car. I had three and she told me she would give me a thousand.  I didn't want to make her feel like I was using her and give me the money, and I had to be spending time with her.  So that Sunday I told Angela a lie that I was going to my mom's house because I was going out with my some friends.  She took me over to my mom house and she pays and I never even called back and I just told her my battery went dead.  But Dana came over there and get me when I get to my mom home and told her to come pick me up.  So she pulled up and I walked outside and got in the car.  You know, we left.

(*Id.* at 59-60.)  When Wiggins picked Thomas up "[i]t was still sunny but it was probably almost seven o'clock that evening."  (*Id.* at 60.)  They stopped at a store and then went to Wiggins' house. (*Id.*)

Thomas spent the night of April 20, 1997 with Wiggins.  (*Id.* at 61.)  Thomas testified that the next day, April 21, 1997, he "didn't leave early because I know my mom won't be there, and then I wanted to spend a little more extra time with [Wiggins].  So she dropped me off that evening about 2:30, and my mom was at home."  (*Id.*)  Wiggins dropped Thomas off at his mother's house.  (*Id.*) Wiggins drove a white car.  (*Id.* at 62.)  Nobody else came to Wiggins' house while Thomas was there, and Thomas and Wiggins did not go outside of the house together.  (*Id.*)  Thomas explained that,

> [t]o my understanding of Dana's family, they not very fond of black guys.  And her father normally visits her house, and her neighbors in the area and things, you know,

88

really wanted someone to go up there and say to her father that she had a black boyfriend because that would create a lot of problems.

(*Id.*)

When Thomas got to his mother's house, he took a bath and told his mother that "I got me another $1,000 to go buy me a car." (*Id.* at 63.) Thomas called Angela Jackson to pick him up and take him to the car lot, and they went to the car lot together "[p]robably about three o'clock." (*Id.*)

At the lot, Thomas showed the saleswoman his money and test drove the car. (*Id.*) Thomas was asked why he put the car in Angela Jackson's name, and he answered:

> Well, at that time I didn't have—I had some identification, but I didn't have no driver's license to upgrade my vehicle. And by my car being as flashy as it was, I know I'm going to be stopped by the police driving the car because it look like a drug dealer's car. So I didn't want to take a chance on going to jail with no driver's license at that time.

(*Id.* at 64.) Thomas testified that "[i]t didn't take no time" to buy the car. (*Id.*) "I come back from test driving and I counted the money out." (*Id.*)

Thomas testified that, after purchasing the car, "I got in my car and Angie got back in her car and we went back to her place. I said, 'I'll be over to your house in a little bit.' So she went on home and I made a few stops and showed my mom to see the car. And we got to arguing about the car." (*Id.*) According to Thomas, his mother thought the car looked like a drug dealer's car and would draw attention to him. (*Id.* at 64-65.) Thomas recalled that his mother was unhappy with him:

> She told me that I had disobeyed something that she asked me to do, and she was trying to help me but I still took it upon myself to do what I wanted to do with that money. So I just told her I'm going to get me a job and work, and I still do all right. So she said we'll see and I left and went and picked up Angela. And we rode around in the car getting the feel of the car. I stopped and showed the car to a few of my relatives.

(*Id.* at 65.) When Thomas drove around and showed the car to his relatives, it was around 6:00. (*Id.*)

Thomas went back to Angela Jackson's apartment and parked the car on a side street so it would be visible from the window. (*Id.* at 65-66.) Angela Jackson got a telephone call and told

Thomas that she needed to meet someone. She left her daughters with Thomas and was gone for "a couple of hours." (*Id.* at 66.)

Thomas admitted that he had more than one felony conviction. (*Id.*) Thomas had pled guilty to nine separate felony counts of robbery. (*Id.* at 67.) The cases were all in state court in Tennessee. (*Id.*) He had been released from prison on February 24, 1997. (*Id.*)

Thomas was asked how he had met Dana Wiggins, and he responded:

> Well, basically, like you meet any other female. This particular day that I met her, I was riding with one of my friends in his car. And we was on—was it Tulklahoma [sic]—something like that. And I had seen her car once before on the parking lot of Tiffany's. I had seen her car and I had seen her standing outside her car one day. And I had remembered the way the car looked.
>
> Okay. So then some day later it just so happened, we was coming down the street but we was passing her little white car that she was in. And when I looked over I said that's the same girl I had seen before. Slow down. So my friend of mine slowed down and we were side by side. And I was hollering from the passenger seat to her to tell her to stop. She let the window down and I said to pull over so I can talk to you, so she pulled over. We got out and we started talking and exchanged phone numbers.

(*Id.* at 68.) Thomas testified that "I know right then I told [Dana Wiggins] that I had one that I was staying with, so that it wouldn't be no problem so that she could respect what I told her, that I had somebody. So to make sure she wouldn't come between me and Angela at the time, we get an understanding. So she understood that and she didn't have no problem with that." (*Id.* at 68-69.)

Thomas testified that he had seen Angela Jackson "with a nice little wad of money" the day after he bought his car. (*Id.* at 69.) Thomas had taken Angela Jackson to "the Clayton Homes Apartment Complex around Danny Thomas and Lauderdale—the projects . . . to get some money that he was to give her for her brother, and he was getting out of prison." (*Id.* at 69-70.) Thomas was asked who had given Angela Jackson the money, and he answered, "Well, this dude named Bobby Jackson. She never got out of the car. We pulled up he was already standing outside . . . ." (*Id.* at 70.) Thomas saw Bobby Jackson give Angela Jackson the money, and he testified that "it was

exactly $2,700 that he gave her . . . ." (*Id.*)[9] Thomas was asked whether he knew Bobby Jackson, and he replied, "Not just personally." (*Id.* at 71.)

According to Thomas, Anthony Bond had seen Angela Jackson with Thomas on one occasion when Thomas and Jackson were driving in Jackson's car. (*Id.* at 72-73.) When Thomas was living with Angela Jackson, he never took friends to her apartment. (*Id.* at 73.) When Thomas was living with Russell Carpenter, the only visitor he had was his cousin William Upchurch, who he called "Bill, Jr." (*Id.*) When Thomas lived with his mother, he was not allowed to have visitors. (*Id.* at 74.)

Thomas denied going with Anthony Bond to rob the Walgreens on April 21, 1997. (*Id.*) Between 12:00 and 1:00 p.m. on that day, he was with Dana Wiggins at her trailer on Shelby Drive. (*Id.*) Thomas was asked whether he had owned any firearms in 1997, and he responded:

> No, sir, not at all. Like I said, I'm on parole and my parole stipulates that I must not be in any possession of a firearm nor around firearm or anybody with a firearm or in the same household or I would have to go back and bag my parole up.

(*Id.* at 75.) Thomas testified that he did not violate the conditions of his parole: "No, sir. Wasn't trying to. I had just did four years. I wasn't trying to go back to do no more time." (*Id.*)

On cross-examination, Thomas affirmed that it was his style to like nice things. (*Id.* at 76.) Thomas was asked whether, when he got out of prison, he had lacked the money to buy nice things, and he replied, "Like I said, when I first got out, I didn't have no money until my family help me out." (*Id.*) "The day I put my feet on free soil, I was a broke man when I walked outside until my family pitched in to help me get on my feet." (*Id.*) Thomas agreed that he wanted to get some money to buy nice things, but he testified that "the car was not first priority." (*Id.* at 77.)

Thomas insisted that "I didn't rob no Wells Fargo truck." (*Id.*) He conceded that he bought a car on April 21, 1997, the very afternoon of the robbery. (*Id.*) He had "exactly" $4000 in cash that

---

[9]The Court sustained the Government's objection to the statement that, "when he walk to the car he say here are 2,700 for cocaine." (*Id.*)

he used to purchase the car. (*Id.*) Thomas denied that the $4000 had come from the courier's money bag, stating that it "came from my family." (*Id.* at 78.)

Thomas admitted that he put the car in Angela Jackson's name. (*Id.*) He testified that he had a "parole identification card, but I don't have a driver's license." (*Id.*) He admitted that he was worried about the police stopping him while driving in that fancy car. (*Id.*) Despite that concern, he admitted that he drove the car all that day. (*Id.*) He also drove that car for the next month and had "got me some driver's license." (*Id.*) Thomas recalled that, at some point, "[m]y starte[r] had played out but I drive my vehicle up until October." (*Id.*) Thomas was asked whether he had forgotten about his worries about the police, and he responded: "I had a driver's license then so it wasn't no problem. I was stopped several times and got speeding tickets and I went down and paid my tickets off. I had a driver's license no problem because I was legitimate." (*Id.* at 79.)

Thomas denied that he put the car in Angela Jackson's name because he had a lot of money from the robbery that he could not explain. (*Id.*) He conceded that he did not put the car in Dana Wiggins' name even though she had given him $1000. (*Id.*) He acknowledged that a woman he had known for "like a month" had given him $1000. (*Id.*)

Thomas insisted that he was with Dana Wiggins at her trailer at the time of the robbery. (*Id.* at 80.) "Ain't no question about it." (*Id.*) He reiterated that "I was there with Dana." (*Id.*)

Thomas admitted that Wiggins came to see him at the Jail on Monday, November 9, 1998, the day before she testified. (*Id.* at 80-81.) Thomas testified that "[s]he visit every visiting day." (*Id.* at 81.) He denied that he had asked Dana Wiggins to lie for him. (*Id.*) Thomas was asked whether Wiggins had visited him on October 26, 1998, the day a trial date had been set, and he responded that "I can't recall no dates, but my visiting days are Monday evenings and Friday mornings. She most definitely there on Mondays." (*Id.*)

Thomas recalled that he had seen the news about the armored car being robbed. (*Id.*) He was asked whether that was how he remembered that he had purchased his car on April 21, 1997, and he replied:

It was in the news the same day that my car was bought that the news—
breaking news, some flash—they break in on the program and put that thing on the
TV.  Like I say, I was there at home and it came on.  I said whoever rob that truck I
sure hope—they if they get caught they through.  That's exactly my words.

(*Id.* at 82.)  Thomas reiterated, "I said, whoever had rob that truck, I hope they get it because they

get caught they going to be gone for some time.  That's exactly what I told."  (*Id.*)  Thomas agreed

that there was no question that he saw a news report about the robbery.  (*Id.*)  "They flashed it all

over that day."  (*Id.*)

Thomas was asked whether he had been pretty interested in armored cars at the time, and he

replied that "I wouldn't take a job working for no company like that.  I'm not going to put my life

on the line and take a chance on trying to rob me and I get shot.  I wouldn't consider trying to do

nothing like that."  (*Id.* at 82-83.)  At that point, the following exchange occurred:

> Q.    You didn't take much of a chance getting shot in this case, did you?
>
> A.    For what?  I wasn't no where there.
>
> Q.    You ran right behind the man and shot him in the head, didn't you?
>
> A.    No, sir.
>
> Q.    You didn't take any chance at all, did you?
>
> A.    I didn't attempt—you can check my previous records in my previous
> robberies.  I never hurt no one, shot no one.  It was like money bags from restrooms
> and I just stashed those.

(*Id.* at 83.)

Thomas was with Dana Wiggins on April 21, 1997 until he decided to pick up Angela

Jackson and buy the car.  (*Id.*)  He conceded that there was no question that he knew Anthony Bond.

(*Id.*)  He described Bond as "an associate."  (*Id.*)  Thomas had previously called Bond his "partner,"

and he explained that "[i]t just common speech, you know, in the traffic."  (*Id.*)  "In the streets out

there.  My partner, my dog, my nigger, you know, slang words like that."  (*Id.* at 84.)  He denied that

Bond was his getaway driver, but reaffirmed that "I do know him."  (*Id.*)

Thomas was asked about his testimony that he just happened to see Angela Jackson with a big wad of money the morning after he bought the car, and he responded: "It wasn't the very morning. Like I said, it was the next day. I took her to pick some money up from a dude named Bobby Jackson." (*Id.*) Thomas confirmed that he had seen Angela Jackson with a big wad of money. (*Id.*) At that point, the following exchange occurred:

> Q.      Isn't it true that the big wad of money you saw her with is that First American Bank on Winchester when you had her put it in the bank, right?

> A.      I never did see she [sic] her put it in the bank—she told me she was going. She asked me to go with her. I told her how[ ]long is it going to take. I didn't have no patience[ ]and I said you go ahead on, and I fixing to go out here and ride. So she got in her little car and went to the bank.

(*Id.*)

Thomas agreed that he drove a purple or pink box Chevy and Angela Jackson drove a little red Suzuki. (*See id.* at 84-85.) He conceded that, before he got the $4000 and the box Chevy, he drove Angela Jackson's car "on several occasions." (*Id.* at 85.) He denied that he had driven Angela Jackson's car on April 21, 1997. (*Id.*) According to Thomas, "[w]hen I bought my vehicle, I never drove her car. Before I even bought my vehicle, I rarely drove Angela's car." (*Id.*)

Thomas conceded that he was living with Angela Jackson in April 1997. (*Id.*) He agreed that his nickname was "Bowleg." (*Id.*)

Thomas denied that he had bought a shotgun at a pawnshop in Frayser. He testified that "I never went to no pawn shop. My parole stipulates I can't be around firearm, in the possession of or in the car with or in the household with one. I can't be around it or I'll go back to the penitentiary." (*Id.* at 85-86.) At that point, the following exchange occurred:

> Q.      Isn't it true you wanted that shotgun to protect your fancy car?

> A.      I don't need no shotgun to protect no fancy car. What am I going to do with it? I'd rather have a nice gun I can hold in my hand instead of a big old shotgun.

> Q.      You'd rather have a nice gun you can hold in your hand?

94

A.     On the same—I don't want no big old shotgun to protect a vehicle when I can easily call the police or have a handgun or something. I can't be—have no weapons.

Q.     You'd rather have a ni[c]e handgun like the one you put up to that guard's head, wouldn't you?

A.     That wasn't me, sir.

Q.     You got rid of that pistol, didn't you?

A.     The [sic] wasn't me, sir.

Q.     That's why you wanted to get a shotgun. You wanted another gun, didn't you?

A.     Sir, like I told you, I have no idea of this crime that took place until later that evening.

(*Id.* at 86.) Thomas denied that he had threatened Angela Jackson and her children. (*Id.*)

Thomas agreed that he had previously been convicted of robbery. (*Id.* at 87.) He agreed that he had been convicted of theft of property over $500 in 1992. (*Id.*) He also admitted that he had previously been convicted of aggravated robbery. (*Id.*) Thomas was convicted of aggravated robbery in Case Number 93-09267 on January 31, 1994 and sentenced to eight years. (*Id.* at 87-88.) Thomas was convicted of aggravated robbery in Case Number 93-05161 on September 6, 1994 and sentenced to twelve years. (*Id.* at 88.) Thomas testified that, "[l]ike I said, I had about nine robberies I plead guilty to and was convicted. I [sic] two sentences that was eight and the rest was 12, and they all ran into one. I served one con[v]iction for all these robberies." (*Id.*) In addition to his conviction in Case Number 93-05161, he was also convicted on September 6, 1994 of aggravated robbery in Case Numbers 93-05160, 93-05159, 93-05158, 93-05157, 93-05156, 93-05155 and 93-07600. (*Id.* at 88-90.) Thomas admitted that he had been convicted in ten robbery cases and one theft case. (*Id.*) He received concurrent sentences of twelve years and eight years for the various robberies, resulting in an effective sentence of twelve years. (*Id.*) The guilty pleas had occurred in 1994, and Thomas was back on the street in February 1998. (*Id.* at 90-91.)

Thomas was asked whether he had committed another robbery in April 1997, two months after his release, and he replied:

> No, sir. Like I told you, I had to get myself together. I was young at the time I committed those robberies. At the time I was in prison, I got my GED and got my man together. I don't have time to go back out there and do what I did to make the same mistakes now. I have a child whom I've never spend time with because I was locked up.
>
> So now that I got to be a father figure or role model and keep my son from following in my footsteps. That's why I got out to try to find me a decent girlfriend to try to have something. Get some help so I can get me a vehicle, so I can me [sic] a car, and once I got my car I got me a job and that's what I did.

(*Id.* at 91.) Thomas denied that he ran up behind the guard and shot him in the back of the head. (*Id.*)

### Keith Echols, Travis Brown, Willie Cooper—Fifth Amendment

Irby had hoped to present the testimony of Keith Echols, Travis Brown, Sharod Rodgers, and Willie Cooper about statements Bond had made about the robbery, conduct they had observed from Angela Jackson and contacts Angela Jackson may have had with Bond. (11/10/1998 Trial Tr. 529-31, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn., ECF No. 100.) Some or all of the witnesses had pending state criminal charges, and there was a concern that they might assert their Fifth Amendment rights. (*See* 11/12/1998 Trial Tr. 28, 30, *id.*, ECF No. 103.) Both Thomas and Bond were alleged to have been involved in some of the pending cases. (*Id.* at 24.) Irby stated that,

> after speaking with my client, I don't think we'll put this gentleman on the stand. We could wait a few minutes, but I don't think we want to put any one of those four witnesses on the stand. But I've had a communication problem between my client and myself in communicating some things that need to be considered before putting any of these individuals on the stand. I don't think— now that's my client's decision.

(*Id.* at 31.) The Court cautioned the defense that, "once he gets on the stand, he's on the stand. So we need to be sure." (*Id.*) As he was getting ready to leave, Travis Brown stated that, after consulting with his attorney, he did not want to testify. (*Id.* at 32.)

At the conclusion of Thomas' testimony, defense counsel stated outside the presence of the jury that, "now that this has happened, I want to use some of the people that have been [writted] in, I want to put them on the stand. Before he was going to testify I was trying to stay away from that, but now that this has happened, I want to put these folks on the stand." (*Id.* at 92.)

The Court addressed Keith Echols outside the presence of the jury. After being advised of his rights, Echols stated that he did not want to testify and invoked his Fifth Amendment rights. (*Id.* at 95-100.) Travis Brown was also addressed outside the presence of the jury, at which time he invoked his Fifth Amendment rights. (*Id.* at 101-05.) Willie Cooper was also addressed outside the presence of the jury and invoked the Fifth Amendment. (*Id.* at 106-10.)

### 31. Danise Murphy, Holiday Inn Express (November 12, 1998)

Danise Murphy testified that she lived in Memphis and was a desk clerk at a Holiday Inn Express located at 340 State Line Road, Southaven, Mississippi. (*Id.* at 111.) She was authorized to keep the books and records of the company and was testifying pursuant to a subpoena. (*Id.* at 111-12.) Murphy had checked the records for April 21, 1997 and found no registration in the names of Andrew Thomas, Angela Jackson, or Angela Thomas. (*Id.*) The Holiday Inn Express required guests to present identification when they check in. (*Id.*) Murphy testified that the policy was "very much so [even] if they pay with cash." (*Id.* at 112-13.) The Holiday Inn Express had no specific policy about guests from Memphis. (*Id.* at 113.)

Murphy testified that there were no other hotels or motels on State Line Road in Southaven, Mississippi, although there were several other hotels in Southaven. (*Id.*) The other hotels in the vicinity of State Line Road were a Comfort Inn, a Best Western and a Shoney's Inn. (*Id.*)

On cross-examination, Murphy testified that she did not know anything about the other motels or about who checked into them. (*Id.* at 114.) She agreed that there were quite a few motels in Southaven. (*Id.*) She also agreed that State Line is a very long road that goes outside of the city of Southaven. (*Id.*)

97

On redirect examination, Murphy testified that there were not any other motels or hotels on State Line Road even right outside of Southaven. (*Id.* at 114-15.)

### 32. Jennifer Howe, Best Western (November 12, 1998)

Jennifer Howe testified that she lived in Coldwater, Mississippi and was employed by the Best Western located at 8945 Hamilton Road, Southaven, Mississippi. (*Id.* at 124-25.) The hotel was located one block from State Line Road. (*Id.* at 125.) Howe was an administrative assistant and assistant general manager and was testifying pursuant to a subpoena. (*Id.*)

Howe had checked the records for April 21, 1997; April 22, 1997; and April 23, 1997. No guests were registered under the names Andrew Thomas, Angela Jackson or Angela Thomas. (*Id.* at 125-26.) Company policy required guests to present either a valid driver's license or a state identification card with a picture when checking in. (*Id.* at 126.)

### Government's Rebuttal

### 33. Paul Vandenbosch, Discount Cellular (November 12, 1998)

The Government called Paul Vandenbosch to testify in rebuttal. (*Id.* at 127.) Vandenbosch was the chief operating officer of Discount Cellular and Paging. (*Id.* at 127-28.) Vandenbosch had been employed by the business that owned Discount for fourteen years, and he testified that Discount had been acquired approximately two and one-half or three years prior to the trial. (*Id.* at 128.) Vandenbosch was familiar with the business practices of Discount. (*Id.*) Discount had two stores in Memphis, one on Stage Road and another on Mount Moriah and Ridgeway. (*Id.* at 128-29.) The Mount Moriah store had both retail and office space. (*Id.* at 129.) "We have a front business and then offices in the back." (*Id.* at 129-30.) Typically, one person was scheduled to work on the sales floor, to be joined by someone recently out of college during the afternoon hours. (*Id.* at 130.) There were three employees who worked in the office, including Rubin Gureado, the market manager; Kristy Copper, who was responsible for the paperwork; and Michele Redford, who was responsible for issues pertaining to pagers, including activating and deactivating the devices. (*Id.* at 130-31, 146-47, 148.)

Vanderbosch testified that "[w]e keep time sheets on each employee that works unless they are on a salary basis, then they are expected to work a 40 hour work week, but everybody else has to fill out a time card sheet and they turn that into us on a weekly basis." (*Id.* at 131-32.) Employees on the retail floor "are all on hourly wages plus a commission basis for activation." (*Id.* at 132.) They were paid by the hour. (*Id.*) Discount kept records of the sales its retail employees made, and it kept cash register records pertaining to its employees. (*Id.*)

Vanderbosch testified that he knew Dana Jo Wiggins and had worked with her for "[t]he past roughly two years. I don't remember when she left the business, but for two years or so." (*Id.*) Wiggins had worked for Discount in 1997. (*Id.*) At the time of trial, she was no longer employed by Discount. (*Id.* at 133.) Vanderbosch believed Wiggins had left more than six months before the trial. (*Id.*) Vanderbosch knew Wiggins by sight and described her as "[k]ind of a short girl with, I guess, shoulder length hair, kind of a brown, lighter brown, perky attitude." (*Id.*) Wiggins had worked in the Mount Moriah location as a salesperson. She was responsible for waiting on customers and answering the phone. (*Id.*) She had been an hourly employee. (*Id.*)

Vandenbosch was Discount's custodian of records. (*Id.* at 134.) He produced a W-4 for Dana Wiggins as well as a time sheet, a copy of her paycheck and a report of transactions. (*Id.* at 133-36.) **Wiggins' time sheet reflected that she had worked on April 21, 1997 from 9:00 a.m. until 3:00 p.m. and from 3:30 p.m. until 6:00 p.m.** (*Id.* at 137.) Wiggins was paid for 8½ hours on April 21, 1997. (*Id.* at 138.) She signed her timesheet. (*Id.* at 138-39.) The pay records reflected that Wiggins was paid for April 21, 1997. (*Id.* at 139-40.) Wiggins also earned commissions on sales. (*Id.* at 140.) **Wiggins had had sales on April 21, 1997, at 2:13 p.m. and 3:30 p.m.** (*Id.* at 140-41.) When a salesclerk makes a sale, he or she enters their initials on the computer. (*Id.* at 140-41.) Occasionally a salesperson will complete a sale that had been begun for another salesperson and will enter the initials of the initiating salesperson. (*Id.* at 142.) Vanderbosch emphasized that "that's not a typical all-day thing. That's a one case scenario . . . ." (*Id.*) Discount's records reflected that, on April 21, 1997, Wiggins was the only salesperson on duty until the afternoon, when

a part-time college student was also scheduled.  (*Id.* at 142-43.)  Wiggins sold $247.04 worth of merchandise on April 21, 1997.  (*Id.* at 143.)  Discount's records also reflected that Wiggins made telephone calls from work on that day.  (*Id.* at 145.)

Vanderbosch also testified that, during the lunch break, he had seen Wiggins and another person sitting on a bench near a stairway and Wiggins appeared to be surprised.  (*Id.* at 145-46.) Vanderbosch elaborated that, "[j]ust when she saw me she got surprised and shocked and then turned to her friend [and] turned her head to the side and I don't know what she said, but, you know, she wouldn't look up at me."  (*Id.* at 146.)

On cross-examination, Vanderbosch testified that his work location was in Jackson, Tennessee.  (*Id.*)  He was in Jackson on April 21, 1997.  (*Id.*)  Rubin Gureado was managing the Memphis office on that date.  (*Id.* at 146-47.)  On April 21, 1997, Gureado, Wiggins, Copper and Redford were employed at the Mount Moriah location.  (*Id.* at 147.)  Vanderbosch did not recall where Copper and Redford were on April 21, 1997.  (*Id.*)  They were full-time employees, as was Wiggins.  (*Id.* at 148-49.)  Gureado sometimes worked at other Discount locations, although "it would not be normal" if he were not there at all on April 21, 1997.  (*Id.* at 149.)  Copper sometimes performed audits at other Discount locations.  (*Id.* at 153.)

Vanderbosch testified that employees are prevented by "[g]reed" from entering another employee's initials for a sale they had made.  (*Id.* at 149-50.)  Employees have a code for long-distance telephone calls that they are instructed not to share with anyone else.  (*Id.* at 150-51.) Vanderbosch conceded that "[i]t could happen" that an employee could obtain a co-worker's code and make telephone calls in that person's name.  (*Id.* at 151.)

Time records were typically filled out on a weekly basis.  (*Id.* at 151-52.)  Vanderbosch was asked whether employees might trade time with each other, and he responded:  "Absolutely not. That's not acceptable and never has been."  (*Id.* at 152.)  Vanderbosch explained that, if he were going to be late, he might ask Rubin to fill in, but Rubin would not record on Vanderbosch's timesheet that Vanderbosch was there.  (*Id.*)

On April 21, 1997, there would have been one full-time hourly employee and one part-time employee at the Mount Moriah location. (*Id.* at 155.) Russ McBride was the part-time worker who had been scheduled to work on April 21, 1997. (*Id.* at 157-58.)

The cash drawer summary showed three sales on April 21, 1997. (*Id.* at 157.) That included only sales "that had cash transactions applied to them." (*Id.*) Vanderbosch testified that "[t]here could be other transactions recorded elsewhere but not sale[s]. A sale to us is cash money or money whether it's cash or not." (*Id.* at 158.) The other transactions are things for which a customer is not charged, such as "paging issues, the code changes, number changes, things of that nature . . . ." (*Id.* at 157.)

### The Jury Charge and Verdict

Closing arguments were held on November 12, 1998. At the end of the day, the Court instructed the jury. The jury was then excused until the next morning, when jury deliberations were scheduled to commence. (Mins., *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 65.) As previously noted, *see supra* p. 4, on November 13, 1998, the jury returned a verdict of guilty against Thomas on all counts.

### C.      Criminal Case Number 00-20211

On October 24, 2000, a grand jury returned a three-count indictment against Dana J. Wiggins and Thomas. (Indictment, *United States v. Wiggins*, No. 2:00-cr-20211-01-JPM (W.D. Tenn.), ECF No. 1.) Count 1 charged Wiggins with perjury at Thomas' trial in Case Number 98-20100-JPM, in violation of 18 U.S.C. § 1623. Specifically, Wiggins was charged with falsely testifying that Thomas was with her at the time of the armored car robbery on April 21, 1997. Count 2 charged Thomas with perjury in his criminal trial insofar as he had denied robbing and shooting the armored car courier. Count 3 charged Wiggins and Thomas with conspiring to obstruct the due administration of justice in Case Number 98-20100-JPM, in violation of 18 U.S.C. § 371.

Pursuant to a written Plea Agreement, Wiggins appeared before this judge on February 26, 2001, to plead guilty to Count 1 of the Indictment. (Mins., *id.*, ECF No. 22; Plea Agreement, *id.*,

ECF No. 23.) At a sentencing hearing on October 2, 2001, United States District Judge Thomas A. Wiseman, Jr. sentenced Wiggins to a term of imprisonment of twenty-four months, to be followed by a two-year period of supervised release. (Mins., *id.*, ECF No. 35.) Judgment was entered on October 4, 2001. (J. in a Criminal Case, *id.*, ECF No. 37.)

In an order issued on December 30, 2002, the Court granted the Government's motion to dismiss the Indictment against Thomas. (Order Dismissing Indictment, *id.*, ECF No. 50.)

### D. The State Criminal Proceedings

James Day, the victim of the armored car robbery, died on October 2, 1999, from complications related to injuries he had suffered on April 21, 1997. *State v. Thomas*, 158 S.W.3d 367, 374 (Tenn. 2005). Thomas and Bond were subsequently indicted in state court for the murder of James Day. *Id.* at 373. After a trial in the Criminal Court for Shelby County, Tennessee, both Thomas and Bond were found guilty of felony murder. *Id.* at 373 & 373 n.1. Thomas received the death penalty, and Bond was sentenced to life imprisonment without the possibility of parole. *Id.*; *State v. Bond*, W2005-01392-CCA-R3CD, 2006 WL 2689688, at *1 (Tenn. Crim. App. Sept. 20, 2006). The Tennessee Court of Criminal Appeals affirmed Thomas' conviction and sentence, *State v. Thomas*, No. W2001-02701-CCA-R3-DD, 2004 WL 37297 (Tenn. Crim. App. Feb. 27, 2004),[10] and the Tennessee Supreme Court affirmed, *State v. Thomas*, 158 S.W.3d 361 (Tenn. 2005), *cert. denied sub nom. Thomas v. Tennessee*, 546 U.S. 855 (2005).

Thomas subsequently filed a Petition for Post Conviction Relief and Writ of Error Coram Nobis in the Shelby County Criminal Court. An evidentiary hearing was held on the Petition and,

---

[10]The Tennessee Court of Criminal Appeals vacated Bonds' conviction for felony murder and remanded for a new trial. *Id.* at *1, *55. After his retrial, Bond was convicted of felony murder and sentenced to life without parole. The Tennessee Court of Criminal Appeals affirmed. *State v. Bond*, No. W2005-01392-CCA-R3-CD, 2006 WL 2689688 (Tenn. Sept. 20, 2006), *appeal denied* (Tenn. Jan. 29, 2007). The denial of Bond's state post-conviction petition was affirmed. *Bond v. State*, No. W2011-02218-CCA-R3-PC, 2013 WL 275681 (Tenn. Crim. App. Jan. 24, 2013), *appeal denied* (Tenn. June 11, 2013).

on August 4, 2008, the post-conviction court denied relief.[11]  The Tennessee Court of Criminal Appeals affirmed.  *Thomas v. State*, No. W2008-01941-CCA-R3-PD, 2011 WL 675936 (Tenn. Crim. App. Feb. 23, 2011), *appeal denied* (Tenn. Aug. 25, 2011), *cert. denied sub nom. Thomas v. Tennessee*, 132 S. Ct. 1713 (2012).

On April 27, 2012, Thomas filed a petition pursuant to 28 U.S.C. § 2254 challenging his felony murder conviction and death sentence, which was docketed as *Thomas v. Colson*, No. 2:12-cv-2333-JPM-tmp (W.D. Tenn.).  At a status conference on September 12, 2014, the Court determined that it was appropriate to recuse itself .  (Min. Entry, *id.*, ECF No. 84; Order of Recusal, *id.*, ECF No. 85.)  On March 30, 2015, United States District Judge Samuel H. Mays, Jr. denied Thomas' § 2254 petition and denied a certificate of appealability.  (Order, *id.*, ECF No. 102.) Thomas' appeal is pending before the Sixth Circuit as *Thomas v. Carpenter*, No. 15-5399 (6th Cir.).

### E.    Civil Case Number 03-2416

On June 2, 2003, Thomas filed his *pro se* § 2255 Motion, accompanied by a motion seeking appointment of counsel.   (§ 2255 Mot., *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 1; Mot. for Appointment of Counsel, *id.*, ECF No. 3.)  The sole issue presented in the § 2255 Motion was whether trial counsel rendered ineffective assistance, in violation of the Sixth Amendment.  Thomas contended that his attorney:

1.    Performed his duties under an actual conflict of interest;

2.    Did not conduct a thorough investigation of facts surrounding the charges and possible defenses;

3.    Failed to prepare adequately for trial;

4.    Failed to consult with him and to keep him informed concerning his defense;

5.    Failed to object to inadmissible evidence;

6.    Failed to develop a viable defense strategy;

---

[11]A copy of that order has been docketed at ECF No. 144-1.

103

7.      Failed to raise or preserve meritorious issues during his trial;

8.      Mounted an incompetent defense; and

9.      Acted with reckless disregard for his best interests and with the apparent intention to weaken Movant's case during trial and on direct appeal.

(§ 2255 Mot. at 3, *id.*, ECF No. 1.)

Because the § 2255 Motion failed to state the factual basis for his claims, the Court issued an order on September 30, 2003, that, *inter alia*, directed Thomas to amend his Motion to comply with Rule 2(b) of the Rules Governing Section 2255 Proceedings for the United States District Courts ("§ 2255 Rules") and denied appointment of counsel. (Order, *id.*, ECF No. 4.) Movant filed his amended § 2255 Motion on October 29, 2003. (Am. § 2255 Mot., *id.*, ECF No. 5.) That amendment raised the following twelve issues, which did not precisely conform to the issues raised in the original § 2255 Motion:

1.      Whether trial counsel had a conflict of interest insofar as the Government had appointed him to represent Thomas;

2.      Whether trial counsel rendered ineffective assistance during his questioning of DUSM Sanders;

3.      Whether trial counsel was ineffective in failing to object to the hearsay testimony of Tanya Monger;

4.      Whether trial counsel operated under an actual conflict of interest because he represented both the defense and the Government, causing him to "manipulated" Movant to sign a stipulation that he was a convicted felon, which the Government used as an admission of guilt on Count 3;

5.      Whether trial counsel rendered ineffective assistance at the sentencing hearing by failing to request a psychiatric examination and failing to call character witnesses;

6.      Whether appellate counsel rendered ineffective assistance by failing to argue that (a) the Court erred by failing to allow DUSM Sanders to testify that the eyewitnesses had identified someone other than Thomas, (b) the Government suppressed the fact that Robert Fisher and Richard Fisher had identified Terrance Lawrence and Bobby Jackson, and (c) Bond had previously given a statement denying any involvement in the Walgreens robbery;

7.      Whether the Government failed to disclose exculpatory evidence, including (a) a 911 dispatch tape; (b) that eyewitnesses had identified other suspects and given descriptions that did not match Thomas; and (c) that Bobby Jackson and Terrance Lawrence had committed an armored car robbery on July 21, 1997;

8.      Whether trial counsel failed to conduct an adequate investigation, failed to prepare for the cross-examination of Angela Jackson, and failed to interview Dana Wiggins' co-worker, who would have testified that she clocked in for Wiggins on April 21, 1997;

9.      Whether this judge exhibited bias by failing to allow defense counsel to cross-examine DUSM Sanders and by disallowing testimony that someone else could have committed the robbery;

10.     Whether the life sentence imposed on Count 3 was illegal because prior convictions were improperly used to enhance Movant's sentence;

11.     Whether trial counsel was ineffective in failing to obtain the testimony of Sharod Rodgers, Travis Brown, Keith Echols and Willie Cooper after this judge threatened and coerced them into exercising their Fifth Amendment rights; and

12.     Whether trial counsel failed to investigate the crime, interview witnesses and prepare a defense.

(*Id.*)[12] Thomas also asserted that newly discovered evidence demonstrated his actual innocence. (*Id.*) On August 12, 2004, Thomas filed another motion seeking appointment of counsel. (Mot. for Appointment of Counsel, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 8.)

The Court issued an order on September 23, 2004, that, *inter alia*, denied appointment of counsel, directed Thomas to submit the newly discovered evidence on which he relied within thirty days and directed the Government to respond. (Order, *id.*, ECF No. 9.) On October 26, 2004, Movant filed "Part II of Amended Motion for 2255 Petition," which purported to assert fifty-three additional issues, and a third motion for the appointment of counsel. (Second Am. § 2255 Mot., *id.*, ECF No. 10; Mot. for Appointment of Counsel, *id.*, ECF No. 11.) The Government filed its Response to Defendant's Motion Pursuant to 28 U.S.C. § 2255 ("Answer") on December 20, 2004. (Answer, *id.*, ECF No. 14.) Movant filed a reply, titled "Response Brief of Defendant, Motion Pursuant to 28 U.S.C. § 2255" on January 3, 2005. (Reply, *id.*, ECF No. 15.)[13]

On March 1, 2006, an attorney filed a notice of appearance on Movant's behalf, accompanied by a motion to stay proceedings for ninety days. (Mot. to Stay Procedings, *id.*, ECF No. 17; Not. of Appearance, *id.*, ECF No. 18.) The Motion to Stay was granted on March 3, 2006. (Order, *id.*, ECF No. 21.) Various lawyers were subsequently admitted *pro hac vice* on Movant's behalf. (Order, *id.*, ECF No. 29; Order, *id.*, ECF No. 41; Order, *id.*, ECF No. 100; Order, *id.*, ECF No. 103; Order, *id.*, ECF No. 104; Order, *id.*, ECF No. 115; Order, *id.*, ECF No. 116; Order, *id.*, ECF No. 159.)

---

[12]The pages to this filing are not numbered and do not appear in the correct order. The Court has attempted to decipher the issues presented using Movant's paragraph numbers and has edited Movant's description of his issues for clarity.

[13]Thomas did not sign this document, as required by Federal Rule of Civil Procedure 11(a). The factual statements in this Reply also were not made under penalty of perjury.

Subsequently, on January 6, 2005, the Clerk docketed a letter to this judge from Thomas asking for an evidentiary hearing and presenting further argument. (Letter, *id.*, ECF No. 16.) A copy of this document was not served on counsel for the Government.

On July 10, 2006, Thomas filed a Motion for Leave to Conduct Discovery Pursuant to Rule 6 of the Rules Governing § 2255 Cases that sought leave to take the depositions of Anthony M. Bond, Bobby Lee Jackson and Angela Jackson and to serve a subpoena compelling a handwriting sample from Bond. (Mot. for Leave to Conduct Disc., *id.*, ECF No. 30; Mem. in Supp. of Leave to Conduct Disc., *id.*, ECF No. 31.) The proposed discovery was intended to support a claim that trial counsel failed adequately to investigate whether Bobby Jackson committed the Walgreens robbery. The Motion for Leave to Conduct Discovery relied in part on a letter that Thomas supposedly received from Bond in 2002 (the "Bolegg Letter"), in which Bond admitted that he committed the Walgreens robbery with Bobby Jackson and stated that he testified falsely at trial because (a) Bond believed Thomas had been pursuing a sexual relationship with Bond's girlfriend; (b) Angela Jackson believed Thomas had cheated on her with another woman; and (c) Angela Jackson had been having an affair with Bobby Jackson. (Mem. in Supp. of Leave to Conduct Disc. at 1-4, *id.*, ECF No. 31.) The Government filed its response to the Motion for Leave to Conduct Discovery on August 9, 2006. (Resp. to Mot. for Leave to Conduct Disc., *id.*, ECF No. 35.) On September 18, 2006, Thomas filed a motion seeking leave to file a reply, which attached a copy of his proposed reply. (Def.'s Unopposed Mot. for Leave to File a Reply, *id.*, ECF No. 37.)

On December 21, 2006, Thomas filed a Motion for Leave to Issue a Subpoena to Movant's Trial Counsel Pursuant to Rule 6 of the Rules Governing Section 2255 Cases (Mot. for Leave to Issue a Subpoena, *id.*, ECF No. 42), which sought an order directing that Movant's trial counsel, Robert C. Irby, "produce the files relating to his representation of Thomas" (*id.* at 1). The Government responded to the Motion for Leave to Issue a Subpoena on January 12, 2007. (Resp. to Mot. for Leave to Issue a Subpoena, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 44.)

Both discovery motions were referred to United States Magistrate Judge Tu M. Pham. (Order Referring Mot., *id.*, ECF No. 45; Order Referring Mot., *id.*, ECF No. 46.) Magistrate Judge Pham conducted a hearing on March 1, 2007 (Min. Entry, *id.*, ECF No. 49) and, on March 23, 2007, issued

an order granting Movant's Motion for Leave to Issue a Subpoena and denying his Motion for Leave to Conduct Discovery (Order, *id.*, ECF No. 50). Thomas appealed and, on July 9, 2007, the Court issued an order concluding that

> the Bond letter, if true, could demonstrate a failure by Irby to investigate all possible exculpatory evidence. The Court therefore finds that (A) the Magistrate Judge's holding that the Bond letter provides no relevant information was clearly erroneous; (B) some discovery is appropriate in this case because (1) it is premature to conclude that the letter is inherently unreliable and (2) the letter, if true, may demonstrate a failure by trial counsel to investigate all leads and resulting prejudice to Thomas; and (C) only limited discovery—directed at authenticating the Bond letter—is appropriate at this stage.

(Order at 8, *id.*, ECF No. 52; *see also id.* at 25 ("If the letter was not even written by Bond, or if Bond testifies that the letter is simply untrue, then no basis exists for further discovery. Therefore, authentication of the letter is a prerequisite for further discovery. In the eventuality that authentication is impossible, the Court will then decide whether alternative discovery methods would be warranted.") (footnote omitted).)[14] The Court ordered the Government to produce Bond to testify under oath as to the authenticity of the Bolegg Letter and to provide a handwriting sample. (*Id.* at 26.)

At a hearing on August 30, 2007, Bond testified that he was twenty-nine years old. (08/30/2007 Hr'g Tr. 24, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 64 (sealed).) He was born in Memphis and had attended Douglas Elementary School and East High School. (*Id.* at 25.) Bond had voluntarily left school in the tenth grade. (*Id.* at 25, 26.) He testified that he was a good reader. (*Id.* at 26.) Bond stated that he wanted to have counsel present. (*Id.* at 26-27.) He had finished his state direct appeal and was preparing to file a post-conviction petition. (*Id.* at 27-28.) His family was in the process of hiring a lawyer to represent him in the post-conviction proceeding. (*Id.* at 28.) Bond stated that he had some idea what the lawyers wanted to ask him about, but "[r]eally with my case going on, I feel like I ain't got nothing to say." (*Id.*)

---

[14] Although the Court declined to hold at that stage of the proceedings that the Bolegg Letter was inherently unreliable, the Order stated that "the Court agrees that the letter is suspicious in its timing, comprehensive content, and the manner in which it is drafted . . . ." (*Id.* at 15.)

The Court concluded that it was necessary to appoint counsel to represent Bond and also concluded that Bond could be asked to provide exemplars of his handwriting without violating his Fifth Amendment rights. (*Id.* at 31-34.) Bond was asked again whether he wanted to have counsel appointed to represent him, and he replied that, "[b]asically, it is fine, but like I said, I don't have anything to say." (*Id.* at 41-42.) "With or without the attorney, you know, I don't get it what I'm being called here for." (*Id.* at 42.) Bond stated again that he was requesting counsel, but he also reiterated that "what I'm saying I don't get why I'm here, I'm not willing to answer any questions." (*Id.*) "With or without counsel." (*Id.*)

The Court informed Bond that a lawyer would be appointed to represent him and that he would be required to provide a handwriting sample. (*Id.* at 43.) Bond insisted again that he wanted counsel and also stated that, "[i]f they need my handwriting for something, I done signed a thousand documents since I have been in prison, they could look at that. I don't want nothing to do with these people, that's what I'm trying to tell you." (*Id.*; *see also id.* at 44 (same).)

After a recess, Jake Erwin appeared on behalf of Bond. Erwin advised the Court that

> I have had the opportunity to meet with Mr. Bond and, regretfully, I don't think Mr. Bond is going to be in a position where he's going to willingly help anybody in this matter, even if it means that Your Honor would hold him in contempt. As you know, he's serving a life without parole sentence in state court and, you know, if Your Honor were to place him in federal custody at any time, he would think that is better than where he is probably.

(*Id.* at 54.) Erwin stated that he had told Bond that the Court could "try and impose the strictest and the sternest of the situations," but "the only thing that I'm comfortable saying is that he at this point is refusing and would refuse to give a handwriting exemplar . . . [a]nd that he will face whatever consequences that may bring." (*Id.* at 55.) Erwin also related that Bond had told him that he had responded in writing to a request by Thomas' counsel to meet with him, and that Bond suggested that they use that document as a handwriting examplar. (*Id.*) Erwin added that, "[a]s far as anything about the content of the letter, we don't have anything to say at this time. He's not going to affirm or deny." (*Id.* at 56.)

The parties addressed whether Bond should be held in contempt and, if so, what sanction could be imposed. (*Id.* at 57-58, 59.) Further discussion was had on whether additional examplars of Bond's handwriting could be obtained. (*Id.* at 58, 61.) There was also discussion about whether Bond's refusal to testify warranted an inference that he wrote the Bolegg Letter and, if so, whether Thomas had demonstrated good cause to take the depositions of Angela Jackson and Bobby Jackson. (*Id.* at 59-60.) The Court agreed that it would be appropriate for Thomas' attorneys to subpoena Bond's mother to see whether she had any letters that he had written. (*Id.* at 63.) Erwin stated that he would speak to Bond and attempt to persuade him to cooperate but that, "[m]y impression, however, not much is going to be done to persuade him in this particular matter." (*Id.* at 63-64.) Erwin asked the Court to delay holding Bond in contempt in order to give him time to meet with Bond and discuss his options. (*Id.* at 65.) The Court agreed with that proposal and stated that the matter would be addressed in a week. (*Id.* at 66.)

At the next hearing date on September 6, 2007, Erwin announced that Bond would refuse to provide a handwriting sample. (09/06/2007 Hr'g Tr. 6, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 66.) Erwin also made the following statement:

> I can say to the court that he denies writing the letter that is purported to have been written by him, but he will affirm that he did write the letter to Ms. White denying or saying I don't want to speak to you or meet any further, and he points out there are several documents that he signs throughout the course of his incarceration that are easily accessible.

(*Id.*) In response to the Court's question whether Bond personally wrote the note to counsel, as opposed to dictating it to someone else, Erwin conferred with Bond and then stated that he had. (*Id.* at 6-7.)

There was further discussion at the hearing about attempts to obtain examples of Bond's handwriting, including the status of a subpoena to his mother and a civil case that he had filed while incarcerated. (*Id.* at 7-11.) Thomas' attorneys asked for a formal finding of contempt based on Bond's refusal to give a handwriting sample. (*Id.* at 12.) Bond was recalled to the stand, where he affirmed that his attorney had discussed with him the request to give a handwriting sample and the

penalty for contempt. (*Id.* at 14-15.) Bond understood that he could be held in lockdown for eighteen months without privileges, and he agreed that he had told his attorney that he was under the same conditions in state prison. (*Id.* at 15.) He stated that he would not give a handwriting sample. (*Id.* at 16.) He also stated that he had written the letter he sent to Thomas' attorney in his own hand. (*Id.*)

Bond testified that he recalled filing a *pro se* lawsuit under 42 U.S.C. § 1983. (*Id.*) In response to whether that suit was in his own handwriting, Bond testified: "That, I can't remember, it has been so many years ago." (*Id.*) He also testified that "I had someone help me with it at the time. I can't remember if I wrote it. The only thing I know that I wrote, it is on a piece of paper to his attorney telling them I don't want to talk to them, and I don't want to speak to them, period, nothing about my case. That's the only thing I ever wrote." (*Id.* at 16-17.) Later in the hearing, Bond was shown the note, which was written on pink paper, and he testified that that was the "letter I wrote on a piece of notebook paper." (*Id.* at 26.) He testified that it was not a duplicate or carbon: "No, it's like a little note pad that you write little notes to yourself." (*Id.*)

At the conclusion of the *voir dire*, Erwin argued against holding Bond in contempt. (*Id.* at 17-18.) Thomas' counsel stated that "[w]e're really just looking for a formal finding of contempt. . . . [I]f we could get a formal finding of contempt on the record, I think that would be sufficient for us." (*Id.* at 18.) The Government did not take a position on whether Bond should be held in contempt. (*Id.* at 19.) Although Bond did not have a Fifth Amendment right to refuse to give a handwriting sample, Erwin advised that Bond intended to pursue a collateral challenge to his conviction. (*Id.* at 20.) Erwin further stated that,

> with respect to any Fifth Amendment issues, Mr. Bond has advised not only that he didn't write the letter, but that his position with respect to the facts of the case are just as what he testified to in the initial trial in federal court and that there's nothing that he would be saying any differently, as so we're not fearful of that—of any potential repercussions because we're not saying anything different from what we have ever said. That's our position, we have made that clear to the government.

(*Id.* at 20-21.)

The Court then made the following findings:

> The court does find that Mr. Bond is in contempt of an order of the court under unusual circumstances and not—and, therefore, it is not clear the effect of any determination of finding of contempt, and I say that because it is clear that we needed to appoint counsel for him. He does have a state proceeding. He has provided useful information to the court in a limited way in a setting in which he has a reason to exercise caution, so it's not like the gentleman who refused to provide the records for calculation of pension benefits for his company where we took him into custody and held him in custody until he would produce those records. Mr. Bond has a complicated legal situation and should not be required to compromise that even in this setting. The court does note that he has taken a position regarding issues in the case and has offered information through counsel and that there are alternative sources of writing which can be attributed to him. So I do find that Mr. Bond is in contempt under—but under circumstances that are somewhat different than normal —the normal contempt setting . . . .

(*Id.* at 21-22.) The Court also stated that it was uncertain whether it would be appropriate to draw any adverse inference in the case and that there did not appear to be an effective sanction for the contempt. (*Id.* at 22.) The Court deferred a ruling on the penalty to be imposed until after all alternative sources of writing exemplars had been exhausted. (*Id.* at 22, 23-24.) A hearing was set for September 20, 2007 to address whether additional discovery should be allowed. (*Id.* at 32.)

The Court issued an order on September 6, 2007, stating that the original of Bond's previous civil action, *Bond v. Gales, et al.*, No. 2:01-cv-02581-BBD-jdb (W.D. Tenn.), had been received and directing the Clerk to mark the file as an exhibit to the September 6, 2007 hearing. (Order, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 63.)

On September 18, 2007, Thomas' attorneys filed a motion seeking a thirty-day continuance of the scheduled hearing to allow the experts an opportunity to conduct a handwriting analysis of the original documents. (Mot. for Continuance, *id.*, ECF No. 65.) In an order issued on September 19, 2007, the Court granted that motion and reset the hearing for October 19, 2007. (Order, *id.*, ECF No. 67.) On October 11, 2007, counsel for Thomas filed a Consent Motion Withdrawing Motion for Leave to Conduct Discovery and Discontinuing Hearing on Discovery Motion, in which he sought to withdraw without prejudice the Motion for Leave to Conduct Discovery that had been filed on

July 10, 2006. (Consent Mot., *id.*, ECF No. 69.) In an order issued on October 11, 2007, the Court granted the Consent Motion and discontinued the scheduled hearing. (Order, *id.*, ECF No. 70.)

In an order issued on January 11, 2008, the Court stated that, "[a]s the motion for discovery has been withdrawn, [it] would appear that the issues presented in the amended motion pursuant to 28 U.S.C. § 2255 are ripe for decision." (Order, *id.*, ECF No. 71.) The parties were directed to file their final briefs on the matter. (*Id.*) On May 30, 2008, the Government filed the United States' Brief for Denial of Defendant's Motion to Vacate Sentence Under 28 U.S.C. § 2255. (Gov't's Br. in Opp'n to § 2255 Mot., *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 76.)[15] On June 2, 2008, Thomas filed his Memorandum of Law in Support of His Amended Petition Pursuant to 28 U.S.C. § 2255. (Movant's Mem. in Supp. of Am. § 2255 Mot., *id.*, ECF No. 77.)[16] Thomas' brief sought an evidentiary hearing. (*Id.* at 14-18.) On July 30, 2008, the Government filed its Response to Defendant "Andrew L. Thomas' Memorandum of Law in Support of His Amended Petition Pursuant to 28 U.S.C. § 2255" (Gov't's Resp. to Movant's Br. in Supp. of Am. § 2255 Mot., *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 81), and Thomas filed his Memorandum of Law in Response to the United States' Brief and in Further Support of His Amended Petition Under 28 U.S.C. § 2255 (Movant's Resp. to Gov't's Br. in Opp'n to § 2255 Mot., *id.*, ECF No. 82).

On March 8, 2011, after the Tennessee Court of Criminal Appeals had affirmed the denial of Thomas' state post-conviction appeal, the Court set a status conference in the matter. (Order, *id.*, ECF No. 84.) Also on March 8, 2011, the Court issued an order directing Thomas to file the transcript of the state post-conviction evidentiary hearing. (Order, *id.*, ECF No. 86.) Counsel for

---

[15]This filing was mis-docketed as a response to Thomas' discovery motion.

[16]The Court's local rules limit the size of briefs to 20 pages. (*See* LR 7.2(e), 7.1(d).) Movant filed a 48-page brief but failed to seek leave to file an oversized brief. In addition, Movant briefed a new issue—that trial counsel was ineffective in failing to move for a severance of Count 3—but failed to seek leave to amend his § 2255 Motion to present that issue.

Thomas filed the post-conviction transcripts on March 11, 2011. (Not. of Filing, *id.*, ECF No. 87.) At a status conference on April 5, 2011, the Court set an evidentiary hearing for June 6, 2011. (Min. Entry, *id.*, ECF No. 88.) On April 15, 2011, Thomas filed a Consent Motion for Continuance of Evidentiary Hearing Date, which sought an order continuing the evidentiary hearing to enable Thomas' attorneys to seek leave to appeal the denial of the post-conviction petition to the Tennessee Supreme Court. (Consent Mot. for Continuance, *id.*, ECF No. 90.) The Court granted the Consent Motion (Order, *id.*, ECF No. 91), and the hearing was reset to August 8, 2011 (Setting Letter, *id.*, ECF No. 92). On June 23, 2011, the parties filed an Agreed Motion Setting Pre-Hearing Schedule and for Continuance of Evidentiary Hearing Date, which sought another continuance of the hearing and a schedule for the exchange of experts' reports. (Agreed Mot. Setting Pre-Hr'g Schedule, *id.*, ECF No. 94.) The Court granted that Motion in an order issued on June 28, 2011. (Order, *id.*, ECF No. 95.) The evidentiary hearing was reset for October 12 and 13, 2011, the date requested by the parties. (Setting Letter, *id.*, ECF No. 96.) On September 9, 2011, the parties filed a Joint Motion for Continuance of Evidentiary Hearing Date. (Joint Mot. for Continuance, *id.*, ECF No. 111.) A telephonic hearing on the Joint Motion was conducted on September 19, 2011 and, at the conclusion of the hearing, the Joint Motion was denied. (Min. Entry, *id.*, ECF No. 117.)

An evidentiary hearing on the matter was held on October 12 and 13, 2011. (Min. Entry, *id.*, ECF No. 126; Min. Entry, *id.*, ECF No. 127; 10/12/2011 § 2255 Hr'g Tr., *id.*, ECF No. 132; 10/13/2011 § 2255 Hr'g Tr., *id.*, ECF No. 133.)[17] On December 5, 2011, Thomas filed his Post Hearing Brief in Support of Defendant's Amended Petition to Vacate Sentence Pursuant to 28 U.S.C.

---

[17]On September 20, 2011, the Court notified the parties that the case was eligible for video recording and publication pursuant to the Judicial Conference's Cameras Pilot Project and directed the parties to notify the Court of their consent or non-consent to video recording and publication. (Not. of Eligibility for Participation in Cameras Pilot Project, *id.*, ECF No. 118.) On September 23, 2011, the parties advised that they consented to video recording and publication. (Not. of Consent, *id.*, ECF No. 121.) The video recording of the evidentiary hearing can be found at http://www.uscourts.gov/cameras-courts/united-states-america-et-al-v-thomas.

§ 2255. (Movant's Post-Hr'g Br., *id.*, ECF No. 138.)[18]  The only issues addressed in that filing were as follows:

1. "COUNT [3] SHOULD HAVE BEEN SEVERED OR THE SUBJECT OF A LIMITING JURY INSTRUCTION" and trial counsel's failure to move for a severance or a limiting instruction constituted ineffective assistance (Movant's Post-Hr'g Br. at i, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138; *see also id.* at 9-13);

2. "IRBY'S FAILURE TO INVESTIGATE AND PRESENT THE BOBBY JACKSON DEFENSE FELL BELOW OBJECTIVE STANDARDS OF REASONABLENESS" (*id.* at i; *see also id.* at 13-22);

3. "FAILURE TO INVESTIGATE WIGGINS'S ALIBI CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL" (*id.* at ii; *see also id.* at 22-24); and

4. "THE CUMULATIVE EFFECT OF ALL OF IRBY'S DEFICIENT PERFORMANCE CONSTITUTES INEFFECTIVE ASSISTANCE OF COUNSEL" (*id.* at ii; *see also id.* at 24-25).

The Government filed the United States' Response to "Post Hearing Brief in Support of Defendant's Amended Petition to Vacate Sentence Pursuant to 28 U.S.C. § 2255" on December 23, 2011. (Gov't Resp. to Movant's Post-Hr'g Br., *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 141.)  After obtaining leave to reply, Thomas filed his Reply to United States'

---

[18]Movant's initial and amended § 2255 Motions consisted of little more than a list of issues with little factual development.  (*See* § 2255 Mot., *id.*, ECF No. 1; Am. § 2255 Mot., *id.*, ECF No. 5; Second Am. § 2255 Mot., *id.*, ECF No. 11.)  The issues Movant elected to pursue are contained in his post-hearing brief.  For the sake of clarity, the Court has departed from a strictly chronological recounting of the procedural history of the matter to address the post-hearing briefs before the subsequent motion for leave to amend.

Response to "Post Hearing Brief in Support of Defendant's Amended Petition to Vacate Sentence Pursuant to 28 U.S.C. § 2255" on January 17, 2012. (Reply to Gov't's Resp., *id.*, ECF No. 144.)

On November 21, 2011, Movant filed his Motion for Leave to Amend and Supplement Petition to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255. (Mot. to Am. & Suppl. § 2255 Mot., *id.*, ECF No. 134.) In that Motion, Movant sought leave to amend his § 2255 Motion to add the following issue:

> 5.     "The United States' Failure To Provide Exculpatory Evidence To Mr.
>        Thomas' Trial Counsel Violated Brady[19] . . . ."

(Mem. in Supp. of Mot. to Am. & Suppl. § 2255 Mot. at i, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 134-1 at i; *see also id.* at 3-7; Third Am. to & Suppl. of § 2255 Mot., *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 134-7.) The Government filed its Response to Thomas' Motion on December 21, 2011. (Resp. to Mot. to Am. & Suppl. § 2255 Mot., *id.*, ECF No. 139.)

Also on November 21, 2011, Thomas filed a Motion for Leave to Conduct Discovery Pursuant to Rule 6 of the Rules Governing Section 2255 Cases. (Mot. for Leave to Conduct Disc., *id.*, ECF No. 135.) The Government filed its response on December 22, 2011. (Gov't's Resp. to Mot. for Leave to Conduct Disc., *id.*, ECF No. 140.)

On April 16, 2012, Thomas filed his [Second] Motion for Leave to Amend and Supplement Petition to Vacate, Set Aside, or Correct Sentence Under 28 U.S.C. § 2255 (Second Mot. for Leave to Am. & Suppl. § 2255 Mot., *id.*, ECF No. 149), which sought leave to amend to add an additional ground for the *Brady* claim (Mem. in Supp. of Second Mot. for Leave to Am. & Suppl. § 2255 Mot., *id.*, ECF No. 149-1 at ii, 10-14; *see also* Fourth Am. to & Suppl. § 2255 Mot., *id.*, ECF No. 149-9). The Government filed its response on June 15, 2012 (Resp. to Second Mot. to Am. & Suppl. § 2255

---

[19] *Brady v. Maryland*, 373 U.S. 83, 87 (1963).

Mot., *id.*, ECF No. 153), and Thomas filed a reply on July 26, 2012 (Reply to Resp. to Second Mot. to Am. & Suppl. § 2255 Mot., *id.*, ECF No. 157).

In an order issued on October 10, 2013, the Court granted Movant's two Motions for Leave to Amend and Supplement Petition and dismissed the new claims on the merits. The Court also denied the Motion for Leave to Conduct Discovery. (Order, *id.*, ECF No. 160.)

On January 6, 2015, Movant filed a motion seeking the Court's recusal. (Mot. for Recusal, *id.*, ECF No. 163.) The Government filed its response on February 4, 2015 (Resp. to Mot. for Recusal, *id.*, ECF No. 169; Ex. to Resp. to Mot. for Recusal, *id.*, ECF No. 170.) Movant filed a reply, with leave of Court, on February 17, 2015. (Reply to Resp. to Mot. for Recusal, *id.*, ECF No. 174.) In a separate order, the Court denied the recusal motion.

F.      **The Evidentiary Hearing in Case Number 03-2416**

**—Marty Pearce—**

At the evidentiary hearing held on October 12 and 13, 2011, counsel for Movant called Marty Pearce of Clarksville, Tennessee, who testified that she was a certified document examiner. (10/12/2011 § 2255 Hr'g Tr. 31, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) A certified document examiner "examines handwriting to establish the author of that document." (*Id.*)

Pearce graduated from Central High School in Memphis. (*Id.* at 32.) She testified that, "[a]fter that, I went into finance business, and then after awhile, I went on to real estate and mortgage banking." (*Id.*) Pearce began studying to be a document examiner "[a]bout '87." (*Id.*) In order to become a forensic document examiner, "[y]ou generally take a course, you're tested, and if you pass the test, then you become certified." (*Id.*) Pearce took a course in "Dallas, Texas through the Institute of Graphological Science." (*Id.*) She was certified as a document examiner by "[t]he Institute of Graphological Science by Felix Klein, a well-known document examiner as well who studied in Austria." (*Id.*) Pearce received her certification in 1999. (*Id.*) Pearce testified that, since that time, she has worked full time as a practicing document examiner. (*Id.* at 33.)

Pearce attended several continuing education seminars or workshops.  (*Id.*)  She was a member of "the Tennessee Association of Criminal Defense Lawyers, the Institute of Graphological Science, the International Graphoanalysis Society and the National Association of Document Examiners from 1990 through 2009."  (*Id.* at 33-34.)  She has been "published twice in the Tennessee Association of Criminal Defense Lawyers in their bimonthly newsletters."  (*Id.* at 34.)  Pearce testified that she has "conducted workshops and seminars, one for CIGNA Medicare, Documentation Fraud Unit in Nashville, Tennessee; seminar for Draughon's Junior College in Clarksville, Tennessee for their criminal justice classes; and then other speeches or seminars for professional organizations."  (*Id.*)

The hearing in this matter was the seventieth time Pierce had testified as an expert.  (*Id.*)  The subject of Pearce's testimony in each of the previous cases was document examination.  (*Id.*)  Pearce does not always testify for the defense.  She testified that "I work for whomever hires me and whoever wants to know who signs what."  (*Id.*)  Pearce also testified as follows:

> Q.      Ms. Pearce, you have testified in some interesting cases, have you not?
>
> A.      I have, uh-huh.
>
> Q.      Can you briefly tell me a few of those cases?
>
> A.      Well, I think one of the more interesting would be the Tammy Wynette will in the Nashville area who had passed away.  Her will was about 38 pages long.  They wanted to know if the signature was authentic and also some of the medical documents were in question.  Those did turn out to all be authentic.  And also in the murder trial of Byron Low Tax Looper who was actually convicted of the murder of Senator Tommy Burks in the Cookville area.

(*Id.* at 35.)  According to Pearce, no court had ever refused to recognize her as an expert in document examination, and she had never been disqualified as an expert in document examination.  (*Id.*)[20]

---

[20]The Court notes that there is some confusion in the questions.  Pearce described herself as a "certified document examiner."  The questioner repeatedly referred to her as a "forensic document examiner," a term which had not been used by the witness and had not been defined on direct examination.

Pearce testified that she had been retained as an expert for Thomas in this proceeding.  (*Id.* at 36.)  Her customary fees are "a 550-dollar minimum retainer.  It's a hundred dollars an hour, or for court or sworn testimony, it would be a thousand a day or any part of that day."  (*Id.*)  She received her customary fees in this case.  (*Id.*)

Pearce was retained "to identify an envelope and a letter and compare it to some known documents and decide who the author of these documents are [sic]."  (*Id.*)  One of the documents at issue, referred to as "Q-1," "is an envelope from Anthony Bond and addressed to Mr. Andrew Thomas.  Post date on there is January 7th . . . of 2002."  (*Id.* at 38.)  The other document, called Q-2, "was what we refer to as the Bolegg letter."  (*Id.*)[21]  Pearce testified that "[t]he Q stands for questioned document that we're uncertain of the authorship."  (*Id.* at 40.)  Pearce testified that she had formed an opinion that Q-1 and Q-2 "were written by Mr. Bond" and that she was "[q]uite certain" of her opinion.  (*Id.*)  She explained:  "Well, after analyzing them I spent about 25 hours on all the documents, and comparing them, so after all that time with them, I feel like I know them, so at that point I concluded and I feel very confident about my conclusion."  (*Id.*)

In performing her analysis, Pearce compared the questioned documents to various known documents.  (*Id.* at 41.)  Specifically, K-1 "would be a short note to Jennifer White, a little pink note paper.  That would be K-1, and it is signed by Mr. A. Bond."  (*Id.*)  K-2 is the front and back of an envelope that Bond addressed to his mother, Mrs. Tommie L. Bond.  (*Id.* at 42.)  K-3 is "a letter dated Monday, May 3rd, 1999, and it is addressed to Moms and signed Spanky."  (*Id.* at 41.)  K-5 is the front and back of an envelope "that was addressed to Andrew Thomas from Mr. Anthony Bond . . . that is dated August 9, '01, and that of course is a known document."  (*Id.*)  K-6 is a letter from Bond to Thomas, dated August 9, 2001.[22]  Known documents are documents that "have been given

---

[21]The envelope and Bolegg Letter were marked as Exhibits 2 and 3, respectively.  (*Id.* at 38-39.)

[22]Pearce's testimony was somewhat unclear about the designation of the known documents,
(continued...)

to us as known documents or there has been testimony that Mr. Bond wrote these." (*Id.* at 45.)

There has been testimony concerning K-1 or Exhibit 4, the pink note to Movant's counsel. (*Id.*)[23]

K-2 and K-3, Bond's letter to his mother, Tommie Bond, and the envelope, were provided either by

Bond or by his mother. (10/12/2011 § 2255 Hr'g Tr. 45, *Thomas v. United States*, No. 2:03-cv-

02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Every document was an original except for the

Tommie Bond letter and envelope, which were photocopies. (*Id.* at 41-42.) Pearce testified that use

of a copy did not affect her opinion in this case "because the copy was very clear, easy to see and

easy to analyze, so it was almost like an original." (*Id.* at 46.)

Pearce's methodology started with a visual examination of the documents. Pearce testified

that,

> [a]t first, I looked at all the documents just as a whole kind of getting a picture of
> what I'm going to be working with, noticing things like the placement on the paper,
> how much of the paper was used, how big the margins might be, just kind of an
> overall picture of that, maybe the spacing between lines. And after I got a feel for
> those documents, then I would want a closer look, a much closer look.

(*Id.*) Pearce testified that this was the standard practice in the industry for conducting a handwriting

analysis. (*Id.* at 47.) The analysis took twenty-five hours. (*Id.*)

In response to what special equipment she maintained to help with her analysis, Pearce

testified that "I had my authentication, anything from a jeweler's loop [sic] from a magnifying glass

to power two on up to micronta, which would be 30 power, and then a microscope of 100 power, so,

yes, I did use those instruments. Also, I have measuring tools, a light box and . . . also infrared

lighting." (*Id.* at 47.) A jeweler's loupe is "the little plastic or metal small tool that a jeweler may

---

[22](...continued)
particularly the August 9, 2001 letter. Each of these documents was marked as an exhibit, with one
exhibit sticker for each document. Exhibit 4 is the pink note, Exhibit 5 is the Tommie Bond
envelope, Exhibit 6 is the Tommie Bond letter, Exhibit 7 is the August 9 envelope, and Exhibit 8
is the August 9 letter. (*See id.* at 44-45.)

[23]At the hearing on September 6, 2007, Bond authenticated Exhibit 4 (the pink note) as his
writing. *See supra* p. 111.

use to look to see if your diamond is real." (*Id.*) A micronta "is like a small microscope, only it's just—you look through one eye and not both eyes, and it just magnifies up to about 30 powers." (*Id.*) Pearce testified that her equipment is the standard equipment used in handwriting analysis. (*Id.* at 47-48.) Pearce used that equipment in this case. (*Id.* at 48.) Pearce also maintained a reference library that she consulted in this case. (*Id.*) The analysis Pearce described resulted in her opinion that Bond was the author of the Bolegg Letter (Q-2) and the mailing envelope (Q-1). (*Id.*) Pearce testified that she was "[q]uite certain" and "very sure" of her conclusions." (*Id.*)

Pearce continued her description of the procedure she employed to reach her conclusions:

> Initially, I gave an overlook of the documents that you can see there. I notice margins, all around, top, bottom, sides and placement on the paper such as the envelopes. You will notice that the envelopes were all addressed in somewhat center, maybe a little more to the right than the addressee, but the Q-1 was more centered simply because the envelope is a lot larger, it was easier to do that, and then K-2 started in the center, but the envelope wasn't as long, so it doesn't appear quite the same, but anyway, he is centering his addressee. The—so, basically, I'm noticing the style of the letters, just the things that pictorially catch your eye initially, and then I want to take a closer look.

(*Id.* at 49.) Pearce noted that all of the known documents were not similar in appearance even though they were written by the same person. (*Id.* at 49-50.) "[W]hat I found is that [Bond] has a tremendous variation in his different styles, and so you really have to take a closer look or you will miss something." (*Id.* at 50.) People do not always write the same way. Pearce testified that "I don't usually see quite as much difference as this, but say you're jotting down a grocery list, it's probably not going to look like the day you sent out wedding invitations or Christmas cards, it's probably going to be neater. If you're signing a will, it's going to be a little more professional and legal, so, no, we don't always write exactly the same way, but it's generally at least recognizable in [sic] still our writing." (*Id.* at 51.)

After Pearce examined the general appearance of the documents,

> I wanted to take a closer look, and so I examined more of the spacing. You know, earlier, the general overall, I was kind of looking at the spacing between lines and that sort of thing. Now, I'm getting down to spacing between words and spacing between letters, and what I have found was very, very close spacing. The letters, many times touch each other . . . .

(*Id.*; *see also id.* at 51-53 (applying this analysis to the known documents and Bolegg Letter).) Pearce concluded that the spacing was consistent between the known documents and the questioned documents. (*Id.* at 53.) She explained that having letters touch each other "is his style and his habit even though they may look a little different at first. When you really get into it, you say a-ha, this is the same person." (*Id.* at 52-53.)

Pearce also analyzed the slant of the letters and the speed with which they were written. (*Id.* at 53-55.) Pearce concluded that the slant was inconsistent in both the known and questioned documents. (*Id.* at 55.) She concluded that "this guy does not write consistently. He has some consistent habits, but you will find so many variations in the writing in almost every area." (*Id.*) Pearce agreed that the variation in the slant was a consistency between the known and the questioned documents. (*Id.*) It is standard practice for a handwriting analysis to examine speed, spacing and slant. (*Id.*)

In the next step of her methodology, Pearce "started taking a closer look at the full motions of the letter, the strokes, the heights, the lengths and all that . . . ." (*Id.* at 55-56.) Pearce described similarities in how Bond formed certain letters between various documents, as well as variations. (*Id.* at 56.) Pearce explained that

> [a] variation is something that a writer does on occasion. It could be frequently or rarely, but it's a variation from his regular habit, but a difference is something he just does not do, you will not find that, so that's—but that's why you have to spend a lot of time with the document because you have to look at every single word, every letter of each word to find out what he never did or that he does on occasion.

(*Id.* at 56-57.) Pearce's analysis attempted to distinguish a variance from a difference. (*Id.* at 57.)

Applying these standards, Pearce testified that pointed M's and rounded M's were variations of Bond's style. (*Id.* at 59; *see also id.* at 58 (same), 63 (same).) Pearce also found that the N's in the known and questioned writings had similar features in the final downstroke. (*Id.* at 59, 60, 61.) Bond frequently wrote his E's as capital letters even when they were lowercase. (*Id.* at 60, 62; *see also id.* at 66 (some of Bond's E's "look like a printed block E and some look like the Greek E").) Bond did not use apostrophes (*id.* at 61-62), and his I's often were not dotted (*id.* at 63, 65). "The

T-H's are reasonably tall" and "the T bar crosses pretty much at the top of the H, the little hump there. . . . Anyway, the T bar on that T-H usually kind of almost touches the hump of the H and then goes down, so that's identical." (*Id.* at 63-64; *see also id.* at 57 (same), 59 (same).) Pearce testified that "sometimes that H will have a very rounded top, and sometimes it's kind of squared off at the top, so that again is another variation, but it's not a difference because he does it both ways." (*Id.* at 64.) The T's consistently had a sweeping bar. (*Id.* at 67-68.) The I's were unique in that they had rounded tops and rounded bottoms. (*Id.*) Despite the many variations, Pearce was still able to render an opinion. (*Id.* at 68.)[24]

Pearce was asked how she knew that the similarities between the known and the questioned documents were not the result of simulation, and she replied:

> Well, in simulation, I look for evidence of that and I would find patching, dotting where you have held the pen on the paper too long and the ink has begun to fill it up. The patching, you would maybe make a letter, decide I want that Y to be a little longer, so you go back and patch it or fix it to try to make it look like the author, so I did not find that. No angles that I can't explain except in the known writing, like the George, how the G turned backward, that would be kind of what I'm looking at in the questioned, but I didn't see it in the questioned. I did see that once or twice in the known writing.

(*Id.* at 69.) Pearce testified that it is standard practice to look for patching, dotting and angular movement when examining a document. (*Id.* at 69-70.) Pearce explained that "that gives you tips as to whether or not it has been simulated or not." (*Id.* at 70.) She "concluded that it's not simulated writing, that it's just extremely varied and inconsistent, but it's definitely that of Anthony Bond." (*Id.*) Pearce testified that she was "[q]uite certain" of her conclusion. (*Id.*)

After reading the report prepared by the Government's expert, Pearce examined the questioned writings for indented writing. (*Id.*) "Indented writing is where you have a piece of paper, then maybe you put something over that and then write, and then you may have a little bit of an impression from what you have written over your document." (*Id.*) Pearce testified that "I did not

_____

[24]The demonstrative exhibits used by Pearce during her testimony were admitted as Hearing Exhibit 45.

see anything that would indicate with the naked eye or with infrared, you know. That was a problem here. I didn't see anything, so I didn't pursue that." (*Id.*; *see also id.* at 71 (to test for indented writing, Pearce "used the infrared lighting and magnification and actually felt the writing—the paper").) According to Pearce, the best way to test for indented writing was with an electrostatic detection apparatus ("ESDA"), which "kind of magnetizes some particles so that they will fall into the trenches and make them visible to—it would not be visible to the naked eye, but if you can use this machine, sometimes it appears something there that you couldn't see before." (*Id.* at 71.) Pearce did not have an ESDA, but she testified that, "[i]f I felt like it was really, really essential in the case, then I would submit it to a lab." (*Id.*) The fact that Pearce saw no indented writings "didn't impact [her analysis] either way." (*Id.* at 72.)

Pearce examined the ink used on Q-1 and Q-2 after reviewing the report prepared by the Government's expert. (*Id.*) Pearce testified that, with the equipment available to her, she did not see any difference in the ink used on the two documents. (*Id.*) She testified that, "through magnification, I could see that they's both light black ink. I could see copper colored flakes, but I could see that on both, so that didn't tell me anything." (*Id.* at 72-73.) Pearce conceded, however, that "I don't doubt that [the Government's expert] could see under different filters." (*Id.* at 72.) Pearce did not believe it made any difference whether Bond had used a different pen to address the envelope than he did to write the letter:

> I didn't see the point, because a lot of times I have written a letter, and I know my sister has, and not mail it for a day or two. You might pick up any pen, you know, and then address the envelope if it is after the fact or maybe you have gone to lunch and come back and pick up another pen. So I don't find that significant, it doesn't say anything to the authorship.

(*Id.* at 73.) Pearce was asked whether Bond had access to multiple pens, and she replied, "Yes. I called the Tennessee corrections officer, spoke with him, and he said that in 2002, they would give, you know, paper and pens to the prisoners, so he had access to those." (*Id.*) The findings about the indented writing and the ink impacted Pearce's analysis "[n]ot at all either way." (*Id.*)

Pearce's final conclusion was that "I strongly feel that Mr. Bond wrote both those, Q-1 and Q-2." (*Id.* at 74.)

On cross examination, it was noted that Pearce identifies herself on her *curriculum vitae* with the letters CDE and CGA. CDE stands for certified document examiner. (*Id.* at 75.) CGA stands for certified graphoanalyst. (*Id.*; *see also* Hr'g Ex. 1 at 1.) Pearce was asked whether the initials "CDE" and "CGA" were essentially meaningless, and she replied, "Not to me, they're not." (10/12/2011 § 2255 Hr'g Tr. 106, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) "You may not take it seriously, but that's your opinion. If I'm not mistaken, that's some of the same initials that Mr. Sperry uses." (*Id.* at 107.)

Apart from one semester of psychology, Pearce did not go to college. (*Id.* at 75-76.)

Pearce's fee schedule used the term "certified forensic document examiner." (*Id.* at 76; *see also* Hr'g Ex. 1, "Schedule of Fees and Services.") Pearce was asked the difference between a certified forensic document examiner and a certified document examiner, and she responded, "Basically, none. I think forensic means that I'm able to testify in court or that my findings can be presented to courts." (10/12/2011 § 2255 Hr'g Tr. 76, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Pearce was asked whether she had ever testified or been qualified as a document examiner in the United States District Courts, and she replied that "I'm not as well versed in the different courts, sir." (*Id.* at 76-77.) After examining her *curriculum vitae*, Pearce noted that "there's a federal court in Greenville, Tennessee that I testified in." (*Id.* at 78-79.) Pearce was not certain whether that was a district court or a bankruptcy court and also did not recall if she testified before a jury in that case. (*Id.* at 79.)

Of the seventy times Pearce had testified previously, "[s]ome are before juries, some are before the bench, some are depositions only, probably half a dozen or maybe a dozen depositions or arbitrations." (*Id.* at 77.) Pearce did not know how many times she had testified before a jury. (*Id.*) She testified that it had occurred "[a] few [times]. I really do not know how many times." (*Id.* at 78.) She recalled that "I have done it a few times or several times." (*Id.*)

In response to where she had testified before a jury, Pearce stated that "[o]ne time would have been in Madisonville, Kentucky," but she did not know whether it was state or federal court. (*Id.*) She testified that "I know I have been in state court before, even here in Memphis," but could not say whether she had testified before a jury in that case or cases. (*Id.*)

Pearce testified she had been certified as a document examiner. (*Id.* at 79.) She was certified by "[t]he Institute of Graphological Science out of Dallas, Texas, and also a gentleman named Felix Klein." (*Id.*) The Institute of Graphological Science is "the only accredited school that I am aware of that teaches document examination. They are in Dallas, Texas, and they are literally licensed by the State of Texas." (*Id.* at 80.) The Institute of Graphological Science has "an on-campus, and they also have the correspondence courses that you can take." (*Id.*) The campus is "relatively small. They have the buildings where you meet. They don't have dorms." (*Id.*) Pearce elaborated:

> Q.     Is it in an office building?
>
> A.     No, actually, it was connected to a residential area, it was in a residential area.
>
> Q.     So the institute is in—is it in a house?
>
> A.     Well, there's a house on the property, yeah, but where you had the school is out back in a classroom.
>
> Q.     So the school was out back of a house in a residential area?
>
> A.     That's correct.
>
> Q.     Okay. And you have been there, correct?
>
> A.     Yes, I have.

(*Id.*)

Pearce attended a four-day "intense workshop" at the Institute in 1989. (*Id.* at 80-81.) At the conclusion of the workshop, Pearce took a test administered by Felix Klein. (*Id.* at 81.) Klein was speaking at the Institute and put on the workshop Pearce attended. (*Id.*) The Institute was run by Dr. Mary Lynn Brighton. (*Id.*) Pearce believed that Brighton had a doctorate in psychology, "and handwriting has a lot to do with psychology." (*Id.*) According to Pearce, at the Library of Congress

126

"you would find information about the handwriting would be filed under psychology area." (*Id.* at 82.)

Pearce paid about $400 to attend the workshop at the Institute for Graphological Science. (*Id.*) In response to whether there was a laboratory at the Institute, Pearce testified, "I don't remember a laboratory at that time there. Now, they may have had one that I didn't see because we were seated in a classroom and we had the necessities like measuring tools or magnifying glasses, that sort of thing." (*Id.*) Only those people who passed the test received a certificate. (*Id.*) Pearce passed "[w]ith flying colors." (*Id.*) The test was oral, "but we have to give written answers." (*Id.*) She did not know the pass rate, but testified that "most people were there because they had a genuine interest, they weren't there to fail, they really wanted to learn, so I would say most of them passed, but not all." (*Id.* at 83.)

Pearce says she was also certified by Felix Klein. Klein had been trained in Austria. (*Id.*) Pearce did not know who had accredited Klein. (*Id.*)[25]

Pearce also took a four-day course from Andrew Bradley out of Colorado. (*Id.* at 83-84.) Bradley, who had been trained by the Secret Service, taught his own course. (*Id.* at 84.) In addition to the four-day course, Pearce took a correspondence course from Bradley. (*Id.* at 83, 84.)

In response to how many months of full-time training she had had in forensic document examination, Pearce testified that "[t]hat's hard to say, because there would have been my mentor Pat Fuller." (*Id.* at 84.) Fuller was "a well-recognized handwriting expert in the Nashville area." (*Id.* at 84-85.) Pearce testified Fuller was recognized by the National Association of Document Examiners. (*Id.* at 85.) Membership in the National Association of Document Examiners required more than just payment of a fee. (*Id.*) Pearce testified: "Absolutely not. You have to have references, you have to have a brain . . . ." (*Id.*) Pearce may have testified in a deposition that

---

[25] It is unclear whether the certification by Klein is different from the certification by the Institute for Graphological Science. Pearce had testified that Klein conducted the seminar for the Institute and administered the test. (*See id.* at 81.)

membership in the National Association of Document Examiners required only payment of a fee, but she clarified that, "if you want to be certified by them, no, that's wrong. If you just want to be an associate member, then you can pay a fee and belong, depends on what your objective is." (*Id.*)

Pearce was asked whether she had been certified as a document examiner by any recognized certifying board, and she replied that, "[u]nless you're in the government, you don't have one that's a recognizing board, and we are—as private practitioners do not normally have an opportunity to go to the government training because we're not law officers. I'm a little old to be climbing ropes and, you know, passing physicals, so it wouldn't work for me." (*Id.* at 85-86.) Pearce had not been recertified by any recognized certifying board. (*Id.* at 86.) She testified that "I have just continued my studies as the years have gone by, but, no, I have not been recertified, and I know that the government does that. But I'm not the government, I'm a private practitioner." (*Id.*)

Pearce had been peer-reviewed in the sense that she discussed her cases with Fuller and "some of my associates . . . ." (*Id.*) She also once attended a conference or seminar at which "we all reviewed each other's work in that particular time." (*Id.*) Pearce had never published in a peer-reviewed publication. (*Id.*) She had not been certified by the American Board of Forensic Document Examiners ("ABFDE"). (*Id.* at 86-87.) Pearce seemed to believe that the ABFDE was a government agency, and she was not certain whether private individuals could join. (*Id.* at 87.) Pearce was unfamiliar with the by-laws of the ABFDE and did not know whether she was qualified to join. (*Id.*) She might have testified at a deposition that she was ineligible to join the ABFDE because she lacked a college degree. (*Id.* at 87-88.) She testified that "I think that is one of the requirements, but I don't know all the requirements, I really don't." (*Id.* at 88.)

Pearce's *curriculum vitae* also states that she is a certified graphological analyst ("CGA"). (*Id.*; *see also* Hr'g Ex. 1.) She testified that "graphological training . . . taught me the basics of what to look for in handwriting. It doesn't matter whether I'm looking for something for court or if I'm doing a graphoanalysis, because I'm looking at much of the same thing in the letters, the spacing, the uniqueness of the letters and so on." (10/12/2011 § 2255 Hr'g Tr. 88, *Thomas v. United States*,

128

No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)   Perce was certified by "the Graphoanalysis Society out of Chicago." (*Id.*)  Pearden denied that she had been certified as a graphoanalyst by the Institute for Graphological Science in Dallas at the same time she was certified as a document examiner. (*Id.* at 88-89.)  She testified that "[t]hose were two separate things.  I got—the certified graphoanalyst was a two-year course that I took out of Chicago." (*Id.* at 89; *see also id.* at 102 (Pearce was certified as a document examiner and as a graphologist in 1989, but she noted that it was "[t]he same year, but it wasn't from the same people.  It wasn't from the same course.").)   She conceded, however, that the Institute for Graphological Science also taught graphology. (*Id.* at 90.)

Graphology is "personality or character assessment" as revealed by handwriting. (*Id.*; *see also id.* at 89-90 (a certified graphoanalyst analyzes "[p]ersonality and character assessment").) Pearce contended that she could prove that a person's personality or character can be revealed through his or her handwriting. (*Id.* at 90.)  She insisted that "I'm not a witch doctor.  I'm not a fortune teller, I'm not a clown, I'm for real and I can prove it." (*Id.* at 91.)  Pearce testified that only an ignorant person would liken graphology to palm reading. (*Id.*)

Pearce self-published a book about graphology, titled *Love Letters A to Z, Insights into Romance, Love and Sex*. (*Id.* at 91.)  The introduction to the book contains the following passage:

> Do you find yourself trusting the wrong person?  How many times have you given your heart away to one who does not deserve your love?  Have you ever thought you had found Mr. or Mrs. [R]ight only to find later they were all wrong for you?  Well, don't give up.  There's hope for you yet.  By taking an instant look at a person's handwriting, you can tell if you should take a closer look or turn around and run. Why invest weeks, months or even years if there's no way things will ever work out[!]  I spent 18 years in the single scene and almost as long as a bewildered wife before I got wise and applied the science of graphology to bypass the pitfalls of love, romance and sex.  Now, I'm happily married, own my own business and live in peace and harmony with others.

(*Id.* at 93.)  Pearce agreed that "[i]f you don't put any endings on your letters . . . , you're tight, you don't want to spend your money." (*Id.* at 91-92.)  If someone puts a small bag in the bottom loop of their Y's, "[i]t means you like to have that little money packed in your little bag and holding onto

it." (*Id.* at 92.) An extremely long A means that the writer is an adventuresome lover who finds the chase exciting. (*Id.* at 94-95.) A writer with wide upper loops is susceptible to flattery but cannot stand criticism. (*Id.* at 95.) The use of inflated loops means that the writer is imaginative. (*Id.*) An F with a downward-pointing bar means the writer is controlling. (*Id.*) An "x ring" in an F means the writer is self-destructive. (*Id.* at 96.)

Pearce wrote the book to assist her single friends "that would get the wrong person and then be heart broken, it didn't work out . . . ." (*Id.* at 95.) The book was "slanted toward the love scene." (*Id.*) Pearce insisted that the book is "accurate," although language on the back cover about "[n]o more broken hearts, no more broken bank rolls, no more wasted time" was "hyperbole." (*Id.* at 96.) Pearce was asked whether her mentor, Pat Fuller, had been one of the editors, and she replied that Fuller "looked through it for me, yes. I asked her if she would go through it, but that had nothing to do with her business whatsoever." (*Id.* at 92.)

Pearce insisted that graphology is a science. (*Id.* at 93.) She testified that, "[i]f you're taught properly, it is a science because it works the same way every time. Two and two always make four, four and four always eight." (*Id.*) Pearce was taught the science of graphology by a "[g]entleman named Bunker out of the Chicago area. It was actually kind of the one who wrote the Bible, you might say." (*Id.*) Pearce could not remember her teacher's first name. (*Id.* at 94.)

Pearce was asked whether she had ever charged clients money for graphological services, and she responded that

> [w]hat I have done on occasion, because this is a kind of a happy and light side of my business and only about one percent or maybe even less than one percent of my business, yes, on Christmas, a lot of people like to have what they call entertainment, and they don't like to hear about anybody more than they like to hear about theirself [sic], so I can and do on occasion rarely provide entertainment for like a party or something like that.

(*Id.*) The back cover of her book states that Pearce has analyzed the handwriting of music stars, famous politicians and presidents. (*Id.* at 96-97.) Pearce testified that a newspaper might ask her to analyze the handwriting of presidential candidates. (*Id.* at 97.) Pearce also testified that

I live in Nashville, we have a lot of country stars there, sometimes they have get-togethers and parties, and they would invite me as [party] entertainment to analyze certain people. The TV may say, Marty, we're going to do a story on such and such, would you come and analyze some of the stars.

(*Id.*) Pearce then testified as follows:

> Q.    And it says here [on the cover of her book]—it says that to Pearce handwriting is like looking through a glass window right into the brain. Over the past 30 years, she has actually demonstrated how her every thought is revealed through the little scratches we make with pen and paper, correct?
>
> A.    That's correct. I'm sorry that it offends you, but it's still true.

(*Id.*)

Pearce's book states that she examined the last will and testament of Tammy Wynette. (*Id.*) Pearce's *curriculum vitae* states "Document Examiner of the LAST WILL & TESTAMENT of Country Music Legend, TAMMY WYNETTE." (Hr'g Ex. 1 at 2.) Pearce testified that "Channel 5 News out of Nashville hired me to look at the documents to see whether or not it was Tammy's signature. Also, some medical documents, who had the right to give her medication and shots, and those documents were legit." (10/12/2011 § 2255 Hr'g Tr. 97-98, *Thomas v. United States*, No. 2:03-cr-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) At that point, the following exchange occurred:

> Q.    I though you said on direct examination, I thought you said that you testified in the will case of Tammy Wynette?
>
> A.    I don't think I said I testified in that case.
>
> Q.    So absolutely—
>
> A.    I said Channel 5 hired me. I came to a conclusion in the case, and they used that on Channel 5 news.
>
> Q.    You think on direct examination you didn't say you testified in the Tammy Wynette case, you think you said that Channel 5 of Nashville hired you, is that what you think you said?
>
> A.    That's what I think I said.
>
> Q.    But there's no question you didn't testify in a court proceeding in the Tammy Wynette case?

> A.     No, I didn't, no.
>
> Q.     Nobody hired you in that case, correct?
>
> A.     They didn't pay me, no.  Channel 5 asked me if I would do that for them for their news coverage, and I did, freebie.

(*Id.* at 98.)

Pearce's *curriculum vitae* states that she published two articles in *For the Defense*, a bi-monthly newsletter published by the Tennessee Association of Criminal Defense Lawyers.  (*Id.* at 99; *see also* Hr'g Ex. 1 at 2.)  Her *curriculum vitae* also states she is a member of the Tennessee Association of Criminal Defense Lawyers.  (10/12/2011 § 2255 Hr'g Tr. 99, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)

At the hearing, Pearce testified as follows:

> Q.     You're not a criminal defense lawyer, correct?
>
> A.     No, of course not.
>
> Q.     This is an association of defense lawyers?
>
> A.     Right.
>
> Q.     They don't have any accrediting standards for handwriting or anything like that, right?
>
> A.     No.
>
> Q.     Are you a member?
>
> A.     I am a member.
>
> Q.     You don't have to be a lawyer, you can pay your money and join the Tennessee Association of Criminal Defense Lawyers, is that right?
>
> A.     Probably so, yeah.

(*Id.* at 99.)

Pearce's *curriculum vitae* states that she had been "[a]pproved to teach Document Examination at Glencliff High School (Community Education) in Nashville, TN since 1993."  (Hr'g Ex. 1 at 2 (emphasis omitted).)  Pearce testified that she had been approved by someone at Glencliff

High School "that was over the night classes . . . ." (10/12/2011 § 2255 Hr'g Tr. 100 , *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Pearce's *curriculum vitae* also states that she had been approved "to teach Handwriting Analysis at Nashville Tech, since 1987." (Hr'g Ex. 1 at 2.) Pearce testified that she had been approved by "[w]hoever was in the office there, I don't recall." (10/12/2011 § 2255 Hr'g Tr. 100, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)

Pearce's *curriculum vitae* states that she had been a "Document Examiner on the BYRON "LOW TAX" LOOPER case in the murder of Tennessee Senator, Tommy Burks." (Hr'g Ex. 1 at 2.) Pearce, however, added that she did not testify in court on that case. (10/12/2011 § 2255 Hr'g Tr. 100, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Pearce explained that she had been retained but "it didn't go his way." (*Id.*) Pearce denied that her resume made it appear as if she had testified in court as an expert: "No, I didn't say I did. I worked the case, it doesn't mean—hey, I work a lot of cases that never go to court." (*Id.* at 100-01.)

Pearce testified she is self-employed as a full-time certified document examiner and certified graphological analyst, spending "at least 40 hours a week, sometimes a lot more" at her profession. (*Id.* at 101.) She clarified that she worked at least forty hours a week "[a]s long as I have a case . . . ." (*Id.*) Pearce's hourly rate is $100. (*Id.*) When asked again whether she has actually worked forty hours per week at $100 per hour, and she replied:

> No, no, but I'm not working—I don't always have a case every single day, but when I have cases, I'm working at least 40 hours a week, maybe even more. No, I don't make big, big bucks. If I did, I could afford some—

(*Id.*) Pearce estimated her self-employment income for 2010 to be $23,000. (*Id.* at 102.) She was asked again whether she worked many forty-hour weeks, and she replied:

> Quite a few. It's kind of like when you go into a shop, you know, and they're either dead or they are busy, so I do have lulls and then I have them when I'm slammed. If I'm slammed, I work until the job is done, I don't care about the hours.

(*Id.* at 102.)

The only equipment Pearce has used in the graphology part of her business is a magnifying glass.  (*Id.*)

Before she worked as a document examiner and graphologist, Pearce "was in real estate and mortgage banking . . . ."  (*Id.*)  Pearce has been a loan officer and she sold "real estate for quite some time."  (*Id.*)  She also worked as a secretary for a while.  (*Id.* at 103.)

Pearce was asked what kind of a laboratory she had for her document examination analysis, and she responded that "I mentioned the tools that I had, the light box, the infrared lighting, the tools that measure, the micronta, the magnifying equipment."  (*Id.*)  A micronta "is a 30-power magnifying tool."  (*Id.*)  The cost of a micronta is approximately $30.  (*Id.*)  The micronta was purchased at Radio Shack.  (*Id.* at 104.)

Pearce was asked about the difference between an objective lens and an ocular lense on a microscope, and she responded, "I am not too sure because my microscope has not the double vision, mine has the one lens[]."  (*Id.*)

Pearce testified that a VSC is

an apparatus that you . . . can put two documents down and view them at the same time instead of going through all the rig[a]marole of having to find the words and cut them out and place them side-by-side like I've had to do.  So it saves you a great deal of time, I'm sure.  It also, I believe, has infrared lighting where you can change the wave lengths so that you might be able to see differences in ink.

(*Id.*)  Pearce did not own a VSC and did "[n]ot normally" use one in her document examination practice.  (*Id.* at 104-05.)

Pearce knew what an ESDA is.  (*Id.* at 105.)  In response to whether she owned and used one in her practice, Pearce testified:

Again, we're talking—if I were a doctor, I probably wouldn't own an MRI, I would probably have to send that out.  However, same kind of deal here, I do what I can do and I know my limitations.  If it is something beyond me, I send it to someone who can handle it.

(*Id.*)

Pearce testified that she did not earn enough to afford expensive equipment and that, "[i]f I needed that, then I would have to send it to a lab, but at least I know if I need it." (*Id.* at 103.) In response to how often she had sent things to the lab, Pearce testified that "I can remember one time in particular sending something to California." (*Id.*) Pearce could not recall the name of the lab that she used in that case, but she testified that "I want to say the guy's name was Motley or something." (*Id.*) Pearce was asked whether that was the only time she had used a lab, and she replied that it was "[t]he time that I remember. Like I say, my memory is not wonderful. I'm getting up in years and thinking of retiring." (*Id.* at 105.)

In response to what training she had received in the differentiation of different kinds of ink, Pearce testified that

> I haven't had a great deal of training in that, however, I'm limited to what I can see under a great deal of magnification, lighted magnification. If it was extremely important, pertinent to the case, then I know that there are labs that could be send [sic] to, but I also know that those labs with chemical testing can damage my document, and I was under specific orders not to damage these documents.

(*Id.*) The training Pearce received in differentiating inks "was part of Mr. Bradley's course." (*Id.* at 106.) That was a correspondence course that Pearce started but decided not to complete because "it was so extremely time consuming that I decided in the end—I was making A pluses, so I decided that I'll use these as references, and that's what I have done, so I have that, and then I have like Osborne books or whatever books that assist me." (*Id.*)

Pearce identified the rebuttal report that she prepared after receiving the report prepared by the Government's expert. (*Id.*)[26] Pearce did not dispute the conclusion of the Government's expert that Q-1 and Q-2, the envelope and Bolegg Letter, were written with different ink. (*Id.* at 107.) Pearce testified that "I don't see the significance" of that finding. (*Id.*) "I don't see that it proved either way the authorship, and that is what we're trying to look at is the authorship of this document." (*Id.* at 108.)

---

[26]Pearce's report was received as Hearing Exhibit 43, and her rebuttal report was Hearing Exhibit 44.

Pearce had been taught that chemical testing is the most reliable method of ink analysis. (*Id.* at 107.) That information came from the course Pearce took at the Institute of Graphological Sciences in Dallas. (*Id.* at 107-08.)[27]

Pearce affirmed that she had taken it upon herself to call an officer at the Tennessee Department of Correction to find out whether they use multiple pens. (*Id.*) She was asked whether that was an appropriate part of a forensic document examination report, and she replied that, "[a]ctually, that's the first time I have ever used that. But why not? I mean it doesn't hurt anybody." (*Id.* at 109.) Pearce added that "[w]hat I'm trying to get at is the truth." (*Id.*) She conceded that she was not a private investigator. (*Id.*)

Pearce had not heard of an organization called ASTM. (*Id.*) She did not know whether the ASTM was a worldwide organization that sets standards for the forensics profession. (*Id.* at 109-10.)

Pearce conducted the document examination for this case in her office. (*Id.* at 110.) In response to what she did, Pearce explained that

> I looked at all the documents, both questioned and known, and compared those documents to each other, and then broke it down and broke it down and broke it down to make sure that I had all of the information that I could find in those documents about the writing. Then I weighed my information, and like I said, the only thing I could not explain out of those would have been the little down stroke on a U, and that's the only so-called difference if it is a difference, it may be a variation, it may do that elsewhere, but I didn't see it. So to me, it was a possible difference.

(*Id.*) The only equipment used by Pearce was the microscope she had purchased at Radio Shack, a jeweler's magnifying glass and different measuring instruments. (*Id.* at 110-11.) She did not use any computer-assisted equipment or analysis. (*Id.* at 113.) Pearce testified that "I did it the old-fashioned way." (*Id.*)

---

[27] It is unclear from Pearce's testimony where she heard this information. She said, on the one hand, that chemical testing "may have been mentioned [in the four-day course in Dallas in 1989], but it was also in Bradley's course." (*Id.* at 107-08.) Pearce was then asked whether Bradley's course had been given in Chicago in 1989, and she responded that "that would have been Dallas, Texas" at the Institute for Graphological Science. (*Id.*) The Court assumes that Pearce meant to refer to the course she took in Colorado.

Pearce was not familiar with the term "form discrimination test." (*Id.* at 111.) Pearce did not have the equipment to do a color perception test. (*Id.*) Pearce did infrared testing using "just the infrared bulb." (*Id.*) She testified that "I don't have the different filters, but it's still to me a moot point because that has nothing to do with who wrote the envelope or wrote the letter." (*Id.*)

Pearce was familiar with the term "simulation," which she defined as "when you try to make your writing look like that of another. You may add little lines to make it longer or you may go this direction instead of your normal direction, but generally in a simulation, you're going to get a little bit of yourself in there . . . ." (*Id.* at 111-12.) Pearce saw "no signs" of simulation. (*Id.* at 111; *see also id.* at 112 (same).) In response to whether she saw a difference between the Bolegg Letter and the writings of Bond, Pearce testified that "[t]he only true difference that arose was the final stroke on the U. Everything else in my opinion is a variation." (*Id.* at 112.)

In response to whether she had any experience with "examining jailhouse writings, inmate writings," Pearce testified "Not many." (*Id.*)

Pearce confirmed that she had not noticed any indentations on the Bolegg Letter and the mailing envelope. (*Id.* at 112-13.)

Pearce did not use her training in graphology to analyze Bond's personality. (*Id.* at 113.) Pearce's training in graphology

> supported [her] efforts simply because it teaches you the many things you have to look for. It teaches you basically the same thing that you're looking for initially in document examination, such as the stroke formation, the lightness or darkness of the writing, that is the pen pressure. It teaches you about spacing and speed and the beginnings of the letter, the endings of the letter.

(*Id.*) Pearce insisted that "[j]ust because I saw it first in graphology doesn't take away from the fact that it is true." (*Id.* at 114.) Pearce used "all the training that [she] had" in performing the analyses in this case. (*Id.*) On redirect, Pearce testified that she was not asked to conduct a personality assessment of Bond. (*Id.* at 117.)

On cross-examination, Pearce testified that she had heard of the *Daubert*[28] case and did not believe she had ever been through a *Daubert* hearing. (10/12/2011 § 2255 Hr'g Tr. 115, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)

On redirect, Pearce testified that a college education was not required to be a document examiner. (*Id.*) "At least it wasn't through where I was certified, no." (*Id.*) She conceded that "[i]t may be with Mr. Sperry's board . . . ." (*Id.*)

Pearce testified that it did not matter to her whether she testified before a judge or a jury or whether she was in federal court or state court. (*Id.* at 116.)

Pearce testified that graphology is a personal interest that had no bearing on her qualifications as a document examiner. (*Id.*) If anything, graphology enhances her qualifications "because they have taught me to look at so many minute details." (*Id.*)

According to Pearce, most private practitioners do not have video spectral comparators because they are too costly. (*Id.* at 117.) The machine is not necessary to function as a document examiner in private practice. (*Id.*) It is not standard in the industry that a document examiner must use computer-assisted analysis. (*Id.*)

—**Grant R. Sperry**—

The Government called Grant R. Sperry, a forensic document examiner. (*Id.* at 119.) Sperry testified that

> [m]y primary responsibilities are to conduct examination comparisons over documents that—where there's some question. Generally speaking, questions arise with respect to origin, date and authenticity. Primarily, my examinations focus on the issue of handwriting, whether or not a particular person wrote or did not write a handwriting, but includes such examinations involving date of document, whether or not a date of a document is consistent with the document properties, examinations of stamped impressions, trying to source machine printed entries, whether or not a particular document was copied under a particular copier produced by a particular printer. At the ends of these types of examinations, I render a written report and frequently testify in judicial proceedings or depositions.

---

[28]*Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579 (1993).

(*Id.* at 119-20.)  At the time of the hearing, Sperry had worked as a forensic document examiner for "[a] little over 32 years continuously."  (*Id.* at 120.)

Sperry testified to the formal education and technical training he had received to prepare him to conduct examinations of questioned documents:

> I have completed a two-year in-residence course in forensic document examination with the U.S. Army Crime Laboratory back in the late '70's.  That course was broken down into two phases over the course of two years, an academic and a practical application phase.  The academic phases, of course, is where I studied the various authorities, books and sources, took some seminars and [was] certainly under the supervision of the document examiners with many years of experience.  Practical application in line with the academic part of that course involved the use of various —training and use of various types of equipment and instruments in the forensic document examination profession.  The video spectral comparator, the electrostic detection apparatus, the ESDA, as it's known, microscopy, various other types of analytical equipment.  At the end of the two-year period, I was certified, having tested routinely during that course.  I was certified by the Department of Army in the Criminal Investigation Command as a forensic document examiner.

(*Id.* at 120-21.)  Sperry had also completed other courses in forensic document examination:

> Subsequent to that two-year training program, I completed an FBI's course in forensic document examination, the Secret Service's course on forensic document examination, received additional training in forensic document examination at the Central Intelligence Agency Laboratory in Washington, D.C., the Royal Canadian Mounted Police Laboratory in Canada, the Bureau of Printing and Engraving in Washington, D.C., what used to be the IRS Laboratory in Washington, D.C., Georgia Bureau of Investigation Laboratory and various other laboratories throughout the country.

(*Id.* at 121.)

Sperry is a member and past president of the American Society of Questioned Document Examiners.  (*Id.*)  He has been certified and recertified by the American Board of Forensic Document Examiners ("ABFDE") and is a member of that organization's board of directors.  (*Id.*)  He is also a member of the Southeastern Association of Forensic Document Examiners, a member of the American Society of Testing Materials International ("ASTM") and a fellow with the American Academy of Forensic Sciences.  (*Id.*)

The ABFDE is the main certifying body in the United States for forensic document examiners.  (*Id.* at 122.)  Sperry testified that

> [t]he American Board of Forensic Document Examiners is a certif[ying] body. And the purpose of certification, the purpose of the board is to set certify[ing] standards and to provide training to meet those standards and test individuals on their basic competency in forensic document examination. It involves—first of all, you have to meet the prerequisites which include a college degree, four-year degree, a recognized two-year in-residence program or training program in forensic document examination, and those are prerequisites before you apply for certification. The certification process involves a fairly extensive written examination followed by[,] if you pass that, practical examinations and ultimately an oral board.

(*Id.*)

Exhibit 9 is Sperry's *curriculum vitae*. (*Id.* at 122-23.) In response to whether he has conducted research or published articles in the field of questioned documents, Sperry testified that he has conducted various research projects, including one on disguised writings. (*Id.* at 123.) A disguised writing "is simply where an individual is trying to distort their writing in some fashion to render it unidentifiable." (*Id.*) Sperry has "published in the Journal of Forensic Sciences, which is a peer reviewed journal, and . . . in the American Society of Questioned Document Examiners Journal which is also peer reviewed." (*Id.*)

Sperry testified that he has previously been accepted in court as an expert in forensic document examination. (*Id.*) He has "testified in numerous federal district courts." (*Id.* at 123-24.) He has also testified in courts in all branches of the military and in various state courts throughout the country, "in excess of 325 times or so." (*Id.* at 124.) Exhibit 10 is a list of the trials, depositions, and hearings at which Sperry has provided expert testimony. (*Id.*)

Sperry testified that he was previously employed in the United States Army forensic laboratory, "which is the executive agency in terms of forensics for the Department of Defense . . . ." (*Id.*) In that capacity, Sperry

> conducted innumerable, thousands and thousands of document examinations related to criminal investigations for the United States Military Department of Defense and testified in courts as a result of those around the world. I spent five years in Europe managing the Army laboratory there, forensic document section of that laboratory in particular, and retired from the Army, was a forensic document examiner in 1992. I have since worked with the United States Postal Inspection Service Laboratory here in [the] Memphis area. Since then, . . . through 2006 or so when the laboratory consolidated, and now I do private work, and I did private work before that as well, but now I do consulting work around the country.

(*Id.* at 125.) Sperry left the U.S. Postal Service Laboratory in 2006, when the laboratory essentially closed. (*Id.*) The U.S. Postal Service crime laboratory has been consolidated in Dulles, Virginia. (*Id.*)

At the time of the hearing, Sperry had his own business, and he also continued to work for the Postal Service managing security investigation services. (*Id.* at 125-26.) Sperry testified that "my particular unit of the inspection service issues security clearance from top secret on down, and conducts background investigations, things of that nature." (*Id.* at 126.) Sperry also provided litigation support for active criminal investigations. (*Id.*)

Sperry testified that he had been accepted as an expert in forensic examination of documents "well over 300" times. (*Id.*) The Government offered Sperry as an expert in forensic document examination, and the defense elected to defer its *voir dire* until cross examination. (*Id.* at 126-27.)

Sperry understood that the instant case involves questioned handwriting. (*Id.* at 127.) He testified at length about the factors that make handwriting identifiable. According to Sperry, identification of handwriting is based on two premises: "One is that no individuals have ever been found to have the same set of handwriting features and characteristics, and the other is that no two writings of the same individual will ever be exactly alike." (*Id.*) Handwriting characteristics include

> [s]pacing characteristics, pressure habits, embellishments, T crossing, I-dots, idiosyncracies, baseline habits, the list goes on and on. It's not any individual feature that allows for a writing to be identified or allows for one individual's writing to be separated from another. However, it is a cumulative effect of all these features and characteristics which have taken a number of years to develop that provides for the identification of one person's handwriting habits over another.

(*Id.* at 128.)

Sperry had had substantial experience with jailhouse writings. (*Id.*) He testified that "I have worked a lot of cases over the years, criminal cases where individuals are currently or were at that point incarcerated." (*Id.* at 129.) Sperry had a lot of business from the Mississippi State Penitentiary in Parchman, Mississippi, and from "Leavenworth and other federal prisons throughout the country . . . ." (*Id.*) Sperry explained that

what basically goes on in jailhouse writings, there are a—there are certainly gangs, [cliques] within a jailhouse, and part of what they do—and there's an attempt to—in one sense, and certainly this isn't true across the board, this is an example, they will as a standard of their particular gang or group, they will attempt to create their own writing styles, so they will create embellishments or symbols or that type of thing within the writing that becomes part of their signature, if you will, when they write. Another feature that we frequently see are efforts by writers to simulate the writings of other people. After all, some of these folks have nothing better to do all day long than to practice writing. So we work cases where one person is going to write a note or letter, but they don't want it to be associated with them, so they will have—they will draft out a letter and have another inmate write that letter for them, so if it ever comes back, something they shouldn't have done, then, well, they can say they didn't write it. In other instances, an inmate will replicate or attempt to replicate the writing of one person in order to infer guilt or for some sort of act on the part of that person whose writing they're trying to emulate.

(*Id.* at 129-30.)

> Sperry explained what he meant by the term "simulation":

>> Simulation is attempt[ing] to copy or reproduce another writing. Normally for purposes of attributing that particular writing to that—a writing to a particular person. So it involves—the simulation process basically involves looking at a writing and attempting to simulate the pictorial features of the writing in some fashion. What happens in simulation, the reason simulation fails, especially over an extended writing, even jailhouse writings, is because in the simulation, they are trying to reproduce it pictorially. So they will try to make a particular letter formation or try to emulate a particular characteristic that gives value in their sense or in their—in evaluation to the characteristic of the writing. In other words, they are looking at the writing, and they say this is what I see in this writing that makes it the P or the H or whatever it is that I need to emulate to make it look like this person wrote it, and so they [attempt] to replicate it. Where it fails many times is that yes, it may look like that, but the letter construction, microscopically, is not made in the fashion that the writer normally writes it in, the true writer. Frequently in simulations, you will see where there has been patching. Whoops, this particular letter feature isn't exactly right, so I will go and add the characteristic to it to make it look like what it is supposed to look like. And you see that quite a bit in simulations.

(*Id.* at 130-31.) Sperry explained that, in a simulation, a writer ordinarily will pick one pictorial feature of a letter and use that consistently, ignoring variations:

> [T]his is common, a person who is trying to simulate the general writing features and characteristics of a writer normally don't incorporate variation into their techniques. For the most part, either they're going to be consistent and you're going to see not much variation in terms of the pictorial appearance of the letter except that caused by their own habit interfering, whereas as in Mr. Bond's writing, you will see quite a bit of variation within his writing that [we're] not seeing within the questioned, so

there is more variation within the known writings as one would expect because it's naturally executed writing.

(*Id.* at 167.)

Sperry identified Exhibits 2 through 8 as "documents that were submitted to me for examination and comparison." (*Id.* at 131.) Sperry testified that "I recognize these by the exhibit designation which I placed on them by my initials." (*Id.*) For example, on Exhibit 2, "[t]hat scribble in the right-hand corner above Q-1 are [Sperry's] initials." (*Id.* at 131-32.) Sperry also initialed Exhibits 3 through 8. (*Id.* at 132.)

> Sperry explained that
>
> [i]ndented writings or impressions are simply normal latent impressions, frequently visible, but many times latent impressions that are left when you make some sort of a writing or marking on a document that transfers to a document below it. We frequently encounter it in working with check cases, obviously, the impressions of a preexisting—or check 203 above check 204, threatening notes, harassing notes, even suicide notes, also examine for impressions, see what type of information may be on those types of documents. A lot of the ability to detect impressions depends on the type of writing instrument that was used, writing pressure, things of that nature.

(*Id.* at 133-34.) Sperry testified that, to check for impressions,

> I use an instrument called an electrostatic detection apparatus in addition to normal sidelining visualization techniques. ESDA, as it is known, is capable of detecting indented writings and impressions, you know, 10 or 12, 15 pages deep into a pad of paper, depending on, again, the variables that exist.

(*Id.* at 134.)

Sperry examined Exhibits 2 and 3, the questioned envelope and the Bolegg Letter, for indented writings. (*Id.*) Sperry testified that the envelope in Exhibit 2 was addressed with a black ballpoint pen. (*Id.*) "There's even overwriting. And there is sufficient pressure exhibited within the writing to indicate that should there be something underneath it, there should be some impressions left." (*Id.*) Sperry used "the ESDA as well as the visualizing indented writings technique, which is simply sidelining. Also, used in conjunction with ESDA, various techniques such as slight humidification of the document, makes it a little more porous, it is after all a little bit —somewhat older." (*Id.* at 134-35.) All of those techniques yielded negative results, which means

that "[t]he impressions from the address and return address entries on the envelopes, had there been nothing in the envelope at the time those entries were written, these impressions would be visible on the inside back of that envelope. They aren't." (*Id.* at 135.) That means

> that there was a piece of paper or something in the envelope at the time that the address entries were written. Additionally . . . , there's machine impressions on the document from the cancellation stamp of the Post Office, and the round dater cancellation impression. Again, those are machine produced entries that frequently find their way as impressions on documents. Those impressions are not on the back inside of the envelope either.

(*Id.*) Sperry reiterated that "there was something in the envelope at the time that the handwriting was put on the envelope and at the time the cancellation marks were made." (*Id.* at 135-36; *see also id.* at 137 ("The inside back of Exhibit 2, if there was nothing in the envelope at the time it was addressed should have the impressions of the address entries. . . . There were none.").)

Sperry also testified that the Bolegg Letter itself (Exhibit 3) had no impressions. (*Id.* at 136.) "**The impressions of the envelope entries were not on the letter, no machine markings evident through the various techniques that I conducted.**" (*Id.* (emphasis added).) **Sperry explained that this "means really that Exhibit 3 was not in the envelope, and some other letter was in the envelope at the time, that some other document was in the envelope other than Exhibit 3 at the time" it was addressed.** (*Id.* (emphasis added); *see also id.* at 137 (same).)

Sperry also examined the ink used on the Bolegg Letter and mailing envelope. (*Id.* at 137.) He explained that "I conducted a microscopic analysis of the inks. Both of them are black ballpoint pens on Exhibits 2 and Exhibits 3." (*Id.*) Sperry also "subjected both documents to examination utilizing alternate light sources, utilizing a video spectral comparator which [he had] in [his] laboratory." (*Id.* at 138.)

> A video spectral comparator is a device primarily used for detecting differences in inks, and it's very helpful in deciphering moderation, location of erasure sites, that type of thing, but it is mostly ink differentiation where you have two black inks that appear to the naked eye to be the same. Many, many times, they have different chemical properties that will react differently when subjected to different types of light. And the video spectral comparator allows me to use a series of filters to look at those inks or ink in areas of the spectrum that the human eye cannot detect.

(*Id.*)  That analysis showed that, "although the [black ballpoint] inks may appear to visually be the same, 2 and 3 were written with two different entirely different kinds of ink." (*Id.* at 138-39.)  In other words, the mailing envelope was written with a different type of black ink than the Bolegg Letter.  (*Id.* at 139.)

Exhibits 11 through 13 "are essentially screen shots or saved images of what appear on the screen of video spectral comparator when comparing the ink in Exhibits 2 and 3, using various techniques, a couple of different techniques." (*Id.*)  "Exhibit 11 is a screen shot that has both a portion of Exhibit 2 . . . and Exhibit 3 . . . .  And this is just to show how the documents appear under normal light." (*Id.* at 139-40.)  Exhibit 12 shows the same portions of Exhibits 2 and 3 when exposed simultaneously to infrared light filtered at 610 nanometers.  (*Id.* at 140.)  The ink on Exhibit 2 "is essentially dropping out, it is becoming invisible," whereas the ink in the Bolegg Letter was still visible.  (*Id.*)

Exhibit 13 depicts the return address portion of Exhibit 2 and a portion of the text of Exhibit 3.  (*Id.* at 140-41.)  Sperry explained that, "[i]n this particular case, we're looking at what we call infrared luminescence, and what is happening here is that the documents are being exposed simultaneously to a rather intense light source at roughly 400 to 540 nanometers and filtered at 695." (*Id.* at 141.)  "So what is happening is the ink on Exhibit Number 2 is luminescing, it is very bright, and the ink that comprises Exhibit Number 3 does not luminesce." (*Id.*)  After completing these tests, Sperry concluded that the ink used in addressing the envelope (Exhibit 2) was different from the ink used in the text of the Bolegg Letter (Exhibit 3).  (*Id.*)

Sperry also performed a handwriting analysis of Exhibits 2 through 8.  He explained the techniques used to analyze handwriting:

> In handwriting examination, the first order of business in my opinion is to examine the questioned writing . . . to determine whether or not it has value for identification. . . .  The purpose of that was to determine the writing's value in terms of identifying features and characteristics of the writing, letters, letter formations, habits with respect to letter combinations, relevant slant, absolute slant, naturalness of the writing or not, just evaluating the writing in its entirety.

(*Id.* at 141-42.) In performing that analysis, Sperry used the unaided eye and also used "a computer program designed specifically for forensic document examiners and designed specifically for this type of a case." (*Id.* at 142.) Sperry testified that this is a case in which "we have voluminous questioned writing or hand printing, and we also have voluminous known writings, so if I'm assessing what is a particular writer's habits in the questioned writing, I'm looking at the questioned writing, I'm trying to determine what the habits are with respect to this writer, among other things . . . ." (*Id.*) Sperry used a computer program that examines scanned images of the documents

> and then you take the images of those documents and you type in or key function the text of the documents, you actually type them in, and then you associate the text with the image, that particular word, if you will. From that point on, I can bring up any words, any letters that I want for comparison side-by-side, so I want to look at all the T-H's in the questioned document, I can look at every single one of them at once in a series.

(*Id.* at 143.) Sperry testified that the program "doesn't make comparisons, but it provides me a means by which I can make very, very accurate comparisons as opposed to hit or miss, trying to hunt or peck through a series of documents." (*Id.*)

Sperry concluded that Anthony Bond "did, in fact, write the entries on Exhibit 2," meaning that he addressed the envelope. (*Id.* at 145.) Sperry explained that, on the envelope,

> the writing appears to be naturally executed, there's some overwriting, but there's no evidence of any sort of distortion or unnaturalness in the writings, fluid and pressure variation such as what you would expect in a natural writing. No apparent patching or alterations to the normal writing strokes were evident.

(*Id.* at 143-44.) Evaluating the writing on Exhibit 2 with the known samples of Bond's writing, Sperry performed a detailed assessment and evaluation

> to determine the person's writing habit within the writings that you have. So in other words, if I want to know about Mr. Bond's writing habits with respect to the T-H combination or a J or anything of that nature, I can do that by evaluating a whole series of those at once, and by evaluating those, I not only have an idea in terms of how the letters are formed, the letter combinations, what value they may have, but I can also begin to assess variation. In other words, what are the likely variances within the known writing that I can see in those particular documents collectively.

(*Id.* at 144.)    Applying that methodology, Sperry "determined that there were features and characteristics in agreement with no fundamental differences to conclude that Mr. Bond did, in fact, write the entries on Exhibit 2." (*Id.* at 145.)

Sperry testified that he went through the same process with Exhibit 3, the Bolegg Letter. (*Id.*) He testified that Exhibit 3 "has got a lot of problems.  There's patching, there's evidence in [Exhibit 3] of efforts to touch up some of the letters that otherwise you wouldn't expect to occur in the writing. . . ." (*Id.*)  Sperry explained:

> In assessing the writing in the questioned, one of the things I notice with respect to certain letters and characteristics had to do with the G's and the H's and the E's and so forth, but microscopically I actually looked because we have an original to work with.  For the most part, I could look at these various letters and determine how they were made.  In other words, how the letter formations were actually constructed and—which is a big help because if somebody is trying to simulate—and this is again not uncommon in prison or jail situations whatsoever—if someone is trying to simulate, they're going to capture the pictorial—they're going to capture the pictorial similarity of whoever's writing it is they're trying to simulate. That's fairly standard and they have so much time and talent in terms of their simulation.  What they miss many times is how the letter is formed.  So, yeah, the letter looks like the way a person writes, but it's made entirely different, and the way you tell it is made entirely different, obviously, is a little closer examination, in this case microscopically, or even—some of these are visible without a microscope.  And there may be some other letters that they just missed the boat on entirely in terms of failing to capture how the letter actually appears.

(*Id.* at 147.)

Sperry testified at length about the letter formations he saw in Exhibit 3, the Bolegg Letter, and, in particular, the letters U, G, and Y.  (*Id.* at 147-48.)  Sperry explained:

> In the comparison process, again, what you're looking for is establishing a habit, what is this person's habit.  This is the known writings.  When working known writings, you establish that person's habit.  You establish the range of variation, and then you look at the features and characteristics within the questioned and determine whether or not they fit within the person's habit.  The biggest mistakes that are made by forensic document examiners [or] people who think they're forensic document examiners is that they ignore differences.  If you look for similarities and look for similarities and do not address the differences as they come, then you're going to make mistakes.

(*Id.* at 149-50.)

Sperry testified that "I didn't find a single instance of a single stroke U anywhere within the known writings. They all have a staff. That is a fundamental difference" between the known writings and the Bolegg Letter, Exhibit 3. (*Id.* at 152.) A fundamental difference is "an inexplicable difference," in other words, "if the same writer is involved, even if it's only one characteristic, you would expect somewhere with an eye to the question of the known to see a combination of these U's, staff or non-staff to some degree . . . ." (*Id.*) Sperry found the difference in the U formation "extremely problematic in terms of the writings allegedly being the same person." (*Id.*)

Sperry also testified that the formation of the E's in the known writings are "diametrically opposed to the E formation made in the questioned writings." (*Id.* at 153.) In Bond's known writings, the E is constructed in either four strokes or two strokes. (*Id.* at 154-55.) "Sometimes, it's just comprised of just two strokes where . . . you got a stroke and then essentially you have got what we call a Greek E hanging off of it." (*Id.* at 155; *see also id.* at 153 ("Here is another example . . . where you can actually see that it is made . . . kind of like a Greek E inside the staff in that fashion here, consistently.").) Sperry concluded that, although there was variation in Bond's known writings, "the variation never incorporates what we see in the questioned." (*Id.* at 156.)

Sperry testified that Pearce was mistaken in her analysis of the letter E:

> [O]ne of the consistencies on the questioned is with respect to the E's, upper case E's. Now, you're going to see in the known writings some E's that appear to look like this, but these E's are consistent in the questioned document . . . . You have a stroke that comes down, there's a retrace of the staff and a terminal, and you have got your two strokes there. There's a little variation there, but what doesn't vary very much at all, if at all, within the questioned is the stroke down and up and over, in other words, a single stroke, kind of like an L. That is totally contrary to the way the E's are made in the known writings . . . .

(*Id.* at 150.) In other words, the E's in the questioned writing form the staff and the bottom bar in a continuous stroke, like an L, whereas, in the known writings, the staff of the E is always independent of the bottom bar.

As for the F's, Sperry testified that "the prominent habit of Anthony Bond is more of a flat top F . . . . In the questioned writing, almost across the board, you see something like this, but more

of an arch to it." (*Id.* at 155.) The arch configurations in the known documents "were consistent and they were consistently different compared to the bulk of what we had in the questioned." (*Id.* at 155.)

Sperry testified that the D formation in Bond's known writings is "more lateral than it is vertical," whereas, "[i]n the questioned writings, it's the other way around." (*Id.* at 156.)

In the known writings, the buckle of Bond's K's "fairly consistent[ly]" touch the staff, whereas there is "good separation" between the staff and the buckle of the K in the Bolegg Letter. (*Id.* at 156-57.)

Exhibit 14 is a chart Sperry prepared to illustrate his testimony. (*Id.* at 157-58.) The left-hand column, labeled "Questioned Entries," contains a collection of words from the Bolegg Letter, Exhibit 3. (*Id.* at 158.) The right-hand column contains "representative samples of writings" from various documents written by Bond. (*Id.*) Exhibit 14 was created by using the computer program to run word searches (*id.* at 175-76) and, after finding the words, cutting them out of a copy of the document and putting them in a Photoshop document (*id.* at 176). Sperry concluded that,

> at the end of the day, it doesn't make any difference what the similarities are. If the differences are there and they are not properly reasoned and accounted for, you certainly can't affect an identification. Mistakes are made by people that ignore the differences, and I have evaluated the differences, and there's substantive difference, and in my opinion, Mr. Bond did not write the entries on Exhibit 3.

(*Id.* at 169.)

Sperry testified that he "follow[ed] the ASTM standard on terminology for expressing handwriting conclusions." (*Id.*)

> ASTM stands for the American Society of Testing Materials International, and it is a standard issuing organization composed of professionals, peers within various organizations and industries, and it's a consensus—standard by consensus based organization. . . . With respect to handwriting terminology or handwriting findings, it's basically, I guess, four terms on the identification side. Identification, highly probable, probable identifications, and they refer to the middle of it as inconclusives. I refer to it as neither/nor, I can't tell whether a person wrote it or not. I use a horizontal bar graph. . . . Right in the middle you have I don't know. All handwriting identifications begin with I don't know, and many of them end up with I don't know. Coming in from the right hand side, you have identification, he wrote it, a hundred percent sure, sure as I can be. Occupied a relatively small area of the

graph, horizontal graph, next indication is highly probable, which I would define as defining the standard. One of terms you can use is virtual certainty. Moving a little bit further towards the middle, probable, there's a number of features and characteristics that are in agreement between the questioned and known, there aren't any fundamental differences, but for whatever reason, for lack of known or lack of question, there is a lesser degree of certainty, so you're at probable. Indications conclusion, moving towards the center of the bar graph simply means there's more agreement than I would expect to exist in the questioned— between the questioned and the known that I would expect to exist between any two writers by coincidence.

On the other side [of the center bar], you have indications did not, probably did not, highly probable did not . . . , and then did not, which is elimination.

(*Id.* at 169-71.)

Applying those standards, Sperry concluded that "Mr. Bond wrote the address entries on Exhibit 2, and the features and characteristics that I have described as being similar to Mr. Bond's writing are there on Exhibit 2. And Mr. Bond did not write the entries on Exhibit 3." (*Id.* at 171.) Sperry also concluded that "Exhibit 3 was not inside of Exhibit 2," meaning that the Bolegg Letter was not in the envelope in which it was purportedly received. (*Id.*) Sperry explained that "[i]t doesn't have anything to do with my handwriting opinion, but as a matter of fact, based on examinations for indented writings, . . . Exhibit 3 . . . was not inside of Exhibit 2 during the mailing process." (*Id.*) "The January 7th envelope and January 7th letter are written with two different inks. The January 7th letter was not inside the January 7th envelope." (*Id.* at 172.) Sperry testified that he was "as certain as [he] could be," or 100% certain, that Bond did not write the questioned letter. (*Id.* at 173.)

Sperry also concluded that Bond did write Exhibit 2, the January 7 envelope. (*Id.*) Sperry opined that the Bolegg Letter was not in the envelope when it was addressed but that there was a different letter in that envelope. (*Id.* at 174.) The recipient of the envelope therefore had a sample of Bond's handwriting. (*Id.*) Sperry confirmed that "[w]e don't know who" fabricated the Bolegg Letter. (*Id.*) He had seen organizations or gangs within prisons that have adopted a similar style of writing. (*Id.* at 174-75.) Under questioning by the Court, Sperry summarized some of the prominent differences between the known writings and the Bolegg Letter:

But they missed some subtle things, and it's very common for a person to simulate to miss subtle things. I think I illustrated two of them. One is the G, one is the T crossing. G formation, T crossing, E formation, they're just made differently. And when you get down to that level, that's where sometimes you find some pretty interesting fundamental differences.

(*Id.* at 175.) Sperry's report, and a subsequent addendum to that report, were accepted as Exhibits 15 and 16, respectively. (*Id.* at 176-77.)

On cross-examination, Sperry testified that he had been trained as a document examiner in 1979 and 1980. (*Id.* at 178.) At the time of the hearing, Sperry's training was more than thirty years old. (*Id.*) The FBI course on fundamentals of document examination is "about a two-week course." (*Id.*) Sperry took that course in "about '84, '85." (*Id.* at 179.) Sperry completed the two-week course given by the Secret Service "probably about '83." (*Id.*) Only one of Sperry's publications addressed handwriting analysis. (*Id.*)

Sperry agreed that he had received the majority of his training in document examination from the government. (*Id.*) He also testified that "I receive continuing education on a yearly basis, so I maintain active membership and participation in conferences and workshops. In fact, I conduct workshops throughout the country at various conferences on an annual basis. . . ." (*Id.* at 179.) Sperry agreed that his fundamental training had come from the government. (*Id.* at 180.) He testified that "I was certified by the Department of the Army, Department of Defense, Criminal Investigation Division." (*Id.* at 180-81; *see also id.* at 182 (same).) Sperry also testified that "I have received my board certification through a nonprofit certifying body not affiliated with the government, American Board of Forensic Document Examiners." (*Id.* at 182.)

Sperry essentially worked for the U.S. Army Criminal Investigation Division between 1973 and 2002. (*Id.*) He worked for the Postal Service from 1992 to the present. (*Id.*) Sperry clarified that "[t]o the present in their laboratory system as a forensic document examiner and then manager until 2006." (*Id.*)

Sperry worked as a private forensic document examiner at the same time he was employed by the Postal Service. (*Id.*) He explained that "they allowed that for a period of time." (*Id.*) The

Postal Service did not allow Sperry to accept private clients who were adverse to the federal government. He explained that "[t]he criteria for the postal side is that it cannot conflict with the U.S. government. In other words, I could not have worked for you against the U.S. government." (*Id.* at 182-83.) In private practice, Sperry has not worked for anyone who is adverse to the United States. (*Id.* at 183.) Sperry can, and has, accepted cases where a state government is on the other side. (*Id.* at 183.)

Sperry testified that, in the "[v]ast majority" of his cases, he had been retained as an expert by the government. (*Id.* at 184.) For the majority of his career, he has been a government employee and "criminal investigators or agents of various branches of the Department of Defense and federal agencies would submit cases to us, and I would work them." (*Id.*) In response to how often his analysis supported the government's position, Sperry estimated that it had occurred "maybe 70 percent of the time." (*Id.* at 185-86.) Sperry explained that it can be difficult to calculate a percentage because of the nature of his work:

> I would add, however, that in terms of work I received from the government where they have had subjects that they have put this way, I have eliminated more writers that the government thinks wrote something than I have identified . . . . As an example, the government suspects that writer A wrote a particular document involving, say, a homicide, and I'll come back with a finding that writer A didn't do it, so they go out and they find writer B and C and it turns out that writer C wrote it. There's an example where I have not supported the government—and this happens frequently—the first time around, but they found the right writer eventually perhaps and I will be able to.

(*Id.* at 186.) "So you see where it is difficult for me to give you a percentage, but I can tell you that in terms of the total number of suspects that have come in my career, . . . I have eliminated far, far more writers than I have identified as suspects." (*Id.* at 186-87.)

Sperry was asked about similarities between the known and questioned documents, and he responded that

> [t]here are similarities. . . . The degree of similarities certainly is an important thing if you don't have any differences. You're—if you don't have any differences to deal with, then the similarities based on their significance in terms of value for identification, in other words, how unique are they, in my experience and training, in terms of their individuality, they do become important.

152

(*Id.* at 187.) Sperry explained, however, that the existence of numerous similarities would not

> factor into my analysis when we have got differences. First thing—I mean similarities are great, and I certainly evaluated the similarities, and I looked at the similarities, and there are some similarities, but, again, there are going to be similarities and there's certainly going to be similarities if someone is trying to simulate or emulate another person's writings. So what I have to do is take a look at the writing habits I have and address those differences, and many times those differences turn out to be—you know, they may not be fundamental, there may be an explanation for them.

(*Id.* at 187-88.) Sperry concluded that, "[i]n this case based on my training, the explanation is that there are two different writers because there are just fundamental differences." (*Id.* at 188.)

Sperry was asked how he knew that the differences he identified were not variations. He testified that he examined Bond's known writings to establish his habits "[a]nd once I have an idea of what his habits are, in looking at these writings collectively, I can look at the variation." (*Id.*) Sperry attempted to establish a range of variation (*id.*) so that "I know what to expect in terms of the outer limit, if you will, of the writing and the variation that is contained therein" (*id.* at 189). "If it does not fit within that range of variation, there should be an explanation for it. Many times, the explanation turns out to be the person didn't write it." (*Id.*)

Sperry recalled his testimony about jailhouse writings. (*Id.* at 192.) He was not familiar with any treatise or article that discussed the phenomenon. (*Id.* at 193.) Sperry testified that, "[i]f I had an opportunity, I could probably find several articles that have been written on that by examiners, forensic document examiners. I can only testify to my experience." (*Id.*) Sperry conceded that he had never written on the subject, but he emphasized that "I have examined thousands of writings generated by inmates." (*Id.*) Sperry denied that, when a questioned writing is received by a prisoner, he started with the premise that the writing is forged. (*Id.*) He testified that "I don't work from any premise except that what is in front of me in terms of the evidence, that is, the problem is to determine whether or not a particular writer wrote a particular document. That's where I start." (*Id.*) According to Sperry, "part of my experience will dictate that when I start seeing added strokes below letter formations that are relative[ly in]explicable, it does raise a red flag, it's not conclusive, it is just

part of the examination process that's noted." (*Id.* at 194.) Sperry conceded that it is possible that a writer might go back and correct his writing to make it more pretty. (*Id.*)

Sperry reiterated that the Bolegg Letter, Exhibit 3, is a simulation. (*Id.* at 195.) The following exchange occurred:

> Q. When you say that the letter shows signs of simulation, were you essentially saying that somebody sat down and painstakingly wrote this two-page letter, is that right?
>
> A. Oh, yes, that's exactly right. I wouldn't say painstakingly, but they wrote it.
>
> Q. And you don't believe that someone sat down, wrote 35 sentences, 600 words, 2200 letters instead of just saying I know you didn't do it, he writes this involved letter?
>
> A. Again, I don't really know the content of the letter, what it has to do with anything, and I still don't know that necessarily today. I examined the body of the letter, the writings and the things, the items that relate to the writings and compared those to the known writings, so it was not a matter of whether or not the individual had the time or the effort or whatever the motive was. But what I can tell you is—and I have seen this before, it's not totally an unusual case where an individual will sit down and actually replicate the writing of another person in order to either set them up or to in some fashion defray the interest from the person writing the letter. And quite frankly, it's not a very good simulation. There's a number of characteristics that are within the body of this letter that do not belong to Mr. Bond, which means based on their consistency, and I will use a very good example is the cross bar of the T's, lower case T's, I mean those are just very, very consistent within the questioned and totally inconsistent with the knowns, which leads me to believe that if we were to ever find the writings of the person that wrote it that we're going to see T crossings made in that fashion and E's made in the fashion that they're made within the questioned document.

(*Id.* at 195-96.) Sperry agreed that handwriting changes over the course of a person's life. (*Id.* at 196.)

Exhibit 17 is Sperry's file for the case. (*Id.* at 197.) The handwritten notes are Sperry's chronology. (*Id.* at 198.) Sperry acknowledged that his notes state "limited contemporary K." (*Id.*) Another note questioned whether differences between the Bolegg Letter (Q-2) and known writings might be attributable to changes in habit over a five or six-year period. (*Id.* at 199.) Movant's counsel noted that the Bolegg Letter and envelope were written around 2002, the Tommie Bond letter (Exhibits 5 and 6) was dated in 1999, the Jenny letter (Exhibit 4) was written in 2007, and it

was suggested that there were no contemporary known writings. (*Id.*) Sperry noted, however, that "there's a 2001 document as well, and . . . contemporaneous documents can be within a year or two of each other." (*Id.*) Sperry testified that the differences between the known and questioned documents cannot be explained by the passage of time "because habits do not change that radically." (*Id.*) Sperry concluded that

> I have established a habit over a period of those years in terms of Mr. Bond's writing that I cannot plug this [questioned] writing into in terms of the similarities that you're talking about. In other words, you have fundamental differences in letter formations, you have . . . consistent fundamental differences in letter construction in several areas, and that is not explicable at all by a change of time of this type.

(*Id.* at 201.)

Sperry testified that he spent "approximately eleven hours" on his examination. (*Id.*) The handwriting analysis took "[p]robably ten hours." (*Id.*) Sperry looked at each document. (*Id.* at 202.) He testified that he "looked at every single word at one point or another" and, "if I looked at the words, I would have looked at the letters." (*Id.*) He did not look at every letter in detail, and he did not look at every stroke. (*Id.*) Sperry emphasized that he had confidence in his results because he used a computer program to isolate each instance of the letters that he examined and because "I was looking for differences and the differences were there." (*Id.* at 202-03.) "As an example, I believe there's 200 and something U's altogether at least between the [questioned] and the [known], and all of them on the [known] side that brought up were with a tail, and all on the [questioned] side were without a tail." (*Id.* at 203.)

Sperry testified on direct examination that impressions from indented writings frequently are found on the pages below. (*Id.* at 204.) Sperry conceded that that is not always the case. (*Id.*) He had no idea how many people had handled the Bolegg Letter and the January 7 envelope. (*Id.*) It is not possible that the impressions on the Bolegg Letter wore off through time and handling. (*Id.*) Sperry has examined writings that have been fifty or sixty years old and has found "excellent impressions of letters and entries and so forth that have been written over them." (*Id.* at 205.)

Sperry testified that,

> in this particular case, . . . I know what the original entries are on the face of the envelope, okay. They're made with a ballpoint pen, I can assess the pen pressure, I know that they're producing impressions. In fact, the inside of the envelope actually had some impressions, the inside front, so if you're looking at the front of the envelope, what's—you know, the opposite side has some slight embossing of impressions.

(*Id.*) "Embossing on the back of the inside is not an impression." (*Id.*) Embossing occurs where writing on a piece of paper leaves raised ridges on the back of the sheet. (*Id.* at 205-06.) A fiber tip pen may not create embossing, but a ballpoint pen, such as that used to address the January 7 envelope, is "going to leave impressions with very little pressure." (*Id.* at 206.) Sperry conceded that it was a "very remote[]" possibility that writing has sufficient pressure to create embossing on the back of the envelope but does not leave impressions on the sheet of paper inside the envelope. (*Id.* at 207.) Nonetheless, Sperry reiterated that he was "[a]s sure as I can be" that the Bolegg Letter was not in the January 7 envelope when it was addressed. (*Id.*) Although there is a "theoretical possibility to any proposition," Sperry testified that the possibility that impressions would not have been left on the Bolegg Letter is "very, very, very remote." (*Id.* at 207-08.) "The impressions and perhaps even the machine entry from the cancellation of the postal—the impression from the machine used for the cancellation, I would expect to appear on that letter in some fashion." (*Id.* at 208.) Sperry clarified that the machine impressions he was referring to came from the round dater used by the Postal Service. (*Id.* at 208-09.) Sperry also noted that the address contained some overwriting, which is "particularly susceptible to the leaving of impressions for obvious reasons." (*Id.* at 209.) Sperry concluded that "I would really, really, really expect to see some sort of impression of that overwriting as well as the other writings on there, and perhaps some faint residue of the machine impression if, in fact, the Bolegg letter, Exhibit 3, was, in fact, inside Exhibit 2 at the time it was addressed." (*Id.*)

Sperry agreed that the writer could have used a different pen to address the envelope than he used to write the letter. (*Id.*) He emphasized, however, that "[s]ome authors do use more than one pen, but in this case we have two authors." (*Id.* at 210.)

### —Steven Briscoe—

Movant called Steven Briscoe. In September 1997, Briscoe had been confined at the West Tennessee Detention Facility ("WTDF") "[o]n a pending charge for a felon in possession of a firearm." (*Id.* at 212.) Briscoe remembered "quite a few" other inmates who had been confined at the time, including Bobby Jackson. (*Id.* at 212-13.)

Exhibit 18 is a letter that Briscoe had sent to Assistant United States Attorney ("AUSA") Tony Arvin. (*Id.* at 213-14.) Briscoe addressed the envelope himself and mailed the letter to Arvin (*id.* at 214) but he did not write the letter himself (*id.* at 215). In response to who wrote the letter, Briscoe testified that "I can't give you a definite answer who wrote it, but me guessing, I think a person named Carnell wrote it. I can't remember Carnell's last name. I can't give you a hundred percent answer to who wrote it." (*Id.*) Briscoe was asked whether Carnell had written the letter for him, and he testified that "[h]e had to because I didn't write it. It has been 14 years ago, I can't just give you a hundred percent answer to say yes, he wrote it for me." (*Id.*) Briscoe could not recall dictating the letter to Carnell. (*Id.*) Briscoe also could not definitely recall writing any letter to Arvin. He testified that "I think I did, but I can't say for sure that I did." (*Id.*)

Briscoe recalled that he had had conversations with Bobby Jackson in September 1997 while they were at the WTDF. (*Id.*) According to Briscoe, Bobby Jackson had "talked about the crime he committed and the things he was doing on the streets." (*Id.* at 215-16.) Specifically, Bobby Jackson was "[t]alking about robbing armored trucks." (*Id.* at 216.) "[H]e was physically talking about one that happened at Brooks Mall [sic], and he talking about others too that he was involved in." (*Id.*) Briscoe recalled that Bobby Jackson "talked a lot" about "the one in Southbrook Mall where he got shot, and the guy dropped the money bag and he was mad because the guy dropped the money." (*Id.*)

Briscoe recalled that Bobby Jackson "dropped his pager or something. That's how the authorities were able to track him down." (*Id.*)

Briscoe testified that Bobby Jackson "said he was involved with more robberies, but he didn't go into details about the other robberies too much." (*Id.* at 216.) Briscoe could not recall any specifics about any other robbery that Bobby Jackson claimed to have committed. (*Id.* at 217.)

Briscoe testified that nobody had contacted him in 1997 or 1998 about the content of his letter to Arvin. (*Id.*) If anyone had contacted him, Briscoe would have disclosed everything that Bobby Jackson had said to him about armored car robberies. (*Id.*) Robert Irby did not contact Briscoe about the letter. (*Id.* at 218.)

Briscoe had a conversation with AUSA Arvin about the letter. (*Id.*)[29] Briscoe testified that Arvin wanted to know whether Briscoe had written the letter. (*Id.*)

Briscoe did not know Andrew Thomas. (*Id.*) He did not know Bobby Jackson apart from the time they had spent together at the WTDF. (*Id.*) He did not know Anthony Bond and had "never seen him before." (*Id.*)

On cross-examination, Briscoe agreed that he and Bobby Jackson had been incarcerated together fourteen years ago. (*Id.* at 219.) By the time of the hearing, Briscoe did not have a very good memory of what Bobby Jackson had said. (*Id.*) He confirmed that he had addressed the envelope but did not write the letter. (*Id.*)

—**Scott A. Sanders, U.S. Marshals Service**—

At the time of the evidentiary hearing, Scott A. Sanders was employed by the United States Marshals Service as a Chief Inspector. (*Id.* at 221.) He had held that position for "approximately seven years." (*Id.*) In April 1997, Chief Inspector Sanders was "a criminal investigator, Deputy

---

[29]Although it is not clear from the transcript, this appears to have been a relatively recent contact.

158

United States Marshal." (*Id.*)[30] Chief Inspector Sanders "was assigned at the time to the Safe Streets Task Force [("SSTF")] who investigated robberies such as this, and bank robberies in this district. In this particular case, I was assigned as the case agent." (10/12/2011 § 2255 Hr'g Tr. 221-22, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Sanders explained that,

> [a]t the time, the area was experiencing a large number of bank robberies throughout the period of the year, so in order to address that, the FBI established a task force which was subsequently called the Safe Streets Task Force. It was a multi-agency task force that targeted these particular crimes. It was comprised of officers, investigators from the Memphis Police Department, the Shelby County Sheriff's Department, the Federal Bureau of Investigation and the U.S. Marshal Service.

(*Id.* at 222.) There were "approximately a dozen" members of the SSTF. (*Id.* at 222-23.) In addition to Deputy Marshal Sanders, the SSTF included FBI Special Agents Steve Anthony, John Canale, Joe Rinehart, and C.M. Burgess; MPD Sergeants Mike Kitsmiller and Chad Golden; and Detective J.C. Paris and Sergeant Rick Jewel from the Shelby County Sheriff's Office ("SCSO"). (*Id.* at 223.) FBI Special Agent James Jarboe "was the supervisory special agent of the squad that the Safe Streets Task Force fell under. The FBI coordinated the task force, so he had responsibility for this unit as well as possibly some others on that squad that investigated other crimes." (*Id.*) Supervisory Special Agent Jarboe "assigned cases, reviewed reports, investigated documents, approved those documents, conducted file reviews, approved expenditures of the task force, things of that nature." (*Id.* at 223-24.) Assignments as case agent on an investigation were made "on a rotating basis. They had a list, and the next case would be assigned to the next individual on the list." (*Id.* at 224.)

As case agent, Deputy Marshal Sanders "had primary responsibility for the investigation of this particular robbery. If it was going to be solved or leads would be followed, it would be my

---

[30]Sanders was a Deputy United States Marshal when he testified at Movant's trial in 1998. *See supra* p. 66.

responsibility to see that those were done." (*Id.* at 222.) Sanders performed oversight of the investigation of the Walgreens robbery. (*Id.*)

Sanders was called to the scene of the Walgreens robbery on April 21, 1997. (*Id.* at 224.) He arrived "[a]round lunchtime." (*Id.*) Sanders did not recall whether there were any other officers at the scene when he arrived, but he testified that "I'm certain that there would be uniformed officers, MPD patrol officers that would have made the scene before I would have, but I don't recall any of our task force members that arrived prior to my arriving, nor do I remember that I was the first one on the scene." (*Id.* at 224-25.) Sanders was asked whether any SSTF officers arrived on the scene after he did, and he replied: "Yes, generally, if we weren't at the scene of a previous robbery when this call went out, every available officer that was on the task force working that day would respond to the scene." (*Id.* at 225.)

Sanders knew that he was going to be the case agent before he arrived on the scene. (*Id.* at 225-26.) He testified that,

> [g]enerally, my practice when I knew the case was going to be mine, I would survey the scene very quickly, and as agents or officers on the task force arrived, I would ask them to perform specific tasks. Would you, you know, assist the crime scene officer, and I would request certain things to be done, would you interview these specific tellers at the bank or would you perform this function.

(*Id.*)

Sanders recalled that there were several eyewitnesses to the Walgreens robbery. (*Id.* at 226.) Exhibit 19 is an FBI FD-302 form, dated April 24, 1997, from the SSTF file. (*Id.*) It documents an interview of Gail McDonald by Detective James Paris. (*Id.* at 227.) The term "UNSUB #2" referred to "[u]nknown subject number two." (*Id.* at 227-28.) According to McDonald, "UNSUB #2" "was a black male described by her as heavyset, and approximately 30 to 35 years old, and short hair." (*Id.* at 228.) Sanders did not recall that McDonald had ever amended or disavowed that description. (*Id.* at 228-29.) The interview occurred on April 21, 1997. (*Id.* at 229-30.)

Exhibit 20 is an FD-302 regarding an interview of Richard Fisher conducted by Sergeant Michael Kitsmiller on April 21, 1997. (*Id.* at 229, 231.) Sanders did not personally interview

160

Richard Fisher on that date, but he "went back at a later time and showed a photographic spread to Mr. Fisher." (*Id.* at 230.) Exhibit 20 states that "Fisher described the driver of the vehicle only as being [a] shorter, heavier male black." (*Id.* at 230.) Sanders was not aware that Richard Fisher had ever amended or disavowed this description. (*Id.* at 230-31.)

Exhibit 21 is an FD-302 regarding an interview of Imogene Walls conducted by Detective Paris on April 21, 1997. (*Id.* at 231.) Sanders did not remember participating in the interview, but he testified that "I may have tried to contact Ms. Walls or talk with her at a later date." (*Id.*) Walls described the person she saw sitting in the vehicle as "a male black, heavyset, wearing a white T-shirt, in his mid-30's." (*Id.* at 231-32.) Sanders was not aware that Walls ever had amended or disavowed this description. (*Id.* at 232.)

Exhibit 22 is an FD-302 to document the interview of David M. Roth on April 21, 1997 by Sergeant Kitsmiller. (*Id.*) Sanders did not personally conduct the interview. (*Id.* at 232-33.) Roth described the driver of the Bonneville as "a black male, heavyset, short hair, broad shoulders." (*Id.* at 233.) Sanders was not aware that Roth had ever amended or disavowed this description. (*Id.*) The reference in Exhibit 22 to a white Bonneville refers to the getaway car. (*Id.*)

Sanders was asked about the significance of these eyewitness reports for the SSTF's search for the driver of the getaway vehicle, and he responded that "[i]t gave us approximate age, it gave us a race and a sex, possible size or build of the individual." (*Id.* at 234.) The reports also gave a hairstyle. (*Id.*) According to Sanders, "[i]t gave us a potential to develop suspects or to attract leads based on these descriptions." (*Id.*) Sanders explained that the description of the driver as "heavyset" had limited utility. The witnesses had described the driver as

> [h]eavier than the unsub number 1 or the other individual. I would say yes. Being that the individual you're describing is the driver of a vehicle who never exited the car, you have to imagine yourself being in the place of that witness, you only see them from chest level up, for instance, so it's hard to determine.

(*Id.*)

Sanders knew of a Lieutenant Richard True but did not recall whether he was on "the force" in April 1997. (*Id.*) Sanders did not recall whether Lieutenant True or any police spokesman had made any statements immediately after the Walgreens robbery about the driver of the getaway car. (*Id.* at 234-35.) Sanders testified that, typically, the SSTF "would publish a press release or provide information to the media on descriptions of robbers that we were —that had recently occurred or occurred that day. I'm not aware if Mr. True made a separate release on behalf of the police department . . . ." (*Id.* at 235.) Sanders was shown an article that appeared in the Memphis *Commercial Appeal* on April 22, 1997 to refresh his recollection. (*Id.* at 235-36.) In the article, Lieutenant True "described the gunman as a 20 to 25 year-old black male, light complected, and about five foot ten. He was wearing sunglasses and a baseball cap, a blue and white striped shirt, and he carried a handgun." (*Id.* at 235-36.) He "describes the getaway driver as in his early to mid 20's, black, heavyset and balding or a close cropped hair, True said." (*Id.* at 236.)

Sanders had met Thomas in 1997. (*Id.*) Sanders was asked about Thomas' physical characteristics at the time, and he replied that "I would describe him as a black male, approximately five ten, 150 pounds to 160 pounds." (*Id.*) He would not have described Thomas as heavyset. (*Id.*)

Sanders had met Anthony Bond in 1997. (*Id.* at 237.) He was asked about Bond's physical appearance at the time, and he testified that "I don't recall his exact height and weight. He did appear to be—have broad shoulders, a broader shoulder individual, and just a little bit older possibly than Mr. Thomas was." (*Id.*) The FBI's Prosecutive Report of Investigation concerning Bond, Thomas, and the Loomis, Fargo armored car robbery was introduced as Exhibit 23. (*Id.* at 237-38.) That document described Bond as 6'0" and 135 pounds, which Sanders believed was consistent with his physical appearance. (*Id.* at 238; *see* Hr'g Ex. 23 at SSTF0000119.) Thomas was described as 5'9" and 155 pounds, which was consistent with Sanders' recollection of his physical appearance. (10/12/2011 § 2255 Hr'g Tr. 238, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132; *see* Hr'g Ex. 23 at SSTF0000119.) Based on those characteristics, Sanders

162

would not describe either Thomas or Bond as being heavyset. (10/12/2011 § 2255 Hr'g Tr. 239, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)

Sanders was asked whether he recalled another armored car robbery shortly after the Walgreens robbery, and he replied that, "during that period of time, we probably had four or five armored car robberies, so there were several." (*Id.*) Sanders recalled that one such robbery occurred at the Southbrook Mall. (*Id.*) Sanders testified about his recollection of that robbery:

> That particular case, I was not the case agent, but I did make the scene and assisted in the investigation. In that particular case, Loomis Fargo carrier was picking up receipts from the Shelby County Clerk's office where you renew your license tags. Two individuals inside of the Southbrook Mall waited on him to come out of the clerk's office, attempted to grab the receipts that he was taking back to the truck, a struggle ensued. At that time, one of the individuals attempted to take the armored courier's weapon. The weapon was dropped, I believe, on the ground, and as the struggle ensued, a shot was fired by the guard at one of the individuals who was fleeing the scene. One of those individuals turned to return fire as they were running, and they departed the area without the money.

(*Id.* at 239-40.) Sanders testified that "I remember the two individuals involved. I don't remember which one was driving." (*Id.* at 240.) The getaway car in that robbery had been a red Mustang. (*Id.*) Sanders was shown a newspaper article to refresh his recollection of the physical descriptions of the suspects. The article described the driver of the getaway car as "in his early to mid 20's, black, heavyset and balding or with close cropped hair." (*Id.*) Sanders testified that the SSTF had investigated the Southbrook Mall robbery. (*Id.* at 241.) Special Agent Jarboe "did make the scene at Southbrook Mall because I recall seeing him in the parking lot as I interviewed the driver of the armored vehicle." (*Id.*)

Sanders testified that "I'm sure within days of that robbery, Bobby Jackson was arrested. He was an individual that was shot by the guard, and several days after that, his accomplice, Terrance Lawrence, was arrested out of state." (*Id.* at 242.) Sanders saw Bobby Jackson personally in 1997. (*Id.*) Sanders recalled that Bobby Jackson "was a black male, dark skinned, I believe approximately six feet tall, 240, 250 pounds." (*Id.*) Chief Inspector Sanders agreed that Bobby Jackson could be described as heavyset. (*Id.*)

163

Sanders testified that Bobby Jackson was arrested after the SSTF

> received a tip on his location, which was a relative's house. We responded to that location, several officers, I'm not sure who all was there. We were allowed entry into the residence by, I believe, it was his mother. We found him in a bedroom laying on a bed with some bandages on his wound.

(*Id.* at 243.) Sanders recalled that Bobby Jackson ultimately pled guilty to the Southbrook Mall robbery. (*Id.*)

Sanders was asked whether, during the investigation of the Walgreens robbery, the SSTF considered the Southbrook Mall robbery, and he replied, "Oh, yes, we would have considered it. [The Walgreens robbery] was still unsolved, so we would have considered the circumstances of this robbery in relation to that one to see if they fit." (*Id.*) For a time, Bobby Jackson was considered to be a possible suspect in the Walgreens robbery. (*Id.*) He became a person of interest "shortly after his arrest in July." (*Id.* at 243-44.) Sanders testified that

> I would have started comparing the facts and circumstances of that robbery to the one at Walgreens, the information we had gained from the interviews of him and his co-defendant. I don't recall if Mr. Lawrence gave a statement or not at this time. . . . We would have compared descriptions we had from the Walgreens robbery with Mr. Jackson, things of that nature, yes.

(*Id.* at 244.)

Sanders recalled that fingerprints had been taken from the getaway car used in the Walgreens robbery. (*Id.*) "There were several prints located on that vehicle by the Crime Scene Unit, and those latent prints that were recovered were compared with Bobby Jackson and Terrance Lawrence with negative results." (*Id.*) Exhibit 24 is an MPD Latent Fingerprint Check Request, dated July 29, 1997, asking that the fingerprints of Bobby Jackson and Terrance Lawrence be run against the fingerprint found in the Walgreens investigation. (10/13/2011 § 2255 Hr'g Tr. 254, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) The results of those examinations were negative. (*Id.*)

Sanders was asked whether Bobby Jackson had been considered a suspect in the Walgreens robbery in July 1997, and he responded: "I don't know if I listed him as a suspect. After that

robbery itself at Southbrook Mall, I was certainly interested in exploring and trying to determine if he was involved in the Walgreens robbery." (*Id.* at 254-55.) That was why Bobby Jackson's fingerprints were run. (*Id.* at 255.) Bobby Jackson's image was also included in a photo array that was shown to eyewitnesses to the Walgreens robbery. (*Id.*)

Exhibit 25 is an FD-302 documenting the showing of a photo spread to Robert Fisher on July 29, 1997. (*Id.* at 255-56.) Robert Fisher identified Bobby Jackson as the person he saw driving the white Bonneville. (*Id.* at 255-56.) Sanders testified that Robert Fisher was probably shown a second photo array that included a photograph of Terrance Lawrence, but he did not recall whether that had occurred on the same day. (*Id.* at 256.)

Exhibit 26 is an FD-302 reflecting a photo array that was shown to Robert Fisher on August 4, 1997. (*Id.* at 256, 259.) Sanders recalled that Robert Fisher

> identified an individual in position number three as, quote, this looks like the guy driving the car, and that individual was Bobby Jackson. I recall when I was speaking with Mr. Fisher, it took him quite a bit of time to view [these] displays, and his identification was tentative, he was not sure. And this is probably why I went back on this date to see if it might—if he had thought about it since the last time I was there or it helped him remember anything.

(*Id.* at 257.) Sanders acknowledged that Robert Fisher had identified Bobby Jackson twice, stating that, "both times, he indicated that he thought that individual in position number three was similar or looked like he could have been the guy." (*Id.* at 257-58.) Sanders was asked where in the report it stated that the identification was tentative, and he responded that "I've got a quote in the report that he said, quote, this looks like the guy driving the car. Frequently, when I was on the Task Force displaying photo spreads to individuals, frequently they'll immediately pick out someone and say that's the guy." (*Id.* at 258.)

Sanders was asked whether any other eyewitnesses to the Walgreens robbery had been shown photo lineups, and he replied that "Mr. Fisher had a brother, he was shown a photographic display, Richard Fisher." (*Id.* at 259-60.) Sanders also recalled that Imogene Walls was shown a photo spread and perhaps also Gail McDonald, a customer who was entering the Walgreens store. (*Id.* at

165

260.)  After examining the booking number, Sanders concluded that the photo array that was shown to Richard Fisher did not contain a photo of Bobby Jackson.  (*Id.* at 260-61.)  The FD-302 documenting the photo array shown to Richard Fisher on July 29, 1997 was admitted as Exhibit 27. (*Id.* at 261, 263.)[31]

Chief Inspector Sanders testified that Richard Fisher was "[m]ost likely" shown a second photo array.  (10/13/2011 § 2255 Hr'g Tr. 263, *United States v. Thomas*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)  "If my recollection serves me, he was not very certain if he could pick anybody out the first time, thought a couple may have looked similar[.]" (*Id.*)  Exhibit 28 is an FD-302 of a photo array that had been shown to Richard Fisher on August 4, 1997.  (*Id.* at 264.) That photo array did not contain a photograph of Bobby Jackson.  (*Id.*)

Sanders could not recall whether Gail McDonald had been asked to view a photo array.  (*Id.* at 265.)[32]  He believed that Imogene Walls had been shown a photo array.  (10/13/2011 § 2255 Hr'g Tr. 265, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Sanders believed that David Roth had not been shown a photo spread.  (*Id.*)  He explained that

> [s]everal of those individuals on the day of the robbery, we frequently will ask at the time of that interview, you know, if we found the individuals or if we had photos, would you be able to pick them out.  I recall several individuals that were interviewed at the scene on that day indicated that they would not be able to identify anyone, that what they saw happened so quick or they didn't get a good enough look.

(*Id.*)

---

[31]Exhibit 27 reflects that Richard Fisher identified Terrance Lawrence, Bobby Jackson's accomplice in the Southbrook Mall robbery, as the passenger in the white Bonneville.  (Hr'g Ex. 27 at SSTF0000028.)

[32]It was later determined that Gail McDonald had been shown several photo arrays.  *See supra* p. 176.  In response to a motion filed by Movant after the hearing, Chief Inspector Sanders submitted a declaration stating that McDonald had been shown several photo spreads on May 9, 1997; July 29, 1997; and November 4, 1997, and failed to make an identification.  (Declaration of Scott A. Sanders, dated Dec. 19, 2011 ("Sanders 2011 Decl."), ¶ 3, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 139-4.)

Sanders was familiar with Exhibit 18, the letter from Steven Briscoe to AUSA Arvin. (*Id.* at 266.) He did not recall when he had first seen the letter, but testified that "I remember this being brought to my attention." (*Id.* at 266-67.) Sanders had learned of the Briscoe letter while the Walgreens investigation was ongoing. (*Id.* at 267.) He did not recall who brought the letter to his attention. (*Id.*) Sanders testified that

> I can't say whether I discussed it with [AUSA Arvin] back then or not. This letter was concerning Bobby Jackson in the robbery at Southbrook Mall, so it was—it would lead me to believe that it was probably initially given to another Task Force officer that was handling that case, and it probably came to my attention through that agent, but I can't be positive.

(*Id.*) Sanders recalled that the Briscoe letter discussed the Southbrook Mall robbery and "had a reference that this wasn't his first time . . . ." (*Id.*)

Sanders did not interview Briscoe, and he did not believe that any member of the SSTF had done so. (*Id.* at 268.) Sanders was asked what effect, if any, the Briscoe letter had on the Walgreens investigation, and he responded:

> Very little effect, I would characterize it that way. The information came—that's in this letter came after we already had Bobby Jackson in custody, and I recall Mr. Briscoe was an individual that frequently contacted agents or agencies, individuals with information that he received from the jail. He was what I would say a notorious jailhouse snitch. I know several deputy marshals in my office had received information from him. Sometimes it would pan out, sometimes it wouldn't. He would just—in my opinion, he would sit at the jail and listen to other people talking and then try to report that to authorities to try to assist him in his own case.

(*Id.*) Sanders reiterated that "most of the information [Briscoe] gave was all historical that was already known by authorities. He rarely—well, I'm not sure that I can recall a time that he gave information that we didn't already know about." (*Id.* at 268-69.)

Sanders testified that the Briscoe letter was part of the discovery materials that had been made available to Irby. (*Id.* at 269.) Sanders testified that, "during that discovery process, I wouldn't have had a lot of discussion with Mr. Irby, I would just provide the file and sit while he would go through it, make notes, make copies of documents." (*Id.*) According to Sanders, "I may

have said this is a letter that was received, and—but I would not have given him my opinion or thoughts on it prior to the trial, no, sir." (*Id.*)

Sanders was asked whether Bobby Jackson had ever been interviewed in connection with the Walgreens robbery, and he responded: "Yeah, I'm certain he would have been. I was involved in at least two interviews of Bobby Jackson after the Southbrook Mall. He was providing a statement cooperating with us, identifying other individuals who were involved in that crime." (*Id.* at 269-70.) Sanders testified that, "[a]fter that statement would have been taken, it would be natural and normal for me while he's in a cooperative mood to ask him about that Walgreens robbery, to see if he was involved in that robbery also." (*Id.* at 270.) Sanders had been involved in the interviews of Bobby Jackson because he was the case agent for the Walgreens robbery. (*Id.* at 270-71.) Sanders testified that "I'm quite certain [Bobby Jackson] would have told me no or we would have been continuing to investigate that and probably would have prosecuted to[o] for it if he had confessed to that robbery." (*Id.* at 270.)

Chief Inspector Sanders recalled that

[i]t was at least two interviews, possibly three [with Bobby Jackson]. Shortly after his arrest, I recall myself and Agent C.M. Sturgess interviewed him at The Med wherein he was cooperating with us admitting his involvement, and then several days later, maybe a week or so, I don't recall the exact dates, we had a second interview with him, and it's possible I may have sat in with another agent, the case agent from Southbrook Mall when Mr. Jackson was giving his proffer during the negotiation process for his plea agreement.

(*Id.* at 271.) The proffer session probably took place at the U.S. Attorney's office. (*Id.*) That session addressed the Southbrook Mall robbery, but

we would have asked him at that time, you know, what about the Walgreens robbery or any other robberies, because part of that process is he has to be completely truthful, tell us all of his involvement, everything he knew about that robbery and, you know, anything else we were discussing at the time.

(*Id.* at 271-72.) Sanders did not have a specific recollection of asking Bobby Jackson about the Walgreens robbery. (*Id.* at 272.)

Sanders testified that Bobby Jackson had been cleared as a suspect in the Walgreens robbery. (*Id.* at 277.) This occurred "[a]t the time we made the arrest and took statements from Mr. Bond and several other individuals that had direct knowledge of the Walgreens —the events subsequent to the Walgreens robbery." (*Id.*) That was the first point at which Bobby Jackson had been definitely cleared. (*Id.*) No official document would have reflected that Bobby Jackson had been investigated and cleared. (*Id.*)

Sanders recalled that Anthony Bond's fingerprints had been matched with latent prints taken off of the getaway car used in the Walgreens robbery. (*Id.*) Exhibit 29 is an MPD Latent Fingerprint Check Request, dated October 23, 1997, asking that the fingerprints of Thomas and Bond be run in connection with the Walgreens robbery. (*Id.* at 278.) The document reflected a positive comparison for Bond and a negative comparison for Thomas. (*Id.*)

Sanders was asked how Bond came to be a suspect in the Walgreens robbery, and he testified as follows:

> Mr. Bond and Mr. Thomas and four or five other individuals were arrested by the Memphis Police Department on several other armed robberies that occurred in Memphis. During the course of their investigation and interview of those suspects or subjects, several of the individuals told detectives that Mr. Bond and Mr. Thomas had bragged or talked about their involvement in the Walgreens robbery over the course of the several previous months during the time that they were together or committing those other robberies. So that's when those detectives called me as the case agent in this Walgreens robbery to let me know the information that they had.

(*Id.* at 279.) One of the individuals who provided information was Travis Termaine Brown. (*Id.*) Sanders was asked whether Travis Brown signed a 302 statement, and he replied: "He would not have signed a 302. Subjects—suspects don't sign our documents. We would have taken a statement from him, and we may have written a 302 and attached his typewritten statement that the robbery detectives took." (*Id.* at 279-80.) According to Sanders:

> I don't specifically recall who Mr. Brown said the shooter was. There was an a [sic] Keith Echols, Travis Brown, Sharod Rodgers, Willie Cooper and possibly another individual, and they all indicated they knew of their involvement. One or two gave statements that Anthony Bond bragged about being the shooter, but all the

169

statements are consistent that both had spoken with them or talked about being involved in the robberies, I believe.

(*Id.* at 280.)

Exhibit 30 is an FD-302 for an interview of Travis Termaine Brown on November 3, 1997.

(*Id.* at 280, 282.) Exhibit 30 reflected an interview of Travis Brown by Sanders and Special Agent

Rinehart. (*Id.* at 281.) Sanders testified that Brown was interviewed at the Robbery Squad and

> he gave us some information on a pistol that he had purchased and what might have happened to that pistol at a later time and then talked about occasions where he and Keith Echols and Anthony Bond were riding around town, observed an armored car, and Bond made a statement remember when we hit one of those. He also says—it's also says in here that he indicated that he had heard Bonds and Bow Leg on . . . .

> . . . .

> Brown stated, all totaled, he had overheard [Bond] talking about he and Bow Leg robbing the armored car some six or seven times.

(*Id.*) Travis Brown related that "Bond says, man, I shot that nigger." (*Id.* at 282.)

Sanders recalled that Keith Terrell Echols also gave a statement implicating Bond. (*Id.* at 283.) In that statement, Bond claimed to have been the shooter. (*Id.*) Exhibit 31 is a copy of a robbery witness statement given by Keith Echols on November 5, 1997. (*Id.* at 283-84.) The interview had been conducted by one of the MPD robbery squad detectives and by Sanders. (*Id.* at 284.) In the second page of the statement, Echols related a conversation in which Bond claimed to have shot the Loomis, Fargo driver. (*Id.* at 285; *see* Ex. 31 at SSTF0000050.)[33]

Sanders recalled that Bond entered into a plea agreement in connection with the Walgreens robbery. (10/13/2011 § 2255 Hr'g Tr. 285, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Bond also provided a statement in which he admitted his involvement in the Walgreens robbery "[r]ight after his arrest on those other robberies, which would have been prior to entering any plea agreement." (*Id.* at 285-86.) Exhibit 32 is Bond's statement to the MPD

---

[33]Echols also related that Bond had said that "Bow Legs" was the getaway driver, and he described "Bow Legs" as "a male black, about 5'9"-5'10", about 145-150 lbs., brown shade complexion, about 21-25 years old, medium fade hair style." (Hr'g Ex. 31 at SSTF0000050.)

robbery squad detectives on November 5, 1997. (*Id.* at 286, 287.) At the time, Bond had not been charged with the Walgreens robbery. (*Id.* at 286-87.) Sanders testified that Bond understood that he was a suspect in the Walgreens robbery "because that's what we were questioning him about." (*Id.* at 287.) Sanders identified the first page as "a cover page that I would have attached to the actual statement of Anthony Bond for inclusion in the prosecutor report for the U.S. Attorney's office." (*Id.* at 287-88.) Sanders was present in the MPD offices when Bond made his statement but he did not sit in on the interview. (*Id.* at 288.) Sanders recalled that

> [w]e had several subjects in custody at the time that were giving statements. . . . I apparently took the previous statement we were talking about, so I would have been busy doing that or giving information to detectives or agents that were conducting other interviews to assist them in knowing what to ask or talk with these individuals about.

(*Id.*) Sanders learned the results of the Bond interview shortly after it had occurred. (*Id.*)

In the November 5, 1997 interview, Bond stated that "Bow Leggs" shot Day. (Hr'g Ex. 32 at SSTF0000072.) Sanders was asked whether Bond had been confronted with his previous statements to associates that he was the shooter, and he replied: "I believe so. The other individuals that initially told us about Bond and Bow Legs being involved in this Walgreens robbery had told us that Bond had bragged about being involved—being the shooter. We probably gathered all of that information from those individuals prior to speaking with him so we would have as much information as we could." (10/13/2011 § 2255 Hr'g Tr. 289, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)

During the interview, Bond stated that he had been wearing jeans and a blue, long-sleeved shirt. (Hr'g Ex. 32 at SSTF000073.) Chief Inspector Sanders was not aware that Bond had ever recanted or distanced himself from that statement. (10/13/2011 § 2255 Hr'g Tr. 291, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)

Sanders interviewed Angela Jackson in connection with the Walgreens robbery in November 1997, "immediately after these interviews" with subjects who had implicated Thomas and Bond. (*Id.*) Sanders believed that the decision to interview Angela Jackson "would have been based on Mr.

Bond's statement to us that that is where they went to divvy up the proceeds." (*Id.* at 291-92.) Sanders testified that, before he interviewed Angela Jackson, he had considered that "she could have possibly been an accessory after the fact." (*Id.* at 292.) Based on the information he had at the time, Sanders did not believe any other charges would have been appropriate. (*Id.*)

Sanders testified that he "believe[d]" he informed Angela Jackson that she might have potential criminal liability. (*Id.*) Sanders believed that Angela Jackson had been read her rights prior to the interview. (*Id.*) Angela Jackson was not under arrest at that time. (*Id.*) Neither Sanders nor anybody else suggested to Angela Jackson during the interview that she might be arrested. (*Id.* at 293.)

Sanders testified that Angela Jackson received $750 for her testimony after the sentencing hearing. (*Id.* at 293.) Sanders recalled that "[t]he FBI funded the payment, and I believe I paid her." (*Id.*)[34]

Chief Inspector Sanders was present during the testimony about the Bolegg Letter. Sanders did not know whether anyone had ever performed or attempted to perform a fingerprint test on the letter to look for Bond's fingerprints. (10/13/2011 § 2255 Hr'g Tr. 294, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) He also did not know whether inquiries had been made about whether that testing could be done. (*Id.*)

Sanders did not know how many investigations he had been in charge of as of April 1997. (*Id.* at 295-96.) Sanders recalled that the SSTF had been started at the beginning of 1997 and "[w]e were probably having two or three bank robberies a day, so I would say by that time a dozen or less, I don't know. I really don't know." (*Id.* at 296.) Apart from his participation on the SSTF, Sanders had not been in charge of any other bank robbery investigations. (*Id.*) He testified that "I was not

---

[34]In response to a motion filed by Movant, Chief Inspector Sanders submitted a declaration stating that "[t]he $750.00 payment that was subsequently given to Ms. Jackson was not anticipated, planned, or discussed with her at all prior to the payment being made." (Declaration of Scott A. Sanders, dated June 8, 2012, ¶ 6 ("Sanders 2012 Decl."), *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 153-1.)

on any other task force that handled armed robberies. I was involved on other fugitive matters, seizure matters, investigation of property, things like that." (*Id.*) Members of the United States Marshals Service

> are involved in criminal investigations. We are labeled criminal investigators. We investigate primary responsibility for escapes, bond defaults, probation violations, parole violation. We participate on task forces. I spent several years at the Organized Crime Drug Enforcement Task Force, for instance. We investigate any other matter that's not handled by special agencies that the Attorney General may assign to our agency, so we conduct criminal investigations on a daily basis.

(*Id.* at 297.)

Sanders again testified that the SSTF was comprised of members from the FBI, the USMS, the MPD, and the SCSO. (*Id.*) Officers from the MPD and the SCSO had arrived on the scene of the Walgreens robbery shortly after the shooting. (*Id.*) Case Agent Sanders interacted with the uniformed officers. (*Id.* at 297-98.) Sanders was asked whether he could be certain that he had retained all the information from the uniformed officers, and he responded: "Yes. I may not have personally received it, but all investigations are put into an investigative file. All the officers make their reports into a database, and it is all compiled and retrievable, so all the information from this robbery would have been accessible to me." (*Id.* at 298.) Sanders "asked Mike Kitsmiller or one of the other agents who had access to the MPD database and the Shelby County Sheriff's database to pull the report with all the information that had been inputted on this particular case so I could review it." (*Id.*) The MPD and the SCSO had not been independently investigating the Walgreens robbery. (*Id.* at 298-99.) Sanders was asked whether tips about the robbery had come in to the Shelby County Sheriff's Office and the MPD, and he replied that

> I don't recall the Sheriff's Department receiving any tips. In the city, we have Crime Stopper, [528-CASH], it's a joint operation, so most tips come there, and as they're received, they're immediately distributed or funneled to the appropriate agency that's handling the case, and I did receive numerous tips from Crime Stoppers on this robbery.

(*Id.* at 299.) Sanders represented that, as far as he knew, he received all of the information collected by the MPD and the SCSO in connection with the investigation of the Walgreens robbery. (*Id.*)

173

Sanders acknowledged that all the information provided by Travis Brown and Keith Echols about the Walgreens robbery had come from Bond. (*Id.* at 299-302.) Sanders was unaware of any physical evidence tying Thomas to the Walgreens robbery. (*Id.* at 302.) In response to whether any eyewitness recalled seeing Thomas at the scene, Sanders testified that,

> during the trial, Robert Fisher was going to be called by the defense concerning his
> —I assume concerning his photographic display identification of the other
> individuals. During a break in court, I was out in the hall, and Mr. Fisher was
> walking through the hall, and looked through the back window of the courtroom into
> the courtroom and he saw Andrew Thomas at the counsel table and made a statement
> that that's the guy, that's him.

(*Id.*)[35]

On cross-examination, Chief Inspector Sanders testified that, at the time of the evidentiary hearing, he was responsible for supervising a group of inspectors that provide protection for national assets. (*Id.* at 303-04.) He was assigned to the Center for Disease Control to provide security for "the nation's [cache] of medical counter measures, chemical antidotes, medical supplies for terrorist attacks, natural disasters." (*Id.* at 304.) Chief Inspector Sanders had had that assignment for approximately ten years. (*Id.*) For approximately nineteen months during 2009 and 2010, Sanders had been the Acting United States Marshal for the Northern District of Mississippi. (*Id.* at 304-05.)

Before he had been appointed to the SSTF, Sanders had worked on many criminal investigations. (*Id.* at 305.) He testified that, "[t]he majority of my career, a good 16 years, I have been involved in fugitive investigations, supervising the warrant squad here in the Western District of Tennessee, served as Task Force leader on several major cases for the United States Marshal Service and top 15 fugitive investigations." (*Id.*)

In April 1997, Sanders was assigned to the SSTF and was responsible for investigating the Walgreens robbery. (*Id.*) Sanders obtained the video footage of the shooting. (*Id.* at 305-06.) The video showed a short, thin man whose build matched that of Thomas at the time shooting Day in the

---

[35] The Court notes that Robert Fisher testified at trial that he did not recognize Thomas. *See supra* pp. 68, 69. Sanders clarified on cross-examination that the person he recalled seeing walking through the hall outside the courtroom was, in fact, Richard Fisher. *See infra* p. 176.

back of the head. (*Id.* at 306.) The shooter was not a large, heavyset man like Bobby Jackson and was not over six feet tall like Bond. (*Id.*) When Bond was booked, the USMS records showed a height of 6'2" and a weight of 165 pounds. (*Id.* at 306-07.) Sanders acknowledged that the video was the main piece of evidence in the Walgreens robbery investigation because it showed the shooter. (*Id.* at 307.) Sanders also had the statements of witnesses who saw the shooter jump into a Pontiac Bonneville that sped through the parking lot and out of the shopping center and saw the two perpetrators abandon the Bonneville, get into a red car and leave. (*Id.*)

Sanders testified that the robbery of the armored car courier at the Southbrook Mall in July 1997 occurred inside the mall. (*Id.* at 307-08.) In that incident, two men approached the courier, one of the men grabbed the bag, and there was a struggle. (*Id.* at 308.) The men did not get the money, and they ran through the mall to the parking lot. (*Id.*) The Loomis, Fargo driver fired a shot at the subjects and one of the subjects returned fire, injuring the Loomis, Fargo driver in the leg. (*Id.*) The next day, Bobby Jackson became a suspect in that robbery. (*Id.*) Sanders testified that Bobby Jackson had dropped his pager at the scene. (*Id.*) After investigators received a tip about his location, Bobby Jackson was found with a gunshot wound to his buttock. (*Id.* at 308-09.) Shortly after his arrest, Bobby Jackson was advised of his rights, confessed to the Southbrook Mall robbery, and identified Terrance Lawrence as his accomplice. (*Id.* at 309.)

Chief Inspector Sanders conceded that there were similarities between the Walgreens and Southbrook Mall robberies, namely, that somebody tried to rob a Loomis, Fargo courier and there had been a shooting. (*Id.*) Three months after the Walgreens shooting, after Bobby Jackson had been taken into custody, Sanders showed Robert Fisher photo spreads on two occasions. In response to why he did that, Sanders testified:

> He indicated he saw both the individuals in the car. He—I remember him at one point saying that he focused in on one of their eyes, but the second time was to show a spread with Terrence Lawrence depicted in it. I believe the first occasions we only had a photo spread that had Bobby Jackson, and Terrence Lawrence may not have been in custody or I might not have had a picture of him to display.

(*Id.* at 310-11.)  Sanders recalled that, at trial, Robert Fisher testified that he had seen the suspects for less than ten seconds and could not make a positive identification of anyone.  (*Id.* at 311.)

Sanders also showed a photo spread to Richard Fisher, who made a tentative identification of Terrance Lawrence.  (*Id.* at 311-12.)  Sanders recalled that, at trial, he saw Richard Fisher in the hallway coming around a corner from the witness room with his brother.  (*Id.* at 312.)  Sanders saw Richard Fisher glance through the window of the courtroom, and he "said that's him or that's the guy, and they continued to walk towards the elevator." (*Id.*)  Sanders later learned that Irby had sent Richard Fisher home.  (*Id.*)  After Mr. Day died, Sanders and Arvin passed that information on to the Shelby County District Attorney General's Office.  (*Id.*)[36]

Sanders confirmed that Bobby Jackson's prints were not found on the Bonneville that had been used as the getaway car.  (10/13/2011 § 2255 Hr'g Tr. 312-13, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)  The only print found on that car belonged to Bond.  (*Id.* at 313.)  Sanders did not run Bond's prints against the print found on the Bonneville until Bond, Thomas and some other individuals had been arrested for unrelated robberies.  (*Id.*)  After his arrest, Bond confessed and named Thomas as his accomplice.  (*Id.*)  Keith Echols gave a statement in which he said that Bond had told him that he and Thomas, also known as Bow Legs, did the Walgreens robbery.  (*Id.*)  Travis Brown also heard Bond say that he and Thomas were responsible for the Walgreens robbery.  (*Id.* at 313-14.)

Chief Inspector Sanders had statements from other persons who had heard Bond say that he did the Walgreens robbery with Thomas.  Willie Cooper said he had heard Bond bragging about how he and Thomas did the robbery.  (*Id.*)  Exhibit 33 is an FD-302 of an interview with Willie Cooper on November 6, 1997.  (*Id.* at 314-15.)  Sanders prepared the cover page documenting his receipt of the interview on November 19, 1997.  (*Id.*)  Page 2 of the statement reflects that Cooper had told

---

[36]In the state trial, Richard Fisher identified Thomas as the passenger in the Bonneville. *State v. Thomas*, 2004 WL 370297, at *2.

detectives that he had a conversation with Bond on May 31, 1997, when he, Bond and Keith Echols were driving around. According to Cooper:

> We was riding in the Glenview area. Anthony Bond brought up the conversation about the money. Anthony said he couldn't talk to me about it over the telephone because it was really serious. Anthony told me man me and Bow-legs shot an armored car guard in the head, at a Walgreens on Summer and took the bag of money and he (Anthony) ran off. Anthony said that Bow-legs was waiting in the getaway car.

(*Id.* at 316-17 (quoting Hr'g Ex. 33).)

Sanders had received similar information from Sharod Rodgers. Like Cooper, Rodgers had heard Bond bragging about how he and Thomas had done the Walgreens robbery. (*Id.* at 317.) Exhibit 34 is an FD-302, dated October 24, 1997, attaching an interview of Sharod Rodgers by MPD detectives. (*Id.* at 317-18.) Rodgers told detectives that Bond had told him that he and Thomas committed the robbery and shot the courier in the head and took the money. (*Id.* at 319.)[37] Rodgers told MPD detectives that he did not know the identity of the shooter in the Walgreens robbery. (Hr'g Ex. 34 at SSTF00000229.) At the § 2255 evidentiary hearing, Chief Inspector Sanders agreed that Bond did not tell Rodgers that Bobby Jackson had committed the Walgreens robbery. (10/13/2011 § 2255 Hr'g Tr. 319, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) "None of these individuals ever spoke about Bobby Jackson." (*Id.* at 319-20.)

Sanders recalled that Tanya Monger had been interviewed in the course of his investigation. (*Id.* at 320-21, 324.) At the time, Monger was Bond's girlfriend. (*Id.* at 321.) Monger said that she had heard Bond say that he and Thomas had committed the Walgreens robbery. (*Id.* at 321, 324.)

---

[37]There appears to be a discrepancy between the summary of the conversation provided by Sanders in his cover memo and the written interview by MPD detectives that is attached. The cover memo states that "RODGERS related that he was present during a conversation between ANTHONY BOND . . . ; KEITH ECHOLS . . . ; and, ANDREW THOMAS . . . when he overheard BOND talking about being involved in an armored car robbery." (Hr'g Ex. 34 at SSTF00000228.) In fact, the interview transcript reflects that the persons present were Rodgers, Bond, Echols and "Travis." (*Id.* at SSTF00000229.) Rodgers stated that "Bow Legs" was not present during that conversation. (*Id.*) At the § 2255 hearing, Chief Inspector Sanders acknowledged that Rodgers had not told the MPD detectives that Thomas had been present. (10/13/2011 § 2255 Hr'g Tr. 319, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)

Exhibit 35 is an FD-302 of an interview with Tanya Monger conducted on November 5, 1997. (*Id.* at 325.) That interview recounted the events of April 21, 1997 to which Monger testified at trial. Monger related Bond's description of the armored car robbery, including Bond's claim that "Bow Leg" shot the courier. (*Id.* at 326-28.)

Sanders agreed that various witnesses had said that they heard Bond admit that he and Thomas had taken part in the Walgreens robbery. (*Id.* at 328.) Sometimes Bond claimed that he was the shooter and sometimes that Thomas was the shooter. (*Id.*) In every statement, however, Bond consistently claimed that Thomas was the person who had committed the robbery with him. (*Id.*) Sanders also participated in the interview of Angela Jackson. (*Id.*) Angela Jackson told investigators that "she saw [Thomas] with the money and the gun and saw him spend the money." (*Id.* at 328-29.) On the basis of all of this evidence, Chief Inspector Sanders concluded that Bobby Jackson had been cleared of the Walgreens robbery. (*Id.* at 329.) He testified that "[w]e had overwhelming evidence that Bobby Jackson wasn't involved at this point." (*Id.*)

The one tangible thing that tied Bobby Jackson to the Walgreens robbery was the photo identification by Robert Fisher. (*Id.*) Bobby Jackson was never charged for the Walgreens robbery. (*Id.*)

Sanders testified that the Walgreens and Southbrook Mall robberies were similar in that both involved a Loomis, Fargo courier. (*Id.*) According to Sanders, there were also significant differences between the two robberies:

> The Walgreens robbery, for instance, two individuals, stolen vehicle was used, one remained in the vehicle with it running as the getaway driver. At the time of the robbery, the second individual in a very quick fashion immediately approaches the guard in cold blood from behind and shoots him in the head without saying a word, grabs the bag and leaves.

> At the Southbrook Mall, for instance, both individuals go inside the mall, nobody is left waiting in the getaway car. It's not an immediate shoot and grab the money, it's just try to grab the bag and run away with it. Those are differences. The —there were similarities in the getaway vehicle, they were both red; however, the Walgreens robbery was a red Suzuki Swift. It turned out everybody described it as having a black bumper or a black bra on the front and some type of sticker on the

back window near the extra brake light. The red car at the Southbrook Mall was a red Mustang that belonged to a relative of Jackson, I believe.

(*Id.* at 330.) There also had been no "switch car" used in the Southbrook Mall robbery, as there was with the Walgreens robbery. (*Id.*) In the Walgreens robbery, unlike the Southbrook Mall robbery, "there was a stolen vehicle used, and the getaway driver remained in the vehicle as a lookout." (*Id.* at 330-31.) In the Walgreens robbery, the gunman walked up, shot the courier immediately and grabbed the money, whereas the subjects in the Southbrook Mall robbery "were armed, but they didn't walk right up and shoot the guard from behind so he wouldn't see them. They struggled over the bag, and the first shots were fired by the guard." (*Id.* at 331.) The Walgreens robbery took place in a parking lot with a nearby getaway car, and the Southbrook Mall robbery involved two men inside a mall. (*Id.*) Both Bobby Jackson and Terrance Lawrence pled guilty to the Southbrook Mall robbery. (*Id.*)

The Walgreens and Southbrook Mall robberies also occurred in different parts of the city. The Walgreens robbery occurred in the Berclair area of Summer Avenue, in the northeast part of Memphis. (*Id.*) The Southbrook Mall is in the southwest part of Memphis. (*Id.* at 331-32.)

Sanders testified that, as they were preparing for trial, additional corroborative evidence tying Thomas to the Walgreens robbery was discovered. Angela Jackson told investigators that Thomas had her put some of the money in the bank and used some of the money to buy a car. (*Id.* at 332.) Ms. Sykes, the saleswoman at the car dealership, testified that Thomas had done all the negotiating and had turned over the money. (*Id.*) Investigators also obtained records for the bank account that Angela Jackson had opened. (*Id.*) Sanders testified that "she opened an account. She didn't have an account prior. She opened an account just a day or so after the robbery and deposited some of the money, and then the money was quickly withdrawn in small increments, and there was no money left in that account." (*Id.* at 332-33.)

Investigators also had the video showing a short thin man with a similar height and build to Thomas. (*Id.* at 333.) Mr. Day was about 5'10" or so. (*Id.* at 333.) It was clear from the video that

179

the shooter was shorter than Day. (*Id.*) Bobby Jackson was 6' and 240 pounds. (*Id.*) The Marshals' records showed that Anthony Bond was 6'2" and 165 pounds. (*Id.*)

According to Sanders, early in the trial, the Government learned that Thomas planned to present an alibi defense. (*Id.*) Dana Wiggins testified that she was with Thomas at her trailer at the time of the robbery. (*Id.* at 333-34.) Sanders recalled that Wiggins "testified that they were together the night prior at an hour that would be prior to when the getaway vehicle was stolen." (*Id.* at 334.) Wiggins was Thomas' alibi for the theft of the getaway car and the Walgreens robbery. (*Id.*) Sanders recalled that Wiggins testified that "[t]hey were together that day until a few hours after that robbery occurred." (*Id.*)

Sanders recalled that they discovered that Wiggins was at work during the time she had claimed she was with Thomas. (*Id.*) "[S]he had signed in and out, received a paycheck, she had made two or three sales that day, they worked on commissions, so you have to punch a password into the computer, so that was utilized during the time that she said she was not at work." (*Id.*) After Thomas' trial, Chief Inspector Sanders investigated Wiggins for perjury. (*Id.* at 335.) Wiggins was indicted for perjury, convicted of that offense and sentenced to prison. (*Id.*)

Mr. Day died after the federal trial had been completed, and Sanders assisted AUSA Arvin in turning materials over to the District Attorney's office so they could pursue a murder case. (*Id.*)

Chief Inspector Sanders agreed that the letter from Steven Briscoe did not mention Anthony Bond or the Walgreens robbery. (*Id.*)

On redirect examination, Chief Inspector Sanders testified that the shooter was visible on the videotape for "[a] very short amount of time. If I recall, it was three to four seconds. It's very short." (*Id.* at 336.) In the video, the shooter was "[r]unning up to the victim with his arm out stretched [sic] with the pistol and running away." (*Id.*)

Sanders had previously testified that the physical descriptions of Thomas and Bond in Exhibit 23 were correct. (*Id.* at 336-37; *see also* 10/12/2011 § 2255 Hr'g Tr. 238, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.) (discussing the physical descriptions in Exhibit 23), ECF

No. 132.) Sanders testified that "I did indicate that this was accurate at the time. I'm not sure I remember this document. I'm not sure who wrote this, if I wrote it or someone else did." (10/13/2011 § 2255 Hr'g Tr. 337, *id.*, ECF No. 133.) According to Sanders, "those heights and weights could have been taken out of a law enforcement database." (*Id.*) He conceded, however, that it was unlikely that the heights would change. (*Id.*) Bond was listed as 6' and Thomas as 5'9". (*Id.*)[38] Chief Inspector Sanders insisted that, based on the videotape and the height of the shooter relative to that of Mr. Day, he was able to identify the shooter as Thomas rather than Bond. (10/13/2011 § 2255 Hr'g Tr. 338, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)

Sanders agreed that the information in Willie Cooper's statement (Exhibit 33) was based on information provided by Bond. (*Id.* at 339.) In that statement, Cooper related that Bond had admitted to being the shooter. (*Id.*) The information in Sharod Rodgers' statement (Exhibit 34) was also derived from information supplied by Bond. (*Id.* at 339-40.) The Rodgers statement contained no details of the crime other than Bond's admission that he and Thomas were involved. (*Id.* at 340.)

Sanders confirmed that Gail McDonald had been shown a photo array and was unable to identify anyone. (*Id.* at 341.) That photo array did not include a photograph of Bobby Jackson. (*Id.* at 342.)[39]

Sanders testified that Bobby Jackson had been cleared because there was overwhelming evidence he was not involved in the Walgreens robbery. (10/13/2011 § 2255 Hr'g Tr. 342, *Thomas*

---

[38]Chief Inspector Sanders testified on cross-examination that Bond was 6'2" and weighed 165 pounds. (*Id.* at 306-07.) The Government's post-hearing brief contains a printout from the Marshals Service Prisoner Tracking system, dated August 8, 2006, which listed Bond at 6'2" and 165 pounds. (Gov't Resp. to Movant's Post-Hr'g Br., Ex. A at 3, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 141-1.) That document also listed Bond as 28 years old, which was his age in 2006. At trial, Bond testified that he weighed 160 pounds. *See supra* p. 31.

[39]In a declaration submitted after the hearing, Sanders stated that Gail McDonald was shown a photo spread containing a photograph of Boby Jackson on July 29, 1997. (Sanders 2011 Decl. ¶ 3, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 139-4.)

*v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Sanders recalled that "[h]is name had not been mentioned by anyone." (*Id.*)

Exhibit 36 is the photo array that was shown to Gail McDonald. (*Id.* at 343-44.) Thomas was shown at position two. (*Id.* at 343.) McDonald did not identify any of the persons depicted as being involved in the crime. (*Id.* at 343-44.) Sergeant Kitsmiller showed the photos to McDonald. (*Id.* at 344.)

## —Robert Irby, Esq.—

Thomas' trial counsel, Robert Irby, testified that he had been an attorney for thirty years and was still practicing at the time of the evidentiary hearing. (*Id.* at 346.) Irby had represented Thomas in 1998. (*Id.*) Irby recalled that "[t]he United States District Court Clerk's office called me and asked if I would take the case under the Criminal Justice Act, and I took the case." (*Id.* at 347.) Irby was appointed on August 12, 1998. (*Id.* at 348.)

When Irby was appointed to represent Thomas, he was handling approximately twenty or thirty other cases in both federal and state court. (*Id.*) Irby's caseload did not change during the time he represented Thomas. (*Id.* at 349.) Irby was the only lawyer appointed to represent Thomas. (*Id.*) He was a solo practitioner. (*Id.*) Irby represented Thomas at trial without the assistance of any other lawyers. (*Id.*)

In 2007, Irby produced his case file to Winston & Strawn pursuant to a subpoena. (*Id.*) Irby identified a copy of his case file, which reminded him that "I think I did obtain the work of another lawyer in producing the appellate brief for Mr. Thomas." (*Id.* at 350.) Irby was asked whether the documents constituted his entire case file, and he responded, "That was all I had in my possession, yes." (*Id.*) He testified that "I believe . . . because of the passage of time, a lot of my notes have been accidentally thrown away in other parts of the file. . . . I think anything that would have redactable material was in the notes that got thrown away." (*Id.* at 351.)[40]

---

[40]Irby's file was marked as Exhibit 37. The documents in that file are numbered with the
(continued...)

Irby testified that, after he was appointed, he would have obtained a copy of the Indictment. (*Id.* at 352.) He could not recall when he obtained the Indictment, but testified that it would have been "[s]hortly after being appointed." (*Id.*)[41] Irby understood that Count 2 charged Thomas with using and carrying a firearm during the robbery alleged in Count 1. (*Id.* at 354.) Irby also understood that Count 3 charged Thomas with possession of a Mossberg 12-gauge shotgun. (*Id.*) Irby agreed that nothing on the face of the Indictment tied Count 3 to Counts 1 and 2. (*Id.* at 355.) The Indictment did not allege that the shotgun in Count 3 was used to commit the robbery in Counts 1 and 2. (*Id.*) Irby understood that Thomas did not use the Mossberg shotgun named in Count 3 during the robbery and shooting of Mr. Day. (*Id.*)[42]

Irby recalled that Angela Jackson purchased the Mossberg shotgun three days after the Walgreens robbery. (10/13/2011 § 2255 Hr'g Tr. 355-56, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) He agreed that the Indictment did not allege that the Mossberg shotgun was connected to the robbery and shooting. (*Id.* at 356.) Irby testified:

> Well, yes, looking at the case, that was one of the things I thought about. The government was alleging that the shotgun was purchased to replace the handgun that was allegedly used in the armored car robbery, so, yes, I thought about that, I thought about several factors and practical matters in connection with that and whether or not a motion should be filed about that or whether or not it should be left alone. So I did think about it.

(*Id.*)

Irby was asked why he did not file a motion to sever Count 3, and he responded:

---

[40](...continued)
prefix "RCI."

[41]The indictment was marked as Exhibit 38.

[42]Irby also agreed that, because the Mossberg shotgun had not been recovered, the Government would have been unable to prove that it had traveled in interstate commerce. (*Id.*) Irby is mistaken. At trial, ATF Special Agent John Prickett testified that Mossberg shotguns were manufactured in the State of Connecticut. (11/10/1998 Trial Tr. 378, 379, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.)

It may take a few minutes to answer. When I took the case assignment, I don't recall the exact reason now, but we made a commitment to be ready for trial within four months. We had a complicated case with a lot of potential witnesses, a lot of discovery. Obviously, I knew that it was not alleged that this shotgun was used in the alleged armored car robbery. But in sizing up the situation and with what I knew of Sixth Circuit case law, I thought it would be a waste of time to pursue that, and I did not think that the trial judge would grant that motion. I think that just in general as well as based on the fact that the government was going to allege that the gun was purchased as a replacement for the revolver.

(*Id.* at 356-57.)

Irby was asked why his file did not show any evidence of legal research. He responded that he "probably just did not write down a lot of tasks. Even some of the tasks that are listed on my time voucher don't have—they do not have any time—amount of time indicated in any of the boxes for the tasks simply because if I didn't write down the time even when I listed the task, I didn't charge the government for it and I didn't put it on the form." (*Id.* at 357.) Irby conducted legal research "[b]y going to the law library at the University of Memphis, then Memphis State." (*Id.*) At the time, he performed legal research by looking at books. (*Id.* at 357-58.) He would not necessarily have made photocopies of relevant cases. (*Id.* at 358.) Irby was asked whether he took notes on what he had read, and he testified that

I may have at the time. As I indicated, some of my notes were simply lost with the passage of time or accidentally thrown away with other files. I may have made a few notes, but it's possible that I didn't if I saw something that confirmed what I thought or taught me something the opposite of what I was thinking, I might not have made a note about it.

(*Id.*)

Irby was asked whether there would have been a downside to making a motion to sever even if he thought it probably would not have been granted, and the Court observed that "there might be a ethical question about it, wasting time." (*Id.*) Under questioning by the Court, Irby testified that he had extensive criminal trial experience. (*Id.* at 359.) The Court asked Irby how many cases he had tried, and he responded:

Well, Judge, certainly, I have tried more now than I tried then, but I had tried quite a few. I had been on the Criminal Justice Act Panel for about four or five years at that point, and I had—I don't remember how many I had tried at that point, but I

184

had won several. I think my second one on the panel I won in Your Honor's court. I think the second trial, and I think the third one that went to trial, I won it. I think I had won three or four major felony jury trials at that point, and I think like a month or two before the trial in Mr. Thomas' case, I think I won another one in Judge Gibbons' court. . . .

(*Id.*)

Movant's counsel asked Irby again whether, given that he agreed that Count 3 was not connected to Counts 1 and 2, he believed he had a duty to file a motion to sever Count 3 as facially deficient, and he responded:

> Well, I said based upon looking at the bare words in the indictment, but looking at the context of the case, I don't agree that it had nothing to do with Counts 1 and Counts 2, and as a practical matter, not pretending to know all the law, but as a practitioner of the Sixth Circuit and practitioner in the Western District of Tennessee, I thought that it would be a waste of time to pursue a motion to sever because if the government is going to allege this, as a practical matter, it's not going to be severed. And we had a limited amount of time to deal with a lot of issues in the case . . . .

(*Id.* at 361.)

Irby acknowledged that Count 3 carried a life sentence, whereas the maximum sentences for Counts 1 and 2 were twenty years and five years, respectively. (*Id.* at 362.) Irby had been concerned that, if Thomas were convicted on Count 3, he might receive a life sentence. (*Id.*) Irby testified that he "told Mr. Thomas that more than one time." (*Id.*)

Irby testified that he had not been concerned about the possibility of jury confusion over the distinction between Counts 1 and 2 and Count 3. (*Id.*) He explained that "I knew that a jury would know the difference between a firearm used—alleged to be used in the perpetration of a federal crime as opposed to a firearm that is alleged by the government to have been possessed at a later date." (*Id.* at 362-63.) During *voir dire*, Irby had expressed a concern that jurors might confuse the counts. (*See* 11/06/1998 Trial Tr. 120, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 98.) At the § 2255 hearing, Irby did not recall any confusion during *voir dire* (10/13/2011 § 2255 Hr'g Tr. 363, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133), and his recollection was not refreshed by viewing the transcript (*id.* at 366).

Irby did note that the transcript reflected that the prospective juror who had been under discussion had been discharged for cause. (*Id.* at 367.) Irby explained that

> I was really not concerned about juror confusion because I thought we could make clear the difference in the charges and the nature of the charges between Counts 3 and Counts 1 and 2. What I was concerned about was her bias and what she might take into the jury room at the end of the trial, that's what really concerned me.

(*Id.*)

Irby was asked whether it was a fact that the United States had very little evidence on Count 3, and he replied that "that's what I tried to make it appear. That was my—that was my approach, yes." (*Id.* at 367-68.) The evidence at trial was that Angela Jackson had purchased the Mossberg shotgun. (*Id.* at 368.) Irby recalled the testimony of David Little, the employee who handled the sale, that he would not have completed the sale if he believed that Ms. Jackson was actually purchasing the gun for someone else. (*Id.*) Irby agreed that Angela Jackson was the only person who testified that Thomas had possessed the shotgun. (*Id.*) Although he could not recall all the evidence at trial, Irby believed that the Government did not present any additional evidence on Count 3. (*Id.*) Irby agreed that the jury heard evidence about the Walgreens robbery and the shooting of Mr. Day that was not relevant to or admissible on Count 3. (*Id.* at 368-69.) Irby had been concerned that the evidence on Counts 1 and 2 was emotionally charged. (*Id.* at 369.) He did not recall whether he requested a limiting instruction, but he agreed that the transcript would reflect what had happened. (*Id.*)[43]

Even without a limiting instruction, Irby reiterated that he did not believe the video of the Day shooting would cause the jury to convict Thomas on Count 3 because "I thought that [the jury] was understanding that they were different charges." (*Id.* at 369-70.) Irby did not request a limiting instruction because "we had a limited amount of time, we had a big case. The main thing was to cover all of the witnesses. . . . I did not think that there was anything that I could do that would

---

[43]Movant's attorneys consistently referred to "a limiting instruction" but, during the questioning of Irby, the nature of the limiting instruction that Movant contends should have been requested was not specified.

change the posture in which the case was presented, namely with three counts." (*Id.* at 370.) Irby was asked whether it would have benefitted his defense to file a motion to sever and to seek a limiting instruction, and he testified as follows:

> First of all, I felt that the instructions of the court were clear, so that the jury would know that the elements of Count 3 were different from the elements of Counts 1 and 2. Obviously, it was different because it occurred on a different date allegedly, and it was alleged to have happened in a setting that was not the same setting as what was alleged in Count 1 and Count 2. I thought given the workup of the case and the way the case was proceeding that it would be a waste of time. I thought that I was focusing on the main things about Mr. Thomas' defense, the main things were his alibi defense and the—what we perceived to be the insufficiency of the evidence against Mr. Thomas, and I even thought—I think I—it has been so long, I don't remember exactly what I thought, there may have been some thoughts about if we were to divorce—if we were successful in divorcing Count 3 from Counts 1 and 2, which I didn't think we would be successful, I did not foresee the trial judge granting that motion. I thought the trial judge's instructions about three counts were clear. I thought it would detract from the overall defense because our main effort was the alibi defense and what we perceived to be the insufficiency of the evidence against Mr. Thomas.

(*Id.* at 370-72.) Irby denied that the absence of notes in his file about these issues established that he had given them no thought at all. (*Id.* at 372.)

Irby recalled that Thomas' defense at trial was that he was not present at the scene of the crime and did not shoot Mr. Day. (*Id.*) Irby put on an alibi defense, through the testimony of Dana Wiggins, that Thomas could not have committed the crime because he was with Wiggins at the time. (*Id.* at 372-73.) Irby recalled that the alibi was also presented "through the testimony of Mr. Thomas' mother who testified about the—April 21st of '97 and when Mr. Thomas arrived at her home and who picked him up and who brought him the next—or the day before, who picked him up and who brought him back the day of the 21st." (*Id.* at 373.) Irby recalled "[v]ery well" that that alibi had been proven to be false. (*Id.*) He remembered that, in rebuttal, the Government presented evidence through Wiggins' employer that she was at work on April 21, 1997. (*Id.*) Irby "[a]bsolutely" agreed that that evidence was devastating to the defense. (*Id.*)

Irby was asked whether he had been wary of Wiggins' story before he put her on the stand, and he replied that the question

indicates that I was just wary about one person. I try to be wary in any case that I try. I try to be ethical and not put any proof on unless I have an ethical basis for putting it on. I'm that way—I was that way then, I'm that way now, I'm even more that way now than I was then. But to say—let me answer the question this way: From the beginning, I try to explore all options with every client, and I did this with Mr. Thomas from the very beginning. I knew that the government's allegations were obviously the exact opposite of Mr. Thomas' position. In addition to just in general trying to use an investigator, that's another reason why I obtained CJA money, to retain an investigator to help us in preparing with this. I tried to be wary about all of the facts in this case, yes.

(*Id.* at 373-74.) In response to whether he had been concerned that Wiggins was not telling the truth,

Irby testified:

Yes, I had several conversations with Ms. Wiggins, and at least three or four of the conversations, I advised her of what perjury was. I told her what I just referred to in responding to your question that the government's version was diametrically opposed to Mr. Thomas' version, and I told her that it was important that she tell me the truth, and if she were to testify that she would be telling the truth, and my investigator also spoke with her separately, as he made the same kind of inquiry, and I did not—I tried to do it in a way that was non-threatening, but each time Ms. Wiggins assured me that she was telling the truth, and she said she understood what I was telling her about perjury and she understood that if she were not telling the truth that—and she got on the stand, it would probably be exposed, and that there would be great problems for her.

(*Id.* at 374-75.)

Prior to trial, Irby had asked Wiggins whether she was employed, and he acknowledged that

the robbery occurred on a work day. (*Id.* at 375.) Irby denied that he had had "doubts" about

Wiggins' story:

No, excuse me, I didn't say I had doubts. I was proceeding representing my client in good faith. With all my questions, I advised him and Ms. Wiggins about obvious differences in position of the government and the defense, but I was not proceeding with doubts that would paralyze me in any way. I was proceeding on the assumption that my client was telling the truth and that the witnesses, after we thoroughly interrogated them, was telling the truth, and I did ask Ms. Wiggins about her employment. I asked her about employment records, and I asked her if there was anything in her employment records that would dispute what she was saying, that would indicate that she was at work that day when she was telling us, representing to us that she was not at work that day.

(*Id.* at 375-76.) Irby conceded that he did not ask Wiggins' employer whether she was at work on

April 21, 1997. (*Id.* at 376.) He did not believe that his investigator did so. (*Id.*) Irby agreed that

it would "[p]robably" have been fairly easy to do that. (*Id.*)

When Irby took the case, he made a commitment to the trial judge to be ready for trial in four months. (*Id.* at 382-83.)[44] Irby did not ask for the trial date to be moved back. (*Id.* at 383.) Other than receiving approval for an investigator, Irby also did not ask for additional resources. (*Id.*) In response to whether he asked for additional investigators, Irby explained that he had retained a group named Investigations Unlimited, which had

> three principals in that firm, and they had one or two investigator employees, and the three principals were—I had used them before and they were all retired detectives from the MPD with different ranks. One was a retired sergeant, one was a retired major, and the other one was a retired lieutenant. They all had extensive—one of them had been in the Homicide Bureau for 12 years and one of them had commanded OCU, Organized Crime Unit, before he retired, and the major had commanded the Homicide Bureau and some other bureaus also before he retired, so they had plenty of help in that firm.

(*Id.*) Irby acknowledged that he had been busy and short on time, and he stated that he did not request additional help because "we were supposed to take these cases to trial ourselves, and I just—I just dug into it." (*Id.* at 384.) Irby did not recall whether he had ever told Thomas that he had made a commitment to take the case to trial in four months. (*Id.*) He testified that "[t]hat may have been stated in court and Mr. Thomas may have been there, I don't remember." (*Id.*) In fact, the case was tried less than three months after Irby had been appointed. (*Id.*)

Irby was asked whether he was aware that nothing in the Safe Streets Task Force file supported his statement that Thomas had bought the Mossberg shotgun as a replacement for the pistol used in the robbery, and he responded that "I gleaned that, I got it maybe from a witness or some suggestion maybe in talking with an agent or with the government attorney. I don't know." (*Id.* at 385-86.) Irby was asked whether he was aware that nothing in his case file reflected that the Mossberg had been a replacement gun, and he testified that he did not know but pointed out that some of his work product had been lost or destroyed. (*Id.* at 386.) Irby testified that the idea that

---

[44] The Court recalls that Mr. Day had attended some of the report dates in the case, and the Court was concerned that Mr. Day's physical condition might deteriorate to the point that he would be unable to testify at trial. For that reason, the Court emphasized to Irby at the time of his appointment that he should accept the case only if he could be ready for trial within four months.

the Mossberg was a replacement gun was "something that sticks in my mind that I heard that from someone." (*Id.* at 387.) Irby agreed that he might be mistaken about the Mossberg being a replacement gun: "Oh, sure, because that's not even important really, it's not even a big issue in the case, no, it was just something sticks in my memory from somewhere in the case, that's all." (*Id.* at 388.)

Irby clarified that he "didn't say [he] had no doubts" about Wiggins' story. (*Id.*)

> What I said was I was not paralyzed by doubt personally in my role as a lawyer. I was trying to be careful in warning her of the trouble that she could be in and what it would do to the case if it were discovered that she was not telling the truth, and I explored it—I asked questions every which way in talking with her to try to draw her out, give her an opportunity to tell me what she could tell me, and my investigator, as I understand it, did the same thing, because he also spoke with her at different times when I was not present.

(*Id.*) Irby had "a dim memory" that either he or his investigator had tape recorded conversations with Wiggins. (*Id.* at 389.)

Irby was asked whether the defense had a theory of who had committed the Walgreens robbery, and he responded:

> Well, I know Mr. Thomas' position, and during the trial from time-to-time I tried to plant a seed or a suggestion to let the minds of the jury run on it if we could have done that, and . . . the response of the witnesses was not as full as I wanted it to be, but I did not base my defense for Mr. Thomas or our defense just on trying to convict someone else for the crime. I think that's a risky thing to do for a defense lawyer, that's not my theory. The main thing was the alibi defense and to simply defend saying that he wasn't there and defend on the sufficiency of the evidence because the government did have gaps in its proof, and we wanted to exploit those, and if it had not been blown up at the end, I think we had a better chance to exploit it.

(*Id.*)

Irby was shown the September 23, 1998 letter from AUSA Arvin addressing his discovery request. That letter stated that

> two witnesses tentatively identified Terrance Lawrence and Bobby Lee Jackson as the two men fleeing from the scene of the robbery in the white getaway car. . . . Jackson and Lawrence pled guilty in Case No. 97-20160-Ml to another Loomis, Fargo robbery which occurred on July 27, 1997.

190

(Hr'g Ex. 39 at 2; *see* 10/13/2011 § 2255 Hr'g Tr. 390-91, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Irby agreed that this exculpatory evidence was an avenue that should have been fully explored. (*Id.* at 391.)

Irby was asked what he did with the information, and he replied:

> My investigator and I discussed it. I asked my investigator to check this out. I asked questions of witnesses. I looked at the—we had the photo ID spread that had been presented to the witnesses at the crime scene of the Walgreens there on Summer Avenue. I was interested in it, discussed it with Mr. Thomas more than once. I found some problems with it. First of all, at that time, Bobby Jackson, there was a spate of armored car robberies in Memphis the summer this happened, and I know Bobby Jackson, I believe he was arrested and prosecuted for one at Southland Mall, and I think there were a couple others . . . . We thought about it, we devoted quite a bit of thinking time to it, just thinking how it would work into the defense. There were a couple of problems with it. One, insofar as talking to Bobby Jackson, he was facing charges, and those lawyers don't let you talk to his client if you're trying to get his client to come in and say, sure, I did your guy's armored car robbery, it's not going to happen. That's one problem.
>
> The second problem is the description between—difference between Bobby Lee Jackson and Mr. Thomas. If you will look at the discovery material, for example, I think the name sticks, Ms. Gay—I didn't get to review all of it, but I reviewed a lot of it over the past several days, and my memory was refreshed that she had told the investigators that—not my investigators, but the MPD and the Safe Streets Task Force— . . . . I believe she had indicated something about coming into the Walgreens store that afternoon from a break, and she saw a young man against —standing against one wall of the Walgreens store a short distance from the door, and she gave his description as being about 160 pounds, slim, and there was another witness who also described a person of that shape, and about Mr. Thomas' height. Bobby Jackson is about six two and weighs 240. Also, Bobby Jackson's skin color, as I understand it, is much darker than that of Mr. Thomas, or different color, anyway, so there was a problem with pursuing that and trying to shift it to him. I did try to plant that seed in the minds of the jurors by asking some questions.

(*Id.* at 391-93; *see also id.* at 395 (same).)

Irby was asked whether he had done any investigation into whether Bobby Jackson was one of the perpetrators of the Walgreens robbery, and he replied that he and his investigators showed photographs to witnesses. (*Id.* at 393.) Irby or his investigator "spoke to the Fisher brothers, Mr. Robert Fisher and I think his brother's name is Richard Fisher." (*Id.*) Robert Fisher "had made ID's based upon color photo spreads that MPD investigators had presented to him, but he did that before

Mr. Thomas was ever arrested." (*Id.*) Irby reiterated, however, that he did not think it would have

been productive to present proof that Bobby Jackson was one of the perpetrators:

> [I]n thinking about what the defense was, I felt that it would detract from an insufficiency defense and also the alibi defense. We could try to plant the seeds of doubt and try to do that with Angela Jackson, but she was kind of a tough witness, but we—other than approaching it that way, no, I didn't make it a main focus of the defense because it's my experience that if . . . you're defending an individual on a felony case and you try to convict someone else, which is generally going to be beyond the capabilities of the defense to do, if you do that and you start floundering and you fail in it, the jury is going to hold it against you and you're generally going to lose. So that's why I didn't feature that.

(*Id.* at 393-94.)

Irby denied that his investigation into Bobby Jackson had been limited to talking to the Fisher

brothers. (*Id.* at 394.) He testified that "[m]y investigator used his contacts, I believe, with the MPD

to check on the possibility of connecting Bobby Jackson to this crime." (*Id.*) Irby no longer had a

report from his investigator, but he believed that his investigator had spoken to the officers who were

investigating the armored car robberies at the time. (*Id.* at 394-95.)

At trial, Irby "made some mention of Bobby Jackson, I made the suggestion, tried to suggest

that he was the one who did it." (*Id.* at 395.) Irby recalled that he had mentioned Bobby Jackson

during his cross examination of Angela Jackson and during his closing arguments. (*Id.*) In response

to whether he had proffered any evidence that Bobby Jackson committed the Walgreens robbery, Irby

testified that "we had no evidence to prove that. That's the problem with trying to put on—add that

to your defense." (*Id.* at 395-96.)

Irby recalled that, at trial, he called Robert Fisher as a witness and showed him the

photographic lineup that had been shown him by the SSTF on August 4, 1997. (*Id.*) Irby affirmed

that Exhibit 26 reflects that Robert Fisher had written near the photograph in position three that

"[t]his looks like the guy driving the car." (Hr'g Ex. 26 at 3; *see also* 10/13/2011 § 2255 Hr'g Tr.

396-97, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Irby

agreed that Robert Fisher did not know any of the people in the photo spread. (*Id.* at 397-98.) Irby

admitted that he did not present to the jury the fact that Robert Fisher had selected Bobby Jackson as the getaway car driver on July 29, 1997. (*Id.* at 398.)

Irby did not know why the photo spread was not attached to Exhibit 25, the July 29, 1997 SSTF interview with Robert Fisher. (*Id.* at 398-99.) He testified that "I think that we received it in discovery of both photo ID spreads that were used at both the different times." (*Id.* at 399.)

Irby agreed that Exhibit 25 did not contain any qualifications on Robert Fisher's identification of Bobby Jackson. (*Id.* at 399-400.) He was asked whether the identification in Exhibit 25 was better for his case than the identification in Exhibit 26, which used the word "similar." Irby agreed that the language in Exhibit 25 "is certainly stronger than the notation on the report from August 4th, you know, seven days later, yeah." (*Id.* at 400.) Irby did not recall whether he had asked Robert Fisher about Exhibit 25 at trial but conceded that "I probably did not." (*Id.* at 401.)

Irby explained that he and his investigator made multiple trips to the music store to talk to the Fisher brothers because he knew that the SSTF interviews had taken place months prior to Thomas' arrest and he wanted to be certain of what they had seen. (*Id.* at 402-03.) He continued:

> Now, I noticed on the second 302, the recounting that's attributed to Mr. Bob Fisher is not firm and steadfast as the one that is noted on the FBI 302 that is dated July the 29th of '98. I'm—of '97, excuse me. I wanted to explore that with the Fisher brothers. I wanted to know if they saw the same thing. I wanted to know where they were when the robbery took place. I wanted to know where they were when they saw the getaway car. I wanted to know how close they were, how far away. I wanted to know everything they could remember, what the guys were wearing, everything that you can imagine that is pertinent. What I did learn from the Fishers is that they had rushed out of the music store on the sidewalk or walkway. They were just a few feet from the drive-out under the little archway that's in that side of the strip shopping center and that they were—that Robert Fisher was closer to the getaway car than his brother Richard. Robert Fisher, I presented him with a photograph of Mr. Thomas later on—and of course, when I talked with him, we had everything, we knew that the investigation had focused on Mr. Thomas months after the incident took place, so I was able to present him with a photograph of Mr. Thomas. He indicated to me Mr. Thomas was not one of the two individuals in that car. He was not as firm about going back to what he had told the investigators with regard to—what's reported in the FBI 302's. He was not that secure, was saying to me, that it was position number three, photo ID spreads, that it was that individual who was in the car. What he was firm about with me was that it was not Andrew Thomas. . . .

(*Id.* at 403-04.) Irby clarified that "I do recall [Robert Fisher] saying to me that he was certain that it wasn't Andrew Thomas in the car, but that he was not certain that it was the individual he had picked out in the photo ID spreads. He said he was not certain about that when he talked to me." (*Id.* at 404.) Despite Robert Fisher's uncertainty about his identification of Bobby Jackson, Irby called him as a witness at trial "because he was a very good witness. He was certain that it wasn't Andrew Thomas, and I made certain at trial I asked about that in a very careful way because I knew I was tippy toeing and I didn't want to bring out the wrong answer." (*Id.* at 404-05.) Irby testified that, after laying a foundation about Robert Fisher's opportunity to observe what was happening,

> I asked him to look around the courtroom and look at everyone. I think I asked him to look carefully and to tell us if he saw anyone in the courtroom who was in that car on that day, that getaway car that sped out of the lot through the archway. He looked around and he looked at Mr. Thomas and said no. He said they're not here.

(*Id.* at 405.)

Irby testified that he had been "really afraid to pursue the Bobby Jackson connection" because Bobby Jackson's size appeared to eliminate him as the shooter and that Bond was also "a fair sized guy . . . ." (*Id.* at 405-06.) Irby believed that strategy would have been dangerous in light of the "poor quality video that showed someone who is no taller than the armed car guard who was shot" and the witness statements describing "[a] guy who is about 160 pounds and slim . . . ." (*Id.* at 406.) Irby was asked about the possibility that Bobby Jackson had been the driver, and he testified that Bond had admitted that he was there and that he matched the witness descriptions of the getaway driver. (*Id.* at 406-07.) Irby continued:

> [T]wo of the Walgreens employees said they see a 160-pound guy leaning against the wall near the door when they came in from the break, and you see on a poor quality video a slim guy coming up behind the guard, James Day, shooting him in the back of the head. The slim guy on that video, you can't recognize who it is on that, it's a poor quality video, but you can see the size, it's a slim guy, and he's clearly not bigger in terms of the guard in terms of height, and he's slim, he's not as heavy built as Mr. Day, the guard who was shot who later died. So what does that leave you? That gets you closer to the 160-pound guy they see leaning up there. If I had trotted out the Bobby Jackson bit, Mr. Arvin would have been all over it with these kinds of facts, and we know that Bobby Jackson was six two and 240.

(*Id.* at 407-08.)  Irby agreed that, based on his description, Bobby Jackson was "a big guy."  (*Id.* at 408.)  He recalled that "I think he's bigger than Mr. Thomas was."  (*Id.*)  Irby considered whether Bond might have been the shooter, but he concluded that, "putting it together with everything that we would have had to try to put together to try to shift the blame to create a Bobby Jackson defense and try to prove what Bobby Jackson did, what I'm saying is that would have made it real difficult."  (*Id.* at 408-09.)  Irby concluded that, "under the circumstances of what we had to deal with and the witnesses that we had to deal with, the evidence that we had to deal with and the testimony that we could offer, I didn't think it was a wise thing to do."  (*Id.* at 409.)  Irby recalled that Bond "looked like he was bigger than" 6' and 135 pounds.  (*Id.* at 410.)

Irby recalled that Gail McDonald's description "showed some size similarity to Mr. Thomas' size similarity."  (*Id.*)  Irby was shown Exhibit 19, Gail McDonald's FD-302, and he noted that the statement did not mention a photo lineup.  (*Id.* at 411.)  Irby did not recall whether he had ever seen the photo spread in Exhibit 36.  (*Id.* at 412.)  He testified that "I thought it looked like some that came in discovery, but I can't say for sure."  (*Id.*; *see also id.* at 413 (same).)  Irby did not believe that the photograph of Thomas in position two was a good likeness.  (*Id.* at 414 ("my recollection of Mr. Thomas is it's not a good picture"); *see also id.* at 413 ("Well, in that photograph, it doesn't look like Mr. Thomas.").)

Irby agreed that Gail McDonald's failure to identify Thomas would have been helpful to the defense.  (*Id.* at 414.)  A notation on Exhibit 36 stated that the photo spread had been shown to Gail McDonald.  (*Id.* at 414-15.)

Irby was shown Exhibit 19, Gail McDonald's FD-302, which described the driver of the getaway car as heavyset.  (*Id.* at 415.)  Irby did not recall Bond's build.  (*Id.* at 415-16.)  He was shown a portion of the trial transcript to refresh his recollection, at which point he stated that, at trial, he had asked Bond to stand up and turn around "because he looked bigger than 160 pounds, that's why I had him do it.  He said he's six two and 160.  Well, maybe he was, but to me, he looked like

—I just had him stand up and turn around so that jury could look at that and compare it to the testimony." (*Id.* at 416-17.) Irby agreed that "Mr. Thomas definitely was not heavyset." (*Id.* at 417.)

Irby could not recall why he did not call Gail McDonald to testify at trial that she had seen a heavyset man as the getaway driver. (*Id.*) Irby was asked why his files did not include any notes about why he did not call McDonald, and he replied that he had thrown away "purely work product notes other than trial notes and discovery session notes . . . ." (*Id.* at 417-18.)

Irby recalled the name Imogene Walls but did not recall that she had been a Walgreens customer. (*Id.* at 418.) He was shown Exhibit 21, Imogene Walls' FD-302, which described the driver as heavyset, and asked why he did not call Walls. (*Id.* at 418-19.) Irby testified that "I do not recall now what my thought process was about Ms. Walls and the days leading up to the trial or the trial. That I don't remember." (*Id.* at 419.) Any notes about that decision would have been among the work product that was thrown away. (*Id.*)

Movant's counsel noted that, during his cross-examination of Bond, Irby brought out that Bond had been wearing jeans and a blue long-sleeved shirt during the robbery. Bond had also testified that Thomas had been wearing a striped shirt and shorts and Angela Jackson testified that, on the day in question, Thomas had been wearing a striped shirt and shorts. (*Id.* at 419-20.) Irby testified that "I remember that . . . we had testimony about the clothing and that there was disagreement or disparity . . . with regard to some of the descriptions, but I don't specifically remember that. I don't dispute it." (*Id.* at 420.) Angela Jackson's statement to investigators did not describe what Thomas had been wearing on the day in question. (*Id.* at 420.) Irby could not recall why he did not ask Angela Jackson how she had managed to recall eighteen months after the fact what Thomas had been wearing the day of the robbery. (*Id.*) He agreed that there "[p]robably" would have been no reason not to ask the question. (*Id.*)

Movant's counsel suggested that some eyewitnesses gave descriptions of the shooter's clothing that more closely matched what Bond had been wearing than what Thomas was said to have worn. (*Id.* at 421.) Irby was asked whether that was something that it would have been helpful for

the jury to hear, and he responded that he tried to get into that with some of the witnesses. (*Id.*) Irby agreed that any such testimony would tend to implicate Bond as the shooter and would conflict with Bond's testimony that he had been the getaway driver. (*Id.* at 421-22.) It would also cast doubt on Bond's truthfulness. (*Id.* at 422.) McDonald had described the shooter as wearing light blue jeans. (*Id.* at 423.) Movant's attorney argued that that description differed from the shorts that Bond and Angela Jackson testified Thomas had been wearing. (*Id.*) Irby testified that "I know that there was a difference in color between the shorts that they claim Mr. Thomas had on and the color of shorts that was supposedly worn by the shooter. To refresh my memory more, I would need to look at it in the transcript." (*Id.* at 423-24.) Irby agreed that that information might have been helpful to the defense. (*Id.* at 424.)

Irby recalled a few details about the Southbrook Mall robbery that had been committed by Bobby Jackson. (*Id.*) During his opening statement, Irby had said that one of the eyewitnesses to the Walgreens shooting identified Bobby Jackson and another identified Terrance Lawrence. (*Id.* at 424-26.)[45] Irby was asked why he had made that statement, and he responded that, "[a]s best I can recall at this time I think it was because I was thinking maybe there would be a little bit better flow of information out of some of the witnesses that would enable us to show that, or at least plant the suggestion, I'm not talking about proving it." (10/13/2011 § 2255 Hr'g Tr. 426, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Irby explained that "[i]t was alleged to me that Bond had met Bobby Jackson and that Angela Jackson, Mr. Thomas' wife/girlfriend had a relationship with Bobby Jackson." (*Id.* at 427; *see also id.* at 428 (Irby had been "told that Angela Jackson had a relationship with Bobby Jackson and that she knew him

---

[45](*See* 11/06/1998 Trial Tr. 47, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.) ("One of the two witnesses identified a man by the last name of Jackson, Bobby Lee Jackson. The other witness identified a man whose last name is Lawrence, Terrell [sic] Lawrence. The proof is—there will be some reference in this case to another armored car robbery here in Memphis, Tennessee."), ECF No. 98.)

. . . .").)  Irby had hoped that he might get Angela Jackson or Bond to make an admission at trial on those subjects.  (*Id.* at 427-28.)

Irby conceded that he introduced no evidence that Bobby Jackson had committed the Southbrook Mall robbery on July 21, 1997.  (*Id.* at 428.)  He explained that

> it wouldn't be relevant to this case at all.  In the first place, it's not relevant.  In the second place, what would that have to do with proving Bobby Jackson committed the Walgreens robbery, it wouldn't have proven anything.  And if I had tried that, Mr. Arvin would have objected and the judge would have sustained it, I think.  I may be wrong.

(*Id.* at 428-29.)  In response to why he did not try to introduce that evidence, Irby testified that "I really don't want to get caught trying to do something and get objected to and get nowhere with it and have it happen too many times because that plants a bad seed in the minds of the jury too."  (*Id.* at 429.)  Irby emphasized that "I was never intending to prove that Bobby Jackson committed the Southland [sic] Mall robbery or this one. . . .  I was trying to plant a seed of doubt to get the jury to start thinking, well, maybe there's someone else involved in this . . . .  What I'm saying is I couldn't have proved it, and . . . you can't get someone acquitted trying to prove someone else committed another crime, I don't think."  (*Id.* at 429-30.)  After further questioning by Movant's counsel, Irby elaborated:

> [W]e had no proof to prove that Bobby Jackson committed the robbery at this Walgreens store.  Now, if we had tried to try the case proving that Bobby Jackson committed the robbery at the Southland [sic] Mall, that would be immaterial and irrelevant, and I don't think we could have gotten away with it.  I don't think the judge would have allowed us to get into it.  You can't go out off on a side hunt.  You can if you can show it is related to impeaching a witness, something important to the main thing in your case, you can, but you can't prove some extrinsic thing that has nothing to do with the subject matter of your indictment.

(*Id.* at 430.)

Irby denied that the extent of his investigation into Bobby Jackson had been to talk to the Fisher brothers.  (*Id.* at 430-31.)  He explained that "I left it up to the investigator to check with his sources to see what we could do—if there was anything we could do with Bobby Jackson . . . ."  (*Id.*

at 431.)  Irby expected his investigator to "talk[] with the people he used to work with at the MPD."

(*Id.*)  He explained that

> I think that was an important avenue to take, but we couldn't get anywhere with that. Plus the fact, as I told you, no defense lawyer is going to let his client talk to someone else when that someone else is trying to get him to say, well, yeah, I committed this robbery over here too.  That's not going to work with Bobby Jackson.

(*Id.*)  In response to why the police would have been useful when they had arrested Thomas and Bond for the Walgreens robbery, Irby stated that "I left that part up to my investigator because he had the sources, he had more expertise in that area than I had."  (*Id.* at 431-32.)

Movant's counsel suggested that it was Irby's responsibility to conduct the investigation himself or give his investigator more guidance.  Irby testified that he determined the defense that would be presented at trial "based on what my client tells me and what it looks like the resources are going to reveal in the case."  (*Id.* at 432.)  Irby insisted that "I let [the investigator] decide who he was going to [talk] to because he had more expertise and contacts than I had.  I did not know who to tell him to see.  I asked him to check it out."  (*Id.* at 432-33.)  Irby did not tell the investigator that talking to the MPD would be a dead end "because if you got a good investigator who has been a detective, you will let them try to find some avenues and some source.  There was just nothing there, there was nothing there that we could exploit."  (*Id.* at 433.)  Irby testified that he did not have the expertise to give the investigator specific directions:  "He knew more about police sources than I did, so I let him go into that area and choose those—choose that line of inquiry."  (*Id.*)  "I stayed out of it because I couldn't direct someone who was into his area of expertise and knew more about that than I did."  (*Id.*)  Irby concluded that "we had no opening at that time that we could use and try to prove Bobby Jackson committed this robbery or anything else."  (*Id.*)

AUSA Arvin's discovery letter to Irby (Exhibit 39) had mentioned CrimeStoppers tips.  (*Id.* at 435.)  In response to what he did with that information, Irby testified as follows:

> Well, I had—early in the case, I was given open file discovery by Mr. Arvin other than in his notes.  I went through his file.  I think I copied everything.  In one such meeting, my investigator came with me, and he and I together also copies [sic] things again.  He took a set of copies.  We tried to check those things out as best

possible, but those Crime Stoppers tips, none of them panned out. I mean we read them, but the government could not check most of them out because they were—generally referred to persons who were anonymous, or if they had part of a name, they had no address or they had a nickname for most of them, and maybe a section of the city in which that person with a nickname lived. There was no way to peg anyone to any location so they could be located and identified. The Crime Stoppers tips produced nothing. . . .

(*Id.* at 435-36.) Irby concluded that "[t]here was no need to investigate [the tips] because it was clear . . . for most of them, . . . you could not identify a person or have an address or even an area to which you could peg a person in order to go and find them, it's just not possible." (*Id.* at 436; *see also id.* at 438 (same).)

Arvin's discovery letter stated that "[s]ubsequent investigation by the FBI cleared Lawrence, Jackson, and all of the other persons" named in CrimeStoppers tips. (Hr'g Ex. 39 at RCI000533.) Irby testified that the FBI did not interview people who they could not locate because the tips contained insufficient information. (10/13/2011 § 2255 Hr'g Tr. 436-37, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Irby gave the information to his investigator "and to the best of [his] recollection, [the investigator] indicated . . . that it would produce nothing." (*Id.* at 437.) Irby did not know what steps the investigator had taken to follow up on the tips. (*Id.*) He testified that "I believe [the investigator] told me he checked them out as best he could and there was nothing there for us, and the people were not involved, had nothing to do with the armed car robbery at the Walgreens store on Summer Avenue." (*Id.*) Any notes Irby might have made had been thrown away. (*Id.* at 437-38.)

Irby agreed that there were a few CrimeStoppers tips that had included contact information. (*Id.* at 438.) Irby testified that "I gave it to my investigator, as best I can recall, and . . . he did follow up or attempted to follow up." (*Id.*) Any report that might have been received from the investigator or notes of any telephone call with the investigator had been destroyed. (*Id.* at 438-39.) Irby concluded that, because he had no independent recollection of anything materializing from the tips, "I would tell you that it was not productive, it didn't produce anything." (*Id.* at 439.)

Movant's counsel reminded Irby that he was only required to establish reasonable doubt, not prove that Bobby Jackson had committed the Walgreens robbery. (*Id.* at 439.) Irby acknowledged that that was correct (*id.* at 440), but noted that "[w]e were having to deal with a case as it was presented to us, and I tried to make a logical decision based upon what I though it would look like or sound like to the jury in terms of deciding how we were going to pursue things." (*Id.*)

Irby agreed that Angela Jackson had been one of the Government's primary witnesses at trial. (*Id.*) He agreed that the jury should have been made aware if she were dating someone who had been identified as a participant in the robbery. (*Id.* at 440-41.) Irby agreed that, if Angela Jackson had been dating Bobby Jackson, she might have had a motive to lie to protect him. (*Id.* at 441.) Irby recalled that he had been told that there might have been a relationship between Angela Jackson and Bobby Jackson. (*Id.*) He testified that "I don't know if it was true or not, Angela Jackson denied it, as I recall, but I was trying to pursue that." (*Id.*) Irby had asked his investigator to check it out, and Irby believed that that had been done. (*Id.*) Irby did not recall what his investigator did, but stated that "[t]hat was based upon his expertise. I don't have any note of a report from him. Again, it was an old part of my file that got thrown out. This case is 13 years old." (*Id.* at 441-42.)

Irby agreed that he did not present evidence of a relationship between Angela Jackson and Bobby Jackson because he did not uncover evidence of one. (*Id.* at 442.) He did not recall whether he had asked Angela Jackson about Bobby Jackson. (*Id.*) He did not recall whether he had asked William Upchurch if he knew Bobby Jackson. (*Id.*) In response to why he did not ask about Bobby Jackson, Irby testified: "Well, now, you're switching from asking me if I knew or suspected as opposed to what I might have heard, which is what I was trying to tell you. I knew what Mr. Thomas told me about that. I had no evidence, I had no firm evidence." (*Id.* at 443.)

Irby recalled that Steven Briscoe was a former cellmate of Bobby Jackson. (*Id.* at 443-44.) Irby assumed that he had gotten Briscoe's letter to AUSA Arvin (Exhibit 18) during discovery. (*Id.* at 444.) Irby noted that, while Briscoe said that Bobby Jackson claimed to have committed other

armored car robberies, "he doesn't name any others." (*Id.* at 445.)  Irby did not recall what he did

after seeing the Briscoe letter.  (*Id.* at 446.)

Irby recalled that he had called DUSM Sanders to testify at trial, but he did not remember

why.  (*Id.*)  Irby recalled that "[h]e was a very important investigator on that case." (*Id.* at 447.)  Irby

examined the trial transcript, which reflected that objections to his questions had been sustained.

(*Id.* at 447-48.)  Irby agreed that he had not asked for the nature of the objection.  (*Id.* at 448.)  In

response to why he did not attempt to cure the objection or rephrase his question, Irby testified:

> Well, based upon Mr. Arvin's objection and the judge's ruling, I thought I
> understood the basis for—of the objection being sustained, and I didn't think it left
> me any room to go into it with Marshal Sanders based upon what I knew about the
> rule of evidence at that time.

(*Id.* at 448-49.)  Irby agreed that he did not ask DUSM Sanders about the investigation into Bobby

Jackson, about the Southbrook Mall robbery, or about similarities between that crime and the

Walgreens robbery.  (*Id.* at 449.)  Irby had attempted to ask about Robert Fisher's two identifications

of Bobby Jackson, but the Government's objection had been sustained.  (*Id.*)  Irby did not make an

offer of proof because "I didn't think it would be fruitful . . . ." (*Id.*)  He explained that "I didn't

think the judge would change his ruling.  Because of what the judge just said now referring to Rule

602, I guessed the basis for his decision, and I didn't think he would change his mind." (*Id.* at 449-

50.)  Irby did not ask DUSM Sanders about witness statements describing the driver of the getaway

car as heavyset.  (*Id.* at 450.)  He did not ask what he and his investigators did to determine whether

Bobby Jackson had committed the Walgreens robbery.  (*Id.*)

Irby recalled that a surveillance video had captured the shooting of Mr. Day.  (*Id.* at 451.)

He agreed that the video was grainy and not clear enough to reasonably identify the perpetrator.  (*Id.*)

The video showed the shooter brandishing a gun and putting it to the back of Mr. Day's head.  (*Id.*)

That gun was clearly not the Mossberg shotgun.  (*Id.*)  The video showed Mr. Day falling to the

ground.  (*Id.* at 451-52.)  Irby did not object to the Government's playing the video three times, and

he also did not object when the Government introduced photographic stills taken from the video.

(*Id.* at 452.) Irby did not specifically recall playing the video for the jury himself, although he conceded that "I'm sure I did." (*Id.*) At that point, the following exchange occurred:

> Q. Do you agree that you never really should have allowed the jury to see the videotape of the shooting and robbery which you agree was so shocking so many times without objection?

> A. No, I disagree.

> Q. Why is that?

> A. Well, it's like so many things you're asking questions about, it goes into what the case as it was presented to me to defend at the time, and I wanted the jury to see that the quality of the video was poor, I wanted the jury to see that from the video no one could be identified, and that Mr. Thomas could not be identified. I wanted the jury—part of the—one suggestion was the clothing of the shooter. I wanted the jury, even though it's a black and white video, it is definitely not in color, I wanted to use that for one reason, to show that the clothing of the shooter if it was Mr. Thomas didn't match up with what the witnesses claimed he was wearing. I wanted them to see that—I showed it for them to see discrepancies and to see that there was no proof in this case, coupled with what we had, namely a Bob Fisher who said he looked at the car, saw both of them, he looks around the courtroom and he looks at Andrew Thomas when I had him on the stand and said I don't see anybody in here who was in that car. And I was trying to show reasonable doubt. Yes, the video is shocking, but it wasn't a color video where you saw red blood coming out of the back of Mr. Day's head. It was a bad video, but I didn't think it implicated Andrew Thomas, but yet it would fit in because we were trying to show a discrepancy in clothing, we were trying to show you couldn't ID a face, but, yes, the shooter in that video was obviously slim. He's not big. He's not a heavyset guy, but also you have to know that in a criminal trial, a prosecutor gets to present that kind of evidence and that kind of demonstrative exhibit to a jury, and you can object all you want to, but it's not so shocking that it would be—that the prosecutor would be disallowed from introducing it into evidence by a trial judge, that's not going to happen.

(*Id.* at 452-54.)

Exhibit 40 was Irby's in-court worksheet, and Exhibit 41 was his out-of-court worksheet. (*Id.* at 454-55.) Irby acknowledged that he gets paid based on the time on his worksheets, which are submitted to the court for payment. (*Id.* at 455.) Irby tries to keep accurate time records. (*Id.* at 455-56.) Exhibit 40 reflects that, from August 14, 1998 through February 16, 1999, Irby billed for 31.75 hours of court time. (*Id.* at 456.) Exhibit 41 reflects that Irby billed 18.25 hours for interviews and conferences. (*Id.* at 456-57.) He spent 4.75 hours on legal research and brief writing. (*Id.* at 457.) Irby did not recall how much of that time was spent researching facial deficiencies in indictments.

(*Id.*) Irby emphasized that he had not written his time down for some of the entries. (*Id.*) He explained that, "[n]ormally, my practice if I can't remember the time, if I don't write it down, I will put in an entry for a task, but I won't charge the government any money even though it doesn't mean that I didn't do it, I did it." (*Id.* at 457-58.)

Irby was asked whether 4.75 hours had been insufficient time for legal research and brief writing, and he responded that

> [t]here are times on every case that I may look up a case just to refresh a memory, and I don't write the time down and charge the government or I make a decision based on what the judge is referring to based on what I have already learned in the past from doing research on other cases, and I don't submit a second charge to the government, and I don't pump in some inflated time total that perhaps I learned from five years before. So, no, I don't always have to look up a case. . . . [I]f I remember the holding of the case, I may not go back and look it up again, but I will rely upon it in the case I'm looking at.

(*Id.* at 458-59.)

Irby billed 35.25 hours for investigation and other work. (*Id.* at 459.) The total out-of-court time Irby billed for Thomas' case was 58.25 hours. (*Id.* at 459-60.) He insisted, however, that "I spent more time than that." (*Id.* at 460.) The total for court time and out-of-court time was 90 hours. (*Id.*) In response to how much additional time he spent on the case, Irby testified that, "first of all, we're going back 13 years, I don't remember. I think it would be safe to say it would be at least 25 more hours, maybe more than that. Probably more than that, but I don't remember . . . ." (*Id.* at 460-61.) Irby agreed that he did not get paid for time that he did not record. (*Id.* at 461.) He testified that "that would be typical[], I think, of a private practitioner, it would be difficult to record all of your hours and get them down as billable hours. And in this situation, it benefits the government, so who cares." (*Id.*) Irby testified that, at the time, he was appointed on most of his criminal representations. (*Id.*) He was a solo practitioner. (*Id.*)

Irby denied that he had failed to carefully maintain Thomas' file after the conclusion of the representation:

> That's not what I said at all, and I didn't say from time-to-time I discarded parts. I have no conscious memory of throwing it away. Whatever is missing, it

simply got put in with some older files that were thrown away. I have no conscious memory, I have no conscious decision to throw away any part of his file. It simply happens, it has been 13 years.

(*Id.* at 462.) Irby knew at some point that Thomas had filed a § 2255 motion, but he did not recall when he had learned that. (*Id.*) Exhibit 37 reflects that some documents filed in this § 2255 case are in Irby's file. (*Id.* at 462-63.) In response to whether he had an ethical obligation to maintain the file, Irby testified that "I tried to do that. I did not lose it deliberately. I have no idea when the parts—what is in it that is missing or when it got away from me, I have no idea." (*Id.* at 463.)

Irby testified that Thomas had told him that he suspected there might possibly have been a relationship between Angela Jackson and Bobby Jackson. (*Id.*) Irby testified that "I don't remember specifically what he said. It has been 13 years." (*Id.* at 463-64.) Irby was sure he had asked Thomas if he could identify other people who might know about a relationship, but he did not specifically recall. (*Id.* at 464.) Irby did not remember whether he followed up with any people Thomas might have identified. (*Id.*) Had he done so, Irby testified that "I would like to think I would" have presented that information at trial." (*Id.*)

On cross-examination, Irby testified that he had begun representing criminal defendants in federal court in 1993 or 1994. (*Id.* at 464-65.) Irby had a lot of experience in federal criminal practice. (*Id.* at 465.) Approximately 70% to 75% of his practice was state or federal criminal cases. (*Id.*) Irby had obtained more than one acquittal in federal court before Thomas' trial. (*Id.*) At the time of the evidentiary hearing, Irby believed he had had a total of fifteen acquittals, including two hung juries. (*Id.*)

Irby testified that he had spoken to Thomas many times and obtained his version of the facts. (*Id.*) He hired two experienced police detectives as investigators on the case. (*Id.* at 465-66.) Irby worked closely with the investigators. (*Id.* at 466.) He went to the scene and attempted to interview witnesses. (*Id.*) Irby had also obtained telephone numbers and he and his investigator attempted to call the eyewitnesses. (*Id.* at 466-67.) Irby spoke to Robert Fisher and Richard Fisher several times.

(*Id.* at 467.)  He was aware that Robert Fisher had identified Bobby Jackson from a photo spread and that Richard Fisher had made a tentative identification of Terrance Lawrence.  (*Id.*)

Irby testified that he watched the video and saw that the shooter matched Thomas' physical description "[i]n his slimness . . . ."  (*Id.*)  Irby had been concerned that the jury would see the physical similarities (*id.* at 467-68), but he agreed that there was not much he could have done to prevent the Government from playing the video (*id.* at 468).  Irby went to Pro Photo to try to have the video enhanced.  (*Id.*)  He testified that "I think they tried to enhance the video in this case, but they couldn't do it."  (*Id.*)

Irby believed he had had more handwritten notes than those that had been preserved in his file.  (*Id.* at 468-69.)  He had spent a lot of time thinking about the case.  (*Id.* at 469.)  It was not his practice to write down every thought.  (*Id.*)

Irby testified that he came to the U.S. Attorney's office at least twice to look at the files and physical evidence.  (*Id.*)  He recalled that "I think it was three times."  (*Id.*)  At some point, Irby had reviewed discovery material in a room with DUSM Sanders.  (*Id.*)  Irby had been allowed to review the files and make copies of whatever he wanted.  (*Id.*)

After speaking to Thomas and doing an investigation, Irby developed a strategy.  (*Id.* at 469-70.)  Irby testified that "the strategy was the alibi defense and also to defend and try to magnify inconsistencies in the government's case . . ."  (*Id.* at 470.)  Irby presented the testimony of Robert Fisher that Thomas was not one of the men in the getaway car (*id.*), but he did not recall whether he had introduced the photo arrays that showed that Robert Fisher had identified Bobby Jackson (*id.* at 470-71).  Irby had also planned to call Richard Fisher, who had tentatively identified Terrance Lawrence.  (*Id.* at 471.)  Irby recalled that

> [t]he problem with Richard Fisher, when we got up here in trial, I was going to put him on the stand.  I was a little concerned about him because I had already picked up on the fact that he didn't like defense lawyers.  He felt anybody accused was guilty. I was worried about that, and when I carried a photo of my client a better—an enhanced—something where he could see him, it wasn't a shadowy picture, he looked at it and he said, well, that looks like one of the guys in the car.

(*Id.* at 472-73.)  He decided not to call Richard Fisher, and Irby recalled that "it wasn't until much later that I learned he could say even more damaging things than that." (*Id.* at 473.)

One of the issues Irby had had to confront at trial was the fact that, the afternoon after the robbery, Thomas had thousands of dollars to spend.  (*Id.*)  He had been released three or four months before the Walgreens robbery after serving a lengthy prison term.  (*Id.*)  Irby testified that he had talked to Thomas and his family about where he got that money:

> I think I talked to them thoroughly.  I talked to Mr. Thomas, I talked with his mother more than once, talked with Dana Wiggins several times.  Gene Milner talked with Dana Wiggins several times.  I'm pretty sure he interviewed Mr. Thomas' mother. I was told that they were giving Andrew Thomas money to help him get on his feet, that they knew he needed a car, and the story that was told was good, I mean it seemed to fit together so that it would help add to his alibi. . . .

(*Id.* at 473-74.)  Irby presented Thomas' family and friends "so they could testify about the amount of money that they gave to Andrew Thomas to try to establish that he had enough money to buy the car without any stolen money proceeds . . . ."  (*Id.* at 474-75.)

Irby also had had to deal with the testimony of Angela Jackson.  (*Id.* at 475.)  He agreed that her testimony was very consistent:

> Yes, she was hard to shake, but I was trying to plant in the jury's mind that a woman who has been accused of child abuse and who suspects that her man is maybe slipping around has every reason to lie and try to hurt him, and that was what I was trying to plant in the mind of the jury.

(*Id.*)  Irby's strategy was to try to show that Angela Jackson was so biased against Thomas that she would lie to implicate him.  (*Id.*)  Irby also recalled that he had worked hard to impeach Angela Jackson's testimony that she and Thomas and her children had stayed at a hotel near State Line Road for the two nights after the Walgreens robbery by issuing subpoenas to the hotels.  (*Id.* at 475-78.) Irby presented testimony from two hotel clerks that they had no records of anyone matching the descriptions of Angela Jackson or Thomas renting rooms at that time.  (*Id.* at 477-78.)[46]  Irby

---

[46]Irby also testified that "the fourth and final response, I think I received three four weeks after the trial, and I haven't told you what that response is." (*Id.* at 478.) Irby's file includes records
(continued...)

testified that "I did everything I could do. Yes, I was trying to contradict her testimony, I was trying to impeach her testimony to show that she was not telling the truth." (10/13/2011 § 2255 Hr'g Tr. 478, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) "We were trying every possible approach we could to show that her perceptions were off and to try to cast doubt on her testimony." (*Id.* at 478-79.)

Irby testified to his strategy for handling the testimony of Anthony Bond:

> [F]irst of all, I was trying to show that he fit the description, that there was a possibility that he was the shooter. I was trying to with whatever we could put together, try to show that it was Bond and someone else in that getaway car, and not Andrew. Of course, Bond's fingerprints were found on the stolen car. No fingerprint was found for Andrew Thomas. We had Bond admitting the fact that he was in the getaway car, that he was sitting there, so there was no way out of that for him. I tried to show that—impeach him on the amounts of money showing that his testimony was incredulous [sic] because he must have spent so much money just buying what he claimed to have bought after the robbery that it could not have fit, you know, just trying to find anything I could find that would discredit him and try to set him up as showing if he's lying about this, he's lying about doing it with Andrew.

(*Id.* at 479.)

Irby's main theory of defense was that Thomas had an alibi and that none of the eyewitnesses had identified him. (*Id.* at 479-80.) Irby recalled that he had been very careful in his questioning of Robert Fisher because of his concerns about Richard Fisher during the time leading up to the trial. (*Id.* at 480.) Irby agreed that it was always touchy for a defense attorney when a witness who has not identified a defendant from a photo spread sees him in real life. (*Id.*) Irby testified that, in his experience, "you don't want to ask the same question too many times, in general, and second, ID— identification testimony is very difficult testimony and it's tricky testimony, and an eyewitness can be a difficult witness to handle and you have to handle them carefully." (*Id.* at 481.)

_____

[46](...continued)
from the Comfort Inn located at 8792 Hamilton Road in Southaven, Mississippi, reflecting that Angela Jackson checked in on April 21, 1997 and checked out on April 23, 1997. (Hr'g Ex. 37 at RCI000541-42.) Angela Jackson had listed her address as 609 S. Lauderdale in Memphis. (*Id.* at RCI000542.)

Irby testified that there were "a lot of problems" with the criticisms of his failure to prove that Bobby Jackson had committed the Walgreens robbery with Anthony Bond. (*Id.* at 481-82.) One problem was that Bobby Jackson's partner in the Southbrook Mall robbery had been Terrance Lawrence. (*Id.* at 482.) Irby testified that "that would open up a pandora's box" and, "if the trial judge had allowed it, it would have led to a battle in the courtroom trying another case." (*Id.*) He believed that "no trial judge would have allowed you to try—to put another person on trial and try to prove that someone else did it." (*Id.*) Irby agreed that he had not had any admissible evidence that Bobby Jackson had been involved. (*Id.*) The only potentially admissible evidence was the fact that Robert Fisher had identified Bobby Jackson in a photo spread. (*Id.* at 482-83.) Irby wanted to use the Bobby Jackson references to introduce doubt but did not want to push the matter too far. (*Id.* at 483.) He agreed that "[t]hat was my strategy, to raise it, not to prove it and not to try to push it too far where it would backfire." (*Id.*) Irby believed that "just about all of" of his decisions were judgment calls. (*Id.*)

Irby recalled that he had been criticized for not calling Gail McDonald to testify. (*Id.* at 484.) Gail McDonald's FD-302 (Exhibit 19) said that the shooter was 5'6" to 5'7" and 130 to 150 pounds. (*Id.*) Bond testified that he was 6'2", and Irby recalled that, "[o]bviously, he wasn't 130 pounds, I think he weighed more than 160 pounds. At least, he looked like it. He was a pretty good sized young man." (*Id.*) Irby testified that Gail McDonald's description of the shooter came "closer to Andrew Thomas but it still wouldn't match Andrew Thomas." (*Id.* at 484-85.) Irby believed that he did not call Gail McDonald for that reason. (*Id.* at 485.)

Irby had also been criticized for putting on the alibi defense. (*Id.*) Irby testified that

> my strategy is to represent the client and, obviously, as you know, ethically, if I know
> that proof is a lie, I can't put it on. Even if I don't put on affirmative proof, I'm not
> even allowed—the rules of ethics don't even allow a lawyer to ask cross-examination
> questions that would imply something that is untrue. You can ask cross examination
> questions that allow the jury to develop seeds of doubt and think a fault like that, but
> the attorney cannot—there's a fine line that the attorney cannot cross. Mr. Thomas
> from the beginning told me about the alibi defense. I talked with him more than once
> about it. We talked about it, the overall defense as well as the alibi defense. I can't
> —in talking with him, I told him that, obviously, the defense version was

209

diametrically opposed to the government's version of what happened. There were enough gaps in the government's case, no fingerprint on Mr. Thomas, Bob Fisher's identification, things like that, to give Mr. Thomas some wiggling room and some chance for a reasonable doubt. I was presented with the issue involving Dana Wiggins early on. I talked to Dana Wiggins several times. I was trying to be thorough and careful, not to plant fear in her or to discourage her, but to be certain so that she would understand what we're facing, and I made it clear to her, to Mr. Thomas, that if her testimony were to be untrue and it were uncovered in front of the jury, the wheels would come off the defense case and he would be convicted without a doubt, because the shock effect would overcome anything else good we might have done in the trial and, in fact, that's exactly what happened.

(*Id.* at 485-86.) Irby testified that he thoroughly explored the stories of Thomas and Dana Wiggins:

My investigator talked with Mr. Thomas. My investigator talked with Ms. Wiggins over the months, and I'm very glad for that in the light of what happened in the case. Ms. Wiggins told us what Mr. Thomas told us. . . . I asked every detail imaginable of Ms. Wiggins. I asked her about time sheets, work hours, when she signed her time sheet. She told me weekly, that all of the employees at the cellular phone company signed their time sheets, I think, on Friday and would turn them in. She told me that she had taken that day off, that a lady friend of hers, one of other co-workers who was her work buddy and a friend had worked that day for her, and was going to cover for her and that in exchange, she was going to cover for that friend on a day when that friend later needed a day off. She told me that they did that frequently. I asked her—specifically, I do remember asking her if the employment records at the cell phone company would reflect that, and she said they would. I said would there be —I also asked her if there were any records at the cell phone company that would disprove that or operate, whatever word I used, that would operate to disprove that. She said no, there wouldn't be anything. She said this is the truth, and not to pin someone down, I try to do it nicely, but to let them know what perjury is and let them know that their testimony is important, but to let them know that if they lie under oath that the federal government is probably going to pursue them and get them indicted for perjury and that it is a felony. She said she understood all of those things, and I know that Gene Milner, the investigator, because I do remember him telling me that he did tell her that, and I remember him telling me again—it was after the case blew up based upon her testimony, you know, I do know that the FBI came and talked to Gene, he told them what she told him and what she had told me, and she did admit—I was told that she admitted to the FBI that she lied to me and that she lied to my investigator.

(*Id.* at 486-89.)

Irby also testified that he had sought to present sur-rebuttal proof on the matter, but his request had been denied:

I did petition the court, I wanted to put [Wiggins] back on the stand for surrebuttal. . . . I got her on the phone, she said, well, we all signed off. She said, yeah, I signed it, but she said my buddy has done that for me before when I have worked for her, we

just do that. She was still sticking to her story. So I had no clue—I still had my defense, but I pursued it from every angle.

(*Id.* at 489.)

After the trial, Irby considered whether, in retrospect, he should have subpoenaed Wiggins' time records before he presented her testimony. (*Id.*) Irby concluded that that approach would have presented its own difficulties:

> Then the thought occurred to me if I had done that and confronted her with that, if they're really skillful, I would have again been an unwitting aid to someone lying because they could have prepared a co-worker—because I would have asked for the co-worker, I would have made an appointment, I would have gone with my investigator and interviewed the co-worker because I would have wanted to know if this was true, and I would have to subpoena the co-worker as a witness, and I would have been an unwilling support for them to lie again if this were untrue, or perhaps it could have backfired on Mr. Thomas if the co-worker's manner had been such that it put me on notice something was wrong, I would have started grinding on her, on Ms. Wiggins and maybe I wouldn't have used either one of them and maybe I would have drawn the conclusion that I had to put down a motion to withdraw. That was my options, and I figured that out after the trial, because I thought I had—maybe I should have subpoenaed those records, but you believe your client. When you have talked to a witness four times and you warn them what perjury is, your investigator has talked to them. Yeah, maybe I should have subpoenaed the records, but then it wasn't as though I didn't think about it, and I asked the witness about it and explored it. Four times, I explored it.

(*Id.* at 489-90.)

Irby explained that, ultimately, he believed the information he received from Thomas. (*Id.* at 490-91.) The following exchange occurred:

> A. Yes, I did. I believed my client. And here is another reason, a compelling reason why I felt I could believe my client. Early on in the case, you extended an offer, and I think it [sic] before you knew you would have Bond as a cooperating witness, I think you extended an offer of ten years, to plead to ten years on the armored car robbery and you would dismiss the other two counts. Mr. Thomas insisted he was innocent, he didn't want the offer. I thought that was a lot of credibility. Then as the case progressed, after I think it became apparent that you were going to have Bond as a cooperating witness, you extended another offer to me, and I think it was again because of some gaps in proof, and you must have been concerned, plus maybe you were extending compassion.

> Q. You can't speculate on my mind now.

> A. I'm not speculating. I'm not speculating. I'm not trying to, even though someone might want me to, but you extended an offer of 20 years if he would plead to 20 years on the armored car robbery and you would dismiss Count 2 and 3.

Mr. Thomas rejected it. Mr. Thomas insisted that he was not guilty, I thought that was a lot of credibility, so...

> Q. Did Mr. Thomas more or less insist on the alibi defense?
>
> A. Yes, he insisted to me that it was the truth.
>
> Q. And he himself testified, correct?
>
> A. Yes, he did.
>
> Q. That he was with Dana Wiggins—
>
> A. Yes.
>
> Q. —at the time of the robbery?
>
> A. Yes.

(*Id.* at 491-92.)

Irby also recalled that Louella Barber, Thomas' mother, had supported the alibi defense:

> Yes, she testified she saw Dana Wiggins pick up Mr. Thomas at her home, and she could testify, I think—she testified about the time of that, and then she testified that, I think, that on the following day, the afternoon of the robbery, after the robbery had taken place early in the day, that Dana Wiggins returned Mr. Thomas, and later Angela Jackson came and got Mr. Thomas.

(*Id.* at 492.)

Irby also explained that he had not been concerned that the jury might confuse the felon in possession count (Count 3) with the robbery counts (Counts 1 and 2). (*Id.* at 493.)

> [G]oing back to this lady who was excused for cause during voir dire in the trial was not that there was confusion between Counts 3 and 2 and the elements of it. . . . [M]y concern with that lady or with any other witness [sic] in a case where there is a gun is that there is such a prejudice against guns, they're going to take it in the jury room and hold it against my client, so that was a concern . . . .

(*Id.*) Irby also explained why he advised Thomas that, if he were convicted on Count 3, he would likely receive a life sentence:

> I advised Mr. Thomas from the beginning at every time that it came up, and I didn't just make a reference just to the trial judge, I told him that I think—I'm sure I told him that any trial judge in federal court, if he were convicted of this charge and convicted of Count 3, that he would receive a life sentence, not because of a bleed over between on—from Counts 1 and 2, but the concern was Mr. Thomas' extensive

state criminal court record.  He had eight or nine felony convictions in Tennessee
state court.  That was the concern about Count 3.

(*Id.* at 493.)

Irby knew that the Government would put on proof that the proceeds of the robbery had been
used to buy the car that Thomas drove, that Angela Jackson had deposited some proceeds in the
bank, and that some proceeds had been used to buy a gun.  (*Id.* at 493-94.)  Irby noted, however, that
"it was insisted upon to me that the family contributed money to Mr. Thomas, and that's where the
money came from to buy the car and do what he was doing."  (*Id.* at 494.)  Russell Carpenter also
testified that he had given Thomas money.  (*Id.*)

Irby presented the testimony of William Upchurch and Russell Carpenter to impeach Angela
Jackson.  (*Id.* at 494, 495.)  He had attempted to call Keith Echols, Travis Brown, Sharod Rodgers
and Willie Cooper to testify that "Anthony Bond said that he was the shooter and bragged about it
. . . ."  (*Id.* at 495.)  Irby understood that, legally, it did not matter whether Thomas or Bond was the
shooter, but he observed that "you had to work with what you have to work with in the case."  (*Id.*
at 496.)  Those witnesses all invoked their Fifth Amendment rights and refused to testify.  (*Id.*)

Irby was asked whether Thomas had expressed any dissatisfaction before the trial, and Irby
responded:

> There might have been times when he subtly implied that maybe he wasn't
> satisfied, but he never came right out and said that he was not satisfied.  He didn't
> complain, he didn't write any letters to the judge the way clients frequently do.  All
> lawyers who handle these kinds of cases in state and federal court, he didn't file a pro
> se motion, he didn't say I don't think you're working on my case, he never said
> anything like that to me.

(*Id.* at 496-97.)  Irby testified that, if he felt he needed more time to prepare, he would not have
hesitated to seek a continuance.  (*Id.* at 497.)

On redirect, Irby could not recall whether the photograph he had shown Richard Fisher in the
witness room was part of a photo array.  (*Id.* at 497-98.)

**—Jacob Erwin, Esq.—**

The Government called Jacob Erwin, who was, at the time, an attorney practicing law in Memphis. (*Id.* at 500.) Erwin had been appointed in 2007 to represent Anthony Bond in federal court in connection with Movant's efforts to obtain handwriting samples. (*Id.*) Ewin's representation involved speaking to Bond and appearing in court on two occasions. (*Id.* at 500-01.) Bond's position at the time was that he was unwilling to provide a handwriting sample. (*Id.* at 501-02.) Erwin testified that "I can't say how adamant he was that he would not do the examplar." (*Id.* at 502.) Bond also confirmed that he had written a note to Movant's counsel and that "there was some other documents that he had affirmed was his signature for comparison purposes." (*Id.* at 502.)

Erwin testified that "Mr. Bond did state that his—that the truth was what his testimony was, that he testified truthfully before the court and that that was not going to change." (*Id.*) Erwin had conveyed that in open court in 2007 "and actually Mr. Bond was present during that hearing at my side, and he never indicated otherwise." (*Id.* at 502-03; *see also id.* at 503 ("in our discussion with that, he stated he testified truthfully and that his story—his testimony wouldn't change").) Erwin testified that Bond had wanted him to make that statement. (*Id.* at 503.)

On cross-examination, Erwin was unable to opine on whether he considered Bond to be a truthful person. (*Id.* at 504.) He testified that "I take my clients generally for what they say unless I know it to clearly be otherwise. Nothing in my representation would indicate that I should disbelieve anything that he told me." (*Id.*) Erwin conceded that he had just met Bond the day of the hearing. (*Id.*) He also testified as follows:

> [T]o be clear for you, in terms of my answer, in terms of my limited representation, in terms of all of my discussions with him, I can say this: Certainly, I took it very seriously, I know he took it very seriously, and we took the necessary time to discuss all of his legal situation. And based on that, with the seriousness of a man serving a life sentence and with the potential penalties of further prosecutions for other things here, I again don't have any reason to believe he was being dishonest.

(*Id.* at 504-05.) Erwin may have asked Bond about his criminal history at the time, but he no longer remembered the details. (*Id.* at 505.) He understood that Bond was serving a life sentence without

the possibility of parole.  (*Id.*)  In response to how he remembered a statement Bond had made four years previously, Erwin replied:

> What I did—I would say Mr. Arvin contacted me I would say a couple of weeks ago, advised that this hearing was upcoming, I did take a look at my file which consisted frankly of just a memo, it wasn't a tremendous amount of detailed work, but it did refresh my memory somewhat.  Mr. Arvin then provided to me a copy of the transcript that was just introduced, and I reviewed that as well, which—and I will tell you I do have some specific recollection about spending time with him in that, and what I thought was interesting was his adamant view towards participating in this proceeding, that he did not want to, that he was not comfortable or happy with, I think the way his situation resulted and he didn't care what anybody said, he was not going to participate, and I will never forget that.

(*Id.*)

### G.     Additional Proof Offered by Movant

After the hearing, counsel for Thomas also added additional hearing exhibits, including Marty Pearce's forensic handwriting report, dated July 28, 2011 (Exhibit 43); Marty Pearce's rebuttal forensic handwriting report, dated September 9, 2011 (Exhibit 44); the demonstratives used during the testimony of Marty Pearce (Exhibit 45); the state-court trial testimony of William Upchurch, given on September 22, 2001 (Exhibit 46); the testimony of Barry Brown, Angela Jackson, Bobby Jackson, Tonya Gentry, Gail McDonald and Stephanie Williams at the state-court post-conviction hearing (Exhibits 47, 48, 49, 50, 51 & 53); a deposition of Terrance Lawrence taken on October 2, 2007 (Exhibit 52); and the SSTF investigatory file (Exhibit 54).

### —Wiliam Upchurch, State Court Trial Testimony (September 22, 2001)—

At Thomas' trial in state court, William Upchurch testified that he lived in Northaven.  (Trial Tr. 1513, *State v. Thomas*, No. 00-3095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 46.)[47]  Andrew Thomas was his cousin.  (Trial Tr. 1513-14, *State v. Thomas*, No. 00-3095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 46.)  In 1995, Upchurch had entered a guilty plea to receiving stolen property.  (*Id.* at 1514.)

Upchurch testified that he had "[g]rowed up with" Angela Jackson and knew her in early 1997.  (*Id.* at 1514-15.)  Angela Jackson had been married to Thomas at about that time.  (*Id.* at

---

[47]Upchurch also testified at Thomas' federal trial.  *See supra* pp. 80-82.

1515.) At some point, Thomas and Angela Jackson broke up. (*Id.*) Upchurch testified that, after the breakup, he heard Angela Jackson "[s]aying she were gonna pay him back." (*Id.* at 1516.)

Prior to Thomas' marriage to Angela Jackson, Upchurch had loaned him $500. (*Id.* at 1515.) Upchurch had gotten the money from his job at Barnhardt and Crain Riggin Service on President's Island. (*Id.*)

Upchurch testified that he knew Bobby Jackson, whose nickname was "Bobby Knight [sic]." (*Id.* at 1516.) Jackson had received that nickname because "[h]e's got a knot—knot on his forehead." (*Id.*) Upchurch testified that he "[g]rowed up and went to school with" Bobby Jackson. (*Id.*) According to Upchurch, Angela Jackson and Bobby Jackson were dating. (*Id.*)

On cross-examination, Upchurch testified that he gave Thomas $500 between February 1997 and April 1997. (*Id.* at 1517.) Thomas did not have a job at the time. (*Id.*) Upchurch gave him the money because "I'm his cousin." (*Id.*) Upchurch and Thomas grew up together. (*Id.*) He testified that they talked on the telephone but, when asked when the last conversation had occurred, responded that "[i]t's been awhile." (*Id.* at 1517-18.)

### —Barry Brown, State Post-Conviction Hearing—

Barry Brown testified at the post-conviction hearing that he had grown up with Thomas in South Memphis and had known him for "[a]bout twenty years." (Post-Conviction Hr'g Tr. 64, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 47.) Brown had known some of Thomas' girlfriends and knew that he had been married to Angela Jackson. (*Id.*) When asked how well he knew Angela Jackson, Brown responded, "I knew her very well. We used to date." (*Id.*) Brown and Angela Jackson dated "around '96, '97." (*Id.* at 65.) According to Brown, he and Angela Jackson had dated "[n]ot very long about a month or two" before "I broke up with her." (*Id.*) Brown complained that "[s]he's too possessive. She was then." (*Id.*)

Brown testified that he had been aware of Angela Jackson's other boyfriends around the time he was dating her in 1996 or 1997. (*Id.*) He was aware that Angela Jackson was dating a man named Bobby Jackson, who was also known "[j]ust by Knot, Bobby Knot, Bobby Jackson." (*Id.*)

Bobby Jackson was called Knot "[b]ecause he had a knot on his head." (*Id.* at 66.) He was sometimes called "Knothead." (*Id.*) Bobby Jackson had been dating Angela Jackson in 1997, "[a]round the same time Andrew was dating her." (*Id.*)

Angela Jackson took the breakup with Brown "kind of hard." (*Id.* at 66.) Brown recalled that "[s]he threatened to get me back for quitting her." (*Id.*) Brown testified that "I really didn't pay it no attention, but you know she going—she was going to retaliate in some form. She was going to get me somehow." (*Id.* at 66-67.) In response to whether Angela Jackson had done or said anything to him, Brown responded, "That she was going to get me." (*Id.* at 67.) Brown was asked whether he had ever known Angela Jackson to act in a vengeful manner to anyone else, and he testified, "No more than Andrew, that's it." (*Id.*)

Brown was asked whether he was familiar with the Walgreens robbery and shooting, and he responded, "No, but I heard something about it. That's it." (*Id.* at 67.) He did not know who had committed the robbery, and nobody asked him about the robbery around the time it happened. (*Id.* at 67-68.) He was not in Memphis in September of 2001 because "I was locked up." (*Id.* at 68.)[48] Brown testified that "I got locked up in '98, '99—'99. I got out 2003." (*Id.* at 76.) The first time Brown had been asked about the case was when he was visited by an investigator for Thomas' post-conviction counsel. (*Id.* at 68, 69.) Brown said that, had he been asked the questions at the 2001 trial, his testimony would have been the same as it was at the post-conviction hearing. (*Id.* at 69-70.)

On cross-examination, Brown testified that his true name was "Barry Divinte (Phonetic) Brown" (*id.* at 70) and that he used the aliases Barry Cox, Ronald Cox, Kevin Durham, William Upchurch, and Willie Upchurch (*id.*). He was not the same William Upchurch that had testified at Thomas' state-court trial. (*Id.* at 71.) Willie Upchurch was a real person. (*Id.*)

Brown confirmed that he had no personal knowledge of the crime at all. (*Id.* at 70.) At the time of the post-conviction hearing, he was in custody on various aggravated robberies. (*Id.* at 70-

---

[48]Thomas' state-court trial occurred in September 2001.

217

71.)  He was incarcerated at the Northwest Correctional Complex in Tiptonville, Tennessee.  (*Id.* at 71.)

Brown testified that he knew Bobby Jackson because "[a]ll us grew up in the neighborhood together."  (*Id.* at 71.)

Brown was also questioned by the post-conviction judge, and he testified as follows:

> Q.     So this Angela Jackson she just threatened you because you broke up with her she said she'd get even with you?
>
> A.     Yes, sir.
>
> Q.     Did she ever get even with you?
>
> A.     No, sir.
>
> Q.     Did she ever do anything to you?
>
> A.     No, sir.
>
> Q.     Anything other than just saying I'm going to get you?
>
> A.     She just said it.  That's all.
>
> Q.     You went to jail when, '99?
>
> A.     Yes, sir.
>
> Q.     But you had this problem with her was in '97?
>
> A.     Yes, sir.
>
> Q.     Did you see her after that anymore or run into her on the street or—
>
> A.     No, sir.
>
> Q.     Didn't ever see her again?
>
> A.     No, I done see her, but I didn't never say nothing to her.
>
> Q.     That's what I'm saying.  You saw her, but nothing else ever happened?
>
> A.     No.  Huh-huh.

(*Id.* at 72.)

Angela Jackson testified at Thomas' post-conviction hearing in state court that she had previously testified against Thomas on two occasions.  (Post-Conviction Hr'g Tr. 174, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 48.)[49]  She was aware that Thomas was on death row.  (*Id.* at 175.)  Angela Jackson testified that she had once loved and cared for Thomas.  (*Id.*)  She understood that, if he is not granted post-conviction relief, the State intends to execute him.  (*Id.*)

Angela Jackson attended Georgia Avenue Elementary School "from '76 to around about '80."  (*Id.* at 175-76.)  She attended Vance Junior High "[f]rom '82, '82 to around about '83."  (*Id.* at 176.)  Angela Jackson attended Booker T. Washington High School from 1984 to 1988.  (*Id.*)  She graduated from Booker T. Washington High School in 1988.  (*Id.*)

Angela Jackson could not recall when she first met Thomas.  She testified that "I can't even remember the year.  It's been a long time."  (*Id.*)  When asked how long before the Walgreens robbery she had met Thomas, Angela Jackson testified that it was "[n]ot long" and less than six months.  (*Id.* at 177.)  "Maybe a month or two" after Angela Jackson had met Thomas, he moved in with her.  (*Id.*)  Angela Jackson's two daughters were living in her home at the time.  (*Id.* at 177-78.)  When Thomas moved in, Angela Jackson "didn't know a whole lot" about him.  (*Id.* at 178.)  She did not know that he had a criminal past at that time, and she did not recall when she first learned that he had a criminal past.  (*Id.*)

Angela Jackson had been questioned by the FBI about the Walgreens robbery "in '97 that I recall."  (*Id.*)  She did not remember how long after the robbery this interview had occurred.  (*Id.* at 178-79.)  She testified that "[i]t was about five or six FBI's" who "knocked on my door."  (*Id.* at

---

[49]To avoid unnecessary duplication, the Court's summary of Angela Jackson's testimony at the state post-conviction hearing does not include her full account of the events of April 21, 1997 and the following days and portions of her account of the interview with law enforcement agents on November 4, 1997.  Angela Jackson had testified about those subjects at the federal criminal trial and her testimony has remained, in all material respects, consistent over the years.

179.)  Angela Jackson was questioned at her home.  (*Id.*)  She did not recall whether she had been read her rights.  (*Id.*)  Angela Jackson recalled that "I was scared because there were so many of them.  I didn't know what to think."  (*Id.* at 180.)  She denied thinking she might have been in trouble for something, but she "just didn't know what it was."  (*Id.*)  The FBI did not ever tell her she was in trouble for anything.  (*Id.*)  Angela Jackson testified that "[t]hey told me that they was there because of [the] robbery had took place" at the Walgreens.  (*Id.*)  Angela Jackson told the agents what she knew about the robbery.  (*Id.*)  She testified that "they showed me the pictures [and] asked me to identify it did I know who some people was you know in the photos, and I told them, yes."  (*Id.* at 181.)  Angela Jackson identified Thomas and Bond.  (*Id.*)

Angela Jackson identified a statement that she gave to the FBI on November 4, 1997.  (*Id.* at 188-89.)  Somebody else had written out the statement but she signed it.  (*Id.* at 188, 189.)

Angela Jackson recalled speaking to the FBI on two occasions.  The first time was at her home.  (*Id.* at 190.)  She also "recall[ed] another time speaking with another FBI."  (*Id.*)  Angela Jackson could not remember when the second interview had occurred.  (*Id.* at 190-91.)  She recalled that she had previously testified in state court but did not recall whether she had also testified in federal court.  (*Id.* at 191.)  Angela Jackson recalled speaking to lawyers before she testified for the first time (*id.*), but "I don't know if they was lawyers, prosecutors maybe.  I'm not for sure."  (*Id.* at 192.)  Angela Jackson did not remember whether the lawyers she had spoken to were federal or state prosecutors.  (*Id.*)  She discussed with them "what had happened."  (*Id.*)  She also testified as follows:

> Q.  Were you promised any sort of immunity for your testimony?
>
> A.  No.
>
> Q.  Were you promised any money in exchange for your testimony?
>
> A.  No.
>
> Q.  Nobody told you that we won't prosecute you if you testify against
> Andrew Thomas?

A. I don't remember that anyone saying that. I don't remember anyone telling me that.

Q. You don't remember any of that. Has anybody ever threatened to prosecute you for your involvement in the Walgreens robbery?

A. No.

Q. Never?

A. (No Verbal Response)

Q. So nobody threatened to prosecute you for purchasing a car for Andrew—

A. No.

Q. –after the robbery?

A. No.

(*Id.* at 192-93.)

Angela Jackson had previously testified that she had purchased a gun for Thomas. (*Id.* at 193.) She did not recall how long after the Walgreens robbery this had occurred. (*Id.* at 193-94.) She testified as follows:

Q. Had you told the FBI agents the first time they met you that you had purchased the gun for Andrew Thomas?

A. I don't remember.

. . . .

Q. But you did claim to purchase a gun for Andrew Thomas. Correct?

A. Yes.

Q. And did anybody threaten to prosecute you for purchasing a gun for Andrew Thomas?

A. No.

Q. So you were never threatened with prosecution for that act?

A. Not that I remember, no.

Q.      Not that you remember.  Okay.  And you'd also testified in the statement in the federal hearings that you'd opened up a bank account for Andrew Thomas.  Is that correct?

A.      Yes.

Q.      Did you tell the FBI the first time they met you at your home that you had purchased or that you had opened a bank account for Mr. Thomas?

A.      I don't remember.

. . . .

Q.      Did anybody ever threaten to prosecute you for opening up a bank account for Andrew Thomas?

A.      No.

(*Id.* at 194-95.)

Angela Jackson testified that she did not know a Courtney Jackson, a Coco Jackson, a Bobby Jackson, a Bobby Lee Jackson or a Bobby Knot.  (*Id.* at 203.)  After Angela Jackson was shown a picture of Bobby Jackson from a photo array, she testified that "[i]t looks like he may have grew up in the apartments that we stayed in, but I don't know him personally, no."  (*Id.* at 203-04.)  Angela Jackson testified that she did not know that individual's name and had never spoken to him.  (*Id.*)  She had never dated the person depicted in the photo array and had never "been into it" with him.  (*Id.*)  Angela Jackson believed the person in the photograph might have lived at the Foote Homes Apartments, but she did not know if he lived there at the same time she had lived there.  (*Id.* at 204-05.)  She testified that "I don't know if he actually lived there."  (*Id.* at 205.)  Angela Jackson testified that she had lived at Foote Homes "in the '90's."  (*Id.* at 205-06.)

Angela Jackson testified that she had dated Barry Brown.  (*Id.* at 206.)  In response to how long she had dated Brown, she replied "[n]ot long" and referred to him as a "high school sweetheart."  (*Id.*)  She testified that "I don't remember the exact age that I was."  (*Id.*)  Angela Jackson denied ever telling Brown after they had broken up that she would get even with him.  (*Id.*)

Angela Jackson had a brother named Courtney Williams, who also went by the name Coco.  (*Id.* at 206-07).

On cross examination, Angela Jackson testified that Foote Homes was a large housing project and, when she lived there, she did not know everyone else who lived there. (*Id.* at 207.)

After the robbery, Angela Jackson did not call the police, and she did not tell her mother or friends about what she had seen. (*Id.* at 215.) She explained that "I was scared, and I just felt if I kept my children close, they was the closest thing to me so I felt—I didn't call anyone." (*Id.*)

Angela Jackson did not call the police then or at any other time. (*Id.* at 217.) The FBI found her. (*Id.* at 218.) The FBI agents came to her house and Angela Jackson "told them what had happened." (*Id.*)

Angela Jackson was still married to Thomas when the FBI showed up at her house. (*Id.* at 219.) She did not recall when they got married, but it was after the Walgreens robbery and after they were at the hotel. (*Id.*) Angela Jackson admitted that she had married Thomas after hearing him confess his involvement in the shooting of the courier. (*Id.*) In response to whether that was something she was proud of, Angela Jackson replied, "No. I felt that was the safest thing for me to do." (*Id.*) Angela Jackson was asked how long she and Thomas were married, and she replied, "It wasn't long. We tried to get an annulment, and it didn't go through, and then I tried to get a divorce, but it wasn't granted until like two years after." (*Id.*) When she testified at Thomas' trial in state court, Angela Jackson was still making payments to her divorce lawyer. (*Id.* at 219-20.)

Angela Jackson denied shooting James Day, and she denied shooting him with Bobby Jackson. (*Id.* at 220-21.) She testified that she had never committed a robbery with Bobby Jackson. (*Id.* at 221.) When asked whether she knew Bobby Jackson, Angela Jackson responded, "No. I don't know him personally." (*Id.*) Angela Jackson denied getting together with Bobby Jackson to make up a story about Thomas. (*Id.*) She testified that she was in court because she had been subpoenaed. (*Id.*) This was the third time Angela Jackson had testified about these events (*id.*), and she acknowledged that it was not easy for her (*id.* at 222). Angela Jackson reiterated that it was Thomas, not Bobby Jackson, who had come to her apartment with envelopes full of money and had

ordered everyone around.  (*Id.*)  It was Thomas who was calling the shots at her apartment that day. (*Id.*)

On redirect, Angela Jackson testified that she was still scared of Thomas, but she denied that she would do anything possible to get him out of her life.  (*Id.* at 224.)

### —Bobby Lee Jackson, State Post-Conviction Hearing—

Bobby Lee Jackson testified at the state post-conviction hearing that he had never been known as Knight or as Knothead.  (Post-Conviction Hr'g Tr. 74, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 49.)  He had been called Bobby Knot and Knot.  (*Id.*)  Bobby Jackson grew up in the Claiborne Homes on Lauderdale in Memphis.  (*Id.*)  He had attended Georgia Elementary School, Vance Junior High and Booker T. Washington High School. (*Id.* at 75.)  Bobby Jackson was at Vance Junior High in the late 1970's, and he was at Booker T. Washington "[f]rom '80 to '83, '84, somewhere in there."  (*Id.*)

The only time Bobby Jackson had been in prison was for an armored car robbery.  (*Id.* at 76.) He had been arrested in July 1997, and he was released in 2002.  (*Id.*)  He was incarcerated at the Federal Correctional Institution in Memphis.  (*Id.*)

Bobby Jackson testified that did not know Courtney Jackson.  (*Id.*)  He also did not know Coco Jackson.  (*Id.* at 77.)  He testified that he did not know Angela Jackson or Angie Jackson.  (*Id.*) He did not know William Upchurch, but he did know someone named Bill Upchurch.  (*Id.*)  Bobby Jackson had gone to high school at Booker T. Washington with Bill Upchurch, but did not know him in middle school. (*Id.*)  Bobby Jackson testified that he knew Stephanie Williams (*id.*) and described her as his "play sister" (*id.* at 78).  He testified that he had met Stephanie Williams in junior high and that he still knew her at the time of the post-conviction hearing.  (*Id.*)

Bobby Jackson had been incarcerated for an armed robbery committed at the Southbrook Mall in July 1997.  (*Id.* at 78.)  When asked how he got the idea to commit the robbery, Bobby Jackson responded that "[m]e and my co-defendant discussed it."  (*Id.*)  The co-defendant was named Terrance Lawrence.  (*Id.* at 79.)  At the time, Bobby Jackson had been working at Sears for

six years, from 1991 to 1997. (*Id.* at 79.) The robbery had been Lawrence's idea. (*Id.* at 79-80.) Bobby Jackson and Lawrence first discussed the robbery "[p]robably a couple of days before." (*Id.* at 79.) According to Bobby Jackson, "[a]t the time we just discussed the robbery. I want to go on a robbery with him. We discussed it. That as far as we discussed and we just went for it." (*Id.* at 80.) "I just went along with it." (*Id.*) He explained that "at the time I was under a lot of stress, depressed." (*Id.*) Bobby Jackson and Lawrence spent a day planning the robbery. (*Id.*)

Bobby Jackson testified that, during the robbery, he was unarmed but Lawrence had a gun. (*Id.* at 81.) The guard was shot in the robbery. (*Id.*) In response to who had shot the guard, Bobby Jackson responded, "It was a tussle. Wasn't nobody shot the guard. It was a tussle for the gun. The gun fell and it was a tussle." (*Id.*) He clarified that "[i]t was a tussle over the gun." (*Id.*) According to Bobby Jackson, "[w]e both had a fight with" the Loomis armored car guard (*id.* at 82), during which "[t]he gun went off and shot him twice" (*id.*). Jackson was asked whether "[y]ou shot him twice," and he responded, "Yeah." (*Id.*) Bobby Jackson had also been shot during that robbery. (*Id.*) He and Lawrence did not make off with any money. (*Id.*)

After the robbery, Bobby Jackson and Lawrence split up. (*Id.*) Bobby Jackson was eventually arrested at his mother's house. (*Id.*) He did not know where Lawrence had gone. (*Id.* at 82-83.) When asked what happened to the gun, Jackson testified, "He got rid of the gun. I don't know what he did with it." (*Id.* at 83.) Bobby Jackson had been arrested "I say that morning, the next day, that morning." (*Id.*) Lawrence was arrested "some months later." (*Id.*) Bobby Jackson told the police that Lawrence had been his accomplice. (*Id.*) In response to when he had made that statement, Bobby Jackson replied, "I don't know, but I was in the hospital. When I got shot, I was in the hospital for thirty some days. I don't know. I guess my time going in the emergency. I don't remember." (*Id.*) Bobby Jackson pled guilty and was sentenced to five and one-half years. (*Id.*) He served his entire sentence. (*Id.* at 84.)[50]

---

[50]On December 22, 1997, Bobby Jackson entered a guilty plea to a two-count indictment
(continued...)

Bobby Jackson testified that, while he was in prison, he had never been approached by the police or the FBI about the Walgreens robbery that occurred on April 21, 1997. (Post-Conviction Hr'g Tr. 84, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Tr. 49.) He had never been told that an eyewitness had identified him as the driver of the getaway car. (*Id.*) He did not recall hearing about the Walgreens robbery on the news. (*Id.*)

Bobby Jackson denied knowing Andrew Thomas or Bowlegs. (*Id.*) He also denied knowing Anthony Bond, Barry Brown or Barry Cox. (*Id.* at 84-85.) When he was told that Barry Brown had testified that he had dated Angela Jackson, Bobby Jackson responded that "I don't even know a Angela Jackson." (*Id.* at 85.)

In response to questions by the post-conviction court, Bobby Jackson confirmed that he committed his crime in July 1997, and had been in custody for the next five and one-half years. (*Id.* at 86-87.) He reiterated that he did not know the people mentioned by post-conviction counsel. (*Id.* at 87.) Bobby Jackson used to work at the Sears at the Hickory Ridge Mall, not the Sears near the Southbrook Mall where his robbery had occurred. (*Id.* at 87-88.)

### —Tonya Gentry, State Post-Conviction Hearing—

Tonya Gentry testified at the post-conviction hearing that she knew Thomas and that "I'm friends with a lot of people in his family." (Post-Conviction Hr'g Tr. 226, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 50.) At the time of the hearing, Gentry had known Thomas for fourteen or fifteen years. (*Id.*) Gentry did not recognize the nickname "Bowlegs." (*Id.*)

In response to whether she had known any of Thomas' girlfriends, Gentry responded, "I— his wife. I think they got married. Her name was Angela Jackson." (*Id.*) Gentry testified that Angela Jackson "was my mom's next door neighbor" and that "I've known Angela before I had my

---

[50](...continued)

charging him with violating 18 U.S.C. §§ 1951 and § 924(c). (Mins., *United States v. Jackson*, No. 2:97-cr-20160-01-JT (W.D. Tenn.), ECF No. 49.) On May 27, 1998, Jackson was sentenced to a total term of imprisonment of 66 months. (Mins., *id.*, ECF No. 72.) Judgment was entered on May 29, 1998. (J. in a Criminal Case, *id.*, ECF No. 78.) Bobby Jackson did not appeal.

first son, and he's sixteen." (*Id.*) Gentry clarified that she had known Angela Jackson "[f]or about seventeen, eighteen years." (*Id.*)

Gentry was asked whether she had known any of Angela Jackson's other boyfriends, and she responded, "Her children's dad name is Will. She used to date some guy with a bump on his head. They called him Knothead. I can't think of his real name. I think that's about it." (*Id.* at 227.) Under further questioning, Gentry stated that his name was Bobby Jackson. (*Id.*) Angela dated Bobby Jackson "after her and Andrew had gotten married. It was a time after that." (*Id.*) Gentry could not recall what year that was, stating, "I want to say about '94 or '95 something like—no probably '93, '94 something like that. I'm not—it was in the '90's." (*Id.*) Gentry then testified it was "probably the mid to late '90s if not mistaken. I'm not sure." (*Id.* at 227-28.) She explained that "I know I had graduated from high school. That was '92 and I had a one bedroom so it was like —it had to be '94 or back." (*Id.*)

Gentry confirmed that Angela Jackson had been dating Bobby Jackson while she was married to Thomas. (*Id.*) Gentry was asked whether she knew how the relationship between Angela Jackson and Thomas had ended, and she replied, "No. I just know Andrew had gotten locked up for something about—I don't know. Some kind of murder or something I don't know. I wasn't just really at my mom's house that much to just really know, but I know he had gotten locked up, but I didn't know they was still dating while he was locked up." (*Id.*) Gentry testified that Angela Jackson was dating Bobby Jackson after she had dated Thomas (*id.*), but she did not recall if Angela Jackson was still seeing Bobby Jackson after Thomas was locked up (*id.* at 229). She testified that "I don't know about that. I'm not sure about that because I wasn't living with my mom anymore." (*Id.*) Gentry reiterated that Angela Jackson had been dating Bobby Jackson while she was married to Thomas and after Thomas was out of the picture. (*Id.*)[51] According to Gentry, "I remember her cousin—her cousin's name was—his cousin—no his cousin was talking about it so I remember—

[51] Bobby Jackson was in custody for the Southbrook Mall robbery from July 24, 1997 until May 7, 2002. *See infra* pp. 275-76.

that's all I remember because I'm real good friends with his cousins, Andrew's cousins." (Post-Conviction Hr'g Tr. 229, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 50.) Gentry did not know that Bobby Jackson had ever been locked up. (*Id.*)

Gentry testified that nobody had contacted her until 2007. (*Id.*) In 2007, Gentry lived in the Foote Homes. (*Id.* at 229-30.) She has lived in Memphis consistently since 1988. (*Id.* at 230.) If anyone had come to speak to her prior to 2007, she would have provided the same information she testified to. (*Id.*)

Under questioning by the post-conviction court, Gentry testified as follows:

> Q.     Do you know a Barry Brown?
>
> A.     Yes, sir.
>
> Q.     How do you know him?
>
> A.     Because he used to be with Angela—I mean not Angela, Stephanie and her brothers. I was good friends with Stephanie, Andrew's cousin.
>
> Q.     Stephanie?
>
> A.     Upchurch.
>
> Q.     Upchurch. Is the defendant Mr. Thomas's cousin?
>
> A.     Yes, sir.
>
> Q.     And you were friends with them?
>
> A.     Yes, sir.
>
> Q.     And who was Barry Brown to them?
>
> A.     If I'm not mistaken, he's one of their cousins. I know he used to be with Stephanie's brother Bill Williams. I can't think of Bill's real name.
>
> Q.     How long have you known Angela?
>
> A.     I've known Angela for about eighteen years.
>
> Q.     Do you remember when she was dating Barry Brown?
>
> A.     Barry Brown?
>
> Q.     Yeah.

228

Q.    No, sir.

Q.    You don't remember her dating Barry Brown?

A.    No, sir.

Q.    How well do you know Bobby Jackson?

A.    Bobby Jackson I knew him because he used to date Angela.  He used to come over to her house when she stayed next door to my mom.

Q.    You said that's when she was married to Mr. Thomas?

A.    Yes, sir.

Q.    Where was he?

A.    I think Andrew was locked up or incarcerated.

Q.    So he was already in jail when Bobby used to come around?

A.    Yes, sir.

Q.    Cause once he went to jail, he didn't ever get out again?

A.    No, sir.  Because this is actually the first I've ever heard of Andrew since then.  I thought he was out.  I didn't know he was still incarcerated.

Q.    But when you remember Bobby Jackson coming around Angela that was after Andrew was already in jail?

A.    Uh-huh.

Q.    She was still living next door to your mom?

A.    Yes, sir, I think so.

Q.    And how did you know Bobby Jackson just from dating her?

A.    Yes, sir.

Q.    You didn't know him before that?

A.    No, sir.

(*Id.* at 231-33.)

Gentry attended Booker T. Washington High School, and graduated in 1992.  (*Id.* at 233.)

Gentry did not know that Bobby Jackson had been incarcerated.  (*Id.*)  She did not know whether

Bobby Jackson had stopped seeing Angela Jackson before he went to jail. (*Id.*) She explained that "I started working at the IRS, and I wasn't around very much so I'm not sure, sir." (*Id.*) Gentry testified that she was sure about the times "as well as I can remember." (*Id.*) Gentry agreed that these events happened a long time ago and it was hard to remember when. (*Id.*) In response to how long Bobby Jackson had dated Angela Jackson, Gentry replied, "I'm not sure about that. I don't know if they were dating before he started coming around or what. So I just know about when I started seeing him." (*Id.* at 233-34.) Gentry was asked what season she first saw Angela Jackson with Bobby Jackson, and she responded, "When she first started seeing him, it was kind of like in the Spring. School was beginning to let out you know they was on Spring break. They was getting ready to get out for Summer. I remember that because my mom was still taking my children over to the Martin Luther King Center for Head Start." (*Id.*) Thomas was already in jail at that time. (*Id.*)

The post-conviction court asked Gentry who she knew in Thomas' family, and she responded:

> His Aunt Lena Upchurch and his cousin Stephanie Upchurch, his cousin Bill, Jr., his cousin Toynel (Phonetic) Upchuch, Bill's wife, I think her name is Loretta, Loraine, something like that, his children's mom. I know his Luella. I just know a lot of his cousins. Actually, Stephanie and I were kind of like best friends. We used to play cards and do everything together.

(*Id.* at 234-35.) Gentry denied knowing Anthony Bond, Tanya Monger or Clara Monger. (*Id.* at 235.) She did not recall that Thomas had been called Bowlegs. (*Id.*) Gentry did not know anyone called Tree Tree or Trenian. (*Id.*)

Gentry testified that Angela Jackson did not live next door to her mother any more. (*Id.*) According to Gentry, Angela Jackson probably moved "like in the late '90s." (*Id.* at 236). Gentry did not know Knothead from Foote Homes, and she testified that she only knew him when he dated Angela Jackson, after Thomas was in jail. (*Id.*)

On cross examination, Gentry testified that she did not know Dana Wiggins.  (*Id.* at 237.)
She affirmed that she was close to Thomas' family.  (*Id.*)  Gentry was on probation for theft of
property.  (*Id.*)

On redirect, Gentry was asked whether Angela Jackson had dated Bobby Jackson at the same
time she had dated Thomas.  (*Id.* at 238.)  Gentry responded:  "Yes, sir. Because he—when Andrew
and his cousin Bill they would leave and go somewhere.  Then I would see Knothead.  That's all I
know is they call him Knothead, but I didn't know that they were an item until after Andrew had
gotten incarcerated."  (*Id.*)  After Thomas was incarcerated, Knothead "start spending the night and
everything."  (*Id.*)  Gentry affirmed that Knothead spent time with Angela Jackson before Thomas
was incarcerated.  (*Id.* at 238-39.)

### —Gail Irene McDonald, State Post-Conviction Hearing—

Gail Irene McDonald testified at the post-conviction hearing through a hearing impaired
interpreter.  McDonald used to be employed by the Postal Service.  (Post-Conviction Hr'g Tr. 167,
*Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 51.)  At the time of the post-
conviction hearing, she lived in Olive Branch, Mississippi.  (*Id.*)  She had previously lived in
Memphis and in Hughes, Arkansas.  (*Id.*)

In response to what she saw at the Walgreens on April 21, 1997, McDonald testified as
follows:

> Well, at Walgreens okay I had just driven into the lot to refill some
> medication there at Walgreens, and I sat down and was kind of digging through my
> purse for my papers, you know, my prescription from the doctor, and I noticed a man
> there was a man standing, and then there was a driver kind of in a car across directly
> in front of me.
>
> I knew I didn't feel comfortable about this, but—so I went ahead and was
> preparing myself to go into the store when I noticed a man ran out with a gun, passed
> the wall, and then took a weapon and shot the man after he came out the door of the
> Walgreens, and just shot him and picked up a bag, and then ran, and it was—it was
> right there by the Loomis truck I think it was, and then he kind of turned and still had
> his weapon out, and I thought he might try to shoot me so I kind of cowered, and they
> left.

(*Id.* at 167-68.)  McDonald remembered giving a statement to the police shortly after the shooting, and she recalled "being very nervous about the situation.  I saw the guy get shot in the back of the neck." (*Id.* at 168.)  She testified that

> [t]hat man who was the driver stayed in the car.  There was another guy standing against the wall there at Walgreens, and he was only just a few feet from the door, and he seemed to be waiting for something, and then when the policeman came out with the bag, then it was he that came up behind him and shot.  The guy fell down. He grabbed up the bag of money I assume and got in that car where that driver was sitting waiting, got in that car and drove off.

(*Id.* at 168-69.)

McDonald testified that the driver "looked say maybe a little heavyset, round face." (*Id.* at 169.)  The driver was an African American.  (*Id.* at 170.)  "He had a full head of hair kind of an afro style at that time." (*Id.*)  The shooter "was wearing kind of a blue striped, thin stripes, and then maybe some blue jeans, a cap, kind of had a facial hair around the mouth, but he had a real thin sullen type face." (*Id.* at 169.)  In response to whether the shooter had been wearing long sleeves, McDonald testified, "Definitely long sleeves.  It may have been rolled up somewhat, but it looked like a long-sleeve shirt.  I do remember the color was a thin blue stripe type of shirt." (*Id.* at 169-70.)

McDonald did not recall being interviewed by attorneys for Thomas and Bond.  (*Id.* at 171, 172.)  She testified that "I think I'd remember that, but it's been ten years.  No, I don't think so." (*Id.* at 171.)  McDonald had not been asked to testify at the state trial.  (*Id.* at 172.)

In response to questioning by the post-conviction court, McDonald testified that the only time she had spoken to the police was the day of the shooting.  (*Id.* at 173.)  Two months before the post-conviction hearing, she might have spoken to the FBI.  (*Id.*)  McDonald had never spoken to any lawyer about the case.  (*Id.* at 172.)

**—Terrance Lawrence, State Post-Conviction Hearing (by deposition)—**

At the state post-conviction hearing, Thomas' attorneys introduced the deposition of Terrance Lawrence, which had been taken at the Federal Correctional Institution in Memphis on October 2, 2007.  (Deposition of Terrance Lawrence ("Lawrence Dep."), Hr'g Ex. 52.)  Lawrence was serving

a seventeen and one-half year sentence for the robbery of a Loomis Fargo armored car at the Southbrook Mall. (Lawrence Dep. 5.) Lawrence expected to be released in June 2012. (*Id.* at 5-6.)

The Southbrook Mall robbery occurred on July 21, 1997. (*Id.* at 6.) Lawrence committed the robbery with Bobby Jackson. (*Id.*) Lawrence had known Jackson for about five years before they committed the crime. (*Id.*) He testified that "[m]y sister was married to one of his half brothers." (*Id.*) Lawrence did not know whether Bobby Jackson had any nicknames. (*Id.* at 6-7.) He might have heard somebody call Bobby Jackson "Knock-Knock. Something like that." (*Id.* at 7.) He had never heard Bobby Jackson called Bobby Knight. (*Id.*)

Lawrence testified that it had been Bobby Jackson's idea to commit the Southbrook Mall robbery. (*Id.*) Bobby Jackson approached Lawrence in May 1997. (*Id.*) Lawrence testified that Bobby Jackson "came to me about another robbery that dealt with a job that he had at Sears, and somehow that was put on hold and he suggested let's do this other one." (*Id.*) Bobby Jackson suggested robbing a Loomis Fargo car. (*Id.* at 8.) Lawrence "told him I wasn't interested 'cause with my record if I ever got, you know, got in trouble again, I could be facing a life sentence." (*Id.*) Lawrence "[p]robably didn't really agree to it till about the following month, June. June, probably June of '97." (*Id.*) In June 1997, Bobby Jackson asked Lawrence again, and he said yes. (*Id.* at 8-9.) The plan was "[t]o intercept the armored car guard and produce a weapon and ask them to give us the money." (*Id.* at 9.) Bobby Jackson had planned to carry the gun. (*Id.*)

On July 21, 1997, Bobby Jackson approached the armored car courier, while Lawrence was fifteen or twenty feet away. (*Id.*) Bobby Jackson was carrying a gun. (*Id.* at 9-10.) Bobby Jackson showed his gun to the courier, and the courier "dropped the bag with the money in it and went for his gun, and that's when they started shooting at each other." (*Id.* at 10.) Lawrence ran away without trying to grab the money. (*Id.*) The armored car guard shot Bobby Jackson in the buttocks, and Bobby Jackson shot the armored car guard. (*Id.* at 10-11.) Bobby Jackson and Lawrence got into Jackson's car together and drove away. (*Id.* at 11.) They went to Bobby Jackson's mother's house in Whitehaven, about six blocks from where the robbery had occurred. (*Id.*) Bobby Jackson

was arrested the next day, June 22 or 23, 1997. (*Id.* at 12.) Lawrence was arrested on October 1, 1997, in Kankakee, Illinois, where he had fled. (*Id.*) He pled guilty to the charges against him. (*Id.*)

Lawrence had not been questioned about the Walgreens robbery until an investigator came to see him two weeks before his deposition. (*Id.* at 13.) Nobody had told him that one of the witnesses to the Walgreens robbery had identified him as the shooter. (*Id.*)

Lawrence testified that he did not know Courtney Williams or Coco Williams. (*Id.* at 14.)

On cross examination, Lawrence testified that he knew nothing about the Walgreens robbery. (*Id.* at 14-15.)

### —Stephanie Upchurch Williams, State Post-Conviction Hearing—

Stephanie Upchurch Williams testified that she was a bus monitor and had lived in Memphis her entire life. (Post-Conviction Hr'g Tr. 417, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 53.) She had attended Booker T. Washington High School in 1987. (*Id.*)

Williams testified that Thomas was her cousin. (*Id.*) Williams also knew Bobby Jackson or Bobby Knot. (*Id.*) According to Williams, she and Bobby Jackson "went to the same schools together, and we growed up in the same apartments." (*Id.* at 417-18.) In response to how often she saw Bobby Jackson growing up, Williams testified that "I used to see him every now and then. I'm not going to say every day I see him but I seen him." (*Id.* at 418.) Williams testified that she went to Booker T. Washington at the same time that Bobby Jackson did. (*Id.*)

Williams testified that she knew Angela Jackson. (*Id.*) She recalled that Angela Jackson "went to school with us, and we also grew up in the same apartments." (*Id.*) Williams testified that she and Angela Jackson were friends and that "[w]e see each other every day" when they were growing up. (*Id.*)

Williams testified that Angela Jackson had dated Bobby Jackson. (*Id.*) According to Williams, she knew "[c]ause I seen them." (*Id.* at 419.) Williams had seen Bobby Jackson come over to Angela Jackson's house. (*Id.*) When asked when this occurred, Williams testified that "it was '97, the year '97." (*Id.*)

Williams knew that Angela Jackson had been married to Thomas. (*Id.*) In response to whether Angela Jackson had dated Bobby Jackson before or after her marriage to Thomas, Williams replied, "Before, I think it was before. I think it was before." (*Id.*) She agreed that it was "[a]round the same time." (*Id.*)

On cross examination, Williams acknowledged that she had testified at the state trial. (*Id.*) When asked whether Angela Jackson had dated Bobby Jackson while married to Thomas, Williams responded, "No, I didn't say while they was married. I said around about the same time. It might have been before him and her got together, but I know they weren't talking." (*Id.* at 420.) Williams was asked whether Angela Jackson might also have dated Bobby Jackson after her marriage to Thomas, and she replied, "I'm not for sure." (*Id.*)

On redirect, Williams testified that her maiden name was Upchurch. (*Id.*) She was asked whether Angela Jackson had dated Bobby Jackson before or after Thomas went to prison, and she answered, "I heard about it, it was after. I think it was—like I say I really just don't know, but I do know that they was dating." (*Id.*)

## II.  THE LEGAL STANDARD

Pursuant to 28 U.S.C. § 2255(a),

[a] prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

"A prisoner seeking relief under 28 U.S.C. § 2255 must allege either (1) an error of constitutional magnitude; (2) a sentence imposed outside the statutory limits; or (3) an error of fact or law that was so fundamental as to render the entire proceeding invalid." *Short v. United States*, 471 F.3d 686, 691 (6th Cir. 2006) (internal quotation marks omitted).

A § 2255 motion is not a substitute for a direct appeal. *See Ray v. United States*, 721 F.3d 758, 761 (6th Cir. 2013). "[N]onconstitutional claims that could have been raised on appeal, but

were not, may not be asserted in collateral proceedings." *Stone v. Powell*, 428 U.S. 465, 477 n.10 (1976). "Defendants must assert their claims in the ordinary course of trial and direct appeal." *Grant v. United States*, 72 F.3d 503, 506 (6th Cir. 1996). This rule is not absolute:

> If claims have been forfeited by virtue of ineffective assistance of counsel, then relief under § 2255 would be available subject to the standard of *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). In those rare instances where the defaulted claim is of an error not ordinarily cognizable or constitutional error, but the error is committed in a context that is so positively outrageous as to indicate a "complete miscarriage of justice," it seems to us that what is really being asserted is a violation of due process.

*Id.*

Even constitutional claims that could have been raised on direct appeal, but were not, will be barred by procedural default unless the defendant demonstrates cause and prejudice sufficient to excuse his failure to raise these issues previously. *El-Nobani v. United States*, 287 F.3d 417, 420 (6th Cir. 2002) (withdrawal of guilty plea); *Peveler v. United States*, 269 F.3d 693, 698-99 (6th Cir. 2001) (new Supreme Court decision issued during pendency of direct appeal); *Phillip v. United States*, 229 F.3d 550, 552 (6th Cir. 2000) (trial errors). Alternatively, a defendant may obtain review of a procedurally defaulted claim by demonstrating that he is "actually innocent." *Bousley v. United States*, 523 U.S. 614, 622 (1998).

"[A] § 2255 motion may not be employed to relitigate an issue that was raised and considered on direct appeal absent highly exceptional circumstances, such as an intervening change in the law." *Jones v. United States*, 178 F.3d 790, 796 (6th Cir. 1999); *see also DuPont v. United States*, 76 F.3d 108, 110 (6th Cir. 1996) (same).

After a § 2255 motion is filed, it is reviewed by the Court and, "[i]f it plainly appears from the motion, any attached exhibits, and the record of prior proceedings that the moving party is not entitled to relief, the judge must dismiss the motion." Rule 4(b), Rules Governing Section 2255 Proceedings for the United States District Courts ("2255 Rules"). "If the motion is not dismissed, the judge must order the United States attorney to file an answer, motion, or other response within a fixed time, or to take other action the judge may order." *Id.* The movant is entitled to reply to the

Government's response. Rule 5(d), § 2255 Rules. The Court may also direct the parties to provide additional information relating to the motion. Rule 7, § 2255 Rules.

"In reviewing a § 2255 motion in which a factual dispute arises, the habeas court must hold an evidentiary hearing to determine the truth of the petitioner's claims." *Valentine v. United States*, 488 F.3d 325, 333 (6th Cir. 2007) (internal quotation marks omitted). "[N]o hearing is required if the petitioner's allegations cannot be accepted as true because they are contradicted by the record, inherently incredible, or conclusions rather than statements of fact." *Id.* (internal quotation marks omitted). Where the judge considering the § 2255 motion also presided over the criminal case, the judge may rely on his recollection of the prior case. *Blanton v. United States*, 94 F.3d 227, 235 (6th Cir. 1996); *see also Blackledge v. Allison*, 431 U.S. 63, 74 n.4 (1977) ("[A] motion under § 2255 is ordinarily presented to the judge who presided at the original conviction and sentencing of the prisoner. In some cases, the judge's recollection of the events at issue may enable him summarily to dismiss a § 2255 motion . . . ."). Movant has the burden of proving that he is entitled to relief by a preponderance of the evidence. *Pough v. United States*, 442 F.3d 959, 964 (6th Cir. 2006).

## III.          ANALYSIS OF MOVANT'S CLAIMS

### A.       The Failure to Request a Severance (Claim 1)[52]

In Claim 1, Thomas contends that his attorney rendered ineffective assistance by failing to seek the severance of Count 3 of the Indictment, the § 922(g) count involving the purchase of the Mossberg shotgun, from the two robbery counts. (ECF 138 at 9-13.) Specifically, Thomas claims that his

---

[52]Movant's original and amended § 2255 motions (ECF Nos. 1 & 5) consisted of little more than a list of issues with little factual development. The issues Movant elected to pursue are contained in his Post Hearing Brief in Support of Defendant's Amended Petition to Vacate Sentence Pursuant to 28 U.S.C. § 2255. (Movant's Post-Hr'g Br. 9-25, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Movant also filed two amendments that raised *Brady* claims, which have been dismissed on the merits. *See supra* pp. 116-17. All other issues presented in Thomas' various filings have been abandoned and are DISMISSED.

right to the effective assistance of counsel was violated because Irby failed to move to sever Count [3] of the indictment—felon in possession of a firearm—or seek a limiting jury instruction which might have mitigated the damage from his failure to seek severance. Irby should have made the motion because (i) Count [3] was unrelated to the Walgreens robbery, (ii) there was a real and substantial risk that the jury would erroneously conclude that the government had satisfied the firearm element of Count [3] by presenting evidence that a pistol was used in the Walgreens robbery, and (iii) the jury's sympathy for Mr. Day and the disturbing video presented in the government's case for Counts [1] and [2] likely prejudiced them against Thomas with respect to Count [3].

(*Id.* at 9.) Thomas argues both that his attorney was ineffective in failing to file a pretrial motion to sever Count 3 as improperly joined under Federal Rule of Criminal Procedure 8(a) and that his attorney was ineffective in failing to file a motion to sever Count 3 on the ground of prejudicial joinder under Rule 14(a).

A claim that ineffective assistance of counsel has deprived a movant of his Sixth Amendment right to counsel is controlled by the standards stated in *Strickland v. Washington*, 466 U.S. 668 (1984). To demonstrate deficient performance by counsel, a petitioner must demonstrate that "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. "A court considering a claim of ineffective assistance must apply a 'strong presumption' that counsel's representation was within the 'wide range' of reasonable professional assistance. [*Strickland*, 466 U.S.] at 689, 104 S. Ct. 2052. The challenger's burden is to show 'that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment.' *Id.*, at 687, 104 S. Ct. 2052." *Harrington v. Richter*, 562 U.S. 86, 104 (2011).

To demonstrate prejudice, a prisoner must establish "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland*, 466 U.S. at 694.[53] "A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694. "It is not enough 'to show that the errors had some conceivable effect on the outcome of the proceeding.' [*Strickland*, 466 U.S.] at 693, 104 S. Ct. 2052. Counsel's errors

---

[53]"[A] court need not determine whether counsel's performance was deficient before examining the prejudice suffered by the defendant." *Id.* at 697. If a reviewing court finds a lack of prejudice, it need not determine whether, in fact, counsel's performance was deficient. *Id.*

must be "so serious as to deprive the defendant of a fair trial, a trial whose result is reliable.' *Id.*, at 687, 104 S. Ct. 2052." *Richter*, 562 U.S. at 104; *see also id.* at 112-13 ("In assessing prejudice under *Strickland*, the question is not whether a court can be certain counsel's performance had no effect on the outcome or whether it is possible a reasonable doubt might have been established if counsel acted differently. . . . The likelihood of a different result must be substantial, not just conceivable.") (citations omitted); *Wong v. Belmontes*, 558 U.S. 15, 27 (2009) (per curiam) ("But *Strickland* does not require the State to 'rule out' [a more favorable outcome] to prevail. Rather, *Strickland* places the burden on the defendant, not the State, to show a 'reasonable probability' that the result would have been different.").

"Surmounting *Strickland*'s high bar is never an easy task." *Padilla v. Kentucky*, 559 U.S. 356, 371 (2010).

> An ineffective-assistance claim can function as a way to escape rules of waiver and forfeiture and raise issues not presented at trial, and so the *Strickland* standard must be applied with scrupulous care, lest "intrusive post-trial inquiry" threaten the integrity of the very adversary process the right to counsel is meant to serve. *Strickland*, 466 U.S., at 689-690, 104 S. Ct. 2052. Even under *de novo* review, the standard for judging counsel's representation is a most deferential one. Unlike a later reviewing court, the attorney observed the relevant proceedings, knew of materials outside the record, and interacted with the client, with opposing counsel, and with the judge. It is "all too tempting" to "second-guess counsel's assistance after conviction or adverse sentence." *Id.*, at 689, 104 S. Ct. 2052; *see also Bell v. Cone*, 535 U.S. 685, 702, 122 S. Ct. 1843, 152 L. Ed. 2d 914 (2002); *Lockhart v. Fretwell*, 506 U.S. 364, 372, 113 S. Ct. 838, 122 L. Ed. 2d 180 (1993). The question is whether an attorney's representation amounted to incompetence under "prevailing professional norms," not whether it deviated from best practices or most common custom. *Strickland*, 466 U.S., at 690, 104 S. Ct. 2052.

*Richter*, 562 U.S. at 105.

At the time of Thomas' trial, Rule 8 of the Federal Rules of Criminal Procedure provided as follows:

> **(a)     Joinder of Offenses.**  Two or more offenses may be charged in the same indictment or information in a separate count for each offense if the offenses charged, whether felonies or misdemeanors or both, are of the same or similar character or are based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan.

> **(b)** **Joinder of Defendants.** Two or more defendants may be charged in the same indictment or information if they are alleged to have participated in the same act or transaction or in the same series of acts or transactions constituting an offense or offenses. Such defendants may be charged in one or more counts together or separately and all of the defendants need not be charged in each count.[54]

"The primary difference between the two sections is that it is easier to justify joinder under Rule 8(a) because, unlike Rule 8(b), it also permits joinder of offenses which are merely of 'the same or similar character.'" *United States v. Frost*, 125 F.3d 346, 389 (6th Cir. 1997). Rule 14(a) provided, in pertinent part, that, "[i]f it appears that a defendant or the government is prejudiced by a joinder of offenses or of defendants in an indictment or information or by such joinder for trial together, the court may order an election or separate trials of counts, grant a severance of defendants or provide whatever other relief justice requires."[55]

Although the decisions addressing severance issues frequently conflate the discussion of Rules 8 and 14, *see, e.g.*, Frost, 125 F.3d at 390-91, Rule 8 claims theoretically are supposed to be evaluated on the basis of the indictment alone, *United States v. Dietz*, 577 F.3d 672, 691 (6th Cir. 2009) ("Whether joinder was proper under Rule 8(a) is determined by the allegations on the face of the indictment."); *Frost*, 125 F.3d at 389 ("Rule 8 requires a trial court to examine the allegations of the indictment in order to determine whether the joining of the offenses and/or defendant has been proper."). Relying on *United States v. Chavis*, 296 F.3d 450, 456 (6th Cir. 2002), Movant argues that

> the Mossberg was not the gun involved in the shooting and robbery of Day. Since Count [3] of the indictment involved the possession of a firearm that was not used

---

[54]The present version of Rule 8(a), which was adopted in 2002, provides that "[t]he indictment or information may charge a defendant in separate counts with 2 or more offenses if the offenses charged — whether felonies or misdemeanors or both — are of the same or similar character or are based on the same act or transaction, or are connected with or constitute parts of a common scheme or plan."

[55]The current version of Rule 14(a), which was adopted in 2002, provides that, "[i]f the joinder of offenses or defendants in an indictment, an information, or a consolidation for trial appears to prejudice a defendant or the government, the court may order separate trials of counts, sever the defendants' trials, or provide any other relief that justice requires."

in the commission of the crime against Day and the firearm was allegedly purchased and possessed **three days after** the commission of the crimes charged in Counts [1] and [2], Count [3] should never have been joined in the indictment. Count [3] is simply not of a similar character, not based on the same transaction and not part of a common scheme or plan.

(Movant's Mem. in Supp. of Am. § 2255 Mot. 21-22, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 77.) According to Movant, the Court would have been required to sever Count [3] had Irby filed a motion to sever:

> Since the possession charge is not of the "same or similar character" as the robbery and use of firearm charge, and the three charges are not part of the "same act or transaction," the only possible grounds for joinder of Count [3] would be that the charge constituted part "of a common scheme or plan." *See* Fed. R. Civ. P. 8(a). There were, however, no allegations whatsoever in the indictment concerning the possession of the Mossberg, an entirely different gun, three days after James Day was robbed, to the robbery itself. Thus, the indictment was facially deficient and Count [3] should have been severed as a matter of law.

(*Id.* at 23 (record citation omitted).)

One major problem with Movant's presentation of Claim 1 is that it relies heavily on decisions, such as *Chavis*, that were issued well after trial. The decision in *Chavis*, which was issued in 2002, represented a change in the law. Prior to that time, the Court of Appeals had emphasized that Rule 8(a) is to be construed broadly "to promote the goals of trial convenience and judicial economy." *United States v. Graham*, 275 F.3d 490, 512 (6th Cir. 2001) (internal quotation marks and citation omitted); *see also United States v. Wirsig*, 719 F.2d 859, 862 (6th Cir. 1983) (same). "When the joined counts are logically related, and there is a large area of overlapping proof, joinder is appropriate." *United States v. Anderson*, 642 F.2d 281, 284 (6th Cir. 1981). "To the extent that it is consistent with providing the defendant with a fair trial, the Rule is to be construed liberally to promote the goals of trial convenience and judicial efficiency." *Wirsig*, 719 F.3d at 862-63; *see also United States v. Gough*, No. 97-5617, 1999 WL 183474, at *6 (6th Cir. Mar. 15, 1999) (per curiam) (same); *United States v. Davis*, 809 F.2d 1194, 1208 (6th Cir. 1987) ("Severed trials mean multiple juries, congested trial dockets and overall inconvenience to both citizen and court. Fed.R.Crim.P.

8(a), (b) was intended as a remedy to this problem. We should not contravene the considered purpose of the federal rules absent proven substantial prejudice to the defendants.").

At the time of Thomas' trial, joinder of the felon in possession count (Count 3) with the Hobbs Act and related § 924(c) firearm count (Counts 1 and 2) was permissible under Rule 8(a). Count 2 charged Thomas with using and carrying a firearm during the robbery charged in Count 1, in violation of 18 U.S.C. § 924(c). Thus, both Counts 2 and Count 3 involved firearms. "If the offenses are similar or a like class, then they can be properly joined, 'although not connected temporally or evidentially.'" *United States v. Kirkpatrick*, No. 97-5583, 1998 WL 869978, at *6 (6th Cir. Dec. 1, 1998) (quoting *United States v. Coleman*, 22 F.3d 126, 133 (7th Cir. 1994)). "The offenses need not be of identical statutory origin in order to be *similar*, but their correspondence in type is obviously central to their proper joinder on this ground." *Coleman*, 22 F.3d at 133 n.10; *see also United States v. Werner*, 620 F.2d 922, 926-27 (2d Cir. 1980) (same). "Joinder of offenses is permissible when separate counts refer to the same type of offenses occurring over a relatively short period of time." *United States v. Ellis*, No. 92-2188, 1994 WL 64844, at *2 (6th Cir. Mar. 1, 1994) (per curiam) (internal quotation marks omitted). In this case, Counts 1 and 2 charge that Thomas committed an armed robbery of an employee of Loomis Fargo & Company on April 21, 1997. Count 3 alleges that, on or about April 24, 1997, Thomas, a convicted felon, possessed a Mossberg .12 gauge shotgun, in violation of 18 U.S.C. § 922(g). These offenses are close together in time, occurring only three days apart. The offenses in Counts 2 and 3 are also of a similar character, involving firearms. The offense in Count 3 is also logically related to the offenses in Counts 1 and 2. They are part of the same act or transaction as Counts 1 and 2 and also part of a common scheme and plan. The evidence at trial established that Angela Jackson purchased the Mossberg shotgun for Thomas using the funds from the Walgreens robbery that he had committed three days previously. (11/10/1998 Trial Tr. 437, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) Angela Jackson testified that Thomas had said that he needed the shotgun to protect the purple car that he had also purchased with the robbery proceeds. (*Id.*) Thus, the purchase of the

shotgun in Count 3 is based on the same act or transaction in Counts 1 and 2 and is part of a common scheme or plan. *See United States v. Green*, Nos. 90-3468, 90-3469, 1991 WL 175283, at *3 n.1 (6th Cir. Sept. 10, 1991) (affirming denial of motion to sever 21 U.S.C. § 841(a) and 18 U.S.C. 922(g) counts and noting, "[w]ere we to find the severance motion preserved, we nevertheless would find that the district court's denial of the motion constituted an exercise of sound discretion. . . . The evidence in this case established that Ripley traded the firearm to Green for Brown. The firearm was exchanged for cocaine. Thus the firearm was interrelated to the drug trafficking activities.").[56]

Joinder of Count 3 with Counts 1 and 2 promoted judicial economy because of the substantial overlap in proof. In order to prove Count 3, the Government would have been entitled to establish that Thomas had committed an armed robbery at the Walgreens in which he shot the Loomis, Fargo courier and stole the money bag. Angela Jackson would have been permitted to offer essentially the same testimony she offered at Thomas' trial about how Thomas and Bond appeared at her apartment

---

[56]Notably, the decision in *Green* referred to the evidence introduced at trial rather than the allegations of the indictment. *See also Wirsig*, 719 F.2d at 863 ("We are satisfied that the government alleged and introduced proof sufficient to establish a nexus between the drug charges and the tax evasion charges.").

In his Reply, Movant argues that *Chavis* did not represent a change in the law because the opinion in *Chavis* cited the 1997 decision in *United States v. Frost*. (Reply to Gov't's Resp. 7-8, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144.) Although the decision in *Frost*, 125 F.3d at 389, did state that "Rule 8 requires a trial court to examine the allegations of the indictment in order to determine whether the joining of the offenses and/or defendants has been proper," that is not the standard that was applied in reviewing the severance issue in *Frost*. The five defendants in *Frost* had been charged in a 31-count superseding indictment with conspiring to defraud the federal government and the University of Tennessee. Two of the defendants were professors and three were students. One professor filed a motion to sever on the ground that not all counts against him should have been joined together, and one student filed a severance motion that argued that not all counts against her should have been joined and that she was entitled to a separate trial from her co-defendants. *Id.* at 388-89. In holding that the counts were properly joined, the Court of Appeals did not limit itself to the allegations in the superseding indictment but, instead, considered trial economy and convenience. *Id.* at 390. Notably, the decisions cited in *Chavis* for the proposition that the counts were misjoined were from other circuits. *See Chavis*, 296 F.3d at 458-59 (discussing *United States v. Hubbard*, 61 F.3d 1261 (7th Cir. 1995), and *United States v. Terry*, 911 F.2d 272 (9th Cir. 1990)).

on April 21, 1997 with envelopes containing money and checks, that they divided up the money and disposed of the checks, that Thomas instructed Bond to dispose of the pistol that had been used in the robbery, that Thomas admitted that he had robbed the courier and shot the guard, and that he went on a spending spree with the money in the days after the robbery, including the stay at the hotel, the purchase of the car, the opening of the bank account, and the purchase of the shotgun.[57]

Thomas relies on the 2002 decision in *United States v. Chavis*, 296 F.3d at 458, in which the United States Court of Appeals for the Sixth Circuit held that the offenses of making false statements to a federally licensed firearms dealer and simple possession in excess of five grams of cocaine base were improperly joined. The Court of Appeals explained:

> We conclude that the joinder of the drug and firearms offenses in the instant case was not proper. There is no evidence or allegation in the indictment suggesting that Chavis's possession of cocaine base in June of 1999 was part of "the same act or transaction" as the purchase of the handgun in September of 1997 or that the two offenses were otherwise "connected together or constituting parts of a common scheme or plan." Fed. R. Crim. P. 8(a). There is no indication in the indictment or elsewhere in the record that Chavis possessed or used any weapons, including the handguns cited in Count One, in connection with his possession of cocaine base in June of 1999. Nor is there a common thread of an overarching criminal scheme connecting these two crimes. The indictment did not allege that Chavis's illegal acquisition of the firearms was related to drug activity in any way, "and it is the face of the indictment on which we must focus in deciding whether the charges were properly joined." *Hubbard*, 61 F.3d at 1270. The lack of any relationship between the two counts in the indictment is further demonstrated by the significant gap in time—nearly two years—that occurred between the offense conduct underlying Count One and that underlying Count Two. *Id.* at 1271. Therefore, the government's case for joinder depends upon whether the two offenses were of the "same or similar character." Fed. R. Crim. P. 8(a).

> We conclude that the firearms charge was not of the "same or similar character" as the crack cocaine charge. As the Seventh Circuit has noted, "[t]he unlawful possession of a firearm is ... an offense wholly distinct from the distribution of narcotics, established on proof of elements unique to that offense." *Hubbard*, 61

---

[57]Movant stresses that some evidence offered in the joint trial, such as the surveillance video, would not have been admissible in a trial on Count 3. (*See* Movant's Post-Hr'g Br. 10, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138; Reply to Gov't's Resp. 7, *id.*, ECF No. 144.) That is not necessarily so, because the source of Thomas' funds to purchase the shotgun is part of the Government's proof of the § 922(g) count. Even if the surveillance video was inadmissible to prove Count 3, "Rule 8(a) does not require that all evidence relating to each charge be admissible in separate trials." *Wirsig*, 719 F.2d at 863.

F.3d at 1270–71; *see also Terry*, 911 F.2d at 276. Likewise, causing someone to make false statements to a federally licensed firearms dealer is an entirely distinct offense from possessing with intent to distribute crack cocaine. Although drugs and guns are frequently connected in particular criminal activities, which would permit joinder under the "the same act or transaction" or the "common scheme or plan" prongs of Rule 8(a), in the abstract illegally purchasing a firearm does not necessarily involve drug activity.

*Id.*

Movant also relies on the Sixth Circuit's decision in *United States v. Locklear*, 631 F.3d 364

(6th Cir. 2011), which involved charges of bank robbery and felon in possession of a firearm.

Applying *Chavis* and looking only to the face of the indictment, the Court of Appeals concluded that

the offenses were misjoined:

> Measured by the allegations in the superseding indictment, the offenses described in these counts are not "of the same or similar character," or "based on the same act or transaction," or "connected with or constitute parts of a common scheme or plan." Fed. R. Crim. P. 8(a). One offense occurred on December 23, 2004 and did not involve the possession of guns. The other occurred nearly three weeks later and involved nothing but the possession of guns. The indictment otherwise alleges nothing to show that the two offenses were part of a common plan. Their joinder fails the face-of-the-indictment test.
>
> The government does not even argue the contrary. Instead, it argues that the test is inapposite: in its view, "the face of the indictment rule applies to justify joinder, not to invalidate it." Gov't Br. at 15. That proposition may be true in other circuits, but it is not true in this one. One need look no further than *Chavis*, in which we applied the face-of-the-indictment rule to hold that the drug and gun offenses in that case were misjoined under Rule 8(a). *See* 296 F.3d at 458. We apply the same rule to reach the same result here. The offenses in this case were misjoined.

*Id.* at 368-69. Thus, in *Chavis* and *Locklear*, unlike earlier Sixth Circuit cases, the only factor

relevant to a severance motion under Rule 8(a) is the allegations of the indictment.

Even after the decisions in *Chavis* and *Locklear*, it is not clear that Count 3 was improperly

joined to Counts 1 and 2. *Chavis* involved two entirely unrelated crimes: the purchase of a handgun

in 1997 and the simple possession of cocaine base in 1999. *Locklear* also involved distinct

crimes—bank robbery (committed without a firearm) and felon in possession—that occurred nearly

three weeks apart and that were not alleged to be connected. By contrast, the offense in Count 3

occurred three days after the offense in Counts 1 and 2. Each of the offenses is alleged to have

occurred in Memphis, Tennessee. The offense in Count 2 involved a firearm, as did Count 3. Although Movant is correct that Count 3 does not allege that the shotgun was purchased with the proceeds of the robbery in Count 1 or that Movant purchased the shotgun in Count 3 to protect the car he purchased with the robbery proceeds or to replace the pistol he used in Count 2, it is not clear that, even after *Chavis* and *Locklear*, Count 3 is not "of the same or similar character" as Count 2.

Irby was not ineffective for failing to move for a severance of Count 3 under Rule 8(a) based on the allegations on the face of the indictment. Although "face of the indictment" language appeared in *Frost*, which predated Thomas' trial, there was no controlling Sixth Circuit decision at that time that would have indicated that the joinder of Count 3 with Counts 1 and 2 was improper. An attorney does not render ineffective assistance by failing to anticipate future developments in the law. *Lucas v. O'Dea*, 179 F.3d 412, 420 (6th Cir. 1999); *Alcorn v. Smith*, 781 F.2d 58, 62 (6th Cir. 1986) ("nonegregious errors such as failure to perceive or anticipate a change in the law . . . generally cannot be considered ineffective assistance of counsel"); *Hall v. Bell*, No. 2:06-CV-56, 2010 WL 908933, at *25 (E.D. Tenn. Mar. 12, 2010) ("An attorney's failure to anticipate later legal developments generally does not amount to ineffective assistance."); *see also United States v. Burgess*, 142 F. App'x 232, 240 (6th Cir. 2005) (attorney was not ineffective for failing to anticipate Supreme Court's decision in *United States v. Booker*).[58]

Movant further argues that, even if joinder were appropriate under Rule 8(a), trial counsel was ineffective in failing to move for a severance under Rule 14(a). (Movant's Post-Hr'g Br. 11-12, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) In some cases in which joinder is permissible under Rule 8(a), a defendant may move for separate trials on certain

---

[58]Thomas also fails to consider whether, in response to a severance motion, the Government could have brought a superseding indictment that would have cured the failure to allege that Count 3 was "based on the same act or transaction or on two or more acts or transactions connected together or constituting parts of a common scheme or plan" as the offenses in Counts 1 or 2. *See* Fed. R. Civ. P. 8(a) (1998). The Government would have had ample time to bring a superseding indictment as the limitations period applicable to the offenses was five years. 18 U.S.C. § 3282.

counts on a showing of prejudice. Fed. R. Crim. P. 14(a). "Severance is only required if there is a serious risk that a joint trial would compromise a specific trial right of one of the defendants, or prevent the jury from making a reliable judgment about guilt or innocence. But it is well settled that defendants are not entitled to severance merely because they may have a better chance of acquittal in separate trials." *United States v. Fields*, 763 F.3d 443, 457 (6th Cir. 2014) (internal quotation marks and citation omitted), *cert. denied*, 135 S. Ct. 392 (2014), 135 S. Ct. 978 (2015), 135 S. Ct. 987 (2015). "As a general rule, a spillover of evidence does not require severance and may be cured by limiting instructions." *United States v. Washington*, 565 F. App'x 458, 466 (6th Cir.), *cert. denied*, 135 S. Ct. 277 (2014). "In determining whether a defendant suffered prejudice, courts consider such factors as whether spillover evidence would incite or arouse the jury to convict on the remaining counts, whether the evidence was intertwined, the similarities and differences between the evidence, the strength of the government's case, and the ability of the jury to separate the evidence." *United States v. Dale*, 429 F. App'x 576, 578 (6th Cir. 2011). A failure to grant a severance has been found to be an abuse of discretion only where the movant demonstrates "'substantial,' 'undue,' or 'compelling' prejudice." *United States v. Lopez*, 309 F.3d 966, 971 (6th Cir. 2002); *see also Washington*, 565 F. App'x at 466 (same); *United States v. Saadey*, 393 F.3d 669, 678 (6th Cir. 2005) ("In order to prevail on a motion for severance, a defendant must show compelling, specific, and actual prejudice from a court's refusal to grant the motion to sever."). The existence of some risk of confusion "must be balanced against society's interest in speedy and efficient trials." *Fields*, 763 F.3d at 458 (internal quotation marks omitted).[59]

---

[59]Similarly, misjoinder of offenses under Rule 8 does not warrant relief if the Government establishes that the error was harmless, meaning that the misjoinder did not have a substantial and injurious effect or influence in determining the jury's verdict. *United States v. Lane*, 474 U.S. 438, 449 (1986); *Locklear*, 641 at 369; *Chavis*, 296 F.3d at 461. In both *Chavis* and *Locklear*, the Court of Appeals held that the misjoinder was harmless. *Locklear*, 631 F.3d at 370; *Chavis*, 296 F.3d at 463-64.

Movant makes several arguments about the prejudicial effect of the joinder. First, Movant suggests that the jury might have confused the pistol used to commit the Walgreens robbery, which was charged in Count 2, with the Mossberg .12 gauge shotgun charged in Count 3. (Movant's Post-Hr'g Br. 10, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) According to Movant, "[t]he jury apparently accepted the government's argument that Thomas was the individual with the gun depicted in the surveillance video (which was repeatedly played at trial) and it is likely that they improperly concluded that this evidence could also support a finding of guilt for Count [3]." (*Id.*) Second, Movant argues that "there is a substantial probability that the graphic and emotionally charged nature of the evidence presented for Counts [1] and [2] prejudiced the jury as to Count [3]." (*Id.*) Third, Movant suggests that, absent the robbery charges, Thomas would never have prosecuted for possessing the Mossberg shotgun. (*Id.* at 7; Reply to Gov't's Resp. 6-7, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144.)

These arguments are not persuasive for several reasons. First, the testimony at trial was clear that the Walgreens robbery was committed with a silver pistol. (11/09/1998 Trial Tr. 142, 145, 246-47, 260, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99; 11/10/1998 Trial Tr. 422, 424, *id.*, ECF No. 100.) That fact was underscored by the surveillance video, which makes clear that the shooter used a pistol rather than a shotgun. Irby testified at the evidentiary hearing that he did not believe there was a substantial risk that the jury would confuse a pistol with a shotgun. (10/13/2011 § 2255 Hr'g Tr. 362-63, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.) ("No, I was not [concerned about potential juror confusion]. I knew that a jury would know the difference between a firearm used—alleged to be used in the perpetration of a federal crime as opposed to a firearm that is alleged by the government to have been possessed at a later date."), ECF No. 133.) The Court also made a similar observation. (10/12/2011 § 2255 Hr'g Tr. 19 ("I think everybody in the south would know that it's a vastly different type of firearm."),

*id.*, ECF No. 132.)[60]  If there were anyone on the jury who lacked that familiarity with firearms, the testimony of ATF Special Agent John Prickett would have provided the necessary background information:

> Q.     What kind of weapon is a Mossberg 12-gauge shotgun, describe that for the jury?
>
> A.     It is a 12-gauge, the model 500 is a pump gauge shotgun.  I believe it comes in—I think it is made up at—as far as a 28-inch barrel, but it comes also in an 18 inch barrel, which is for close quarter type use, possible for home protection for something of that nature.
>
> Q.     Is the 12-gauge a fairly heavy gauge for a shotgun?
>
> A.     Yes, sir.
>
> Q.     A heavy gun?
>
> A.     Yes, sir.

(11/10/1998 Trial Tr. 378-79, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.)  Angela Jackson also described the Mossberg as a "long shotgun." (*Id.* at 437.)

---

[60]Movant points to Irby's statement in *voir dire* that, "in the light of what Ms. [Prospective Juror] said, I'm concerned about confusion with the jury because she was confusing a shotgun count with the other count."  (11/05/1998 Trial Tr. 120, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 107.)  After reviewing the prospective juror's statements (*see id.* at 103 ("Just that there was a shotgun present and there was a robbery present, so I kind of put those two together."), Irby testified at the evidentiary hearing that

> I was really not concerned about juror confusion because I thought we could make clear the difference in the charges and the nature of the charges between Counts 3 and Counts 1 and 2.  What I was concerned about was her bias and what she might take into the jury room at the end of the trial, that's what really concerned me.

(10/13/2011 § 2255 Hr'g Tr. 367, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133; *see also id.* at 493 ("[G]oing back to this lady who was excused for cause during voir dire in the trial was not that there was confusion between Counts 3 and 2 and the elements of it. . . .  [M]y concern with that lady or with any other witness [sic] in a case where there is a gun is that there is such a prejudice against guns, they're going to take it in the jury room and hold it against my client, so that was a concern . . . .").)  The prospective juror at issue was discharged for cause because she was not comfortable sitting on a case that involved firearms.  (*See* 11/05/1998 Hr'g Tr. 107, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 107; *see also id.* at 99-106.)

Second, the Indictment and the Court's instructions to the jury made clear that the offense in Count 3 involved a shotgun and was committed on a different date than the offenses in Counts 1 and 2. Count 3 of the Indictment alleged that Thomas purchased a "Mossberg .12 gauge shotgun." *See supra* p. 3. When the jury had been seated, the Court read the Indictment and emphasized the difference between Counts 1 and 2 and Count 3:

> Count 3, on or about April 24—and remember there is—there are two [counts] that say April 21, and this count says April 24, April 24, 1997, in the Western District of Tennessee, Andrew L. Thomas, having been convicted of a crime punishable by imprisonment by a term exceeding one year, did possess in and affecting commerce a firearm, that is a Mossberg 12-gauge shotgun, serial number K742634, in violation of Title 18, United States Code, Section 922(g).

(11/06/1998 Trial Tr. 5, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 98.) The Court also emphasized that the jury should consider each charge separately:

> The defendant in this case is charged with three crimes. The number of charges is no evidence of guilt and this should not influence your decision in this case in any way.

> It is your duty to separately consider the evidence that relates to each charge and to return a separate verdict for each one.

> For each charge, you must decide whether the government has presented proof beyond a reasonable doubt that the defendant is guilty of that particular charge. Your decision on one charge, whether it is ultimately guilty or not guilty, should not influence your decision on any of the other charges.

(*Id.* at 6-7.) This instruction was also given at the conclusion of the trial. (11/12/1998 Trial Tr. 214-15, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 97.) The Sixth Circuit has approved use of this limiting instruction, *Chavis*, 296 F.3d at 462, and has stated that "*Lane* instructs us that we should presume that the jury followed this instruction and did not make an improper propensity inference," *id.*; *see also United States v. Cope*, 312 F.3d 757, 781 (6th Cir. 2002) ("[A] jury is presumed capable of considering each count separately, and any prejudice may be cured by limiting instructions.") (citation omitted). Thomas' "conclusory statement that the joinder of all charges prejudiced him because the jury instruction was not sufficiently limited does

not establish that any of his substantial rights was affected by the inclusion of the" § 922(g) charge. *United States v. White*, 543 F. App'x 563, 566 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 2681 (2014).[61]

Third, the argument on Count 3 made clear that the firearm charged in that count had not been in the Walgreens robbery. During the Government's opening statement, the prosecution stated:

> Finally, Count 3 of the indictment charges Andrew Thomas of [sic] the crime of being a convicted felon in possession of a firearm . . . .
>
> The evidence, as Judge McCalla told you, the stipulation will show that Andrew Thomas prior to April of 1997—Count 3 charges April 24, 1997—I will tell you about that in a minute—before April of 1997, he had been convicted of a felony, a crime punishable by more than one year imprisonment. The evidence will also show that Count, ladies and gentlemen, that on April 24th, 1997, just three days after the robbery, three days after the robbery, Andrew Thomas went to a pawn shop in North Memphis and bought a 12-gauge Mossberg shotgun with cash from the robbery, and just like with the car and the bank account, he had Angela Jackson put that 12-gauge shotgun . . . in her name, her name.

(11/06/1998 Trial Tr. 40-41, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 98.)

The opening statement by defense counsel also emphasized the distinction between Count 3 and Counts 1 and 2:

> As to Count number 3, possession of a shotgun as a convicted felon, Mr. Thomas has stipulated to one element and one element alone of that count, that he is a convicted felon. That is as far as it goes. That incident had nothing to do with this armored car robbery. The government wants to paint it as though it does. They want to show, well, a shotgun was purchased with proceeds from the robbery. Well, if it was purchased with proceeds from the robbery, Andrew Thomas did not buy it. And since Andrew Thomas did not commit the robbery, he had no robbery proceeds. We're going to submit to you that there is going to be proof that shows someone else owned that shotgun in question that is referred to in Count number 3 of the indictment. . . .

(*Id.* at 47.)

Movant's suggestion that the jury may have been confused about the difference between the two firearm counts and believed it could convict Thomas on Count 3 because a pistol had been used in Count 2 is entirely speculative and is not supported by the trial record.

---

[61] Although Movant appears to suggest that an additional, or different, limiting instruction should have been given, he has not specified the nature of that instruction. *See supra* p. 186 & n.43.

Next, Thomas argues that there is a substantial risk that the graphic and emotionally charged nature of the evidence presented in Counts 1 and 2 predisposed the jury to convict him on Count 3. (Movant's Post-Hr'g Br. 10, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Thomas is presumably referring to the surveillance video and to the testimony of James Day, the Loomis, Fargo courier who was confined to a wheelchair at the time of the federal trial. Movant's speculation does not rise to the level of "compelling, specific, and actual prejudice." *Saadey*, 309 F.3d at 971. The surveillance video itself makes clear that the weapon used in the Walgreens robbery was not the Mossberg shotgun that was the subject of Count 3. The evidence, the jury instructions and the arguments of counsel make clear that Count 3 concerned the purchase of a different gun with the robbery proceeds three days after the Walgreens robbery. It is presumed that the jury followed the Court's instructions and did not improperly infer from evidence that Thomas had committed the Walgreens robbery that he also purchased a shotgun. *See supra* p. 250.

The absence of prejudice in this case is demonstrated by the weight of the evidence against Thomas. As the Court of Appeals observed,

> [i]n this case, there was overwhelming proof of Thomas' guilt, namely: a.) the testimony of his accomplice and co-defendant; b.) the testimony of his girlfriend that she witnessed him with the proceeds of the robbery and heard him brag about his involvement; c.) substantial corroborating evidence, including the videotape of the robbery; and d.) the testimony which contradicted his purported alibi.

*United States v. Thomas*, 29 F. App'x at 246.

Although the Court of Appeals did not explicitly focus on the strength of the evidence on Count 3, there was more than sufficient evidence to convict Thomas. At the sentencing hearing, the Court stated that "I believe that the defendant's wife at the time was truthful in her testimony," Sentencing Hr'g Tr. 19, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 93), and that "[t]here is no real question that Angela Jackson and Mr. Thomas went to the Frayser Pawn Shop—a pawn shop in Frayser, Tennessee and purchased a firearm. The firearm was purchased by . . . Mr. Thomas through Ms. Jackson," (*id.* at 21). The jury clearly believed the testimony of Angela Jackson despite Movant's attempts to impeach her. Angela Jackson testified

that she purchased the Mossberg shotgun at Thomas' direction. (11/10/1998 Trial Tr. 437-39, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) Thomas told Angela Jackson to put the gun in her name, and she complied. (*Id.* at 439.)[62] Thomas also provided Angela Jackson with the cash to purchase the shotgun. (11/10/1998 Trial Tr. 439, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100; *see also id.* at 437 (the source of the funds was the robbery proceeds).) After they left the store, Thomas carried the shotgun to the car. (*Id.*)[63] When they got it home, Thomas "put the gun up under the bed." (11/10/1998 Trial Tr. 440, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) Angela Jackson also testified that she saw Thomas buying ammunition for the shotgun at K-Mart and that

---

[62] Angela Jackson's testimony was corroborated by the Form 4473 that she completed when the shotgun was purchased. (*See* 11/09/1998 Trial Tr. 355-57, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99.) That form reflected that she was 4'11" tall. (*Id.* at 357.) The Court agrees with the Government that it is unlikely that the petite Jackson would have purchased such a large shotgun for herself. (*See* Gov't Resp. to Movant's Post-Hr'g Br. 6, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 141.)

[63] On cross-examination, Angela Jackson testified that Thomas had taken the gun out of the store. (*Id.* at 496.) Thomas makes much of the testimony of David Little, the pawn shop owner, that, if he saw the purchaser of a firearm hand it to someone else, "I would probably stop them from walking out of the door." (11/09/1998 Trial Tr. 362, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99.) The record did not reflect whether Little had ever refused to complete a sale or prevented a customer from leaving with a firearm because he suspected that the purchaser was a straw buyer. Little did not recall the transaction with Angela Jackson (*id.* at 359, 361), although he believed he must have waited on her (*id.* at 361). He conceded that he had no idea what happens after purchasers have left the store. (*Id.* at 362.) He also admitted that people frequently came into the store together to buy things. (*Id.*) The testimony of Little did not seriously undercut Angela Jackson's credibility. Her testimony was ambiguous about whether she gave Thomas the shotgun before or after they left the pawn shop. As a licensed firearms dealer, Little had every incentive to testify that he believed that people who complete Form 4473 are the real purchasers of firearms. Even if that were not the case, Little may well not have noticed what Angela Jackson and Thomas did after the sale had been completed.

she had seen him fire the shotgun. (*Id.*)  After Thomas moved out, Russell Carpenter, a friend of Thomas, came over to get the shotgun. (*Id.* at 442-43.)[64]

Angela Jackson's testimony that she bought the Mossberg shotgun for Thomas and put it in her name is further corroborated by the facts that, on the day of the Walgreens robbery, she purchased the purple car for Thomas and put it in her name. (11/10/1998 Trial Tr. 425-28, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.)  The next day, Angela Jackson opened a bank account at Thomas' request and deposited over $2000 of the robbery proceeds into it. (*Id.* at 432-35.)  Prior to that time, Angela Jackson had not had a bank account. (*Id.* at 435.)  Over the next few weeks, Angela Jackson withdrew money from the account at Thomas' instruction so that he could fix up the car. (*Id.* at 435-46.)  Angela Jackson's testimony is further

---

[64]Movant emphasizes that "Russell Carpenter testified that he had only been in Angela Jackson's apartment one time and that was to drop off a plate.  Carpenter *never* testified that he picked up a gun for Thomas." (Movant's Post-Hr'g Br. 13, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138 (record citation omitted).)  As an initial matter, the defense never asked Carpenter about Angela Jackson's testimony that he had picked up a gun and, therefore, there is no denial in the record.  Apart from that, Carpenter's testimony is suspect for several reasons.  He was a convicted felon, having previously been convicted of credit card fraud. (11/12/1998 Trial Tr. 22, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 103.)  If he had admitted to picking up the shotgun for Thomas, he would have been confessing to a violation of 18 U.S.C. § 922(g).  Carpenter was also a friend of Thomas who had known him for eight or nine years (*id.* at 7-8) and did not want to see Thomas get in any trouble (*id.* at 22).  Carpenter's credibility was also suspect because he testified that he had given Thomas money totaling $500 or more when he was released from prison (*id.* at 8, 20-21), but he had no records to document those transactions (*id.* at 20, 21).  At the sentencing hearing, the Court stated that, "frankly, the testimony given by those who asserted that they provided money to [Thomas] was not credible." (Sentencing Hr'g Tr. 20, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 93.)

Carpenter's testimony about Angela Jackson's allegedly vengeful nature also was not credible.  Carpenter testified that he knew Angela Jackson "[v]aguely." (11/12/1998 Trial Tr. 8, *id.*, ECF No. 103.)  According to Carpenter, Angela Jackson had come by his house "[a] couple of times but she didn't come in.  She sat in the car and waited on [Thomas]." (*Id.* at 16.)  Carpenter had been to Angela Jackson's apartment only once, to drop off a plate. (*Id.*)  Given that limited contact between Carpenter and Angela Jackson, Carpenter's testimony about the supposedly vindictive things he heard Angela Jackson say (*id.* at 9, 16-18) strains belief.

corroborated by the facts that, although Thomas had not worked between the time of his release from prison and his separation from Angela Jackson, he had thousands of dollars to spend beginning the day of the Walgreens robbery. Angela Jackson testified that, in addition to the car, the bank account, and the Mossberg shotgun, Angela Jackson and Thomas also stayed at a hotel for two days after the robbery. (*Id.* at 428, 432.)[65] Thomas also purchased clothing for himself and Angela Jackson (11/10/1998 Trial Tr. 429, 437, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100), and various items of "jewelry, rings, necklaces, different stuff like that" (*id.* at 436), including a wedding ring for Angela Jackson (*id.* at 436-37).[66]

Given the strength of the evidence against Thomas on Count 3, it is unlikely that the jury's verdict was motivated by evidence that he had used a different firearm to commit the Walgreens robbery. *Locklear*, 631 F.3d at 370; *Chavis*, 296 F.3d at 464 ("Moreover, there is little basis in the record for concluding that the jury would not have convicted Chavis on the firearms charge in the absence of his testimony, given the strength of the government's case.").

---

[65]Although the proof was not introduced at trial, Irby's file contains records from a Comfort Inn in Southaven, Mississippi, reflecting that Angela Jackson had checked in on April 21, 1997 and checked out on April 23, 1997. *See supra* p. 208 n.46.

[66]At trial, the defense attempted to explain Thomas' new-found wealth by presenting the testimony of his mother and friends, including Carpenter and Dana Wiggins, that they had given him money. The jury clearly did not believe this testimony. In his filings in the instant case, Thomas' attorneys have suggested that he might have gotten the money by committing crimes other than the Walgreens robbery. (*See* Reply to Gov't's Resp. 4-5, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144 ("Finally, the Bond Letter contains an alternative explanation for the source of the money Thomas spent in 1997—the 'Big Mike Boy' robbery involving $15,000 and twenty pounds of marijuana.").) By the same reasoning, Thomas might have obtained the money from one of the eight aggravated robberies for which he was arrested on October 22, 1997. Thomas pled guilty to those additional robberies on October 15, 2001. (*See* http://jssi.shelbycountytn.gov/ (Indictment ## 98-04518, 98-04520, 98-04521, 98-04522, 98-04523, 98-04524, 98-04525, 98-04526.) For obvious reasons, the defense did not attempt to prove that Thomas might have gotten money from the "Big Mike Boy" robbery or any other criminal act and Thomas does not argue that his attorney was ineffective in failing to do so.

Movant also argues that, absent the robbery charges, Thomas would never have been prosecuted for possessing the Mossberg shotgun.  (Movant's Post-Hr'g Br. 7, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138; Reply to Gov't's Resp. 6-7, *id.*, ECF No. 144.)  In one sense, Movant is correct—the Government would not have known that Angela Jackson had  purchased the Mossberg shotgun for Thomas had he not committed the Walgreens robbery which eventually led law enforcement officers to Angela Jackson's door.  It was only by interviewing Angela Jackson did investigators learn that Thomas, a convicted felon, had purchased the shotgun through a straw buyer three days after the robbery.[67]  That, however, is not what Movant means.  He argues that, had the Government been required to try Count 3 separately from Counts 1 and 2, the Government would have foregone the opportunity to try Thomas on the § 922(g) count for which he ultimately received a life sentence.  That argument is entirely speculative and is based on the notions—which the Court has rejected— that the evidence against Thomas on Count 3 is weak and controverted and that none of the evidence supporting Counts 1 and 2 would have been admissible in a separate trial on Count 3.  Given Thomas' extraordinary record of armed, violent felonies, *see supra* pp. 2-3, including nine previous Tennessee convictions for aggravated robbery,[68] it would seem reasonable for the Government to prosecute Thomas for an offense that had the potential to take him off the streets for the rest of his life even if it had to try the § 922(g) count separately.[69]  It is unnecessary, however, for either the parties or the Court to speculate in this manner about what might have happened had Count 3 been severed.  "[I]t is well settled that defendants are

---

[67] The Court finds that Angela Jackson's credibility is bolstered by the fact that she provided information to law enforcement that might prove damaging to herself, including her straw purchase of the Mossberg shotgun and the use of her car in the Walgreens robbery.

[68] Even before Thomas' eight aggravated robbery convictions in 2001, which post-dated the sentencing in this case, *see supra* p. 255 n.66, Thomas' prior criminal record was a serious one, particularly in light of his relatively young age at the time of his arrest in 1997.

[69] Under these circumstances, it would also seem reasonable for the Government to attempt to cure any defects by bringing a superseding indictment.

not entitled to severance merely because they may have a better chance of acquittal in separate trials." *Fields*, 763 F.3d at 457. Movant has not cited any authority for the proposition that the Court can find prejudice by speculating that the Government would likely have responded to a severance order by declining to proceed to trial on Count 3.

Because Thomas has not shown "compelling, specific, and actual prejudice," *Saadey*, 393 F.3d at 669, the Court would not have been inclined to exercise its discretion to grant a Rule 14(a) severance motion. Therefore, Irby was not ineffective in failing to make the motion, and Thomas suffered no prejudice.

For all the foregoing reasons, Claim 1 is without merit and is DISMISSED.

### B. The Failure to Investigate and Present the Bobby Jackson Defense (Claim 2)

In Claim 2, Thomas argues that his attorney rendered ineffective assistance by failing to investigate and present evidence that Bond committed the Walgreens robbery with Bobby Jackson, who had pled guilty to an armored car robbery at the Southbrook Mall in Memphis that he committed in July 1997. (Movant's Post-Hr'g Br. 13-22, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) According to Thomas, Irby failed to investigate or present four pieces of evidence: First, Irby failed to elicit testimony from Robert Fisher that he had twice identified Bobby Jackson as the driver of the getaway car. Irby also failed to present the testimony of Richard Fisher, Gayle McDonald, David Roth, and Imogene Walls, all of whom had identified the driver of the getaway car as a heavyset black man. (*Id.* at 14.) Second, Irby failed to introduce Bobby Jackson's confession and conviction for the Southbrook Mall armored car robbery, which Thomas characterizes as "remarkably similar." (*Id.*) Third, Irby failed to introduce evidence regarding the letter from Steven Briscoe. (*Id.*) Fourth, Irby failed to investigate the alleged romantic relationship between Angela Jackson and Bobby Jackson. (*Id.* at 14-15.)

In his Reply, Thomas emphasizes that "[e]vidence of the guilt of a third-party [sic] is broadly admissible under the Constitution." (Reply to Gov't's Resp. 12, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144.) Movant has overstated the legal rule. The only

authority cited by Movant, *Holmes v. South Carolina*, 547 U.S. 319, 331 (2006), which was decided

after Movant's trial, held that a South Carolina evidentiary rule that barred evidence of third-party

guilt – if the prosecution had introduced forensic evidence – was arbitrary and violated the rights of

criminal defendants to have a meaningful opportunity to present a complete defense. The Supreme

Court noted, however, that trial judges have broad latitude with respect to the admission of evidence,

including evidence that another person might have committed the crime:

> While the Constitution thus prohibits the exclusion of defense evidence under
> rules that serve no legitimate purpose or that are disproportionate to the ends that
> they are asserted to promote, well-established rules of evidence permit trial judges
> to exclude evidence if its probative value is outweighed by certain other factors such
> as unfair prejudice, confusion of the issues, or potential to mislead the jury. *See, e.g.,*
> Fed. Rule Evid. 403; Uniform Rule of Evid. 45 (1953); ALI, Model Code of
> Evidence Rule 303 (1942); 3 J. Wigmore, *Evidence* §§ 1863, 1904 (1904). Plainly
> referring to rules of this type, we have stated that the Constitution permits judges "to
> exclude evidence that is 'repetitive ..., only marginally relevant' or poses an undue
> risk of 'harassment, prejudice, [or] confusion of the issues.'" *Crane [v. Kentucky]*,
> 476 U.S. [683,] 689–690, 106 S.Ct. 2142 [(1986)] (quoting *Delaware v. Van Arsdall*,
> 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986); ellipsis and brackets
> in original). *See also Montana v. Egelhoff*, 518 U.S. 37, 42, 116 S. Ct. 2013, 135 L.
> Ed. 2d 361 (1996) (plurality opinion) (terming such rules "familiar and
> unquestionably constitutional").
>
> A specific application of this principle is found in rules regulating the
> admission of evidence proffered by criminal defendants to show that someone else
> committed the crime with which they are charged. *See, e.g.,* 41 C.J.S., *Homicide* §
> 216, pp. 56–58 (1991) ("Evidence tending to show the commission by another person
> of the crime charged may be introduced by accused when it is inconsistent with, and
> raises a reasonable doubt of, his own guilt; but frequently matters offered in evidence
> for this purpose are so remote and lack such connection with the crime that they are
> excluded"); 40A Am. Jur. 2d, *Homicide* § 286, pp. 136–138 (1999) ("[T]he accused
> may introduce any legal evidence tending to prove that another person may have
> committed the crime with which the defendant is charged .... [Such evidence] may
> be excluded where it does not sufficiently connect the other person to the crime, as,
> for example, where the evidence is speculative or remote, or does not tend to prove
> or disprove a material fact in issue at the defendant's trial" (footnotes omitted)).
> Such rules are widely accepted, and neither petitioner nor his *amici* challenge them
> here.

*Id.* at 326-27 (footnote omitted); *see also Andrews v. Stegall*, 11 F. App'x 394, 396 (6th Cir. 2001)

(noting that, "[g]enerally, evidence of third party culpability is not admissible unless there is

substantial evidence directly connecting that person with the offense," and holding that evidence of

"a vague threat that was allegedly made some unknown time before the murder, to the victim's

stepson" was properly excluded where the stepson was unavailable at trial); *United States v. Freeman*, No. 06-20185, 2010 WL 3927736, at *2-3, 4, 8 (E.D. Mich. Oct. 4, 2010) (evidence that murder victim had been robbed and shot at by an unidentified person three days before the murder held to be admissible third-party culpability evidence), *aff'd sub nom. United States v. West*, 534 F. App'x 280 (6th Cir. 2013). Evidence of third-party guilt is admissible if there is proof that a specific person had the means, motive, and opportunity to commit the crime. *United States v. West*, No. 06-20185, 2009 WL 2026322, at *5, 6 (E.D. Mich. July 8, 2009), *aff'd*, 534 F. App'x 280 (6th Cir. 2013), *cert. denied*, 134 S. Ct. 803 (2013).

In evaluating the Bobby Jackson defense, it is important to keep in mind that the only independent evidence linking Bobby Jackson to the Walgreens robbery is the fact that one eyewitness, Robert Fisher, had selected Bobby Jackson's picture from a photo array as someone who resembled the driver of the getaway car. Most of the evidence in support of the Bobby Jackson defense can be traced, directly or indirectly, to Thomas himself. (*See, e.g.*, 10/13/2011 § 2255 Hr'g Tr. 443, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.) ("I knew what Mr. Thomas told me about that. I had no evidence, I had no firm evidence."), ECF No. 133; *see also id.* at 463-64 (same).) The course of proceedings in this matter provide reason to be skeptical of evidence that originates with Thomas. It was Thomas who testified at his criminal trial that he was with Dana Wiggins during the Walgreens robbery and during the time the getaway car was stolen, and it was almost certainly Thomas who induced Dana Wiggins and his mother, Louella Barber, to testify in support of that alibi. The rebuttal testimony of Wiggins' employer, and Wiggins' subsequent guilty plea to a perjury charge, conclusively establish that alibi to have been false.

1.        **The Bolegg Letter is a Forgery**[70]

The centerpiece of the "Bobby Jackson Defense" is a letter purportedly written by Bond to Thomas in 2002 (the "Bolegg Letter") in which Bond recanted his trial testimony, confessed that he had committed the Walgreens robbery with Bobby Jackson, and admitted that he and Angela Jackson had conspired to name him as the shooter in that robbery because, *inter alia*, Angela Jackson was in a romantic relationship with Bobby Jackson.[71]  The Bolegg Letter was written well after Thomas' federal trial, and defense counsel cannot be faulted for failing to discover a document that did not yet exist.  Thomas is presumably using the Bolegg Letter to corroborate his assertions that Bond committed the Walgreens robbery with Bobby Jackson and that Angela Jackson had a motive to provide false testimony because of her romantic involvement with Bobby Jackson.  For the following reasons, the Court concludes that the Bolegg Letter is a forgery.

At the outset, no direct evidence was introduced that Thomas received the Bolegg Letter in the mail from Bond in 2002.  Thomas did not testify at the evidentiary hearing and, therefore, there is no evidence that he received a letter from Bond in or about January 2002 and that the letter that was introduced into evidence at that hearing as Exhibit 3 was in the properly addressed and postmarked envelope that was received into evidence as Exhibit 2.  The course of proceedings in this case strongly suggest that Thomas did not have the Bolegg Letter when he filed his § 2255 Motion in 2003.  It was not until Thomas filed his amended § 2255 Motion on October 26, 2003 that Thomas argued, for the first time, that he had newly discovered evidence of his innocence.  *See supra* p. 106. It is inconceivable that Thomas would not have mentioned the Bolegg Letter when he commenced this action on June 2, 2003 if it had been in his possession at that time.

---

[70]In the interest of clarity, the Court will address the evidence Thomas cites in support of Claim 2 in the opposite order that it is presented in his post-hearing memorandum.

[71]The Bolegg Letter is Exhibit 3 to the evidentiary hearing, and the mailing envelope is Exhibit 2.  (*See* Am. Ex. & Witness List, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 130.)

Although Bond exercised his Fifth Amendment right not to testify at the hearings in 2007 because he had planned to file his own state post-conviction petition, his appointed counsel, Jake Erwin, advised the Court that Bond "denie[d] writing the letter that is purported to have been written by him." (09/06/2007 Tr. at 6, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 66; *see also id.* at 20-21 ("[W]ith respect to any Fifth Amendment issues, Mr. Bond has advised not only that he didn't write the letter, but that his position with respect to the facts of the case are just as what he testified to in the initial trial in federal court and that there's nothing that he would be saying any differently, and so we're not fearful of that—of any potential repercussions because we're not saying anything different from what we have ever said. That's our position, we have made that clear to the government.").)[72]

Although the postmarked envelope itself might be admissible to prove that an envelope was mailed to Thomas on or about January 7, 2002, *see Prudential Ins. Co. v. Kaltofen*, No. 90-3750, 1991 WL 275581, at *8 (7th Cir. Dec. 23, 1991) ("The postmark is very reliable, and although it does not fit any of the enumerated hearsay exceptions, it is a 'perfect candidate' for the residual exception in Fed. R. Evid. 803(24)."); *Enders v. Associated Co., Inc.*, No. 94-1028-PFK, 1995 WL 580052, at *6 (D. Kan. Sept. 27, 1995) ("the postmark is admissible under subsection (24) as an inherently trustworthy statement"), there is no direct evidence that Thomas received the Bolegg Letter itself in the mail. This failure of proof is important in light of the conclusion of Grant Sperry, the Government's expert, that the mailing envelope is authentic but the Bolegg Letter itself is not.

---

[72]As previously noted, the Court found Bond to be in contempt but stated that there were "unusual circumstances . . . and, therefore, it is not clear the effect of any determination of finding of contempt . . . ." (*Id.* at 21; *see also id.* at 21-22 (same).) Although Movant emphasizes that Bond had been found in contempt and that, "if Bond did not write the letter, as he allegedly claims, there is no apparent reason why he would have refused to provide a handwriting sample to prove his alleged non-authorship" (Reply to Gov't's Resp. 11-12, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144), he has not argued that the Court must draw an adverse inference from Bond's refusal to testify.

(*See* 10/12/2011 § 2255 Hr'g Tr. 145, 171-73, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)

Even if the Court were to find that the Bolegg Letter were written by Bond, it would not necessarily follow that its contents should be accepted as truthful. Recantation testimony offered years after trial is viewed with great suspicion. *See, e.g.*, Dobbert v. Wainwright, 468 U.S. 1231, 1233-34 (1984) (Brennan, J., joined by Marshall, J., dissenting from denial of stay of execution) ("Recantation testimony is properly viewed with great suspicion. It upsets society's interest in the finality of convictions, is very often unreliable and given for suspect motives, and most often serves merely to impeach cumulative evidence rather than to undermine confidence in the accuracy of the conviction. For these reasons, a witness' recantation of trial testimony typically will justify a new trial only where the reviewing judge after analyzing the recantation is satisfied that it is true and that it will render probable a different verdict.") (internal quotation marks omitted); *Freeman v. Trombley*, 483 F. App'x 51, 63 (6th Cir. 2012) ("Woodside's account of Joplin's unsworn recantation is inherently unreliable. As an unsworn statement by a convicted felon purporting to recant sworn testimony originally given in trial and substantially confirmed under oath three years later, its reliability is inherently suspect.") (footnote omitted) (collecting cases); *Brooks v. Tennessee*, 626 F.3d 878, 897 (6th Cir. 2010) ("this court views with great suspicion the recantation testimony of trial witnesses in postconviction proceedings"); *McCray v. Vasbinder*, 499 F.3d 568, 574 (6th Cir. 2007) ("While Effinger said that McCray was the murderer at trial, he said he 'couldn't identify' the perpetrator at the evidentiary hearing. Reasonable jurors no doubt could question the credibility of this about face from another inmate and rationally could discount his testimony as nothing more than an attempt to keep from being 'pegged as a rat' for having originally identified McCray as the gunman.") (record citation omitted); *Giles v. Wolfenbarger*, 239 F. App'x 145, 147-48 (6th Cir. 2007) (recanting affidavit not reliable evidence of actual innocence where "[t]here is no evidence concerning the authenticity of the affidavit, the motivation of the affiant, the circumstances of the affidavit's execution, the timing of its submission, or its consistency with other evidence in the trial

record"); *Matthews v. Ishee*, 486 F.3d 883, 895 (6th Cir. 2007) ("we view Roulette's recanting testimony with 'extreme suspicion'"); *Bower v. Curtis*, 118 F. App'x 901, 908 (6th Cir. 2004) ("The recanting of trial testimony by prosecution witnesses is typically viewed with the 'utmost suspicion.'"); *Williams v. Coyle*, 260 F.3d 684, 708 (6th Cir. 2001) ("Legally, recanting affidavits are always viewed with 'extreme suspicion.'"); *Byrd v. Collins*, 209 F.3d 486, 508 n.16 (6th Cir. 2000) ("Recanting affidavits and witnesses are viewed with extreme suspicion by the courts.") (internal quotation marks omitted); *see also Stines v. United States*, 571 F. App'x 384, 388 (6th Cir. 2014) (affirming denial of § 2255 motion based on district court's assessment that co-defendant's recantation of his trial testimony was not credible).

Even if it were established that Bond wrote the Bolegg Letter, that would not prove that Bond's trial testimony was false and the contents of the Letter were true. The Bolegg Letter does not even rise to the level of a recanting affidavit because it was not made under penalty of perjury and because Bond, through counsel, has disavowed the Letter. Prior to the Walgreens robbery, Thomas and Bond were close friends. As a result of Bond's testimony, Thomas is now on death row for his state-court murder conviction. It is possible that Bond's former friendship with Thomas might cause him to attempt to help Thomas escape the death penalty now that Bond himself is no longer subject to that punishment. It is also likely that Bond is bitter because he is serving life without parole on his state conviction (and he was sentenced to a longer term than he had expected on his federal conviction) despite the substantial assistance he provided in the prosecution of Thomas in both state and federal court. (*See* 10/13/2011 § 2255 Hr'g Tr. 505, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) That bitterness might cause him to write a letter to undermine Thomas' convictions, while at the same time refusing to take the additional step of cooperating with an investigation of his new statements. In short, even if the Court were to accept

that Bond might have written a letter to Thomas four years after the federal trial, the existence of the Bolegg Letter is not persuasive evidence of the truth of its contents.[73]

At the evidentiary hearing, both parties offered "expert" testimony about the authenticity of the Bolegg Letter. Movant offered the testimony of Marty Pearce, while the Government relied on Grant Sperry. The Court did not rule at that time on whether Pearce and Sperry are qualified to give opinion testimony. Under Rule 702 of the Federal Rules of Evidence,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> (a)      the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
>
> (b)      the testimony is based on sufficient facts or data;
>
> (c)      the testimony is the product of reliable principles and methods; and

---

[73]The state post-conviction court came to the same conclusion:

> Initially, this court questions the veracity of Bond's recanted confession. Despite petitioner's contention that Bond had no motive to lie, this court is not convinced of this proposition. . . .
>
> This court finds the letter is highly suspicious. The letter contains obvious contradictions. First, Bond appears to claim he is not responsible for petitioner's predicament. He states "don't blame me for you being on death row." However, Bond then goes on to describe a plot by himself and Angela Jackson to implicate petitioner in the Walgreens robbery. The letter implicates petitioner in additional crimes, providing a convenient answer for how petitioner was able to obtain the money to buy a new car and pay for the hotel room he rented shortly after the robbery.
>
> . . . .
>
> Thus, this court finds Bond's motives for writing the recantation letter are just as likely nefarious as they are pure. Therefore, this court is not "reasonably well satisfied" that Bond's recantation is true.

(Order Denying Pet. for Post-Conviction Relief and Writ of Error Coram Nobis at 50-51, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), ECF No. 144-1.)

(d)     the expert has reliably applied the principles and methods to the facts of the case.

"A trial judge has broad discretion in the matter of the admission or exclusion of expert evidence . . . . This discretion is particularly broad in a bench trial." *United States v. Demjanjuk*, 367 F.3d 623, 633 (6th Cir. 2004). In a jury trial, the trial judge exercises a "gatekeeping function" over purported expert testimony, in which it is required to "'decide whether this particular expert had sufficient specialized knowledge to assist the [trier of fact] in deciding the particular issues in the case." *Killion v. KeHE Distribs., LLC*, 761 F.3d 574, 593 (6th Cir. 2014) (quoting *Kumho Tire Co., Ltd. v. Carmichael*, 526 U.S. 137, 148 (1999)). "The 'gatekeeper' doctrine was designed to protect juries and is largely irrelevant in the context of a bench trial." *Deal v. Hamilton Cnty. Bd. of Educ.*, 392 F.3d 840, 852 (6th Cir. 2004).

[T]he district court is still required to rely only on admissible and reliable expert testimony, even while conducting a bench trial. This is true even though district courts conducting bench trials have substantial flexibility in admitting proffered expert testimony at the front end, and then deciding for themselves during the course of trial whether the evidence meets the requirements of *Kumho Tire Co.* and *Daubert* and deserves to be credited.

*Gonzales v. Nat'l Bd. of Med. Exam'rs*, 225 F.3d 620, 635 (6th Cir. 2000) (Gilman, J., dissenting); *see also McGuire v. Metro. Life Ins. Co.*, No. 12-10797, 2014 WL 3894363, at *15 (E.D. Mich. Aug. 8, 2014) (denying motion to exclude expert testimony in bench trial without prejudice).

Various Courts of Appeal, including the Sixth Circuit, have found handwriting analysis to be admissible under Rule 702. In *United States v. Jones*, 107 F.3d 1147, 1160 (6th Cir. 1997), the Sixth Circuit Court of Appeals held that "expert handwriting analysis is a field of expertise under the Federal Rules of Evidence." The Court of Appeals cautioned that "[t]his decision, however, does not guarantee the reliability or admissibility of this type of testimony in a particular case. Because this is non-scientific expert testimony, its reliability largely depends on the facts of each case." *Id.; see also United States v. Prime*, 431 F.3d 1147, 1154 (9th Cir. 2005) (district court did not abuse its discretion in admitting testimony from forensic document examiner and noting that "[t]he district court's thorough and careful application of the *Daubert* factors was consistent with all six circuits

265

that have addressed the admissibility of handwriting expert testimony, and determined that it can satisfy the reliability threshold") (collecting cases); *United States v. Brown*, 152 F. App'x 59, 62-63 (2d Cir. 2005) (noting that attacks on handwriting analysis under Rule 702 have been rejected by other Courts of Appeals and that, "[w]hile our own court has not addressed the issue, we have routinely alluded to expert handwriting analysis without expressing any reservation as to its admissibility under Rule 702") (collecting cases); *United States v. Mooney*, 315 F.3d 54, 62-63 (1st Cir. 2002) (district court did not abuse its discretion in allowing handwriting expert to provide an opinion that defendant was the author of letters at issue); *United States v. Paul*, 175 F.3d 906, 909-11 (11th Cir. 1999) (district court did not abuse its discretion in admitting testimony of handwriting expert); *United States v. Tipton*, 964 F.2d 650, 654 (7th Cir. 1992) ("We agree with the district court that the government's expert witness had more than sufficient training, knowledge, experience and expertise to qualify as an expert regarding forged documents. In our opinion, the defendant has failed to demonstrate that the district court's decision to admit the testimony of Robin Hunton as an expert witness in the area of forensic document examination was an abuse of discretion.") (citation omitted); *United States v. Yass*, No. 08-40008-JAR, 2008 WL 5377827, at *2 (D. Kan. Dec. 19, 2008) ("The Court has reviewed the decisions of the federal appellate courts, including an unpublished Tenth Circuit opinion, which have been unanimous in approving expert testimony in the field of handwriting analysis. Rather than to exclude handwriting analysis as 'junk science,' as urged by defendant, the Court finds the process of handwriting analysis sufficiently reliable to satisfy *Daubert* and the Federal Rules of Evidence and declines to depart from the clear majority of courts weighing in on the issue. Moreover, despite the uneven treatment of handwriting experts by district courts, every appellate court to have considered the issue of handwriting testimony has held that the expert's ultimate opinion was admissible.") (footnotes omitted).[74]

---

[74]The testimony of handwriting experts is not without controversy. Courts have split on the admissibility of evidence criticizing the methodology of handwriting examiners. *Compare United* (continued...)

Movant's handwriting expert, Marty Pearce, concluded that the Bolegg Letter (Exhibit 3) and the mailing envelope (Exhibit 2) were written by the same person and that both were authored by Anthony Bond. (*See* Forensic Handwriting Report at 2, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), Hr'g Ex. 43.) Pearce reasoned as follows:

> I paid particular attention to numerous factors: slant, size, speed, fluidity, rhythm, stroke formations, baseline, letter proportions, connections, directional movement, placement, margins, spacing, style, etc.
>
> After careful examination of both similarities and differences in writing characteristics, under lighted 2-30x magnification, and based on the original documents, I was able to establish a natural range of Mr. Bond's writing habits. Many strong similarities including light pen pressure, closely spaced letters, unique letter formations extending below the baseline, and omission of I-dots are only a few of the factors that enable me to reach my conclusion. I found no tremors, hesitation marks, uncertain movements, abrupt turns, no patching or retouching indicative of simulated writing in Q-1 or Q-2. The questioned writings appear to flow naturally and fluidly.

---

[74](...continued)
*States v. Velasquez*, 64 F.3d 844, 848 (3d Cir. 1995) (district court abused its discretion in refusing to admit testimony criticizing the lack of standards in the field of handwriting analysis because "Professor Denbeaux's testimony as a critic of handwriting analysis would have assisted the jury in evaluating the Government's expert witness") *with Paul*, 175 F.3d at 912 ("The Third Circuit did not err in excluding the testimony of Denbeaux because he "was not qualified to testify as an expert in handwriting analysis" and "was not an expert on the limitations of handwriting analysis"). Other courts have excluded the testimony of handwriting experts for reasons particular to the evidence in the case. *See, e.g.*, United States v. McDaniel, Criminal Action No. 12-393-01, 2014 WL 2609693, at *5 (E.D. Pa. June 11, 2014) ("The Third Circuit has held handwriting analysis and the ACE–V methodology to be generally reliable and scientifically sound, as required under Rule 702 and *Daubert*. Ms. Gottesman, however, fails to provide evidence that her expert opinion in this case derived from a proper application of the ACE–V methodology, rather than reliance on specific similarities between 'known' and 'question' documents. The Court finds, based on the evidence presently on the record, that Ms. Gottesman's testimony is inadmissible because the Government has not met a showing of sufficient reliability."); *United States v. Johnsted*, 30 F. Supp. 3d 814, 822 (W.D Wis. 2013) (discussing the reliability of handwriting analysis and concluding that, "[b]ecause the government has not provided enough evidence to demonstrate the reliability of handwriting analysis to the hand printing in this case, Bolsover's expert analysis will be excluded at trial"); *see also Deputy v. Lehman Bros.*, 345 F.3d 494, 506-09 (7th Cir. 2005) (district court abused its discretion in excluding testimony of forensic document examiner because its concerns properly went to weight and credibility rather than to admissibility but noting that, on remand, "the district court must properly function as a gatekeeper pursuant to *Daubert* and determine whether testimony concerning the genuineness of a signature is properly the subject of expert opinion").

(*Id.*) At most, Pearce was able to testify to pictorial similarities between the Bolegg Letter and mailing envelope and the known samples. As a result of her analysis, Pearce testified that she was "[q]uite certain" that Bond was the author of both the envelope and the Bolegg Letter. (10/12/2011 § 2255 Hr'g Tr. 70, *Thomas v. United States*, No. 2:03-cv-2416-JPM (W.D. Tenn.), ECF No. 132; *see also id.* at 74 (same).)

The Government's expert, Grant Sperry, concluded that Bond was the author of the January 7, 2002 mailing envelope but that he was not the author of the Bolegg Letter. (10/12/2011 § 2255 Hr'g Tr. 145, 171-73, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Sperry concluded, based on an analysis of impressions, that the Bolegg Letter was not in the envelope when the envelope was addressed or postmarked. Sperry also concluded that some other paper was in the envelope when it was addressed and postmarked. (*Id.* at 136, 137.) The Court finds this analysis, which is not based on the characteristics of Bond's handwriting, to be highly persuasive.[75] Sperry also concluded that different ink pens were used to produce the writing on the mailing envelope and the Bolegg Letter. (10/12/2011 § 2255 Hr'g Tr. 138-39, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Movant does not appear to challenge this conclusion, although he disputes its significance.[76] Finally, Sperry concluded that,

---

[75]Movant states that "Sperry did not consider the possibility that something else was mailed in the envelope *along with* the Bond Letter which could have shielded the Bond Letter and absorbed the intended writings from the envelope." (Movant's Post-Hr'g Br. 21, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Movant did not ask Sperry whether the presence of something else in the envelope would have shielded the Bolegg Letter. More fundamentally, however, Thomas, the alleged recipient and custodian of the Bolegg Letter, has not offered any testimony about its receipt or the contents of the envelope.

[76]It is correct that a single writer *could* have used different pens to write the Bolegg Letter and address the mailing envelope. This fact does not make the ink analysis irrelevant, as Pearce and Movant argue. (*See* Movant's Post-Hr'g Br. 20-21, *id.*, ECF No. 138.) Movant appears not to appreciate the fact that use of a single pen to produce both writings would have been strong evidence that a single author produced both documents. At a minimum, use of a single pen would establish that the Bolegg letter was written at the prison where Bond was incarcerated, which would undercut
(continued...)

although Bond addressed the mailing envelope, he was not the author of the Bolegg Letter based on differences between that letter and the known documents. (10/12/2011 § 2255 Hr'g Tr. 145, 169, 171, 173, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)

The Court finds that Sperry is unquestionably qualified as a person entitled to give opinion testimony under Rule 702. The Sixth Circuit Court of Appeals has previously held that a district court did not abuse its discretion in finding Sperry to be qualified to offer opinion testimony. *United States v. Jones*, 107 F.3d at 1161 ("Given Sperry's various training experiences, his job responsibilities, his years of practical experience, and the detailed nature of his testimony in this case, we hold that the district court did not abuse its discretion by admitting his testimony."). The Court also concludes that Sperry is qualified as a forensic document examiner by virtue of his knowledge, skill, experience, training, and education and, therefore, that he may offer opinion testimony on that subject. The Court finds Sperry's conclusions to be persuasive.[77]

---

[76](...continued)
Sperry's suggestion that the Bolegg Letter may have been forged at Thomas' direction.

[77]Movant argues that Sperry's analysis is "Biased and Unreliable." (Movant's Post-Hr'g Br. 19, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Movant's reasoning is not persuasive. The Court is not convinced that Sperry's continued employment as a consultant for the Postal Service would be likely to cause him to slant his conclusions in criminal cases that do not involve the Postal Service. Movant also overlooks Sperry's testimony that his analysis has frequently excluded individuals suspected by the Government and that he has excluded more people than he has implicated. (10/12/2011 § 2255 Hr'g Tr. 185-87, *id.*, ECF No. 132.) Second, contrary to Movant's suggestion, Sperry testified that he did not start with the premise that a jailhouse writing was likely to be a forgery. (*Id.* at 193.) Based on his experience, Sperry testified that forgery of jailhouse writings is common. (*Id.* at 128-30.)

As for the alleged unreliability of Sperry's analysis, Movant argues that "Sperry only considered differences between the [Bolegg] Letter and the known writing samples in contravention of industry standards for handwriting analysis." (Movant's Post-Hr'g Br. 20, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Movant has cited no authority to establish this purported "industry standard." The citation to Hearing Exhibit 43, Pearce's report, is unexplained. Pearce did not testify that it is improper for a document examiner to focus on the differences between known and questioned writings and, even if she had, the Court is not persuaded
(continued...)

Although the Court has admitted the testimony of Pearce, the Court finds that her testimony is entitled to little weight. First, it is questionable whether Pearce has been "qualified as an expert" within the meaning of Rule 702.

> Rule 702 expressly recognizes five bases for qualifying an expert: "knowledge, skill, experience, training, or education." It is clear that a background in just one of these five may be sufficient. For example, a witness with an academic background in a given area but no practical experience may still qualify as an expert. The same is true for a witness with experience but no formal education. However, most experts will have some background in several bases. In that case, a court may consider the totality of a witness's background when evaluating the witness's qualifications to testify as an expert. . . .

> While Rule 702 does not define the meaning of the terms used to describe the bases for expert qualification, the courts have given them common sense interpretations. "Education" sufficient to qualify an expert may be formal, resulting in a degree or certification. "Education" also may be based on informal self-study or independent research. "Training" usually means on the job instruction or work-related classes. "Skill" is a specialized aptitude developed as a result of significant involvement with a specific subject. "Experience" may qualify a witness

---

[77](...continued)
that Pearce is qualified to establish an industry standard. Sperry's testimony makes clear that there were certain pictorial similarities between the known and questioned writings, as one would expect with a forgery, but that the proper analysis of a document focuses on differences. (10/12/2011 § 2255 Hr'g Tr. 147, 149-50, 169, 175, 187-88, 195-96, *id.*, ECF No. 132.)

Next, Movant notes that Sperry only spent 11 hours on his analysis, whereas Pearce spent 25 hours. (Movant's Post-Hr'g Br. 20, *id.*, ECF No. 138.) Movant overlooks the fact that Sperry had the benefit of a computer program that allowed him to collect all instances of letter combinations and words for analysis, while Pearce performed her analysis manually. Sperry also testified that he looked at every single word and letter, although not necessarily at every stroke. (10/12/2011 § 2255 Hr'g Tr. 202, *id.*, ECF No. 132.) There is no evidence in the record that Pearce looked at every letter and every stroke.

Movant also argues that "Sperry failed to consider the alleged differences he saw were just normal variations due to the passage to time and the varying circumstances under which each sample was written." (Movant's Post-Hr'g Br. 20, *id.*, ECF No. 138.) The Court is persuaded by Sperry's testimony that analysis of differences is a more reliable means of demonstrating authorship than consideration only of similarities. Although Sperry acknowledged that handwriting might change over the course of a person's life (10/12/2011 § 2255 Hr'g Tr. 196, *id.*, ECF No. 132), he concluded that the differences between the known and questioned documents in this case could not be accounted for by the passage of time (*id.* at 200-01).

as an expert so long as it is obtained in a practical context. This means that experience developed as a professional expert witness is not sufficient.

       Common indicia of expertise is membership in learned or professional societies and authorship of books and articles in the field. While these may be suggestive of expertise, they are neither conclusive nor essential to qualifying as an expert witness.

29 Charles Alan Wright, Kenneth W. Graham, Jr., Victor James Gold, and Michael H. Graham,

*Federal Practice and Procedure: Evidence* § 6265 (1st ed.) (footnotes omitted).

Pearce's formal qualifications in the field of handwriting analysis are not impressive. Pearce is not a college graduate. (10/12/2011 § 2255 Hr'g Tr. 75-76, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) She claimed to be a Certified Document Examiner as a result of having taken a four-day seminar at the Institute of Graphological Science in Dallas, Texas in 1989. (*Id.* at 79, 80-81.)[78] Pearce has also attended various courses and workshops (Exhibit 1), most of which were quite brief. Pearce did not complete the course she had started on ink differentiation, explaining that it was too time-consuming. (*Id.* at 106.)

Pearce's "certification" was obtained by passing an examination administered after completion of a four-day workshop at the Institute of Graphological Science. (*Id.* at 81.) Pearce has conceded that she has not been certified as a document examiner by any national certifying board. (*Id.* at 85-86; *see also id.* at 86-88.) Pearce has not published in any peer-reviewed journal. (*Id.* at 86.)

Moreover, Pearce's own description of her qualifications have been contradictory. On the one hand, in addition to her minimal formal qualifications, Pearce's *curriculum vitae* states that she has conducted workshops and seminars and has testified sixty-seven times in various federal and

---

[78] Pearce noted that her *curriculum vitae* used "some of the same initials that Mr. Sperry uses." (*Id.* at 107.) There appears to be no overlap between the training received by Sperry and that which Pearce claims to have received.

state courts.  (Exhibit 1.)[79]  Pearce testified that no court has ever refused to recognize her as an expert in document examination, and she has never been disqualified as an expert in document examination.  (10/12/2011 § 2255 Hr'g Tr. 35, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)  On the other hand, Pearce did not know whether she had ever been qualified as an expert in federal court, but believed she had testified in either a district court or a bankruptcy court in Greenville, Tennessee.  (*Id.* at 76-79.)  The sixty-seven court appearances listed on Pearce's resume include depositions and arbitrations.  Pearce did not know how many times she had testified before a jury.  (*Id.* at 77-78.)  Pearce did not believe she had ever been through a *Daubert* hearing.  (*Id.* at 115.)

Throughout her testimony, Pearce tended to overstate her experience and professional qualifications.  For example, Pearce testified that she was a full-time certified document examiner and certified graphological analyst.  (*Id.* at 101; *see also id.* at 33 (same).)  She claimed to spend "at least 40 hours a week, sometimes a lot more" at her profession.  (*Id.* at 101.)  After further questioning, it appeared that, if Pearce earned $23,000 in 2010 and charged her standard fee of $100 per hour, she worked 230 hours, which works out to 5.75 forty-hour weeks.  (*See id.* at 101-02.)  Viewed from another perspective, if those 230 hours were assumed to be spread evenly throughout the year, she would have worked slightly less than 4.5 hours per week.[80]  This suggests that Pearce's experience is less extensive than she has represented.

---

[79]According to Pearce, by the time of the evidentiary hearing, she had testified 70 times.  (10/12/2011 § 2255 Hr'g Tr. 34, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.)

[80]This analysis appears to overstate the time spent by Pearce on handwriting analysis in two ways.  First, it does not take into account the fact that Pearce's fee for court appearances was $1000 per day or any part of a day.  (Hr'g Ex. 1, Schedule of Fees and Services, Page 2.)  Given the level of Pearce's earnings from self employment, even a handful of court appearances would substantially reduce the number of hours she could have spent in her laboratory.  Second, the analysis assumes that no part of Pearce's self-employment income was accounted for by party appearances as a graphologist or by sales of her self-published book on graphology.

The cross-examination revealed other troubling exaggerations by Pearce that seriously impact her credibility. For example, Pearce testified on direct examination that she had testified in a case brought by the heirs of Tammy Wynette. (10/12/2011 § 2255 Hr'g Tr. 35, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) During cross-examination, it was revealed that Pearce's only involvement in that case was being paid by a local television station to examination the will and provide commentary. (*Id.* at 97-98.) Pearce also represented that she had testified in the murder trial of Byron "Low Tax" Looper (*id.* at 35), whereas, on cross-examination, Pearce revealed that she had been retained by Looper's defense team but had not been called as a witness because her testimony would not have been favorable (*id.* at 100-01). Pearce appears to have intentionally overstated her court experience, as the information on direct examination about Wynette and Looper was provided in response to a question about interesting cases in which she had testified.

Even if it were assumed that Pearce's experience qualifies her to identify pictorial similarities in known and questioned writings, Pearce does not appear to have the knowledge and skill to recognize the limitations of her training.[81] Pearce was not familiar with the ASTM or the ABFDE. (*Id.* at 86-88, 109-10.) She did not use any equipment more sophisticated than a micronta, which she purchased at Radio Shack for $30, to an analyze the Bolegg Letter. (*Id.* at 103-04; *see also* Hr'g Ex. 43 at 2 ("After careful examination . . . under lighted 2-30x magnification . . .").) Pearce was able to identify only one instance in which she had sent a handwriting sample out to a laboratory for more sophisticated analysis. (10/12/2011 § 2255 Hr'g Tr. 103, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) Pearce failed to detect the indentations and embossed writing that had been discovered by Sperry's analysis. (*See id.* at 69-70 (explaining why the similarities are not the result of simulation), 70-71 (embossed writing was not visible using the naked eye or infrared lighting), 72.) Pearce also failed to appreciate the significance of Sperry's

---

[81] Pearce's credibility was further undermined through her insistence that graphology—the use of handwriting to analyze personality traits—is scientifically valid. (*See, e.g.*, id. at 90, 93, 97.)

conclusion that different inks were used to address the mailing envelope and to draft the Bolegg Letter. (*See id.* at 72-73.)[82]

In short, the Court concludes, based on Sperry's analysis, that the Bolegg Letter is a forgery. Even if the Court were to disregard Sperry's analysis for the reasons stated by Movant (*see* Reply to Gov't's Resp. 20, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144), that would not establish that Pearce's conclusions should be adopted. Movant has the burden of establishing that the Bolegg Letter is genuine and that its contents should be taken as true. Given the testimony at the evidentiary hearing, the Court would not adopt Pearce's analysis even if it were persuaded to reject Sperry's analysis. The Bolegg Letter does not even rise to the level of a recantation. It is entitled to no weight.[83]

---

[82]Thomas attempts to bolster Pearce's testimony with the finding of the post-conviction court in the state capital murder case. Movant asserts that "Judge James C. Beasley, Jr. of the Shelby County Criminal Court found that 'the [Bond] letter was not inherently unreliable,' and 'accept[ed] the testimony of the handwriting expert and [found] the letter was likely written by Bond.'" (Reply to Gov't's Resp. 12, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144.) Movant has not accurately summarized the findings of the post-conviction court. The "inherently unreliable" language in the post-conviction order was a paraphrase of a statement by this judge. (*See* Order Denying Pet. for Post-Conviction Relief and Writ of Error Coram Nobis at 51, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.) ("Additionally, this court notes that, while finding the above letter was not inherently unreliable, a United States District Judge who reviewed the letter found the letter was 'suspicious in its timing, comprehensive content, and the manner in which it is crafted.'"), ECF No. 144-1). Movant has selectively quoted one phrase from this judge's written statement and has omitted the post-conviction court's findings that "this court is not 'reasonably well satisfied' that Bond's recantation is true" (*id.* at 51), as well as its statements that it "questions the veracity of Bond's recanted confession" (*id.* at 50) and "finds the letter is highly suspicious" (*id.*).

The post-conviction court did state that "this court accepts the testimony of the handwriting expert and finds the letter was likely written by Bond . . . ." (*Id.* at 51.) The State chose not to cross-examine Pearce at the post-conviction hearing and, therefore, the weaknesses in that testimony were not exposed. (*See* Post-Conviction Hr'g Tr. 61-62, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), ECF No. 87-1.) The State also chose not to present its own expert.

[83]Movant asserts, in a footnote, that the Bolegg Letter "is also persuasive evidence of actual innocence which is arguably a cognizable claim in this proceeding, particularly in light of Thomas's
(continued...)

## 2. Other Evidence of a Relationship Between Angela Jackson and Bobby Jackson is Not Persuasive

At his state trial and at the state post-conviction proceeding, Thomas introduced the testimony of William Upchurch, Barry Brown, Tonya Gentry and Stephanie Upchurch Williams, all of whom testified that Angela Jackson and Bobby Jackson were in a romantic relationship at or around the time of the Walgreens robbery. Those witnesses did not testify at the evidentiary hearing in federal court, thereby depriving the Court of the opportunity to assess their demeanor and credibility. Whether considered individually or collectively, the Court does not find the testimony to be persuasive.

In evaluating the testimony of these witnesses, it is important to recall the chronology of events. Thomas was released from prison on February 24, 1997. (11/12/1998 Trial Tr. 10, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 103.) He met Angela Jackson in March 1997 and moved into her apartment some time thereafter. (*Id.* at 51; *see also* 11/10/1998 Tr. Tr. 410, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) The Walgreens robbery occurred on April 21, 1997. Thomas married Angela Jackson on May 7, 1997. (11/10/1998 Trial Tr. 405, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) They separated in early June, 1997. (*Id.* at 409; *see also* 11/12/1998 Trial Tr. 54-55, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 103.) Bobby Lee Jackson committed the Southand Mall robbery on July 21, 1997. Bobby Jackson was arrested on July 24, 1997 (Arrest Warrant returned executed, *United States v. Jackson*, No. 2:97-cr-20160-01-JT (W.D. Tenn.), ECF No. 3), he was in federal custody during the pendency of the criminal case (Order

---

[83](...continued)
death sentence from his Tennessee trial." (Movant's Post-Hr'g Br. 18 n.4, *id.*, ECF No. 138.) The Supreme Court has not recognized freestanding actual innocence claims in non-capital cases. *See Hodgson v. Warren*, 622 F.3d 591, 601 (6th Cir. 2010) (explaining that freestanding actual innocence claims may be raised only in capital cases); *Wright v. Stegall*, 247 F. App'x 709, 711-12 (6th Cir. 2007); *Cress v. Palmer*, 484 F.3d 844, 854-55 (6th Cir. 2007). Because the instant case is not a capital case, Thomas cannot raise a freestanding claim of actual innocence.

of Temporary Detention, *id.*, ECF No. 6; Order of Detention, *id.*, ECF No. 10; Mins., *id.*, ECF No. 27), and he was in prison until his release on May 7, 2002 (*see* http://www.bop.gov/inmateloc/ (BOP register number 16042-076)). Thomas was arrested in October 1997 on unrelated state charges, and he was held in the Shelby County Jail at least until his federal indictment.

Each of the witnesses who testified to a relationship between Angela Jackson and Bobby Jackson was a relative or close friend of Thomas. William Upchurch, who testified at Thomas' state and federal trials, was a cousin to Thomas and has acknowledged that he and Thomas were very close. (11/10/1998 Trial Tr. 669, 672, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100; *see also* Trial Tr. 1513-14, 1517, *State v. Thomas*, No. 00-3095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 46.) Stephanie Upchurch Williams, who testified at the state post-conviction hearing, was a cousin to Thomas. (Post-Conviction Hr'g Tr. 417, 420, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 53.)[84] Tonya Gentry had known Thomas for fourteen or fifteen years and was friends with many members of his family (Post-Conviction Hr'g Tr. 226, *Thomas v. State*, No. 00-3095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 50), including her best friend Stephanie Upchurch (*id.* at 231, 234-35). Gentry may have gotten some of her information about the supposed relationship between Angela Jackson and Bobby Jackson from Thomas' cousins. (*Id.* at 229.) Barry Brown had grown up with Thomas and had known him for about twenty years. (Post-Conviction Hr'g Tr. 64, *Thomas v. State*, No. 00-3095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 47.) Tonya Gentry believed that Barry Brown was related to the Upchurches. (Post-Conviction Hr'g Tr. 231, *id.*, Hr'g Ex. 50.) Each of these witnesses had a strong motive to do anything possible to help Thomas.

Several of the witnesses provided entirely conclusory testimony about a relationship between Angela Jackson and Bobby Jackson. William Upchurch testified that, after the breakup between

---

[84]Stephanie Upchurch testified at the sentencing phase of Thomas' state capital trial. According to the Tennessee Supreme Court, "Stephanie Williams and Tamara Weeks, the defendant's cousins, testified that they had close relationships with the defendant. Williams said that she did not want to see the defendant die . . . ." *State v. Thomas*, 158 S.W.3d at 376.

Angela Jackson and Thomas, Angela Jackson had said she was going to pay Thomas back. (Trial Tr. 1516, *State v. Thomas*, No. 00-3095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 46.) Upchurch testified that he had grown up and gone to school with Bobby Jackson. (*Id.*) He asserted, without elaboration, that Angela Jackson and Bobby Jackson were dating. (*Id.*)

In Thomas' federal trial, Upchurch testified that he had heard Angela Jackson threaten Thomas. (11/10/1998 Trial Tr. 670, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) In context, according to Upchurch's federal trial testimony, Angela Jackson had refused to give Upchurch the title for the purple car Thomas had purchased with the robbery proceeds and had threatened instead to burn it. (*Id.* at 670-71.) Upchurch did not mention Angela Jackson's purported threat to burn the car title at Thomas' state trial, and he also did not mention the supposed relationship with Bobby Jackson at the federal trial.

Barry Brown also testified, without elaboration, that Angela Jackson had dated Bobby Jackson in 1997, "[a]round the same time Andrew was dating her." (Post-Conviction Hr'g Tr. 66, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 47.)[85]

Stephanie Upchurch Williams testified that Angela Jackson had dated Bobby Jackson in 1997. (Post-Conviction Hr'g Tr. 418-19, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 53.) Williams was uncertain whether Angela Jackson had dated Bobby Jackson before or

---

[85]Brown's testimony about Angela Jackson's supposedly vindictive nature also was not impressive. Brown testified that he had dated Angela Jackson and that, when he broke up with her, she had said that she was going to pay him back. (*Id.* at 64-67.) In response to questioning by the post-conviction court, Brown testified that Angela Jackson had seen him since the breakup but had never done anything to him. (*Id.* at 72.)

Brown's testimony about when he dated Angela Jackson is in conflict with that of Jackson. Brown testified that he had dated Angela Jackson in 1996 or 1997, within a short time of when she had dated Thomas and, supposedly, Bobby Jackson. (*Id.* at 65.) Angela Jackson described Brown as a "high school sweetheart." (Post-Conviction Hr'g Tr. 206, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 48.) Angela Jackson attended high school between 1984 and 1988. (*Id.* at 176.) Angela Jackson does not appear to have any reason to lie about when she dated Barry Brown.

after her marriage to Thomas. (*Id.* at 419, 420.) She testified on cross-examination that she was not saying that Angela Jackson had dated Bobby Jackson during her marriage to Thomas. (*Id.* at 420.)

Although Tonya Gentry provided approximate dates for the relationship between Angela Jackson and Bobby Jackson, her chronology made no sense. She first testified that Angela Jackson and Bobby Jackson had dated in 1994 or 1995, after Angela Jackson's marriage to Thomas. (Post-Conviction Hr'g Tr. 227, 228, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 50.) She then testified that Angela Jackson and Bobby Jackson had dated during the middle to late 1990's. (*Id.* at 227-28.) According to Gentry, Angela Jackson had dated Bobby Jackson while she was married to Thomas and after she and Thomas had separated. (*Id.* at 229.) She later testified that Angela Jackson had dated Bobby Jackson after Thomas was incarcerated. (*Id.* at 232.) As previously noted, *see supra* pp. 275-76, Bobby Jackson had been incarcerated since July 24, 1997, whereas Thomas was not arrested until October 1997.

Angela Jackson and Bobby Jackson have denied a romantic relationship. Angela Jackson testified at the post-conviction hearing that she did not know anyone named Bobby Jackson. (Post-Conviction Hr'g Tr. 203, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 48.) After viewing a photograph of Bobby Jackson, Angela Jackson believed she might have seen him at the Foote Homes, but she had never spoken to him or dated him. (*Id.* at 203-05, 221.) Bobby Jackson testified that he did not know Angela Jackson. (Post-Conviction Hr'g Tr. 77, 85, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 49.)[86] Bobby Jackson also denied knowing Anthony Bond (*id.* at 84-85), Andrew Thomas (*id.* at 84) and Barry Brown (*id.* at 85).

In light of the unpersuasive testimony offered by William Upchurch, Barry Brown, Tonya Gentry and Stephanie Upchurch Williams about the purported relationship between Angela Jackson and Bobby Jackson, and the likely bias of these witnesses, the Court concludes that Irby was not

---

[86]Although Angela Jackson and Bobby Jackson attended the same schools, there may not have an overlap in their attendance dates.

278

ineffective for failing to present this testimony at trial and that Thomas suffered no prejudice from that omission.

### 3. Steven Briscoe Had No Relevant Information

Movant also claims that his attorney was ineffective by failing to introduce evidence regarding the letter Steven Briscoe wrote to AUSA Arvin. (Movant's Post-Hr'g Br. 14, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Briscoe, a "notorious jailhouse snitch" (10/13/2011 § 2255 Hr'g Tr. 262, *id.*, ECF No. 133), had been held at the WTDF with Bobby Jackson. Most of the letter consisted of a detailed description of the circumstances surrounding the Southbrook Mall robbery. Briscoe also related that Bobby Jackson "told me that this wasn't his first time robbing a Armor Truck Carrier, but that this was his first time getting caught." (Hr'g Ex. 18 at SSTF00000285.) The letter concluded that "I just wrote part of what I know . . . ." (*Id.* at SSTF00000286.)

The Court is not persuaded that Thomas has established that his attorney's failure to follow up on the Briscoe Letter constituted deficient performance or that he suffered any prejudice. The only portion of the Briscoe Letter that has any possible relevance to the instant case is the statement that Bobby Jackson "told me that this wasn't his first time robbing a Armor Truck Carrier, but that this was his first time getting caught." (*Id.* at SSTF00000285.) The letter did not mention the Walgreens robbery. At the evidentiary hearing, Briscoe testified that Bobby Jackson "said he was involved with more robberies, but he didn't go into details about the other robberies too much." (10/12/2011 § 2255 Hr'g Tr. 216, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) By the time of the evidentiary hearing, Briscoe could not recall the details of any other robbery that Bobby Jackson had mentioned. (*Id.* at 217.)[87]

---

[87]Briscoe's testimony highlighted another oddity about inmate writings. Briscoe testified that he had addressed the envelope but did not write the letter to Arvin. (*Id.* at 214-15.) Briscoe believed the letter had been written by an inmate named Carnell (*id.* at 215), and he would not affirm that Carnell had written the letter for him (*id.*). The parties did not explore why Briscoe, a jailhouse

(continued...)

Because there is no evidence in the record that Briscoe had any information linking Bobby Jackson to the Walgreens robbery, Thomas has not established that his attorney was ineffective in failing to interview him prior to trial or that he suffered any prejudice. As for Movant's suggestion that Irby should have introduced evidence about the Briscoe letter, the letter is hearsay. No showing has been made that Briscoe himself had any information that would have been relevant at trial. The purported statement by Bobby Jackson that the Southbrook Mall robbery was not his first armored carrier robbery would have been excluded because it did not link Bobby Jackson to the Walgreens robbery. *See* Fed. R. Evid. 401, 403.

### 4. The Southbrook Mall Robbery Was Not Relevant

Movant also argues that defense counsel was ineffective for failing to introduce Bobby Jackson's confession and conviction for the Southbrook Mall robbery, which he characterizes as "remarkably similar" to the Walgreens robbery. (Movant's Post-Hr'g Br. 14, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) That evidence would have been excluded because it was irrelevant, a waste of time, and had the potential to mislead the jury.

It is important to remember that the Walgreens robbery and the Southbrook Mall robbery were not the only two armored car robberies in Memphis in 1997. Chief Inspector Sanders testified that, "during that period of time, we probably had four or five armored car robberies . . . ." (10/12/2011 § 2255 Hr'g Tr. 239, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D.

---

[87](...continued)
informant who was well known to the Government, would have asked another inmate to write a letter for him. Briscoe apparently is literate because he addressed the envelope himself.

This peculiarity with regard to Briscoe's letter does not help Thomas establish that the Bolegg Letter was written by Bond or at his request. It is Thomas' burden to authenticate the letter and he has come forward with no evidence that another inmate wrote the letter at Bond's request. The experts have agreed that the author of the Bolegg Letter has, at a minimum, tried to reproduce the pictorial style of Bond's writing. No plausible explanation has been offered for Sperry's conclusion that something other than the Bolegg Letter was inside the mailing envelope when it was addressed.

Tenn.), ECF No. 132; *see also* 10/13/2011 § 2255 Hr'g Tr. 391, *id.* (Irby testified that "there was a spate of armored car robberies in Memphis the summer this happened"), ECF No. 133.) The similarities between the Walgreens and Southbrook Mall robberies appeared to be limited to the facts that the perpetrators were two black males, a Loomis, Fargo courier's money bag had been taken or attempted to be taken, shots were fired, and the perpetrators had driven a red car at some point. Those similarities were outweighed by the numerous differences between the two robberies. The robberies occurred in different parts of Memphis. (10/13/2011 § 2255 Hr'g Tr. 331-32, *id.*, ECF No. 133.) The Walgreens robbery occurred outside, whereas the Southbrook Mall robbery occurred inside an enclosed shopping mall. The getaway driver in the Walgreens robbery remained in the car, whereas both perpetrators in the Southbrook Mall robbery were inside the shopping center. The Southbrook Mall robbery involved an attempt to snatch the bag and run, and the gunfire was initiated by the courier. The Walgreens robbery involved an ambush attack in which the courier was shot in the head from behind and his bag was stolen after he had fallen.[88] The perpetrators of the Walgreens robbery drove a stolen white car that they abandoned and got into a red car that they kept a block away from the crime scene. The Southbrook Mall robbery did not involve a "switch" car. The red

---

[88]That Bobby Jackson had been involved in a single robbery involving an armored courier's money bag does not establish that that was some type of criminal "signature" unique to him. Prior to the Walgreens robbery, Thomas had been involved in numerous robberies involving a money bag. *See* PSR ¶¶ 58 (armed robbery in First Tennessee Bank parking lot on January 4, 1993, in which a bank bag containing $6000 was taken), 60 (armed robbery in First Tennessee Bank parking lot on February 1, 1993, in which a bag containing $5000 in cash and checks was taken), 61 (armed robbery at First Tennessee Bank parking lot on March 9, 1993, in which Thomas drove the getaway car and a bank bag was obtained), 62 (armed robbery at First Tennessee Bank parking lot on February 1, 1993, in which a bag containing $75 in coins and $1020 in food stamps was taken), 63 (armed robbery in First Tennessee Bank parking lot on March 8, 1993, in which a bag containing $976 in cash and $69.23 in checks was stolen), 64 (armed robbery in Union Planters Bank parking lot on March 15, 1993, during which $290 in cash and $610 in checks were stolen), 65 (armed robbery in First Tennessee Bank parking lot on March 15, 1993, in which bank bag containing $800-900 in cash was stolen). Of course, the details of Thomas' criminal history were not admissible at his federal trial to show that he is the sort of person who would steal an armored courier's bag or that that was his *modus operandi*.

car in the Southbrook Mall robbery was a Mustang, whereas the red car in the Walgreens robbery was Angela Jackson's Suzuki Swift. (*See generally* 10/13/2011 § 2255 Hr'g. Tr. 330-31, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Chief Inspector Sanders testified that the witnesses to the Walgreens robbery "described it as having a black bumper or a black bra on the front and some type of sticker on the back window near the extra brake light." (*Id.* at 330.)[89]

The Southbrook Mall robbery was committed by Bobby Lee Jackson and Terrance Lawrence. There is no question that Anthony Bond was one of the perpetrators of the Walgreens robbery. Apart from the discredited Bolegg Letter, there is no evidence in the record that Bobby Lee Jackson and Anthony Bond knew each other. Bobby Jackson has denied knowing Bond. (Post-Conviction Hr'g Tr. 84-85, *Thomas v. State*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 49.) Bond has denied knowing Bobby Jackson. (11/09/1998 Trial Tr. 292, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99.) At the time of the Walgreens robbery, Bond was eighteen years old. (*Id.* at 236.) Bond had been in prison until his release in November 1996. (*Id.* at 238.) Bobby Jackson was thirty years old when he committed the Southbrook Mall robbery. (J. in a Criminal Case, *United States v. Jackson*, No. 2:97-cr-20160-01-JPM (W.D. Tenn.), ECF No. 78.) He had never been incarcerated until he was arrested for the Southbrook Mall robbery. (Post-Conviction Hr'g Tr. 76, *State v. Thomas*, No. 00-03095 (Shelby Cnty. Crim. Ct.), Hr'g Ex. 49.) Bond and Bobby Jackson lived in different parts of the city.[90] There also is no evidence that Bobby Jackson, who was employed at Sears prior to his arrest, had been off work the day of the Walgreens robbery.

_____

[89]Movant has never explained the discrepancy between the red cars involved in the two robberies. It seems inconceivable that Angela Jackson would have falsely told investigators that the red car that had been involved in the Walgreens robbery belonged to her.

[90]Bobby Jackson's judgment listed his address as 6226 Ridgeline Drive, Memphis, TN 38115. (J. in a Criminal Case, *United States v. Jackson*, No. 2:97-cr-20160-01-JPM (W.D. Tenn.), ECF No. 78.) Bond's judgment listed his address as 3060 Manhatten, Memphis, TN 38112. (J. in a Criminal Case, *United States v. Bond*, No. 2:98-cr-20100-02 (W.D. Tenn.), ECF No. 85.)

For these reasons alone, Bobby Jackson's confession and conviction for the Southbrook Mall robbery does not establish that he had the means, motive, and opportunity to commit the Walgreens robbery.

Movant's trial counsel was not ineffective by failing to introduce evidence of Bobby Jackson's confession and conviction in the Southbrook Mall robbery, and Movant suffered no prejudice. If defense counsel had offered evidence about the Southbrook Mall robbery, it would have been excluded. (*See* Fed. R. Evid. 401, 403; *see also* 10/13/2011 § 2255 Hr'g Tr. 428-30, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)

### 5.     More Eyewitness Testimony Would Not Have Mattered

Finally, Movant complains that his trial counsel failed to elicit testimony from Robert Fisher that he had twice identified Bobby Jackson as the driver of the getaway car and failed to call Richard Fisher, Gail McDonald, David Roth, and Imogene Walls to testify that the driver of the getaway car was "heavyset." (Movant's Post-Hr'g Br. 14, *id.*, ECF No. 138.) None of this testimony would have directly undermined Thomas' guilt, as all parties appear to agree that, if Thomas was present, he was the shooter. Movant also fails to appreciate that, if his attorney had introduced the evidence from these witnesses that was favorable to him, the Government would have elicited incriminating testimony from those same witnesses. For the reasons that follow, the testimony that Movant contends should have been introduced would not have materially assisted him and there were risks associated with calling the additional witnesses.

The defense did call Robert Fisher to testify on Thomas' behalf at trial. Robert Fisher testified that he had only gotten a brief glimpse of the occupants of the getaway car and that all he really remembered was the eyes of one of the occupants. (11/10/1998 Trial Tr. 594, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.) Robert Fisher believed that the driver appeared to be taller than the passenger. (*Id.*) Robert Fisher was asked to testify to the identification he had made during the investigation, and his testimony makes clear that that identification was tentative: "Well, I was asked can you identify anybody. I told them at the time

I couldn't definitely. I could say that one of them looked like the guy that I saw driving." (*Id.* at 597.)[91] Robert Fisher also failed to identify Thomas after seeing him in the courtroom. (11/10/1998 Trial Tr. 599-600, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 100.)

Robert Fisher's trial testimony makes clear that defense counsel did everything Thomas now claims he should have done with two exceptions. First, defense counsel failed to note that Robert Fisher had been shown the photo array on a second occasion, when he selected same individual in position three. That information was cumulative to the testimony that had been presented, and the language used by Robert Fisher when he viewed the photographs was inadmissible as hearsay. Regardless of what Robert Fisher may have said to investigators, his testimony at trial makes it clear that his identification was tentative.

Second, defense counsel failed to elicit the fact that the person who Robert Fisher had selected was Bobby Jackson. Defense counsel could not have obtained the name of the person at position three from Robert Fisher because he lacked personal knowledge. Defense counsel attempted to elicit Bobby Jackson's name through Deputy Marshal Sanders, but the Government's objection was sustained. (11/12/1998 Trial Tr. 35, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 103.) In the absence of additional evidence linking Bobby Jackson to the Walgreens robbery, that objection could not have been cured. (*See* 10/13/2011 § 2255 Hr'g Tr. 449-50, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)

Movant also complains that his attorney did not call Richard Fisher, Gail McDonald, David Roth and Imogene Walls to testify that the getaway car driver was "heavyset," which would have

---

[91] A copy of the signed photo array, with Richard Fisher's notation that "[t]his looks like the gay [sic] driving the car," was admitted as Exhibit 55 to the evidentiary hearing. (Hr'g Ex. 55 at 2, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 129.) There appear to be physical similarities between the photograph of Bobby Jackson that Robert Fisher identified and Anthony Bond's October 22, 1997 booking photo. (*See* Gov't Resp. to Movant's Post-Hr'g Br., Ex. A at 4, *id.*, ECF No. 141-1.)

corroborated Robert Fisher's tentative identification of Bobby Jackson and contradicted Anthony Bond's testimony that he was the driver. (Movant's Post-Hr'g Br. 14, *id.*, ECF No. 138.) The witnesses' descriptions of the driver as "heavyset" were based on a brief glimpse of the head and shoulders of the driver of a car that was speeding through the shopping center parking lot. (*See* 10/12/2011 § 2255 Hr'g Tr. 234, *id.*, ECF No. 132.) At the time of trial, Bond was 6'2" and 160 pounds. (11/09/1998 Trial. Tr. 292, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99.) Irby believed that Bond was heavier than 160 pounds. (10/13/2011 § 2255 Hr'g Tr. 416-17, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) A photograph of Bond at the time he was booked in October 1997 shows that he had broad shoulders. (*See* Gov't Resp. to Movant's Post-Hr'g Br., Ex. A at 4, *id.*, ECF No. 141-1.)

The testimony of these additional witnesses either would not have helped Thomas or would have actually harmed him. David Roth testified at trial and, contrary to Movant's suggestion, defense counsel brought out on cross-examination that he had thought at one point that the driver of the getaway car was heavyset. (11/09/1998 Trial Tr. 166, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99.) He testified on direct examination that the occupants of the car were "two black men." (*Id.* at 153; *see also id.* at 156 ("light skinned black people").) He also testified that "[i]t seemed to me that the passenger was probably my build and the driver seemed to be heavier than me." (*Id.* at 156.) Roth testified on cross-examination that he was 5'10". (*Id.* at 161.) It is unclear what other information Movant contends his attorney should have elicited from David Roth.

Richard Fisher, Gail McDonald and Imogene Walls did not testify at trial. Richard Fisher had told investigators that the driver of the getaway car was a "shorter, heavier male black." (10/12/2011 § 2255 Hr'g Tr. 230, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132; *see also* Hr'g Ex. 20 (FD-302 regarding interview of Richard Fisher).) Although the description of the driver as "heavier" might have corroborated the information supplied

by Robert Fisher and Roth,[92] defense counsel made the well-informed strategic decision not to call Richard Fisher to testify at trial. Irby testified that he had been uncomfortable with Richard Fisher because he had shown him a good photograph of Thomas and Richard Fisher had said, "well, that looks like one of the guys in the car." (10/13/2011 § 2255 Hr'g Tr. 472-73, *id.*, ECF No. 133.) Chief Inspector Sanders saw Richard Fisher glance through the window of the courtroom, see Thomas sitting at the defense table, and tell his brother "that's him or that's the guy." (*Id.* at 312.) In the state trial, Richard Fisher identified Thomas as the passenger in the Bonneville. *State v. Thomas*, 2004 WL 370297, at *2. Because the price of calling Richard Fisher to testify to his description of the driver as "heavier" would have been his identification of Thomas as the passenger, Irby's strategic decision not to call Richard Fisher to testify was plainly reasonable.

The testimony of Gail McDonald also would not have been useful to Movant. McDonald had described "UNSUB #2" as "a black male" who was "heavyset, and approximately 30 to 35 years old, and short hair." (10/12/2011 § 2255 Hr'g Tr. 228, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 132.) However, McDonald's description of "UNSUB #1" is fairly close to that of Thomas: she described the subject as a black male, 20 to 25 years old, 5'6" to 5'7" tall, and weighing 130 to 150 pounds. (Hr'g Ex. 19.) McDonald recalled that that subject was dressed in a blue baseball cap, a blue and white striped short-sleeved pinstripe shirt, light blue jeans, and white tennis shoes. (*Id.* at SSTF00000019.) The subject also had a "[v]ery narrow face." (*Id.*) Irby believed that he did not call McDonald to testify because that description was fairly close to Thomas. (10/13/2011 § 2255 Hr'g Tr. 484-85, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.)

---

[92]Chief Inspector Sanders testified at the evidentiary hearing that Richard Fisher had made a tentative identification of Terrance Lawrence, Bobby Jackson's partner in the Southbrook Mall robbery, as the driver of the getaway car. (10/13/2011 § 2255 Hr'g Tr. 311-12, *id.*, ECF No. 133.) Although that identification might have provided another tie between the Southbrook Mall robbery and the Walgreens robbery, it undercuts the defense theory that Anthony Bond committed the Walgreens robbery with Bobby Jackson. There were only two perpetrators of the Walgreens robbery, and one of them was Anthony Bond.

Imogene Walls also described the person she saw sitting in the vehicle as a male black, heavyset, wearing a white t-shirt, and in his mid-30's. (10/12/2011 § 2255 Hr'g Tr. 231-32, *id.*, ECF No. 132.) Walls, however, had described the individual she had seen leaning against a wall as a male black, slim, and 20 years old. (Hr'g Ex. 21 at SSTF00000033.)

In summary, the evidence available to counsel at the time of trial that Bobby Jackson had participated in the Walgreens robbery was weak at best. Irby was aware that he could not convert Thomas' trial for the Walgreens robbery into an exploration of the facts and circumstances of the Southbrook Mall robbery. (10/13/2011 § 2255 Hr'g Tr. 428-30, *Thomas v. United States*, No. 2:03-cv-02416-PM-tmp (W.D. Tenn.), ECF No. 133.) Although Irby explored the discrepancies in the descriptions provided by the witnesses, he made a conscious decision not to attempt to prove that Bobby Jackson was involved in the Walgreens robbery. Irby was aware that, apart from Robert Fisher's tentative identification, he had no evidence that Bobby Jackson had committed the Walgreens robbery. (*Id.* at 433, 482-83.) Irby, an experienced trial attorney, explained that it generally was not a good idea for a defense attorney to rely too heavily on evidence of third-party guilt. He explained that "you're defending an individual on a felony case and you try to convict someone else, which is generally going to be beyond the capabilities of the defense to do, if you do that and you start floundering and you fail in it, the jury is going to hold it against you and you're generally going to lose." (*Id.* at 394; *see also id.* at 483 ("That was my strategy, to raise it, not to prove it and not to try to push it too far where it would backfire.").) Irby believed that the most viable defense strategy was to question the sufficiency of the evidence and to establish the alibi defense. (*Id.* at 394; *see also id.* at 479-80 (Irby's main theory of defense was that Thomas had an alibi and that none of the eyewitnesses had identified him).) He was concerned that the surveillance video made the Bobby Jackson defense problematic because Bobby Jackson's size appeared to eliminate him as the shooter and Bond was also "a fair sized guy . . . ." (*Id.* at 405-06.) The video showed that the shooter was no taller than the victim. (*Id.* at 406.) Day was 5'11" (11/09/1998 Trial Tr. 129, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 99), and Bond

was 6'2" (*id.* at 292). For all the foregoing reasons, defense counsel was not ineffective, and Thomas suffered no prejudice, from the failure to pursue more vigorously the Bobby Jackson defense.[93] Claim 2 is without merit and is DISMISSED.

### C.    The Failure to Investigate Dana Wiggins' Alibi (Claim 3)

Thomas also contends that his attorney "was unambiguously deficient because he failed to investigate the truthfulness of Wiggins' alibi testimony before placing her on the stand." (Movant's Post-Hr'g Br. 22, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Although Irby had been concerned that Wiggins' testimony might be false, he failed to obtain the payroll records that would have established that she was at work during the armored car robbery, not at home with Thomas as she had claimed. (*Id.* at 22-23.)

"Deficient performance can be shown where counsel fail to make a reasonable investigation that they should have made." *Moore v. Mitchell*, 708 F.3d 760, 767 (6th Cir.), *cert. denied*, 134 S. Ct. 693 (2013).

> [S]trategic choices made after thorough investigation of law and facts relevant to plausible options are virtually unchallengeable; and strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation. In other words, counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary. In any ineffectiveness case, a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments.

*Strickland v. Washington*, 466 U.S. at 690-91.

The Sixth Circuit elaborated:

---

[93] Thomas also argues that Irby failed adequately to investigate whether Bobby Jackson had committed the Walgreens robbery with Bond. (Movant's Post-Hr'g Br. 14, 15-16, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) It is unnecessary to address this claim at length because, even assuming that Irby's investigation was inadequate, Thomas has failed to demonstrate prejudice. At best, Irby could have presented the testimony of Thomas' relatives and friends, which was not convincing and which would not have established that Bond and Bobby Jackson even knew each other.

A lawyer's *Strickland* duty "'includes the obligation to investigate all witnesses who may have information concerning his or her client's guilt or innocence.'" *Ramonez v. Berghuis*, 490 F.3d 482, 487 (6th Cir. 2007) (quoting *Towns v. Smith*, 395 F.3d 251, 258 (6th Cir. 2005)). "The focus in failure-to-investigate claims ... is the reasonableness of the investigation (or lack thereof)." *English v. Romanowski*, 602 F.3d 714, 726 (6th Cir. 2010) (citing *Wiggins v. Smith*, 539 U.S. 510, 527, 123 S. Ct. 2527, 156 L. Ed. 2d 471 (2003)). "In assessing the reasonableness of an attorney's investigation, ... a court must consider not only the quantum of evidence already known to counsel, but also whether the known evidence would lead a reasonable attorney to investigate further." *Wiggins*, 539 U.S. at 527, 123 S. Ct. 2527.

In the bulk of our failure-to-investigate cases, the record shows that counsel has either completely failed to investigate a potential witness, *see, e.g., Avery v. Prelesnik*, 548 F.3d 434, 437 (6th Cir. 2008) (finding ineffective assistance where counsel instructed an investigator to contact potential alibi witnesses, but where counsel never personally tried to contact any of those witnesses); *Stewart v. Wolfenbarger*, 468 F.3d 338, 356 (6th Cir. 2006) (concluding counsel ineffective where alibi witness was never contacted or subpoenaed), or the record shows that had the attorney taken some investigatory steps he or she would have discovered additional crucial information. *See Ramonez*, 490 F.3d at 487 (finding counsel ineffective because through even minimal investigation "he would have learned that [witnesses] could testify as to what took place in the house, and that their testimony would have supported Ramonez's version of events.").

*Hale v. Davis*, 512 F. App'x 516, 520-21 (6th Cir.), *cert. denied sub nom. Hale v. Hoffner*, 134 S. Ct. 680 (2013).

A defendant who provides false information to his attorney cannot later complain that his attorney relied on that information.

The reasonableness of counsel's actions may be determined or substantially influenced by the defendant's own statements or actions. Counsel's actions are usually based, quite properly, on informed strategic choices made by the defendant and on information supplied by the defendant. In particular, what investigation decisions are reasonable depends critically on such information. For example, when the facts that support a certain potential line of defense are generally known to counsel because of what the defendant has said, the need for further investigation may be considerably diminished or eliminated altogether. And when a defendant has given counsel reason to believe that pursuing certain investigations would be fruitless or even harmful, counsel's failure to pursue those investigations may not later be challenged as unreasonable. In short, inquiry into counsel's conversations with the defendant may be critical to a proper assessment of counsel's investigation decisions, just as it may be critical to a proper assessment of counsel's other litigation decisions.

*Strickland*, 466 U.S. at 691; *see also Owens v. Guida*, 549 F.3d 399, 412 (6th Cir. 2009) (defense counsel was not ineffective in failing to discover additional mitigation evidence in capital case,

explaining that "[a] defendant cannot be permitted to manufacture a winning IAC claim by sabotaging [his] own defense, or else every defendant clever enough to thwart [his] own attorneys would be able to overturn [his] sentence on appeal.") (collecting cases); *Lackey v. Johnson*, 116 F.3d 149, 152 (5th Cir. 1997) ("In general, counsel is not ineffective for failing to discover evidence about which the defendant knows but withholds from counsel."); *Sutton v. Bell*, No. 3:07-cv-30, 2011 WL 4595801, at *36 (E.D. Tenn. Sept. 29, 2011) ("defense counsel may properly rely on information supplied by the defendant in determining the nature and scope of the needed pretrial investigation").

In *Lackey*, 116 F.3d at 152-53, the Fifth Circuit Court of Appeals affirmed a district court's finding that defense counsel was not ineffective by accidentally eliciting testimony that the petitioner, who had been charged with molesting his granddaughter, had previously molested his daughter. The Court of Appeals reasoned that "Lackey did not inform trial counsel about the previous sexual abuse before trial and our review of the record reveals that there is no evidence that Lackey's attorney knew or should have known about the prior abuse." *Id.* at 153; *see also Nance v. United States*, Civ. No. 08-1272-JDT-egb, Crim. No. 04-10038-JDT, 2013 WL 5317354, at *20 (W.D. Tenn. Sept. 23, 2013) (defense counsel was not ineffective in failing to file a suppression motion in reliance on client's representation that he did not live at the residence), *aff'd*, 580 F. App'x 454, 455 (6th Cir. 2014); *Brooks v. Cain*, Civil Action No. 06-1869, 2009 WL 3088323, at *14 (E.D. La. Sept. 21, 2009) (counsel was not ineffective in failing to discover impeachment evidence about which petitioner was aware, reasoning that "[c]ounsel would have no reason to independently suspect that Clay blamed a prior arrest on petitioner or that Clay's alleged drug-dealing would be relevant to petitioner's identification of the shooter; therefore, unless petitioner informed counsel of these suspicions, a fact he does not allege, counsel can hardly be faulted for failing to investigate such matters. Further, petitioner candidly admits that he was present at the shooting and, therefore, he would have known whether Short was also present. In fact, petitioner testified at trial that Short was around the corner at the time of the shooting; however, he does not allege that he previously apprised counsel of Short's alleged absence. Therefore, again, there is no basis for finding that

counsel had any reason to suspect that Short was allegedly elsewhere.") (footnotes omitted); *Laurey v. Graham*, 596 F. Supp. 2d 743, 749 (W.D.N.Y. 2009) (counsel was not ineffective for failing to discover the whereabouts of a potential witness because "any such failure is attributable to Petitioner, who knew of Parker's whereabouts, but did not share the information with his attorney. In fact, during Petitioner's trial, he and Parker were confined in the same jail. Yet, Petitioner never conveyed that information to his attorney until after trial.") (record citation omitted).[94]

In most cases involving alibi witnesses in which an attorney has been found to be ineffective, he has failed to interview or present the testimony of the witness. This is not a case in which defense counsel failed to investigate and present an alibi defense. Defense counsel interviewed Wiggins and Thomas and repeatedly impressed on them the harm that would be caused to the defense if the alibi were shown to be false. (10/13/2011 § 2255 Hr'g Tr. 374-75, 485-86, 486-89, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 133.) Wiggins' testimony was also corroborated by that of Louella Barber, Thomas's mother, who testified that Thomas was living with her in April 1997 and that Wiggins had picked Thomas up on April 20, 1997 and brought him home on the afternoon of April 21, 1997. (*Id.* at 492.) Thomas now contends that his attorney was ineffective in failing to discover that Wiggins was at work at Discount Cellular at the time of the Walgreens robbery on April 21, 1997, when she claimed to have been with Thomas.

---

[94]*Cf. Hopper v. Dretke*, 106 F. App'x 221, 229 (6th Cir. 2004) (affirming dismissal of ineffective assistance claim arising from counsel's failure to attend polygraph examination, and stating, "We have held that counsel is not constitutionally ineffective for failing to discover, and make strategic decisions based on, evidence that a defendant consciously withholds from counsel. The constitution does not require perfect knowledge from counsel, and we cannot evaluate Hemphill's conduct under the distorting lens of hindsight. Hopper knew that the 'Chip story' was false, began cooperating with the police prior to having counsel appointed, and still sought to talk to police after learning from his counsel that the prosecution intended to seek the death penalty for the shooter. Hopper also knew that Hemphill's acquiescence in his second decision to cooperate with the police was based on her knowledge of only the 'Chip story.' Yet, Hopper still made the decision to talk to the police for a second time. While in an ideal world, counsel would have perfect knowledge and unlimited time in which to interview clients and formulate trial strategy, that is not what the constitution requires.") (footnotes omitted).

Although the evidence of Wiggins' time records was damaging to the defense, Thomas has not established that his attorney's performance was constitutionally ineffective. It is apparent that Thomas collaborated with Wiggins and Barber to come up with a story to tell Irby. That three witnesses told a similar story provided corroboration for Thomas' alibi. Irby also testified that he had been convinced to believe Thomas because he had rejected several favorable plea offers and insisted that he was innocent. (*Id.* at 491-92.) Although it is now clear, in hindsight, that Irby could have discovered the lie had he thought to subpoena Wiggins' time records, "a defendant is entitled to competent representation, but not a perfect defense." *Crehore v. United States*, 127 F. App'x 792, 796 (6th Cir. 2006).

In a case remarkably similar to the instant case, a Sixth Circuit panel rejected an ineffective assistance claim arising from the fact that the defendant's lawyer "called as an alibi witness a woman whose testimony the prosecution impeached with a document purporting to show she was not where she said she was on the day of the robbery." *Smith v. Dallman*, No. 92-3677, 1993 WL 216486, at *1 (6th Cir. June 18, 1993). The Court of Appeals reasoned that

> Smith's counsel called the witnesses Smith wanted him to call, and these witnesses testified as expected. Criminal defendants are entitled to effective assistance, not perfect defenses. No violation of the Constitution resulted from the lawyer's failure to find the time card the prosecutor used on cross-examination.

*Id.* at *2.[95]

---

[95]The cases cited in Thomas' reply (Reply to Gov't's Resp. 15, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 144) are of no assistance to him. In *Bigelow v. Haviland*, 576 F.3d 284, 288 (6th Cir. 2009), the Court of Appeals held that defense counsel's failure to investigate and discover additional alibi witnesses constituted ineffective assistance, reasoning that, "[o]nce evidence emerged supporting Bigelow's alibi defense, Rost's failure to take even these minimal steps to corroborate it was objectively unreasonable." Unlike the instant case, *Bigelow* did not involve an attorney's reliance on a false alibi provided by his client in conjunction with other witnesses.

Thomas presumably relies on *Awkal v. Mitchell*, 559 F.3d 456, 463-64 (6th Cir. 2009), for the proposition that defense counsel's decision to call an unlicensed psychologist who had obtained a degree from a mail-order university constituted deficient performance. That decision, which did

(continued...)

Defense counsel was entitled to rely on the information provided by Thomas as to his whereabouts at the time of the robbery, which was corroborated by Wiggins and Barber.[96] Claim 3 is without merit and is DISMISSED.

### D. The Cumulative Effect of Counsel's Ineffectiveness (Claim 4)

Finally, Thomas argues that the cumulative effect of his attorney's errors deprived him of a fair trial. (Movant's Post-Hearing Br. 24, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Specifically, Thomas argues that his attorney failed to produce witnesses mentioned in his opening statement and failed to object to the repeated showing of the surveillance video. (*Id.* at 24-25.)

The Sixth Circuit Court of Appeals has "acknowledge[d] that trial-level errors that would be considered harmless when viewed in isolation of each other might, when considered cumulatively, require reversal of a conviction." *Campbell v. United States*, 364 F.3d 727, 736 (6th Cir. 2004). The Court of Appeals also emphasized that "the accumulation of non-errors cannot collectively amount to a violation of due process." *Id.* (internal quotation marks omitted). In *Campbell*, the Court of Appeals concluded that, "[b]ecause Campbell has not shown that any of the alleged instances of ineffective assistance of counsel deprived him 'of a fair trial, a trial whose result is reliable[,]' he

---

[95](...continued)
not involve counsel's decisions with respect to alibi witnesses, was subsequently vacated. The Court of Appeals, sitting en banc, held that counsel's performance was not deficient. *Awkal v. Mitchell*, 613 F.3d 629, 640-45 (6th Cir. 2010) (en banc).

[96]Although Thomas emphasizes that Irby "was concerned that Dana Wiggins was not telling the truth about the alibi defense" (Movant's Post-Hr'g Br. 22, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138), that concern appears to have been aroused because Wiggins' story was inconsistent with the anticipated testimony of Anthony Bond and Angela Jackson. (*See* 10/13/2011 § 2255 Hr'g Tr. 373-74, *id.*, ECF No. 133.) Of course, if counsel had pursued the "Bobby Jackson defense," as Thomas contends he should have, he would have had to believe that Bond and Angela Jackson were lying and conspiring to frame Thomas. If that were so, then he would have had less reason to be suspicious of Wiggins. In other words, Claims 2 and 3 are in some tension with each other.

cannot show that the accumulation of these non-errors warrant relief." *Id.* (quoting *Strickland*, 466 U.S. at 687).[97]

Thomas argues that his attorney rendered ineffective assistance by promising the jury they would hear evidence from four witnesses who would exculpate him, namely, Keith Echols, Travis Brown, Sharod Rodgers, and Willie Cooper. Each of those witnesses would have testified that Bond had bragged that he had shot Day. At trial, each of those witnesses invoked their Fifth Amendment rights. *See supra* pp. 96-97.

Movant argues that defense counsel's "failure to ascertain whether these individuals would testify prior to trial and his reckless promise to the jury which he could not keep amounted to deficient performance which prejudiced Thomas." (Movant's Post-Hr'g Br. 24, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) As support, Thomas relies on *English v. Romanowski*, 602 F.3d 714, 728-29 (6th Cir. 2010), in which the Court of Appeals held that defense counsel rendered ineffective assistance in failing to investigate the petitioner's then-girlfriend before promising to call her as a witness. The Court of Appeals also affirmed the district court's finding that the prisoner had established that, but for counsel's ineffectiveness, there was a

---

[97]The only authority cited by Thomas in support of his cumulative error claim is *Groseclose v. Bell*, 895 F. Supp. 935, 960 (M.D. Tenn.), *aff'd on other grounds*, 130 F.3d 1161 (6th Cir. 1997), in which a district court stated that "[t]he Sixth Circuit has recognized that errors which individually might not rise to the level of a constitutional violation may, when considered cumulatively, render a trial fundamentally unfair." *Groseclose* predated the AEDPA, which requires that state prisoners may obtain relief under 28 U.S.C. § 2254 only if the state court decision rejecting a constitutional claim was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on an objectively unreasonable factual determination. 28 U.S.C. § 2254(d)(1). The Sixth Circuit has subsequently held that cumulative error is not a viable constitutional claim in a § 2254 petition filed by a state prisoner. *Lorraine v. Coyle*, 291 F.3d 416, 447 (6th Cir. 2002) ("The Supreme Court has not held that distinct constitutional claims can be cumulated to grant habeas relief. Thus, it cannot be said that the judgment of the Ohio courts is contrary to *Berger*, or to any other Supreme Court decision so as to warrant relief under the AEDPA."), *amended on other grounds*, 377 F.3d 459 (6th Cir. 2002); *see also Gillard v. Mitchell*, 445 F.3d 883, 898 (6th Cir. 2006) (same); *Moore v. Parker*, 425 F.3d 250, 256 (6th Cir. 2005) (same). The limitations on habeas relief in 28 U.S.C. § 2254(d)(1) do not apply to federal prisoners who file § 2255 motions.

reasonable probability that the outcome of the trial would have been different. *Id.* at 729. The Court of Appeals quoted the First Circuit's decision in *Anderson v. Butler*, 858 F.2d 16, 17 (1st Cir. 1988), for the proposition that "little is more damaging than to fail to produce important evidence that has been promised in an opening." *English*, 602 F.3d at 729.[98]

Thomas' brief contains no citation to the record to document the alleged promise made by Irby. (*See* Movant's Post-Hr'g Br. 24, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Defense counsel did not mention Keith Echols, Travis Brown, Sharod Rodgers and Willie Cooper during his opening statement. (*See* 11/06/1998 Trial Tr. 42-50, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 98.) Instead, defense counsel argued that Thomas was not present at the Walgreens on April 21, 1997, that Bond was present, and that the second robber was either Bobby Jackson or "Terrell [sic] Lawrence." (*Id.* at 45-47.) Because defense counsel did not promise the jury that Echols, Travis Brown, Rodgers and Cooper would testify at trial, he was not ineffective in failing to ascertain prior to trial whether they would invoke their Fifth Amendment rights.[99]

Movant also argues that defense counsel was ineffective by failing to object to the Government's showing of the surveillance video at trial. (Movant's Post-Hr'g Br. 25, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.) Movant asserts, with little analysis, that the video "had minimal probative value" and was "jarring," a "visual assault," "troubling," "shocking" and "incredibly damaging." (*Id.*) The video was unquestionably relevant: it showed the shooting of Day and the robbery of the courier bag. The prejudicial effect of the video

---

[98] Movant's brief incorrectly identified *Caldwell v. Lewis*, 414 F. App'x 809 (6th Cir. 2011), as the decision that had quoted *Anderson v. Butler*. (*See* Movant's Post-Hr'g Br. 24, *Thomas v. United States*, No. 2:03-cv-02416-JPM-tmp (W.D. Tenn.), ECF No. 138.)

[99] Contrary to Movant's suggestion, those witnesses would not have exculpated him. Each of the witnesses had told investigators that Bond had told them that he committed the Walgreens robbery with Thomas, or "Bow Leg." *See supra* pp. 170, 176-77. The witnesses would have impeached Bond with his prior statements that he was the shooter.

was minimized by its low quality and lack of detail. The video was in black and white and not in high resolution. It also did not show the victim's injury and showed no blood. Any risk of prejudice was outweighed by the probative value of the video: it allowed the jury to view the perpetrator, in real time, including his height, his build and his dress. The video was important to show the jury that the shooter was consistent in height and build with Thomas.[100] The video also allowed the jury to decide for itself whether Bond might have been the shooter rather than the driver of the getaway car, as he claimed at trial.[101]

Because defense counsel did not promise the jury in his opening statement that it would hear the testimony of Keith Echols, Travis Brown, Sharod Rodgers and Willie Cooper, and because defense counsel had no valid objection to the playing of the surveillance video, Thomas suffered no prejudice from these non-errors. Claim 4 is without merit and is DISMISSED.

## IV.        APPEAL ISSUES

Twenty-eight U.S.C. § 2253(a) requires the district court to evaluate the appealability of its decision denying a § 2255 motion and to issue a certificate of appealability ("COA") "only if the applicant has made a substantial showing of the denial of a constitutional right." 28 U.S.C. § 2253(c)(2); *see also* Fed. R. App. P. 22(b). No § 2255 movant may appeal without this certificate.

A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right, and the COA must indicate the specific issue(s) which satisfy the required showing. 28 U.S.C. §§ 2253(c)(2) & (3). A "substantial showing" is made when the movant demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate

---

[100]The video also allowed the jury to see that the weapon used was not the Mossberg shotgun that was the subject of Count 3.

[101]As previously noted, *see supra* p. 5, at the sentencing hearing the Court stated that "I have had the chance to see the defendant on many occasions now or at least a number of occasions, and I am satisfed that he is the individual in the tape." (Sentencing Hr'g Tr. 19, *United States v. Thomas*, No. 2:98-cr-20100-01-JPM (W.D. Tenn.), ECF No. 93.)

to deserve encouragement to proceed further." *Miller-El v. Cockrell*, 537 U.S. 322, 336 (2003) (internal quotation marks and citation omitted); *see also Henley v. Bell*, 308 F. App'x 989, 990 (6th Cir. 2009) (per curiam) (same). A COA does not require a showing that the appeal will succeed. *Miller-El*, 537 U.S. at 337; *Caldwell v. Lewis*, 414 F. App'x 809, 814-15 (6th Cir. 2011) (same). Courts should not issue a COA as a matter of course. *Bradley v. Birkett*, 156 F. App'x 771, 773 (6th Cir. 2005).

In this case, reasonable jurists could disagree about the resolutions of Claim 1, whether trial counsel rendered ineffective assistance by failing to seek a severance of Count 3, the § 922(g) charge, and therefore, the Court GRANTS a limited certificate of appealability on that issues. Because reasonable jurists could not disagree about the resolution of Claims 2, 3 and 4, the Court DENIES a certificate of appealability on those issues.

The Sixth Circuit has held that the Prison Litigation Reform Act of 1995, 28 U.S.C. §§ 1915(a)-(b), does not apply to appeals of orders denying § 2255 motions. *Kincade v. Sparkman*, 117 F.3d 949, 951 (6th Cir. 1997). Rather, to appeal *in forma pauperis* in a § 2255 case, and thereby avoid the appellate filing fee required by 28 U.S.C. §§ 1913 and 1917, the prisoner must obtain pauper status pursuant to Federal Rule of Appellate Procedure 24(a). *Kincade*, 117 F.3d at 952. Rule 24(a) provides that a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit. Fed. R. App. P. 24(a)(1). However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, or otherwise denies leave to appeal *in forma pauperis*, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court. *See* Fed. R. App. P. 24(a) (4)-(5).

The Court CERTIFIES, pursuant to Rule 24(a), that an appeal in this matter would be taken in good faith to the extent the appeal addresses the above-referenced issue for which the Court has granted a certificate of appealability. An appeal that does not address that issue would not be taken

in good faith, and Movant should follow the procedures of Rule 24(a)(5) to obtain *in forma pauperis status* for an appeal raising those issues.

IT IS SO ORDERED this 27th day of August, 2015.

/s/ Jon P. McCalla
JON PHIPPS McCALLA
UNITED STATES DISTRICT JUDGE